THE HONORABLE BARBARA J. ROTHSTEIN

FILED ──ENTERED
──LODGED ──RECEIVED

FEB 2 1 2003

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                    DEPUTY

## UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| RAYMOND LEICH, a resident of Florida, derivatively on behalf of EVERGREEN STATE RESTAURANT CORP.,<br><br>    Plaintiff,<br><br>v.<br><br>CRAIG and JANE DOE EDWARDS, Washington residents, and their marital community,<br><br>    Defendants,<br><br>and<br><br>EVERGREEN STATE RESTAURANT CORP., a Washington corporation,<br><br>    Nominal Defendant. | NO. C 03-0108 BJR<br><br>DECLARATION OF RAY LEICH |
| CRAIG R. EDWARDS, on his own behalf and on behalf of EVERGREEN STATE RESTAURANT CORP.,<br><br>    Counterclaimant and Third-Party Plaintiff,<br><br>v.<br><br>RAYMOND M. LEICH, an individual; CLIFFORD L. JONES and LINDA JONES, and their marital community; and EVERGREEN RESTAURANT VENTURES, INC., a Washington corporation,<br><br>    Counterclaim Defendants and Third-Party Defendants. | |

CV 03-00108 #00000013

DECLARATION OF RAY LEICH - 1
3962\001\149394.01

**ORIGINAL**

TOUSLEY BRAIN STEPHENS PLLC
700 Fifth Avenue, Suite 5600
Seattle, Washington 98104-5056
TEL 206.682.5600 • FAX 206.682.2992



1    I, Ray Leich, declare and state as follows:

2    1.      I am Plaintiff in this action. I am over the age of 18, am competent to testify, and do so

3    based upon my personal knowledge.

4    2.      I am an owner of Evergreen State Restaurant Corporation ("Evergreen"), nominal

5    Defendant in this matter. I am a director of the corporation. Third Party Defendant Clifford

6    Jones ("Jones") is also an owner and director. The only other owner is Defendant Craig

7    

8    Edwards ("Edwards"). Edwards is the only other director; he is Chairman of the Board.

9    3.      Edwards owns 70 of 101 issued and outstanding shares of Evergreen. Jones owns 30

10   shares. I own one share. I have provided tax assistance to Evergreen since its inception.

11   4.      I have read the Complaint in this manner and I hereby verify under penalty of perjury

12   under the laws of the State of Washington that the contents of this complaint are true and

13   correct. The allegations contained in the Complaint are incorporated into this Declaration by

14   

15   reference.

16   5.      I have also read the Demand Letter presented by my attorneys to the Board of Directors

17   of Evergreen. This Demand Letter is attached to this Declaration as Exhibit A. I verify that the

18   background information and other facts contained in the demand letter are true and correct, and

19   incorporate it into this Declaration by reference. I urge the Court to review the allegations of

20   

21   misconduct contained in the Demand Letter.

22   6.      Jones and I personally presented the Demand Letter to Edwards on January 20, 2003.

23   Edwards voted against complying with the Demand Letter. Because Edwards owns more than

24   two thirds of the outstanding and issued shares of Evergreen, and, I believe, would have used

25   his controlling interest to fire me from my position as a director in order to take whatever

26   action he desired (he has told me in the past that he is willing to do this), I believed it would be

DECLARATION OF RAY LEICH - 2
3962\001\149394.01

TOUSLEY BRAIN STEPHENS PLLC
700 Fifth Avenue, Suite 5600
Seattle, Washington 98104-5056
TEL 206.682.5600 • FAX 206.682.2992

1   futile to vote in favor of the action. Accordingly, I avoided what I believe to be unnecessary

2   expense and delay by also voting against the Demand Letter and seeking recourse as a

3   shareholder.

4   7.      Through a network of joint ventures and limited partnerships, Evergreen owns an

5   interest in and has management responsibilities for each of 27 Outback Steakhouse restaurants

6
7   located throughout the Pacific Northwest. Distributions to Evergreen from this operation have

8   historically totaled more than one million dollars annually; Evergreen has no other assets or

9   sources of income. Evergreen's participation in the restaurants is subject to franchise

10  agreements with Outback Steakhouse of Florida, Inc ("OSF"). These franchise agreements

11  give OSF broad latitude in approval and termination of franchisees. A true and correct copy of

12  one of the franchise agreements is attached to this Declaration as Exhibit B.

13  8.      For most of the period 1995-2001, Edwards was President of Evergreen and managed

14
15  its obligations with respect to the restaurants, OSF, and the various limited partnerships.

16  During this same period, however, Edwards experienced problems with his alcoholism and was

17  twice forced to seek treatment. At OSF's urging, Jones took over management of Evergreen

18  during Edwards' absences. Unfortunately, Edwards' conduct and mismanagement, exacerbated

19  by his personal problems, jeopardized Evergreen's relationship with OSF and Evergreen's

20  limited partners. Finally, in January 2001, OSF threatened to terminate Evergreen's franchise

21
22  agreements unless Edwards was removed from active control and replaced by Jones. A copy of

23  a January 10, 2001 letter from Joseph Kadow at OSF to Edwards, which I received

24  contemporaneously, is attached to this Declaration as Exhibit C.

25  9.      Section 5.3 of the franchise agreements seem to permit OSF to decide who will be the

26  "Operating Partner"—up until now it had been Edwards—and we were all concerned that this

TOUSLEY BRAIN STEPHENS PLLC
700 Fifth Avenue, Suite 5600
Seattle, Washington 98104-5056
TEL 206.682.5600 • FAX 206.682.2992

1   might mean the end of Evergreen. Termination of Evergreen's franchise rights would result in

2   tremendous losses and, I believed and continue to believe, open us up to lawsuits from our

3   limited partners, joint venture partners, and others.

4   10.     In response to OSF's threats, Edwards, Jones and I unanimously agreed that Third Party

5   Defendant Evergreen Restaurant Ventures Incorporated ("ERVI"), majority owned and

6
7   operated by Jones (simultaneously unanimously elected president of Evergreen), would take

8   over Evergreen's management responsibilities. In consideration, ERVI would receive any

9   management fees permitted under the various franchise and limited partnership agreements.

10  Evergreen would continue to hold its ownership interests but would essentially be a "silent"

11  investor. The alternative to this strategy was to face termination by OSF and the consequent

12  collapse of Evergreen's asset value. I own five percent (5%) of ERVI.

13  11.     I want to stress that there was no question that Edwards agreed to this arrangement.

14
15  Edwards, Jones and I spent two days in Washington State in late January, 2001, scrambling to

16  keep OSF from terminating the relationship.  With Edwards' help we advised the staff that

17  they would be working for a new company (not yet named at that time), and we also explained

18  the situation to our various partners and restaurant operations managers. Edwards was

19  supportive of the idea at the time as the only means of keeping Evergreen alive and protecting

20  our investments and future distributions. Critically, this arrangement was approved by OSF as

21  franchisor.

22
23  12.     With the consent of all Evergreen shareholders, the ERVI/Evergreen arrangement has

24  lasted for more than two years. It is directly responsible for the continued viability of

25  Evergreen and any increases in shareholder value. All of the management fees ERVI

26  receives—and additional funds from Jones—have been used to enhance the value of

DECLARATION OF RAY LEICH - 4
3962\001\149394.01

TOUSLEY BRAIN STEPHENS PLLC
700 Fifth Avenue, Suite 5600
Seattle, Washington 98104-5056
TEL 206.682.5600 • FAX 206.682.2992

1   Evergreen's limited partnerships.  This, in turn, has enhanced the value of Evergreen itself.

2   ERVI's prudent use of management fees is also directly responsible for the increase in

3   distributions from the 27 limited partnerships:  from approximately $4 million in 2001 to

4   approximately $6 million in 2002.  In the meantime, OSF, although it continues to take issue

5   with Edwards' majority ownership of Evergreen (claimed by OSF to violate the franchise

6   agreements), has granted extensions to Evergreen to work its issues out.  These extensions and

7   the friendly atmosphere between Evergreen and OSF would not exist but for the efforts of

8   Jones, ERVI and me, and would certainly immediately cease to exist if Edwards used his

9   majority interest to re-seize operational control.

10

11   13.     Edwards has scheduled a special shareholders meeting for Monday, February 24, 2003.

12   At this meeting, he proposes to use his voting power as two-thirds shareholder to amend

13   Evergreen's bylaws in a manner that would purport to force Evergreen to break its longstanding

14   agreement with ERVI by paying Evergreen's expenses and overhead—all unrelated to

15   management of the limited partnerships, in which Evergreen no longer plays an active role—

16

17   before remitting any funds to ERVI to pay for management operational expenses.  Attached as

18   Exhibit D to this Declaration is a true and correct copy of a letter I received from Edwards,

19   with the proposed Amended Bylaws attached.

20   14.     All management fees are urgently required to be spent on supporting the limited

21   partnerships and none can be spared to pay for Evergreen "expenses" unrelated, as Evergreen

22   does not provide management support, to the purposes for which the management fees are

23   collected.  In addition, OSF has required as a condition of continued franchise control that

24   Edwards have no active role in management.  Still further, the limited partnerships themselves

25   expect and require that management fees collected pursuant to limited partnership agreements

26

DECLARATION OF RAY LEICH - 5
3962\001\149394.01

1   and franchise agreements be used solely for providing management services directly related to

2   the operation of the limited partnerships. A true and correct copy of a limited partnership

3   agreement is attached to this Declaration as Exhibit E.

4   15.    A similar issue exists with respect to the manner of "expenses" Edwards might expect

5   to be retained by Evergreen pursuant to the proposed amended bylaws. For years, Edwards

6
7   used his position as President of Evergreen and controlling shareholder to treat the Evergreen

8   as his personal bank account. As reported by an independent forensic accountant, Edwards

9   paid for personal expenses out of corporate funds, and often reimbursed himself for duplicate

10   expenses and expenses charged but not incurred. The magnitude of this improper conduct,

11   which is mentioned only in passing here in the interests of brevity, cannot be overstated.

12   Edwards also improperly held back a large percentage of the management fees—claimed by his

13   attorney to exceed at one point $500,000—to be applied to Evergreen as a profit rather than

14
15   used to strengthen and support the limited partnerships from whom the fees were collected.

16   16.    There are other issues with the proposed amendments to the bylaws that threaten the

17   viability of Evergreen that I stand ready to bring to the Court's attention if requested.

18   17.    A return to Edward's practices would irreparably harm Evergreen and its shareholders

19   and threaten the viability of the corporation.

20   18.    Attached as Exhibits F and G to this Declaration are two letters from Joseph Kadow,

21   General Counsel for OSF, dated May 15, 2002 and July 23, 2002, respectively.

22

23

24

25

26

DECLARATION OF RAY LEICH - 6
3962\001\149394.01

TOUSLEY BRAIN STEPHENS PLLC
700 Fifth Avenue, Suite 5600
Seattle, Washington 98104-5056
TEL 206.682.5600 • FAX 206.682.2992

1       I declare under penalty of perjury under the laws of the State of Washington that the

2   above information is a true and correct to the best of my knowledge, information, and belief.

3

4       DATED this _____ day of February, 2003. at _____.

5

6                                        _____

7                                        Ray Leich

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

TOUSLEY BRAIN STEPHENS PLLC
700 Fifth Avenue, Suite 5600
Seattle, Washington 98104-5056
TEL 206.682.5600 • FAX 206.682.2992

1        I declare under penalty of perjury under the laws of the State of Washington that the

2   above information is a true and correct to the best of my knowledge, information, and belief.

3

4        DATED this _2 0ᵗʰ_ day of February, 2003. at _TAMPA, FLORIDA._

5

6

7                       Ray Leich

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF RAY LEICH - 7
3942\001\143394.01

TOUSLEY BRAIN STEPHENS PLLC
700 Fifth Avenue, Suite 5600
Seattle, Washington 98104-5056
TEL 206.682.5600 • FAX 206.682.2992

02/20/2003 THU 18:13  [JOB NO. 5078]  Ø002

# Tousley
# Brain
# Stephens
PLLC

Attorneys and Counselors

700 Fifth Avenue, Suite 5600
Seattle, Washington 98104-5056
Telephone (206) 682-5600
Facsimile (206) 682-2992

**DAVID D. HOFF**
Dhoff@tousley.com

**JANISSA A. STRABUK**
Jstrabuk@tousley.com

**VIA HAND DELIVERY AND U.S. MAIL**

OUR FILE NO:
C-3962-001.L1A

January 17, 2003

Board of Directors
Evergreen State Restaurant Corporation
3650 131st Avenue SE, Suite 320
Bellevue, Washington 98006

Re:    Demands for Compliance with the Outback Franchise Agreements

Dear Evergreen State Restaurant Corporation Directors:

We represent Mr. Clifford Jones and Mr. Raymond Leich, shareholders in Evergreen State Restaurant Corporation (the "Shareholders"), regarding their conclusions that Evergreen State Restaurant Corporation ("Evergreen") has not complied with the Outback Restaurant Corporation Franchise Agreements (the "Agreements"). Our clients have also concluded that Evergreen's majority shareholder, Craig Edwards, has committed malfeasance, breached his fiduciary duty, committed minority shareholder oppression, and committed other tortious conduct, all to the detriment of Evergreen and our clients. These conclusions are based in part on the report of Hagen Streiff Newton & Oshiro, referenced herein, concluding Mr. Edwards has committed fraud and converted corporate funds, giving rise to potential civil and criminal liabilities for his actions while in control of Evergreen.

As a result of Mr. Edwards' actions, Evergreen State Limited Partnerships Nos. 1-27 ("Franchisees") are in default under the Agreements. If Outback Restaurant Corporation ("Outback") chooses to exercise its rights under the Agreements, Evergreen is in danger of losing its only valuable asset - the Outback Franchise.

The Shareholders, in cooperation with Outback, have provided Mr. Edwards numerous options and reasonable opportunities to remedy the default under the Agreements, all of which have been summarily rejected by Mr. Edwards. Mr. Edwards' only response to the Shareholders' proposals has been to make unjustified accusations against Mr. Jones, threaten his removal, and demand that his shares be sold to Mr. Jones at an unreasonable and unjustifiable price.

The Shareholders hereby demand that Evergreen's Board of Directors immediately commence litigation against Mr. Edwards seeking damages caused to Evergreen and to bring the Franchisees into compliance with the Agreements.

## EXHIBIT A

A PROFESSIONAL LIMITED LIABILITY COMPANY CONSISTING OF INDIVIDUALS AND PROFESSIONAL SERVICES CORPORATIONS

Board of Directors
Evergreen State Restaurant Corporation, Inc.
January 17, 2003
Page 2

The factual background, giving rise to our demand, is as follows:

**Historical Events**
**1993 - 1995**

In 1993, Mr. Edwards asked Mr. Jones if he would be interested in investing in the Northwest franchise of Outback, which Outback was going to grant to Mr. Edwards . Mr. Jones expressed an interest in becoming an investor of up to 10% of the limited partnership interest in each Northwest Outback restaurant if Mr. Edwards was granted the franchise. In 1994, after he had been awarded the Northwest franchise, Mr. Edwards disclosed to Mr. Jones that he was in over his head financially and was having difficulty running the franchise. He asked Mr. Jones to become a shareholder in Evergreen rather than limiting his proposed involvement to that of a passive investor in the limited partnerships. Mr. Jones agreed, but stressed to Mr. Edwards that he was not interested in an active management role. The two agreed that Mr. Jones would invest $400,000 and become a 30% owner in Evergreen; Mr. Edwards would invest $200,000 and the franchise rights, be the operating partner and become a 70% owner. Mr. Jones wrote his check for $400,000 while Mr. Edwards (undisclosed to Mr. Jones) contributed only $164,900 of the promised $200,000.[1] During that same year, Mr. Edwards and Mr. Jones asked Mr. Leich to become a shareholder; he agreed, and paid the same per share price as Mr. Jones. The stock ownership was and presently remains: Mr. Edwards - 69.3%; Mr. Jones - 29.7%; and Mr. Leich - 1%.

**1995**

In summer 1995, Mr. Leich contacted Mr. Jones and stated his concern that Mr. Edwards was drinking heavily, and creating serious behavioral problems that were affecting his ability to manage Evergreen. During that time, Mr. Edwards was absent, neglected necessary work required on the restaurant leases, and ignored important decisions. Mr. Edwards made numerous promises that things would be and were being taken care of, but they were not.

In July 1995, Mr. Jones was informed that Chris Sullivan, Outback CEO, wanted to meet with the Evergreen Shareholders regarding Mr. Edwards' behavior and his inept management. Mr. Sullivan first met privately with Mr. Jones and requested that he assume operating control of Evergreen in order to get the company back on track. Mr. Jones accepted the offer in an effort to help both Evergreen and Mr. Edwards. In a meeting with all Shareholders, Mr. Sullivan informed them that Mr. Jones was taking over and demanded that Mr. Edwards remedy his behavior problem or Outback would pull the franchise. Mr. Edwards then entered into an alcohol treatment program.

**1995 - 1996**

During the next 18 months, Mr. Jones, at his own expense, traveled to Seattle, often staying for more than 30 days, in order to get Evergreen and its restaurants up and running. Mr. Jones took no salary and the only compensation he received was a one-time fee of $60,000,

---

[1] *See* Exhibit A.

Board of Directors
Evergreen State Restaurant Corporation, Inc.
January 17, 2003
Page 3

plus $10,000 for each new lease originated. These payments were to cover reimbursement of his out-of-pocket expenses. Mr. Jones received $120,000 over the two-year period. The money was reflected on Evergreen's financial statements as a consulting fee. Evergreen's Board specified that this arrangement was limited and applicable only to Mr. Jones for services he provided through December 1996.[2] At the end of 1996, after securing eight leases with six others pending, opening and growing eight restaurants, and moving Evergreen and its restaurants to profitability, Mr. Jones relinquished operating control back to Mr. Edwards. The Board once again named Mr. Edwards President and CEO, with the hope that he would now be able to manage the operations effectively.

### 1997

Mr. Jones commenced a mission for his church, which lasted through June 2000, and did not take any active role in Evergreen affairs.

### 1998 - 1999

Immediately after the 1998 Board meeting, Mr. Edwards disclosed to the Board that he desired to charge the partnerships a fee of $10,000 for each new lease (the sum used to partially cover Mr. Jones' expenses during the 18-month period he ran Evergreen), in addition to his salary. Both Mr. Leich and Mr. Jones were shocked that he would seek compensation from the company other than his salary and expenses and informed him that any such payments were improper and unauthorized. Mr. Edwards agreed that he would not take the payments. During 1998 and 1999, Mr. Leich and Mr. Jones received distributions with minimal information from Mr. Edwards, but with his assurance that things were going well. Near the end of 1999, Mr. Jones and Mr. Leich began receiving reports that Mr. Edwards' previous problems had returned. These reports were verified in early 2000 when Mr. Edwards was found intoxicated in Evergreen's parking lot. Mr. Leich notified Mr. Sullivan of the problem, and Mr. Edwards agreed to seek further treatment.

### 2000

In September 2000, after his second round of treatment, Mr. Edwards held a meeting in Florida with a number of investors and Paul Avery, Outback's president. As a result of the meeting and a subsequent verbal confrontation between Mr. Edwards and a limited partner in the Franchisees, (Jim Woodside), Mr. Sullivan contacted Mr. Jones in Germany and requested a face-to-face meeting. At that meeting, Mr. Sullivan told Mr. Jones that because of the ongoing problems created by Mr. Edwards' management of the franchise, Outback was giving Evergreen three options to resolve the problems: (1) roll up the Northwest franchise; (2) turn over the franchise to Tom Shannon, who has franchises in California; or (3) allow Mr. Jones' to return to operational control of Evergreen.. The first two options would result in extreme damage to the value of Evergreen. Although he had no interest in a full-time operating position, Mr. Jones, in order to protect his investment and those of the other Shareholders and investors, returned to Seattle and once again took over operational control of Evergreen. Mr. Sullivan informed

---

[2] *See* Exhibit B.

Board of Directors
Evergreen State Restaurant Corporation, Inc.
January 17, 2003
Page 4

Mr. Edwards that he was being removed as operating partner and was not to be involved, in any manner, in the operations of the restaurants, or to participate in any role whatsoever, or claim to represent any facet of the business. Mr. Sullivan was concerned that Mr. Edwards' management and behavior had put the entire Outback organization in a bad light.

### 2001 – Present

In January 2001, Mr. Jones returned to operational control of Evergreen. Thereafter, he began to uncover serious mismanagement and breaches of fiduciary duty that Mr. Edwards had committed during his tenure as president and CEO. Mr. Jones also discovered severe personnel issues, was forced to dismiss both management and operational personnel, and forced to defend sexual harassment claims. The costs and expenses of these personnel matters were extremely detrimental to Evergreen and were directly caused by Mr. Edwards' poor management, lack of policies, procedures, training, hiring, and compliance.

### Delinquent Sales Taxes and Other Mismanagement

Mr. Edwards also chose not to pay sales tax on the equipment purchased for the restaurants. Once Mr. Jones and Mr. Leich were informed about this illegal conduct, they demanded that he correct the situation; Mr. Edwards chose not to comply. As a result, Evergreen was forced to pay over $600,000 in back taxes, interest, and audit expenses. Further, Mr. Jones found that, in spite of his assurances to the contrary, Mr. Edwards had been paying himself $10,000 per lease, and, in fact, had raised the charge to $15,000 per lease in addition to his salary, and in direct opposition to the direction of the Board in 1998. Finally, Mr. Jones found, along with numerous other accounting inaccuracies, that because of the financial mismanagement of Mr. Edwards, Evergreen's 27 restaurants had a working capital deficit of more than $3,000,000. The deficit was a direct violation of Section 6.2 of the Agreements.

Mr. Jones' efforts to cure the problems caused by Mr. Edwards resulted only in continued accusations of misconduct and threats from Mr. Edwards to terminate Mr. Jones based on his voting control of 69.3% of Evergreen.

### Outback Demands Compliance

Because of Mr. Edwards' threats, the Shareholders attempted to structure a shareholders agreement. Mr. Jones subsequently discussed this agreement with Outback's General Counsel, Joseph Kadow. At Mr. Kadow's request, Mr. Jones attempted to structure a proxy for Mr. Edwards to sign to ensure proper management of Evergreen and to placate Outback's desire for compliance with the Agreements.[3] After conferring with Mr. Sullivan and agreeing to sign the proxy with a five-year limit, Mr. Edwards summarily refused to execute the document.[4] As a result of Mr. Edwards' sudden "change of heart" with regard to the proxy agreement, Outback

---

[3] *See* Exhibit C.
[4] *See* Exhibit D.

Board of Directors
Evergreen State Restaurant Corporation, Inc.
January 17, 2003
Page 5

demanded that Evergreen comply not only with the provisions of Section 5.3 concerning voting power, but also with those concerning ownership.[5]

### Mr. Edwards Refuses To Cooperate In Solving the Defaults

In spite of the then known issues with Mr. Edwards, Outback and Mr. Jones were still willing to work on an amicable solution.

In response to Outback's then current demands, Mr. Jones offered a reasonable solution to the problem of share ownership in Evergreen. The Shareholder proposal allowed for the purchase of a sufficient number of shares to give Mr. Jones a 50% ownership in Evergreen, with a valuation based on the same formula used by Outback when valuing franchises for purchase. Although this solution would not have been in strict compliance with Section 5.3 of the Agreements, Outback agreed to approve such a structure.[6]  As with all other attempts to save and enhance value in Evergreen, these efforts have been unsuccessful, due to Mr. Edwards' unreasonable positions.[7]

Mr. Edwards' continued refusal to address these issues has created an extremely volatile relationship with Outback and put Evergreen's only asset, the 27 franchises, at risk.

### The Accountant's Report

On January 13, 2003, Hagen Streiff Newton & Oshiro submitted the findings of its review of the financial affairs of certain Evergreen State Limited Partnerships. The findings, based only on a sampling of several locations, demonstrate egregious conduct giving rise to civil, as well as potential criminal, liability of Mr. Edwards. Some of the highlights of the report are as follows:

1.  Mr. Edwards has fraudulently increased ESRC's reported financial value by improperly recording cash credits, resulting in an overstatement in Evergreen's value at the expense of the limited partners;

2.  Mr. Edwards improperly attributed unsubscribed units to the general partner without purchasing them;

3.  Mr. Edwards failed to comply with the funding requirement in the Franchise Agreement, thereby creating a debt in the amount of $885,088;

4.  Mr. Edwards violated his fiduciary duty to make minimum contributions as required in the private placement memorandum;

5.  Subscribed units and units recorded in the books and records do not coincide;

---

[5] *See* Exhibit E.
[6] *See* Exhibit F.
[7] *See* Exhibits G and H.

Board of Directors
Evergreen State Restaurant Corporation, Inc.
January 17, 2003
Page 6

6.     Audited and reviewed financial statements of E-D Joint Venture and combined
       E-D and E-J Joint Ventures are not in accordance with generally accepted
       accounting principles;

7.     Mr. Edwards materially overstated the equity of the joint ventures due to the
       omission of minority interest;

8.     The combined E-D and E-J Joint Ventures financial statements omit any
       explanatory note as to the respective interest of each joint venture;

9.     Mr. Edwards failed to comply with debt restrictions pursuant to the Franchise
       Agreements and has obscured the failure in the audited financial statements by
       irregular accounting entries amounting to (i) understatement of amounts owed to
       ESRC of $307,710 as of 12/31/00, and (ii) overstatement of paid in capital of the
       general partner of $307,710, as of 12/31/00;

10.    Subsequent to January 1998, Mr. Edwards paid himself $15,000 each for store
       opening and site selection in conflict with Board of Directors instructions;

11.    Mr. Edwards reimbursed himself for store opening and site selection expenses
       that contain numerous items not properly expensed and/or not related to store
       opening or site selection. As stated in the report, "These repeated and blatant
       duplications indicate that the intent was to be reimbursed for expenses not
       incurred;" and

12.    Mr. Edwards charged personal expenses for insurance and a storage unit to
       Evergreen without the knowledge of the other Board members, both through
       expense report reimbursements and direct payment by Evergreen.

       An example of the gravity of the conduct of Mr. Edwards is shown on pages 23–25 of the
report. The report shows duplicated and overcharged expenses; expenses charged but not
incurred; false claims; and personal charges.

       **In reviewing the accounting report, it is significant to consider that Mr. Edwards is
a CPA and former senior partner of one of the largest accounting firms in the country.**

       While this report only tested certain locations, it is obvious that a thorough forensic
accounting review would expose many millions of dollars in irregularities during Mr. Edwards'
tenure.

       **Shareholders' Demands**

       Over the past eight years, the Shareholders have attempted to work with Mr. Edwards to
address numerous issues and develop an acceptable business strategy for Evergreen, often at the
personal and professional expense of the Shareholders, and always in response to problems

Board of Directors
Evergreen State Restaurant Corporation, Inc.
January 17, 2003
Page 7

caused by Mr. Edwards' behavior and ineffective management. Notwithstanding the Shareholders' repeated efforts to encourage Mr. Edwards to amicably resolve the problems and defaults under the Agreements, he has failed to cooperate.

*Evergreen must cure all defaults and strictly comply with the Agreements. This is the* only way that Evergreen can regain the confidence of investors and Outback, and develop an effective plan to enhance shareholder value. Therefore, the Shareholders demand that litigation immediately be commenced against Mr. Edwards to recover damages he has caused to Evergreen and force him to bring the Franchisees into compliance with the Franchise Agreement.

Mr. Edwards has used Evergreen's treasury as his own personal bank account. In responding to and dealing with these demands, the Shareholders further demand that he not use Evergreen funds to retain counsel or in any way to fund his defense in this matter.

**Conclusion**

Mr. Edwards is using the current situation for his own personal, undeserved, financial gain just as he has during his entire tenure, regardless of the expense or impact on Evergreen.

As you consider how to proceed on these important topics, be reminded that, as Evergreen's Board of Directors, you have a responsibility to prevent waste of the Company's assets. Consider whether Mr. Edwards has and is using the Company's assets and resources in the best interests of *all* Shareholders. Every member of the Board of Directors will be held accountable for these actions.

Very truly yours,

TOUSLEY BRAIN STEPHENS PLLC

David D. Hoff

Janissa A. Strabuk

DDH/jka
Enclosures
3962\001\147323.02

EXHIBIT A

| Evergreen State Restaurant Corp | | |
| --- | --- | --- |
| Paid-In Capital Summary as of 12/31/01 | | |
| | | |
| Initial capital | | |
| Jones | 400,000 | |
| Edwards | 164,900 | 564,900 |
| | | |
| Landlord contributions | | |
| 1995 | 52,000 | |
| 1996 | 256,373 | |
| 1997 | 1,635,629 | |
| 1998 | 1,533,151 | |
| 1999 | 1,986,500 | |
| 2000 | 613,881 | 6,077,534 |
| | | |
| Other transactions recorded as paid in capital | | |
| | 279,908 | 279,908 |
| | | |
| Total Paid In Capital at 12/31/01 | | 6,922,342 |

EXHIBIT __A__

EXHIBIT B

ESRC
Stockholder Meeting
October 28, 1996

A stockholder meeting was held on October 28, 1996 in Clearwater, Florida to discuss the following areas:

- Sales Review

    - Week ended October 26, 1996   Average        $49.3
                                     Boise          $70.5

    - Review of nine months ended September 30, 1996 E.D. Joint Ventures
    - Distributable cash forecast
    - 4% Management fee charge on Boise

- Marketing Review

    - Review of Drewry marketing plan
    - Discussion of radio effectiveness

- Preparation for meeting with Drewry in Orlando

    - Sales trends
    - Support progress - Seattle, Bellevue, Kirkland, Federal Way
    - Alaska proprietor status
    - Food tech compensation and allocation to stores of bonus
    - Sexual harassment insurance

- Future Site Review

    - Locations
    - Investor list
    - ESRC Investment
    - Purchase of land sites

EXHIBIT __B__

- Financial statement review of ESRC through September 30, 1996

  – Accrual basis
  – Distributable cash basis
  – Upcoming charges
      New proprietors
      Food Tech
      Service Tech
  – Forecast of 1997 revenues
  – Distributions
  – Deferred compensation plan for Cliff
  – Annual ratification by Drewry and ESRC of EDJV liquidation paragraphs in agreement and allocation of taxable income/loss for year.
  – Confidentiality agreements for Drewry and Cliff
  – Shareholder loans paid off
  – Distributions for Cliff - we need agreement to protect ESRC to distribute on his behalf
  – Lunch for selected venders (appreciation lunch)

Detailed actions (notes for follow-up) and agreements follow:

In the discussion of sales for the stores it was noted that it appears we have reached a low point and that October will be a "key" month for trends. The discussion also centered on the charge of a 4% management fee to the Boise store as per the partnership agreement. We agreed that for the first few months (until the royalty fees to Outback are to be paid) we will charge and evaluate the cost of servicing this store in light of the 3% management fee charged to "in town" stores. At that point we will set the fee and adjust it on an as needed basis.

We discussed, at length, the system sales of our stores and the general "softness" of sales in light of significant radio advertising, grass roots marketing and Marc's emphasis on service at the stores. It was agreed that Craig would follow-up with Marc on his sales plan for each store and what needed to be done to enhance sales in our system. It was generally agreed that while we understand radio is a building process, we are not convinced that we are obtaining the results from radio that we had envisioned.

The discussions related to our meeting with Marc Drewry centered on the items listed in the above agenda. Particular emphasis was given to the area of Food tech compensation and allocation of his costs to stores being limited to bonus only. We also agreed that we needed to put in place insurance related to sexual harassment and employment practiced. We agreed that the stores should be held accountable and responsible for this insurance because this is where the risk is most likely to occur.

Once again, the question of Marc not signing his employment agreement was discussed. There have been numerous attempts over the last one and one-half year by each of us individually and as a group to obtain his signature. These again have centered on Marc understanding that this agreement represents only the employment agreement and not a liquidation agreement. Marc has continued to want to discuss and make liquidation and potential buyout provisions a part of his employment agreement when these provisions are already defined in the E.D. Joint Venture agreement he has signed and which was structured under the direction of Joe Kadow (Outback General Counsel), Ray Leich, Brian Comstock and Bob Shaw (Short Cressman and Burgess), and Craig Edwards. We agreed that we have exhausted all alternatives to obtain his signature and that the most prudent business decision for us is to operate under the spirit of the agreement yet rely on the E.D. Joint Venture agreement which is a signed document under which we legally operate.

As it relates to the financial results of Evergreen State Restaurant Corp we discussed operating results for the nine month period ended September 30, 1996 and compared those results to the budgeted results for the year under the proforma financial statements prepared for the bank. Those financial statements were based upon the notion that we would build and open seven restaurants in 1996. We will only open five restaurants in 1996 and, as a result, our operating plan for ESRC is higher than actual results.

We reviewed the operating budget of Evergreen noting the approximately $400,000 of management fee would come from the restaurants and another $400,000 would come in the form of distributions. We should end up about $50,000 short on management fees to cover our expenses on Evergreen for the year ended December 31, 1996. We then forwarded attention on the Evergreen Distribution which was used to reduce shareholder debt by $200,000 and invest in future restaurants by approximately $150,000. In essence, it is projected that we should about break even at the Evergreen State Restaurant Corp level for the year ended December 31, 1996.

There was discussion as it relates to distributing any excess cash to the shareholders, but the amount of this distribution would be identified and set after year end depending upon cash availability.

Discussion then centered on Cliffs expenses for 1996 and his efforts in the real estate areas. We revisited our meeting on May 24, 1996 in which we agreed that we would allocate his expenses to new store openings and charge each store $10,000 for site location to cover his time and expenses. After significant discussion we agreed that while these efforts might or might not yield six new leases (for 1996/1997) we would pay a flat $60,000 for his time and expenses through December 31, 1996. Further, we agreed that all his efforts would cease, unless requested, at December 31, 1996 and that all expenses and activities, if any, after that would be agreed on a per diem basis. Craig indicated that based upon projected letters of intent, we should be able to fund these costs out of the following six leases: Spokane, Tri Cities, Olympia, Southcenter, Vancouver and Portland. However, should these not be completed, we would have to charge each preopening a greater amount to cover Cliffs expenses and time, as noted above. In light of Cliffs personal activities forthcoming in 1997, all real estate activities would be Craig's responsibility at January 1, 1997.

We then discussed the operation of deferral of these expenses into future periods and Cliff and Ray concluded that the time and expense reimbursement of $60,000 would be made in 1997 based upon cash flow availability and not deferred to future periods. The issue of direct deposit on Cliff's behalf of distribution for his partnership interests was discussed. In order to protect the company (E.S.R.C.) from liability, it was agreed that Cliff and Ray would draft up a legal document which indemnified Evergreen State Restaurant Corporation and its officers and employees for actions related to direct deposit of his distributions on his behalf.

No other significant items were noted in our discussions.

Craig Edwards

Cliff Jones

Ray Leich

LAW OFFICES

# SHORT CRESSMAN & BURGESS PLLC

CIA BAUGHER
.O E. BRESKIN
KERRY S. BUCKLIN ★
JOHN O. BURGESS
SAMUEL S. CHUNG
MICHELLE Y. CLARK
BRYAN P. COLUCCIO
BRIAN L. COMSTOCK
STEPHEN P. CONNOR
JEFFREY A. COOP †††
PAUL R. CRESSMAN, JR.
PAUL R. CRESSMAN, SR., P.S.
DEREK D. CRICK
MICHAEL J. CRISERA
PAUL J. DAYTON
WILLIAM L. DIXON V
RICHARD A. DU BEY ∞
BRADLEY A. EVENS
JONATHAN R. FLORA †
MICHAEL R. GARNER ◊

CHRISTINA A. GERRISH
DAVID A. HERRMAN
ROBERT E. HINES †††
DANIEL F. JOHNSON
KAREN L. KENDRICK ††
CLAUDIA KILBREATH
DAVID R. KOOPMANS
ANDREW W. MARON ★★★
CONNIE SUE MANOS MARTIN
ROBIN G. McPHERSON
SCOTT M. MISSALL
MAUREEN L. MITCHELL
KENNETH L. MYER
MARK S. NADLER
JAMES A. OLIVER
CHRISTOPHER R. OSBORN
ALEX J. ROSE
HEATHER M. ROY ‡‡
ANNE-MARIE E. SARGENT
SCOTT A. SMITH

999 THIRD AVENUE, SUITE 3000
SEATTLE, WASHINGTON 98104-4088
FAX: (206) 340-8856
(206) 682-3333

November 19, 2001

CHRISTOPHER J. SOELLING
THANE D. SOMERVILLE
JOHN H. STRASBURGER ††
JOHN O. SULLIVAN
SUSAN THORBRUGGER
BRADLEY P. THORESON
LISA A. WOLFARD
ZACHARY A. WRIGHT

DOUGLAS R. HARTWICH
ROBERT E. HEATON
JOHN J. HOULIHAN, JR. ‡
KENDALL H. MOORE
KENNETH P. SHORT
ROBERT A. STEWART
PAUL R. WILLETT ◊
OF COUNSEL

ROBERT J. SHAW (1942-2000)

★ MEMBER OF PATENT BAR,
   USPTO
‡ ALSO ADMITTED IN
   CALIFORNIA AND ILLINOIS
‡‡ ALSO ADMITTED IN
   OREGON
◊ ALSO ADMITTED IN
   FLORIDA AND IDAHO
★★★ ALSO ADMITTED IN
   SOUTH CAROLINA
† ADMITTED IN CALIFORNIA
   ONLY
†† ALSO ADMITTED IN TEXAS
††† ALSO ADMITTED IN
   MONTANA
◊ ALSO ADMITTED IN
   HAWAII
∞ ALSO ADMITTED IN
   MASSACHUSETTS

Cliff Jones
Evergreen Restaurant Ventures, Inc.
3650-131st Avenue SE, Suite 320
Bellevue, WA  98006

Re:    Evergreen State Restaurant Corp/Shareholder Agreement

Dear Cliff:

Pursuant to our recent discussions and comments regarding Joe Kadow from Outback, enclosed please find a revised Shareholder Agreement between you, Craig, and Ray Leach.

I have sent you a clean and redlined version showing the changes and adding the irrevocable proxy. There are two versions of the proxy, one includes a witness' signature while the other doesn't.  A witness is not required, but is recommended (use a witness if it's convenient, but not if it would delay signing).

Please let me know if you would like me to email a copy to Joe Kadow for his review.

Very truly yours,

Kenneth L. Myer

KLM: rs
Enclosure(s)

**EXHIBIT    C**

360840.1/014009.00091

*[Handwritten note:]* Called Joe said all he would need for O/B protection is the proxy — should also be fine for Ray and al — Called Ken forgot S/A and proceed @ profs for Board meeting

## EVERGREEN STATE RESTAURANT CORP.

## SHAREHOLDER AGREEMENT

This EVERGREEN STATE RESTAURANT CORP. SHAREHOLDER AGREEMENT (the "Agreement") dated _____, 2001, is between Evergreen State Restaurant Corporation, a Washington corporation (the "Corporation") and Craig R. Edwards, Clifford L. Jones and Ray Leich, (the "Shareholders").  The Shareholders and the Corporation want to provide for continuity and harmony in the management and policies of the Corporation by:

       (a)     Restricting the involuntary transfer of Stock;

       (b)     Restricting the voluntary transfer of Stock; and

       (c)     Providing for composition of the Corporation's Officers and Directors.

The Shareholders and Corporation have made an election to be taxed as an S Corporation pursuant to Section 1361 et seq. of the Internal Revenue Code and want to protect such election.

NOW, THEREFORE, IN CONSIDERATION OF THE ABOVE RECITALS, THE MUTUAL UNDERTAKINGS BY THE PARTIES HERETO AND OTHER GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH IS HEREBY ACKNOWLEDGED, IT IS AGREED AS FOLLOWS:

1.    Definitions.

The following terms used in this Agreement shall be defined as follows unless the context clearly indicates some other definition:

       1.1    The "Determination Date" shall be the date on which (a) Stock is involuntarily sold or notice is received by a Shareholder that Stock will be involuntarily sold, or (b) an offer to sell is made.

       1.2    The "Seller" shall be (a) the person who purchased at an involuntary sale, (b) the selling Shareholder, (c) the selling Shareholder's personal representative or assignee, or (d) the personal representative of a deceased Shareholder.

       1.3    The "Purchaser" shall be the Corporation if it is purchasing Stock under this Agreement or any Shareholder so purchasing.

357845.3/014009.00001

1

1.4     "Stock" includes all of the rights, title, and interest which a Shareholder has in the capital stock and in rights to acquire capital stock of the Corporation.

1.5     "Franchise Agreement" shall be the then in force Outback Steakhouse Franchise Agreement governing the restaurants operated by the Corporation.

2.     Restrictions on Transfer of Stock.

No Shareholder shall encumber or transfer any portion of his or her Stock by sale, gift, bequest, devise, or descent, or any other method other than to his or her spouse, and/or natural or adopted descendents ("Permitted Transferee") who agrees to be a party to this Agreement as a Shareholder.  In addition, the Corporation shall not cause or permit the transfer of any shares of its Stock to be made on its books, nor shall it issue any Stock, whether by original issue or issue from its treasury, except in accordance with the terms of this Agreement and the Franchise Agreements.  No transferee shall be recognized as a Shareholder for any purpose until or unless such transferee has been approved as a shareholder of the franchisor, Outback Steakhouse, Inc.  This restriction is in addition to any other restrictions contained herein.

2.1     Involuntary Transfer.

If any portion of the Stock held by a Shareholder should be sold to satisfy his or her debt, such Shareholder agrees to notify in writing the Corporation and other Shareholders of such impending sale within two (2) days of receipt of notice of sale. Whether or not such notice is given, the Corporation and the other Shareholders shall have the right to purchase all, but not less than all, of such Stock, at the Corporation's and other Shareholders' election for the price and on the terms paid by the purchaser at the involuntary sale or for the consideration for the stock if transferred otherwise in lieu of such a sale.  The Corporation shall have the first right to purchase all, but not less than all, such Stock for thirty (30) days following receipt of written notice of the sale or impending sale and shall notify the Seller in writing within such thirty (30) day period; the other Shareholders then shall have the right to purchase all, but not less than all, such Stock, if not purchased by the Corporation, for thirty (30) days thereafter and shall notify the Seller in writing within such thirty (30) day period.  The closing date shall be the later of ten (10) days following the determination of the purchase price or seventy (70) days following delivery of written notice by the Corporation or other Shareholders that he, she or it intends to purchase the Stock.

## 2.2   Bonafide Third-Party Offer.

If a Shareholder receives and chooses to accept a bonafide third-party offer (the "Offer") to purchase all or a portion of his or her Stock, the selling Shareholder shall first notify the Corporation and other Shareholders in writing. Such notice shall contain the name and address of the purchaser and all terms and conditions of the Offer and financial information concerning the purchaser exhibiting sufficient financial resources to consummate the purchase. The Corporation and other Shareholders shall have the right to purchase all, and not less than all, of the Stock subject to and according to the terms of the Offer. The Corporation shall have the first right to purchase all, but not less than all, of the Stock of the selling Shareholder for thirty (30) days following receipt of notice of the Offer; then, if the Corporation does not elect to purchase all of the Stock of the selling Shareholder, the other Shareholders shall have the right to purchase all, but not less than all, of such Stock for thirty (30) days following the expiration of the thirty (30) day period during which the Corporation has such right. Unless a later date is specified in the Offer, the closing date shall be seventy (70) days following receipt by the Corporation of written notice of the Offer. If all, but not less than all, of the Stock is not purchased by the Corporation and other Shareholders within seventy (70) days after receipt of notice of the Offer, such Stock may be transferred to the third party making the Offer for sixty (60) days after expiration of such seventy (70) day period, but shall not thereafter be transferred without compliance with the provisions of this section and shall not be sold at a lesser price or on different terms without compliance with the provisions of this section.

## 3.   Terms of Purchase.

The purchase price shall be paid as follows:

### 3.1   Application of Shareholder's Debt.

To the extent that the Stock is purchased by the Corporation, there shall first be credited against the purchase price the amount of any debt owed the Corporation by the Shareholder whose Stock is being purchased. To the extent that Stock is purchased by another Shareholder, the purchase price shall be reduced, but not below zero, by the amount of any debt owed by the selling Shareholder to the Corporation or to the purchasing Shareholder; and the purchasing Shareholder shall be personally liable to the Corporation to the extent that the purchase price is reduced by a debt owed to the Corporation, and the Shareholder whose stock is being purchased shall be released from liability to the Corporation to the same extent.

### 3.2   Payment of Purchase Price.

Except when the purchase price and terms are determined pursuant to an Offer as permitted in Section 2.2, thirty percent (30%) of the remaining unpaid purchase price

357845.3/014009.00001

3

shall be paid in cash on or before the closing date and the balance of the purchase price shall be paid in five (5) equal annual installments beginning one year after the closing date.

Interest on the declining balance shall be calculated at the Federal Funds Rate published as the "FOMC fed funds target rate" in the Money Rates column of the Wall Street Journal as of the Determination Date.

The purchase price and terms shall be reflected in a promissory note which shall be signed by the Purchaser and delivered to the Seller. The Purchaser may prepay any portion of the note at any time without penalty. To the extent Stock is being purchased by more than one entity, each such entity shall execute a separate note.

4.      Primary Right to Purchase and Maintenance of Percentage Ownership.

Whenever Shareholders have the right or obligation to purchase Stock under this Agreement, each Shareholder shall have the right to purchase sufficient shares to maintain his or her percentage ownership of the Corporation as compared with the other non-selling Shareholders. For example, if the corporate stock were held twenty percent (20%) each by five stockholders, and the stock of one stockholder should be available for purchase under this Agreement, each of the other stockholders would have the right to purchase sufficient shares so that he or she would own twenty-five percent (25%) of the outstanding stock after all of the selling stockholder's stock had been purchased. If a Shareholder does not purchase all of his or her portion, each of the other non-selling Shareholders shall have the right to purchase any unpurchased Stock; and if more than one non-selling Shareholder should so elect, then each shall have the right to purchase a pro rata portion.

5.      Endorsement of Stock Certificates and Adoption of the Agreement by Corporation.

On the execution of this Agreement, the Stock of the Corporation subject to this Agreement shall be endorsed as follows:

> The transfer of this certificate is restricted by the conditions and terms imposed by that certain agreement dated _____ between the corporation and all shareholders. A copy of that agreement is on file at the office of the corporation and may be inspected there.

6.    Additional Stock Included.

This Agreement shall pertain to and cover any and all shares of Stock of the Corporation which may hereafter be held by any of the parties to this Agreement. Any person who becomes an owner of Stock in the Corporation shall thereupon become a party to this Agreement. Such person shall be required to affix his or her signature, and such person's spouse shall be required to affix his or her signature, indicating the date thereof, at the end of this Agreement and, thereafter, such person and his or her spouse shall have the same rights and obligations as any other party to this Agreement; provided, however, that the limitations imposed upon transfer of the Corporation's Stock shall apply to any such new Shareholder whether or not such new Shareholder and his or her spouse executes this Agreement. Certificates of stock issued to such persons shall be endorsed as provided in this Agreement.

7.    S Corporation Provisions.

7.1    Preservation of S-Corporation Status.

Notwithstanding any terms contained herein the contrary, no Shareholder shall be entitled to exercise any rights to sell, gift, transfer, or convey his or her Stock if doing so would cause the Corporation to be disqualified from taxation as an S Corporation under the Internal Revenue Code. The Shareholders agree that they will each maintain an estate plan that will ensure that Stock will not be transferred on death to an entity whose holding of Stock would cause the Corporation to be disqualified from taxation as an S Corporation.

7.2    Closing of Books on Termination of Shareholder's Interest.

The Corporation and Shareholders agree that if the interest of a Shareholder terminates, the Corporation will elect to allocate its income and losses as if its taxable year ended on the date of the termination of the Shareholder's interest. The Corporation agrees to make such election for any taxable year in which the year of a Shareholder terminates. Each Shareholder who owns shares at any time during such taxable year agrees to execute a consent to such election.

7.3    Designation of Tax Matters Person.

The Corporation and Shareholders agree that the president of the Corporation from time to time shall be designated to serve as Tax Matters Person for the Corporation and that such a designation shall be filed annually by the Corporation with its federal income tax return.

357845.3/014009.00001

5

8.      Board of Directors.

At all times during the term of this Agreement, the Shareholders (or their successors or Permitted Transferees) agree that they will each vote or cause the Stock of the Corporation now or hereafter owned by them to be voted so as to cause the Corporation's Board of Directors to consist of three (3) members and to elect Craig R. Edwards, Clifford L. Jones, and Ray Leich ("Directors") to the Board of Directors of the Corporation. In the event one or more of the Directors is unable or unwilling to serve as a director of the Corporation, the Shareholders and their successors-in-interest and Permitted Transferees further agree to vote the nominee of the unable or unwilling Shareholder or if said unable or unwilling Shareholder is deceased, then the nominee of his successors and Permitted Transferees, to the Board of Directors of the Corporation in his stead.

9.      Officers.

At all times during the term of this Agreement, the Shareholders (or their successors or Permitted Transferees) agree that they will each take all such reasonable action as may be required to nominate and cause to be elected the following (or each of the following's respective successor-in-interest or Permitted Transferee) as the respective designated officers of the Corporation (so long as said person is living and is a Shareholder of the corporation):

| | |
|---|---|
| Clifford L. Jones | President and CEO |
| Craig R. Edwards | Secretary |
| Ray Leich | Treasurer |

10.     Proxy.

Pursuant to requirement from the franchisor, Outback Steakhouse Inc., that Craig R. Edwards transfer his right to vote his shares comprising the majority interest in the issued and outstanding voting stock in the Corporation, Craig R. Edwards shall execute an irrevocable proxy nominating Clifford L. Jones, as his proxy, to vote his shares of the Corporation in substantially the same form attached hereto as Exhibit A.

11.     Termination of Agreement.

This Agreement shall terminate on any of the following events:

11.1    The dissolution, bankruptcy or insolvency of the Corporation; or

11.2    The deaths of all Shareholders within a period of ninety (90) days; or

357845.3/014009.00001

11.3   When there survives only one Shareholder as a party to this Agreement.

12.   Gender, Plurals.

Whenever in the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in either the masculine, the feminine or the neuter gender shall include the masculine, feminine and neuter genders.

13.   Binding Effect of Agreement on Successors and Transferees.

This Agreement shall be binding on all of the parties hereto, and on their heirs, executors, administrators, successors, and assigns; and the parties agree to sign any and all instruments necessary or proper to carry out the purposes and intent of this Agreement. To the extent that the Corporation and Shareholders do not elect to purchase Stock under this Agreement and the Stock is transferred to someone who is not a party to this Agreement, the Corporation shall have no obligation to register the change of ownership or issue new certificates until the transferee shall have signed this Agreement, and even if the transferee does not sign this Agreement, he or she shall be bound by all of the provisions of this Agreement as if he or she had signed it.

14.   Notices.

Except as otherwise provided, all notices, offers, acceptances, requests, and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered in person or when deposited in the mail by certified or registered mail to the Corporation at its registered office and to each Shareholder at his or her address set forth in the records of the Corporation, or to such other address as any party shall designate to the other parties in writing.

15.   Spouses' Signatures.

The respective spouses of the Shareholders have signed this Agreement as evidence of their intentions to comply with all of its terms as if such spouse were a party and a separate Shareholder as to his or her community property interest.

IN WITNESS WHEREOF, the parties have executed this Agreement at Seattle, in the County of King, State of Washington.

Shareholders:                                        Evergreen State Restaurant Corp.


_____            By:_____
Craig R. Edwards, Shareholder                     Clifford L. Jones, President



_____
_____, Spouse



_____
Clifford L. Jones, Shareholder



_____
_____, Spouse



_____
Ray Leich, Shareholder



_____
_____, Spouse

**EXHIBIT A**
**EVERGREEN STATE RESTAURANT CORP.**
**IRREVOCABLE PROXY**

KNOW ALL MEN BY THESE PRESENTS, that Craig R. Edwards hereby irrevocably nominates and appoints Clifford L. Jones his true and lawful attorney for his and in his name, place, and stead, with full power of substitution, on or after December 1, 2001, to vote all of the stock of Evergreen State Restaurant Corp., a Washington corporation, now or hereafter standing in the name of Craig R. Edwards at any and all regular or special meetings, or any adjournments thereof which may be held on or after such date of the shareholders of Evergreen State Restaurant Corp. and to take any action as a shareholder without a meeting or vote by executing written consents during said period. This proxy is issued in consideration of Outback Steakhouse Inc.'s requirement of this proxy in return for continuation of the franchises of Evergreen State Restaurant Corp., which is accepted hereby and, because coupled with the interest provided thereby, shall be irrevocable to the full extent permitted by law.

        IN WITNESS WHEREOF, Craig R. Edwards has signed these presents this _____ day of _____, 2001.

                                        _____
                                        Craig R. Edwards

Attest:

_____

Number of Shares Owned:  70

**EXHIBIT A**
**EVERGREEN STATE RESTAURANT CORP.**
**IRREVOCABLE PROXY**

KNOW ALL MEN BY THESE PRESENTS, that Craig R. Edwards hereby irrevocably nominates and appoints Clifford L. Jones his true and lawful attorney for his and in his name, place, and stead, with full power of substitution, on or after December 1, 2001, to vote all of the stock of Evergreen State Restaurant Corp., a Washington corporation, now or hereafter standing in the name of Craig R. Edwards at any and all regular or special meetings, or any adjournments thereof which may be held on or after such date of the shareholders of Evergreen State Restaurant Corp. and to take any action as a shareholder without a meeting or vote by executing written consents during said period. This proxy is issued in consideration of Outback Steakhouse Inc.'s requirement of this proxy in return for continuation of the franchises of Evergreen State Restaurant Corp., which is accepted hereby and, because coupled with the interest provided thereby, shall be irrevocable to the full extent permitted by law.

   IN WITNESS WHEREOF, Craig R. Edwards has signed these presents this _____ day of _____, 2001.

_____

Craig R. Edwards

360924.1/014009.00091

# OUTBACK STEAKHOUSE, INC.

2202 N. West Shore Blvd. • 5th Floor • Tampa, FL 33607
Phone (813) 282-1225 • Fax (813) 282-1209
www.outback.com

February 7, 2002

Craig Edwards
Evergreen State Restaurant Corporation
3650 131st Avenue, S.E.
Bellevue, WA 98006

Dear Craig:

As you know, pursuant to our letter to you dated January 10, 2001, Evergreen State Restaurant Corporation, Evergreen Restaurant Ventures, Inc. and their affiliated partnerships ("Evergreen") were required to name a new Operating Partner for the Outback Steakhouse® restaurants (the "Restaurants") they franchise from Outback Steakhouse of Florida, Inc. ("OSF"). As a result of this letter, Cliff Jones was named as Operating Partner for Evergreen and the Restaurants.

In addition to requiring an Operating Partner that is acceptable to OSF, the Franchise Agreements between Evergreen and OSF also require, pursuant to Section 5.3(a), that the Operating Partner have at least a fifty percent (50%) voting interest in the franchisee during the entire period he serves as Operating Partner. Failure of the Operating Partner to have such a voting interest would constitute a default under Section 13.2 of the Franchise Agreements.

Please confirm as soon as possible that you have executed an irrevocable proxy granting to Cliff Jones at least a fifty percent (50%) voting interest in Evergreen. Such proxy must be irrevocable for a period of at least five (5) years.

Thank you for your attention to this matter.

Very truly yours,

Joseph J. Kadow
Senior Vice President and General Counsel

cc:   Cliff Jones

EXHIBIT    D

## EVERGREEN STATE RESTAURANT CORP.
## IRREVOCABLE PROXY

KNOW ALL MEN BY THESE PRESENTS, that Craig R. Edwards hereby irrevocably nominates and appoints Clifford L. Jones his true and lawful attorney for his and in his name, place, and stead, with full power of substitution, on or after December 1, 2001, to vote all of the stock of Evergreen State Restaurant Corp., a Washington corporation, now or hereafter standing in the name of Craig R. Edwards at any and all regular or special meetings, or any adjournments thereof which may be held on or after such date of the shareholders of Evergreen State Restaurant Corp. and to take any action as a shareholder without a meeting or vote by executing written consents during said period.  This proxy is issued in consideration of Outback Steakhouse Inc.'s requirement of this proxy in return for continuation of the franchises of Evergreen State Restaurant Corp., which is accepted hereby and, because coupled with the interest provided thereby, shall be irrevocable to the full extent permitted by law.

     IN WITNESS WHEREOF, Craig R. Edwards has signed these presents this _____ day of _____, 2001.


_____
Craig R. Edwards


Attest:


_____


Number of Shares Owned:  70

## EVERGREEN STATE RESTAURANT CORP.
## IRREVOCABLE PROXY

KNOW ALL MEN BY THESE PRESENTS, that Craig R. Edwards hereby irrevocably
nominates and appoints Clifford L. Jones, as the Operating Partner of Evergreen State
Restaurant Corp., a Washington corporation, his true and lawful attorney for his and in
his name, place, and stead, with full power of substitution, on or after_____
_____, 2002 until _____, 2007, to vote twenty and one-half (20.5) shares of his
stock of Evergreen State Restaurant Corp. now or hereafter standing in the name of Craig
R. Edwards at any and all regular or special meetings, or any adjournments thereof which
may be held on or after such date of the shareholders of Evergreen State Restaurant Corp.
and to take any action as a shareholder without a meeting or vote by executing written
consents during said period.  This proxy is issued in consideration of Outback Steakhouse
Inc.'s requirement of this proxy in return for continuation of the franchises of Evergreen
State Restaurant Corp., which is accepted hereby and, because coupled with the interest
provided thereby, shall be irrevocable for a period of five (5) years to the full extent
permitted by law.

     IN WITNESS WHEREOF, Craig R. Edwards has signed these presents this _____
day of _____, 2002.


_____
Craig R. Edwards

# OUTBACK STEAKHOUSE, INC.

2202 N. West Shore Blvd. • 5th Floor • Tampa, FL 33607
Phone (813) 282-1225 • Fax (813) 282-1209
www.outback.com

**VIA FACSIMILE AND CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

May 15, 2002

Craig Edwards                          Cliff Jones
P. O. Box 519                          Evergreen Restaurant Ventures, Inc.
Medina, WA  98039                      3650 131st Street SE
                                       Suite 320
                                       Bellevue, WA  98006

Gentlemen:

As you know, by letter dated January 10, 2002 Outback Steakhouse of
Florida, Inc. ("OSF") informed Evergreen State Restaurant Corporation and its
affiliated franchisee partnerships ("Evergreen") that Craig Edwards was no longer
acceptable to OSF as the Operating Partner for Evergreen (as defined in Section
5.3 of the applicable franchise agreements).

By letter dated February 7, 2002, OSF notified you that Cliff Jones was an
acceptable replacement Operating Partner for Evergreen. Our letter of February 2,
2002 reminded you of the requirement contained in Section 5.3 of the Franchise
Agreements that the Operating Partner own at least fifty percent (50%) equity and
voting interest in the franchisee.

As you know, we have always accommodated our franchisees and their
need to include outside investors by applying this 50% requirement to the entity
ultimately in control of the franchisee.  Each of the restaurants in issue is a limited
partnership of which the sole general partner is E-D Joint Venture.  The Managing
Joint Venturer of E-D Joint Venture is Evergreen State Restaurant Corporation.
Therefore, flowing through all the layers, the entity in control of the franchisee is
Evergreen State Restaurant Corporation.  Consistent with our past practices with
our other franchise groups (including as applied to the Evergreen partnerships
Craig Edwards), the Franchise Agreements require Cliff Jones as Operating
Partner to have at least 50% equity and voting interest in Evergreen State
Restaurant Corporation.



EXHIBIT _____E_____

Page 2
May 15, 2002

I acknowledge that we have previously had discussions regarding fulfilling
the requirements of Section 5.3 by Craig's executing an irrevocable proxy in favor
of Cliff or executing an acceptable shareholders agreement.

For a variety of reasons, including facts that have come to our knowledge
regarding Craig's activities during his tenure as Operating Partner, we require that
the terms of Section 5.3 of the Franchise Agreements be strictly complied with.
This will require Cliff obtaining at least 50% equity and voting interest in
Evergreen State Restaurant Corporation. Failure to comply with this requirement
will constitute a default under the Franchise Agreements.

It is my hope that Craig and Cliff will amicably resolve this so that the
franchises will be in compliance with Section 5.3. I urge all of you to consider
the investments made by your limited partners in these restaurants.

I request that each of you contact me (through your counsel if you prefer)
confirming that you will comply with Section 5.3 of the Franchise Agreements
and indicating the time period you anticipate will be reasonably necessary for
compliance. Obviously, we are willing to be reasonable and flexible regarding
timing, provided you are proceeding toward compliance in good faith and with
appropriate speed.

Very truly yours,

Joseph J. Kadow
Senior Vice President and General Counsel

Cc:     Spencer Hall, Esquire
        Hall Zanzig Claflin McEachern

        Gregory L. Williams, Esquire

        Kenneth L. Myer, Esquire
        Short Cressman & Burgess

        Chris Sullivan
        Paul Avery

JJK/cjt

JUL-24-2002  10:11      OUTBACK                                              813 281 2114      P.02/03

# OUTBACK STEAKHOUSE, INC.

2202 N. West Shore Blvd. • 5th Floor • Tampa, FL 33607
Phone (813) 282-1225 • Fax (813) 282-1209
www.outback.com

July 23, 2002

By Facsimile and US Mail

Spencer Hall, Esquire                    Gregory L. Williams, Esquire
Hall Zanzig Claflin McEarchern           3108 Prospect Road
1200 Fifth Avenue, Suite 1414            Tampa, FL 33629
Seattle, WA 98101

Re:   Craig R. Edwards - Outback Steakhouse, Inc.

Dear Spencer and Greg:

This letter is a general response to the correspondence between you that you copied to me, but primarily to Spencer's letter to Greg of June 28, 2002. I don't intend to take the time to dispute every point raised by Spencer and my failure to address any particular point should not be taken as agreement or acquiescence on my part.

With respect to Spencer's statement that Craig does not want to sell only a portion of his shares, quite frankly I think Craig's desires are not what are at issue here. Our interest is in compliance with the franchise agreements. This requires Cliff to have at least 50% ownership of the general partner entity. If Craig wants to sell more and Cliff wants to buy it, that is not my concern. But Craig cannot refuse to comply with the franchise agreements on the basis that he wants to sell only all of his position. I remind everyone that we are now dealing with the second time that we have been required to replace Craig as operating partner solely due to his own actions.

Spencer seems to claim we did not require Craig to comply with the franchise agreements because Craig does not own 50% of the actual franchisee entities.   The reality is we have Craig throwing back in our face an accommodation that we made for him. Craig sat in my office and asked if it would be acceptable (since he was raising money on a restaurant-by-restaurant basis) if he maintained control at the general partner level, even though on a fully diluted ownership basis he would not own 50% of the franchise. We made that accommodation for Craig as we have made for a number of other franchisees. Now after accommodating Craig, he is attempting to misconstrue this.

We are imposing on Cliff the same requirement that we imposed on Craig, no more – no less. Cliff must own at least 50% of the entity that serves as sole general partner and controls the limited partnerships.



EXHIBIT __F__

M:\Legal\L.Troy\Evergreen\Hall&williams.ltr.doc

With respect to valuation, if it will be of any assistance to you, we are willing to explain the formulas and methodologies we have used (subject to appropriate confidentiality agreements) to acquire franchised restaurants in the past. It should then be a relatively simple mathematical calculation to apply these formulas and methodologies to the Evergreen operation. What method you use is not our concern.

Gentlemen, more than enough time has gone by to have had this situation resolved. I feel Outback has been more than patient. Contrary to the assertions of Spencer's letter, our insistence on holding to the requirement that Cliff have 50% ownership is not the result of Cliff's lobbying. The first time Cliff was required to replace Craig we did not require Craig to surrender any ownership because we were hopeful that the replacement of Craig as operating partner would be temporary. In fact this was the case and Craig was able to return as operating partner.

Given the recurrence of the same problems that led to Craig's replacement the first time, and due to Craig's actions subsequent to this second replacement, it became clear that this was a permanent situation. That is the reason we are now requiring Craig and Cliff comply with the ownership requirement. Another example of leniency toward Craig being turned against us.

Please advise as to what you intend to do to resolve this situation. Evergreen has many individual investors involved. Craig and Cliff are not the only parties involved and I hope you will consider their interests as you deal with this matter. There is a readily ascertainable value for these interests and I hope you will proceed in good faith and with all reasonable speed to get this accomplished. Given the time that has elapsed, we will withhold from enforcing our rights under the franchise agreements for 30 days.

As always, Outback reserves all rights and remedies available to it under the franchise agreements and nothing contained herein should be construed as a waiver of any of those rights.

Very truly yours,

*Joseph J. Kadow / signed for in his absence to avoid delay.  Connie Troy*

Joseph J. Kadow
Senior Vice President and General Counsel

JJK/cjt

Aug 05 02 11:12a      Cliff & Linda Jones        19496735979              p.2
Aug-05-02 12:12P Leich & Associates, CPA     813 254 2652            P.01

# HALL ZANZIG CLAFLIN McEACHERN |

*Trial Lawyers*

August 2, 2002

Mr. Gregory L. Williams
3108 Prospect Road
Tampa, Florida 33629

Re:   <u>Craig R. Edwards - Outback Steakhouse, Inc.</u>

Dear Greg:

I am enclosing a draft Shareholders Agreement for Evergreen State Restaurant Corporation.

The draft Shareholders Agreement provides that Cliff Jones will be the President and Chief Executive Officer of Evergreen and the Operating Partner for the Limited Partnerships for not less than five years on the terms and conditions stated in the agreement. You should review the agreement itself, but essentially it provides for earlier termination only upon Cliff's death, resignation, incapacity, nonperformance or breach.

The draft Shareholders Agreement assumes that the owners of Evergreen remain unchanged. Although we do not believe that Outback Steakhouse, Inc. has any right to require that Cliff Jones own 50 percent of Evergreen, Craig is willing to restructure Evergreen's ownership so that Cliff and he each own 50 percent.

To achieve that result, Craig would propose a 2 for 1 split of Evergreen stock. The existing ownership and the new ownership would be as follows:

|          | Existing  | New        |
|----------|-----------|------------|
| Edwards  | 70 shares | 140 shares |
| Jones    | 30 shares | 60 shares  |
| Leich    | 1 share   | 2 shares   |

*A Professional Limited Liability Company*
1200 Fifth Avenue, Suite 1414, Seattle, WA 98101
Tel 206.292.5900 Fax 206.292.5901

EXHIBIT ___G___

Mr. Gregory L. Williams
August 2, 2002
Page 2

HALL ZANZIG CLAFLIN MCEACHERN | *Trial Lawyers*

Ray Leich would sell his two shares to Cliff. Craig would sell 39 of his 140 shares to Cliff for $7.5 million. That figure is based on the values that Cliff and Craig have provided to U.S. Bank. Craig and Cliff would then own 101 shares each. Ray Leich would have no further interest in Evergreen. Cliff would be the Operating Partner for the Limited Partnerships on terms and conditions similar to those contained in the enclosed draft Shareholders Agreement.

I look forward to hearing from you.

Very truly yours,

HALL ZANZIG CLAFLIN MCEACHERN PLLC

Spencer Hall

SH:kab
Enclosure
cc:    Mr. Joseph J. Kadow (w/encl.)
       Mr. Kenneth L. Myer (w/encl.)
       Mr. Ray Leich (w/encl.)

Evergreen Restaurant Ventures Inc.
3650-131ᵗ Avenue SE
Suite 320
Bellevue, WA 98006
425/562-9850
425/562-9865 fax

Outback Steakhouse

# Fax

| | | | |
|---|---|---|---|
| To: | CRAIG EDWARDS | From: | C JONES |
| Co: | | Pages: | 2 |
| Fax: | 425-467-9143 | Date: | 8/9/02 |
| Phone: | | Re: | |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

EXHIBIT H

Craig, I would like to respond to your fax to Ray and me "re: meeting of directors/shareholders." I know of no other meeting you have called for this year. This is the first request you have made, and the first time you have approached me on having a board of directors meeting this year. The only board meeting we have had was held back in April by phone. I called for that meeting, and if you will recall, adjusted both time and date to meet your availability. At that time, both you and Ray were free to bring up any other matters that you felt needed our attention or vote.

As to your reference for access to books and records, both you and Ray have been given any financials or records that you have requested, in addition to the normal financials you receive on a regular monthly basis. We have also sent all data and correspondence requested by your attorney. Many times either you or your attorney has requested documents you have already received, but again these have been sent off in a timely manner, or faxed, or picked up by you.

In regards to our past business relationship, it all changed due to your actions and your request through your attorney for us, and particularly for me, to seek outside counsel and for all correspondence or negotiations to be handled through the attorneys.

I have seen your buyout proposal of $7.5 million. I am not willing to purchase at that price, although I would welcome your purchase of my entire interest using your methodology. Ray and I have sent in our signed nondisclosure agreement to Outback and we are waiting for Bob Merritt to get back in town in order to get their formulas and buyout methodology for franchise buyouts. I would hope that you and your attorney would take advantage of the Outback offer to supply their methodology to all of us.



OUTBACK STEAKHOUSE®
RESTAURANT FRANCHISE AGREEMENT


THIS RESTAURANT FRANCHISE AGREEMENT ("Agreement") is made and entered into this _20_ day of _MARCH_____, 1995, by and between OUTBACK STEAKHOUSE OF FLORIDA, INC., a Florida corporation having its principal office at 550 North Reo Street, Suite 200, Tampa, Florida 33609 (hereinafter "Franchisor"), and EVERGREEN STATE LIMITED PARTNERSHIP I, a Washington limited partnership having its principal office at 18404 104th Avenue, N.E., Bothell, Washington 98011-3414 (hereinafter "Franchisee").


W I T N E S S E T H:


WHEREAS, Franchisor has developed and owns a unique, distinctive system for the establishment and operation of full service restaurants featuring a specialized menu and full bar service (hereinafter "System"); and

WHEREAS, distinguishing characteristics of the System include, without limitation, special recipes and menu items; distinctive design, decor, and furnishings; uniform standards, specifications, and procedures for operations, quality and uniformity of products and services offered; procedures for inventory and management control; training and assistance; and advertising and promotional programs; all of which may from time to time be changed, improved, and further developed by Franchisor; and

WHEREAS, Franchisor identifies the System by the use of certain trade names, service marks, trademarks, logos, emblems, and indicia of origin, including, but not limited to, the marks OUTBACK STEAKHOUSE®, BLOOMIN' ONION®, and such other trade names, service marks, and trademarks as are now or hereafter designated by Franchisor in writing for use in connection with the System (collectively hereinafter "Proprietary Marks"); and

WHEREAS, Franchisor continues to develop, use, and control the use of the Proprietary Marks to identify for the public the source of services and products marketed thereunder and under the System, and to represent the System's high standards of quality, appearance, and service; and

WHEREAS, Franchisee desires to enter into the business of operating an Outback Steakhouse® restaurant under Franchisor's System and to obtain a franchise for that purpose, and to receive

-1-


**EXHIBIT B**

the training and other assistance provided by Franchisor in connection therewith; and

**WHEREAS,** Franchisee understands and acknowledges the importance of Franchisor's high standards of quality, cleanliness, appearance and service and the necessity of operating the restaurant franchised hereunder in conformity with Franchisor's standards and specifications;

**NOW, THEREFORE,** intending to be legally bound, in consideration of the mutual covenants contained herein, the parties hereby agree as follows:

## ARTICLE I
### GRANT

**Section 1.1** <u>Grant</u>. Subject to the terms and conditions contained herein, Franchisor hereby grants to Franchisee the right and franchise, and Franchisee undertakes the obligation, to operate an Outback Steakhouse® restaurant (hereinafter "Restaurant") and to use the Proprietary Marks and System (as same may be modified) solely in connection with the operation of the Restaurant at the approved location indicated in <u>Section 1.2</u>.

**Section 1.2** <u>Location</u>. The street address of the approved location of the Restaurant shall be set forth in Attachment A hereto. Franchisor and Franchisee shall execute the Site Selection and Construction Addendum attached hereto as Attachment B and hereby incorporated herein and made a part hereof. If, at the time of execution of this Agreement, a location for the Restaurant has not been obtained by Franchisee and approved by Franchisor, Franchisee shall lease or acquire a location, subject to Franchisor's prior approval, as provided in Attachment B to this Agreement, and that location shall constitute the approved location. Franchisee shall not relocate the Restaurant without the express prior written consent of Franchisor.

**Section 1.3** <u>Non-Exclusive</u>. Franchisee acknowledges that this franchise is non-exclusive and is granted subject to the terms of <u>Section 7.3(f)</u> hereof. The grant of this franchise does not grant any rights to Franchisee to any other location or territory. The grant of this Franchise does not grant Franchisee any protected trading area. The grant of this franchise does not grant any rights to Franchisee to obtain additional franchises from Franchisor. Franchisor retains the exclusive right to establish, alone or in conjunction with others, or license others to establish, restaurants using the System at any location other than

-2-

the approved location of Franchisee's Restaurant specified in
Section 1.2.

## ARTICLE II
### TERM AND RENEWAL

Section 2.1   Initial Term.  Except as otherwise provided
herein, the term of this Agreement shall expire twenty (20) years
from the date the Restaurant is opened for business; provided,
however, that if Franchisee's approved location is leased, this
Agreement shall expire at the earlier of (i) twenty (20) years from
the date the Restaurant is opened for business or (ii) upon
expiration or termination of the lease.

Section 2.2   Renewal.  Franchisee shall have the option
to renew this Agreement for one (1) additional consecutive term of
twenty (20) years, subject to the following conditions, all of
which must be met prior to renewal:

(a)   Franchisee shall give Franchisor written notice
of Franchisee's election to renew not less than twelve (12) months
nor more than eighteen (18) months prior to the end of the initial
term;

(b)   Franchisee shall, to Franchisor's reasonable
satisfaction, renovate and modernize the Restaurant premises to
reflect the then current standards and image of the System,
including, without limitation, renovation of signs, furnishings,
fixtures, and decor;

(c)   Franchisee shall be in full compliance with all
provisions of this Agreement, as amended, and any other agreement
between Franchisee and Franchisor or its subsidiaries and
affiliates; and Franchisee shall have substantially complied with
all provisions of such agreements during the terms thereof;

(d)   Franchisee shall have satisfied all monetary
obligations owed to Franchisor and its subsidiaries and affiliates
and shall have timely met those obligations throughout the term of
this Agreement;

(e)   Franchisee shall present satisfactory evidence
that Franchisee has the right to remain in possession of the
approved location for the duration of the renewal term of this
Agreement;

(f) Franchisee shall execute and deliver to Franchisor Franchisor's then current form of renewal franchise agreement, which agreement shall supersede this Agreement in all respects, and the terms of which may differ from the terms of this Agreement, including, without limitation, a higher percentage royalty fee and advertising contribution; provided, however, that Franchisee shall pay, in lieu of an initial franchise fee, a renewal fee not to exceed fifty percent (50%) of the initial franchise fee being charged to new franchisees under the System at the time of renewal;

(g) Franchisee shall execute a general release, in a form prescribed by Franchisor, of any and all claims against Franchisor and its subsidiaries and affiliates, and their respective officers, directors, agents, and employees; and

(h) Franchisee shall comply with Franchisor's then current qualification and training requirements.

## ARTICLE III
### FEES

**Section 3.1** <u>Initial Franchise Fee</u>. Franchisee shall pay to Franchisor an initial franchise fee of Forty Thousand Dollars ($40,000), payable as follows:

(a) Ten Thousand Dollars ($10,000) upon execution of this Agreement; and

(b) Ten Thousand Dollars ($10,000) on or before the date of commencement of construction (as defined in Attachment B hereto); and

(c) Twenty Thousand Dollars ($20,000) at least ten (10) days prior to the date on which the Restaurant opens for business.

Upon payment of each portion of the initial franchise fee, that portion shall be deemed fully earned and non-refundable in consideration for administrative and other expenses incurred by Franchisor in granting this franchise and for Franchisor's lost or deferred opportunity to franchise others.

**Section 3.2** <u>Monthly Royalty</u>. During the initial term of this Agreement, Franchisee shall pay to Franchisor a continuing monthly royalty fee in an amount equal to three percent (3%) of the Restaurant's gross sales, as defined in <u>Section 3.6</u> hereof.

-4-

Section 3.3   <u>Advertising Expenditure</u>.   Until such time as Franchisor establishes a national advertising fund or regional advertising cooperative association for Franchisee's region, Franchisee shall expend, on a continuing monthly basis, three percent (3%) of the gross sales (as defined in <u>Section 3.6</u>) of the Restaurant on local advertising as provided in <u>Section 10.2</u> hereof. Such local advertising shall be subject to Franchisor's reasonable prior approval to maintain the image of the System.   Upon notice from Franchisor, and in lieu of the required local advertising expenditure, Franchisee shall contribute, on a continuing monthly basis, a total of three and one-half percent (3.5%) of the gross sales of the Restaurant, allocated as provided in <u>Section 10.3</u> hereof, to a national advertising fund and/or a regional advertising cooperative association for Franchisee's region as provided in <u>Sections 10.4 and 10.5</u> hereof.

Section 3.4   <u>Marketing Administration Fee</u>.   During the initial term of this Agreement, Franchisee shall pay to Franchisor a continuing monthly marketing administration fee (as provided in <u>Section 10.6</u> hereof) in an amount equal to one-half percent (1/2%) of the Restaurant's gross sales as defined in <u>Section 3.6</u> hereof. The marketing administration fee shall be used by Franchisor for administration, development and implementation of advertising and promotion activities.

Section 3.5   <u>Payments and Reports</u>.   All monthly payments to Franchisor required by this <u>Article III</u> shall be paid by the tenth (10th) day of each month on the gross sales for the preceding calendar month, and shall be submitted to Franchisor at the address provided in <u>Section 17.1</u> hereof together with any reports or statements required under <u>Section 9.2</u> hereof.   Any payment or report not actually received by Franchisor on or before such date shall be deemed overdue.   If any payment is overdue, Franchisee shall pay Franchisor, in addition to the overdue amount, interest on such amount from the date it was due until payment is received by Franchisor at the rate of eighteen percent (18%) per annum, or the maximum rate permitted by law, whichever is less.   Such interest shall be in addition to any other remedies Franchisor may have.

Section 3.6   <u>Gross Sales</u>.   As used in this Agreement, "gross sales" shall mean all revenue from the sale of all services and products and all other income of every kind and nature related to the Restaurant, whether for cash or credit and regardless of collection in the case of credit; provided, however, that "gross sales" shall not include any sales taxes or other taxes collected from customers by Franchisee for transmittal to the appropriate taxing authority.

-5-

## ARTICLE IV
### DUTIES OF FRANCHISOR

**Section 4.1**    <u>Initial Training</u>.  Franchisor shall provide an initial training program for Franchisee's Operating Partner (as described in <u>Section 5.3</u> hereof) and two (2) of Franchisee's managers, and shall make available such other training programs as Franchisor deems appropriate.  All training provided by Franchisor shall be subject to the terms set forth in <u>Section 5.6</u> of this Agreement.

**Section 4.2**    <u>Plans and Specifications</u>.  Franchisor shall make available, at no charge to Franchisee, standard plans and specifications for the exterior and interior design and layout of the Restaurant and fixtures, furnishings, equipment and signs. Franchisee shall adapt, at Franchisee's expense, the standard plans and specifications to the Restaurant location, as provided in <u>Section 5.2</u> hereof and Attachment B hereto.

**Section 4.3**    <u>Pre-Opening Assistance</u>.   Franchisor shall provide such on-site pre-opening and opening supervision and assistance (which may include, at Franchisee's expense, an opening crew as described in <u>Section 5.5</u> hereof) as Franchisor deems advisable, subject to the availability of personnel.   Franchisor shall provide such continuing advisory assistance to Franchisee in the operation of the Restaurant as Franchisor deems advisable.

**Section 4.4**    <u>Data</u>.  Franchisor shall make available, from time to time, research data relating to merchandising, marketing, and advertising; and, at Franchisee's reasonable expense, promotional materials for local advertising by Franchisee. Franchisor shall have the right to review and approve or disapprove all advertising and promotional materials which Franchisee proposes to use, as provided in <u>Section 10.4</u> hereof.

**Section 4.5**    <u>Operating Manual</u>.  Franchisor shall provide Franchisee, on loan, one copy of the Outback Steakhouse® Confidential Operations Manual (hereinafter "Manual"), as more fully described in <u>Article VIII</u> hereof.

**Section 4.6**    <u>Advice</u>.   Franchisor shall provide to Franchisee, from time to time as Franchisor deems appropriate, advice and written materials concerning techniques of managing and operating the Restaurant, including new developments and improvements in restaurant equipment, food products, packaging and preparation.

-6-

Section 4.7 <u>Inspections</u>.   Franchisor shall seek to maintain the high standards of quality, appearance, and service of the System, and to that end shall conduct, as it deems advisable, inspections of the Restaurant, and evaluations of the products sold and services rendered therein.

## ARTICLE V
## DUTIES OF FRANCHISEE

Section 5.1 <u>Acknowledgement</u>. Franchisee understands and acknowledges that every detail of the Restaurant is important to Franchisee, Franchisor, and other franchisees in order to develop and maintain high operating standards, to increase the demand for the services and products sold by all franchisees, and to protect Franchisor's reputation and goodwill.

Section 5.2 <u>Opening</u>.   Franchisee shall construct, furnish, and open the Restaurant according to the provisions and schedule set forth in Attachment B hereto. Time is of the essence. Prior to opening for business, Franchisee shall comply with all pre-opening requirements set forth in this Agreement, Attachment B, the Manual, and/or elsewhere in writing by Franchisor.

Section 5.3 <u>Operating Partner</u>. If Franchisee is not an individual, Franchisee shall designate an individual to serve as the "Operating Partner" of the Restaurant.   The Operating Partner shall, at all times, meet the following qualifications:

(a)   The Operating Partner shall own at least fifty percent (50%) unencumbered equity ownership interest in Franchisee and at least fifty percent (50%) voting interest through any voting apparatus in Franchisee during the entire period he serves as Operating Partner.

(b)   The Operating Partner shall devote his full time and best efforts to the personal supervision and conduct of the Restaurant, shall execute this Agreement and shall be individually bound by all obligations of Franchisee hereunder.

(c)   The Operating Partner shall be a person acceptable to both Franchisee and Franchisor.

If, at any time or for any reason, the Operating Partner no longer satisfies each of the above qualifications, Franchisee shall promptly designate another Operating Partner subject to the same qualifications listed above. Any sale, transfer, assignment or other conveyance, no matter how effected and regardless of whether or not for consideration, of any portion of the Operating

-7-

Partner's ownership or voting interest in Franchisee, or any right, title or interest therein, including, but not limited to, the grant of an option or right to purchase (whether or not the exercise thereof is subject to conditions), which would reduce, or in the case of an option or right to purchase, if exercised would reduce, the Operating Partner's ownership or voting interest in Franchisee to less than fifty percent (50%) of the total, shall be deemed a transfer of a controlling interest and shall be subject to the terms and conditions of <u>Section 12.2(b)</u> hereof; and any failure to comply with the terms and conditions of <u>Section 12.2(b)</u> shall be deemed a default by Franchisee under <u>Article XIII</u> hereof.

**Section 5.4** <u>General Manager Employment and Ownership Program</u>. Franchisee acknowledges that the qualifications and experience of the general manager of Franchisee's Restaurant are critical to the successful operation of the Restaurant and thereby the Outback Steakhouse® System. Franchisee acknowledges and agrees that it is beneficial to Franchisee's Restaurant and the Outback Steakhouse® System that the compensation programs for all general managers of Outback Steakhouse® restaurants be identical in all material respects.

(a) Franchisee shall, at all times during the term hereof, employ one (1) full-time general manager of the Restaurant ("General Manager"), such individual to be subject to the reasonable approval of Franchisor. Franchisee shall, after obtaining Franchisor's approval of the General Manager, enter into an employment agreement with the General Manager, which employment agreement shall be subject to Franchisor's approval, which approval shall not be withheld provided the terms of the employment agreement are identical, in all material respects, to the employment terms given to general managers of Franchisor's company owned restaurants.

(b) Franchisee shall allow the General Manager to purchase a ten percent (10%) ownership interest in the Restaurant (as a shareholder or partner, as applicable) on terms and conditions identical, in all material respects, to those given to general managers of Franchisor's company owned restaurants. Franchisee shall obtain Franchisor's prior approval of the agreements relating to the General Manager's ownership interest in the Restaurant, which approval shall not be withheld provided the provisions of such agreements are identical, in all material respects, to the provisions of the agreements provided to general managers of Franchisor's company owned restaurants.

(c) Franchisee shall distribute to the General Manager ten percent (10%) of the Restaurant's cash flow on a monthly basis. In determining the cash flow of the Restaurant and

-8-

the amount thereof to be distributed to the General Manager, Franchisee shall not:   (i) deduct any management fees, corporate overhead allocations or similar charges, in excess of three percent (3%) of the Restaurant's gross sales;   or (ii) deduct any expenditure that is not directly related to, or does not directly benefit, the Restaurant franchised hereunder; or (iii) deduct any percentage rent for the Restaurant premises in excess of three percent (3%) of the Restaurant's gross sales.

**Section 5.5**  <u>Pre-Opening</u>.  In connection with the opening of the Restaurant, Franchisee shall conduct, at Franchisee's expense, such promotional and advertising activities as Franchisor may reasonably require.  Franchisee agrees that Franchisor, in its sole discretion, may require that the Restaurant be staffed, in whole or in part, by an opening crew composed of specially trained representatives of Franchisor, for a total period not to exceed twelve (12) days before or after the date of opening of the Restaurant.   Franchisee shall reimburse Franchisor for all reasonable expenses incurred in providing such opening crew for the Restaurant, including costs of transportation, lodging, meals, and wages.

**Section 5.6**  <u>Training</u>.  Franchisee acknowledges that it is important to the operation of the System and the Restaurant franchised hereunder that Franchisee and Franchisee's employees receive such training as Franchisor deems necessary, and Franchisee agrees as follows:

(a)  Prior to the opening of the Restaurant, Franchisee's Operating Partner and at least one (1) of Franchisee's managers shall attend and complete, to Franchisor's satisfaction, an initial training program conducted by Franchisor.   Franchisor shall provide, free of charge, instructors and training materials for the pre-opening initial training of two (2) representatives of Franchisee.  Any person subsequently employed by Franchisee in the position of manager and each subsequent Operating Partner, if any, shall attend and complete, to Franchisor's satisfaction, such initial training program as Franchisor may require; and Franchisee shall pay to Franchisor a reasonable training fee determined by Franchisor.

(b)  Franchisee shall cause its Operating Partner, managers and other employees to attend and complete, to Franchisor's satisfaction, such courses, seminars, and other training programs as Franchisor may require from time to time.  The Operating Partner and Franchisee's managers and other employees may also attend such optional courses, seminars, and training programs as Franchisor may offer from time to time.  Franchisee shall pay to

Franchisor a reasonable training fee determined by Franchisor for such additional required or optional training.

(c) Franchisee or its employees shall be responsible for any and all other expenses incurred by them in connection with any training programs hereunder, including, without limitation, the costs of transportation, lodging, meals, and wages.

**Section 5.7** <u>Exclusive Use</u>. Franchisee shall use the Restaurant premises solely for the operation of the Restaurant franchised hereunder; shall keep the Restaurant open and in normal operation for such hours and days as Franchisor may from time to time specify in the Manual or as Franchisor may otherwise approve in writing; and shall refrain from using or permitting the use of the premises for any other purpose or activity at any time without first obtaining the written consent of Franchisor.

**Section 5.8** <u>Staff</u>. Franchisee shall maintain a competent, trained staff, including at least two fully trained full-time managers (one of whom may be the Operating Partner), and shall ensure that its employees preserve good customer relations and comply with such dress code as Franchisor may prescribe.

**Section 5.9** <u>Health Standards</u>. Franchisee shall meet and maintain the highest health standards and ratings applicable to the operation of the Restaurant. Franchisee shall furnish to Franchisor, within twenty-four (24) hours after Franchisee's receipt thereof, a copy of any inspection report, warning, citation, certificate, and/or rating which indicates Franchisee's failure to meet or maintain the highest applicable health or safety standards in the operation of the Restaurant.

**Section 5.10** <u>Compliance with Standards</u>. Franchisee shall operate the Restaurant in strict conformity with such methods, standards, and specifications as Franchisor may from time to time prescribe in the Manual or otherwise in writing. Without limiting the foregoing, Franchisee shall:

(a) maintain in sufficient supply, and use and/or sell at all times, only such menu items, ingredients, products, materials, supplies, and paper goods as conform to Franchisor's standards and specifications, and shall not deviate therefrom by the use or offer of nonconforming items, unless approved by Franchisor in writing.

(b) sell or offer for sale only such menu items, products, and services as have been expressly approved for sale in writing by Franchisor; shall sell or offer for sale all types of menu items, products, and services specified by Franchisor; shall

-10-

refrain from any deviation from Franchisor's standards and specifications without Franchisor's prior written consent; and shall discontinue selling and offering for sale any menu items, products, or services which Franchisor may, in its discretion, disapprove in writing at any time. With respect to the offer and sale of all menu items, products, and services, Franchisee shall have sole discretion as to the prices to be charged to customers.

(c)   permit Franchisor or its agents, at any reasonable time, to remove samples of food or non-food items from Franchisee's inventory, or from the Restaurant, without payment therefor, in amounts reasonably necessary for testing by Franchisor or an independent laboratory to determine whether said samples meet Franchisor's then current standards and specifications.   In addition to any other remedies it may have under this Agreement, Franchisor may require Franchisee to bear the cost of such testing if the supplier of the item has not previously been approved by Franchisor or if the sample fails to conform with Franchisor's specifications.

(d)   purchase and install, at Franchisee's expense, all fixtures, furnishings, equipment, decor, and signs as Franchisor may reasonably direct from time to time in the Manual or otherwise in writing; and shall refrain from installing or permitting to be installed on or about the Restaurant premises, without Franchisor's prior written consent, any fixtures, f..rnishings, equipment, decor, signs, games, vending machines, or other items not previously approved as meeting Franchisor's standards and specifications.

(e)   sell or offer for sale products and services only at the Restaurant and shall refrain from off-premises sales or catering unless expressly authorized by Franchisor in writing.

**Section 5.11   Suppliers.**   Franchisee shall purchase all food items, ingredients, supplies, materials, and other products used or offered for sale at the Restaurant solely from suppliers (including manufacturers, distributors and other sources) who demonstrate, to the continuing reasonable satisfaction of Franchisor, the ability to meet Franchisor's then current standards and specifications for such items; who possess adequate quality controls and capacity to supply Franchisee's needs promptly and reliably; and who have been approved in writing by Franchisor prior to any purchases by Franchisee from any such supplier; and who have not thereafter been disapproved. If Franchisee desires to purchase any products from an unapproved supplier, Franchisee shall submit to Franchisor a written request for such approval, or shall request the supplier itself to do so. Franchisee shall not purchase from any supplier until and unless such supplier has been approved in

-11-

writing by Franchisor.  Franchisor shall have the right to require that its representatives be permitted to inspect the supplier's facilities, and that samples from the supplier be delivered either to Franchisor or to an independent laboratory designated by Franchisor for testing.  A charge not to exceed the reasonable cost of the inspection and the actual cost of the test shall be paid by Franchisee or the supplier.  Franchisor reserves the right, at its option, to reinspect from time to time the facilities and products of any such approved supplier and to revoke its approval upon the supplier's failure to continue to meet any of Franchisor's then current criteria.  Nothing in the foregoing shall be construed to require Franchisor to approve any particular supplier.

Section 5.12  <u>Secret Recipes</u>.  Franchisee acknowledges and agrees that Franchisor may develop for use in the System certain products which are highly confidential secret recipes and which are trade secrets of Franchisor.  Due to the importance of quality and uniformity of production and the significance of such products in the System, it is to the mutual benefit of the parties that Franchisor closely control the production and distribution of such products.  Accordingly, Franchisee agrees that in the event such products become a part of the System, Franchisee shall use only Franchisor's secret recipe products and, if required by Franchisor, shall purchase from Franchisor or from a source designated by Franchisor all of Franchisee's requirements of such products.

Section 5.13  <u>Advertising Materials</u>.  Franchisee shall require all advertising and promotional materials, signs, decorations, paper goods (including disposable food containers, napkins, menus, and all forms and stationery used in the Restaurant), and other items which may be designated by Franchisor, to bear the Proprietary Marks in the form, color, location, and manner prescribed by Franchisor.

Section 5.14  <u>Maintenance of Premises</u>.  Franchisee shall maintain the Restaurant in a high degree of sanitation, repair, and condition, and shall make such additions, alterations, repairs, and replacements thereto as may be required for that purpose, including, without limitation, periodic repainting or replacement of obsolete signs, furnishings, equipment, and decor as Franchisor may reasonably direct.

Section 5.15  <u>Required Improvements</u>.  Upon Franchisor's request, Franchisee shall make all improvements and alterations that Franchisor may reasonably determine to be necessary for the Restaurant to conform with the System image as it may be prescribed by Franchisor at that time.  Franchisee shall undertake and

complete such improvements and alterations within reasonable times specified by Franchisor.

Section 5.16 <u>Right of Access</u>.   Franchisee grants Franchisor and its agents the right to enter upon the Restaurant premises at any time for the purpose of conducting inspections; shall cooperate with Franchisor's representatives in such inspections by rendering such assistance as they may reasonably request; and, upon notice from Franchisor or its agents and without limiting Franchisor's other rights under this Agreement, shall take such steps as may be necessary to correct immediately any deficiencies detected during any such inspection.   Should Franchisee, for any reason, fail to correct such deficiencies within a reasonable time as determined by Franchisor, Franchisor shall have the right and authority (without, however, any obligation to do so), to correct such deficiencies and to charge Franchisee a reasonable fee for Franchisor's expenses in so acting, payable by Franchisee immediately upon demand.

Section 5.17 <u>Taxes</u>.  Franchisee shall promptly pay when due all taxes levied or assessed, including, without limitation, payroll, unemployment and sales taxes, and all accounts and other indebtedness of every kind, incurred by Franchisee in the conduct of the Restaurant.   In the event of any bona fide dispute as to Franchisee's liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law; however, in no event shall Franchisee permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor, to occur against the premises of the Restaurant or any assets owned or leased by Franchisee.

Section 5.18 <u>Compliance with Law</u>.   Franchisee shall comply with all federal, state, and local laws, rules, and regulations, and shall timely obtain any and all permits, certificates, or licenses necessary for the full and proper conduct of the Restaurant, including, without limitation, licenses to do business, fictitious name registrations, sales tax permits, fire clearances and liquor licenses.

Section 5.19 <u>Required Notice to Franchisor</u>.  Franchisee shall notify Franchisor in writing within five (5) days of the commencement of any action, suit, or proceeding, or of the issuance of any order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality, which may adversely affect the operation or financial condition of the Restaurant.

Section 5.20  <u>Liens and Encumbrances</u>.  Franchisee shall grant no lien, encumbrance or security interest in the Restaurant or in any of its assets unless the secured party agrees that in the event of any default by Franchisee under any documents related to the lien, encumbrance or security interest, Franchisor shall have the right and option, but not the obligation, to be substituted as obligor to the secured party and to cure any default of Franchisee.

Section 5.21  <u>Additional Requirements</u>.  Franchisee shall comply with all other covenants, obligations and requirements set forth in this Agreement.

### ARTICLE VI
### ADDITIONAL COVENANTS OF FRANCHISEE

Section 6.1  <u>Operating Partner</u>.  Franchisee covenants that during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee and the Operating Partner shall devote their full time, energy, and best efforts to the management and operation of the Restaurant.

Section 6.2  <u>Restriction on Debt</u>.  Franchisee covenants that with respect to all funds received by Franchisee from all persons owning an interest in Franchisee, such persons did not borrow such funds or otherwise incur any debt to obtain such funds, except as specifically permitted in the following sentence. Franchisee covenants that during the term of this Agreement Franchisee and each person owning an interest in Franchisee shall not, without the prior written consent of Franchisor, which consent may be granted or denied in Franchisor's sole discretion, directly or indirectly, borrow any money or incur any debt or liability (other than lease obligations for the Restaurant land and building and trade payables in the ordinary course of business) to establish, operate or maintain the Restaurant, except that Franchisee shall be allowed to borrow, in connection with the opening of the Restaurant, an amount equal to the lesser of: (i) Two Hundred Fifty Thousand Dollars ($250,000), or (ii) forty percent (40%) of the cost of the leasehold improvements, furniture, fixtures and kitchen equipment required for the opening of the Restaurant; provided, however, such borrowing shall have a repayment term of five (5) years from the date of the opening of the Restaurant.  Franchisee shall not extend, renew, refinance, modify or amend any debt or liability permitted by this Section 6.2 except with the prior written consent of Franchisor, which consent may be granted or denied in Franchisor's sole discretion; provided, however, such consent shall not be required if the debt or liability as extended, renewed, refinanced, modified or amended would be permitted under this Section 6.2.

Section 6.3 <u>Confidential     Information     and     Non-Competition</u>.

(a)   Franchisee shall not, during the term of this Agreement or at any time thereafter, communicate, publish, disclose, divulge, use, or authorize anyone else to communicate, publish, disclose, divulge or use, for the benefit of itself (other than in connection with the operation of the Restaurant during the term hereof) or any other person, partnership, association, corporation or other entity, any secret or confidential information relating to the business, trade practices, trade secrets, methods of operation, sales, promotion, marketing, technology, know-how or recipes of the Franchisor, the System or operation of the Restaurant which may be communicated to Franchisee or of which Franchisee may be apprised by virtue of Franchisee's operation under the terms of this Agreement.  Franchisee shall divulge such confidential information only to such of its employees as must have access to it in order to operate the Restaurant.  Any and all information, knowledge, know-how, and techniques which Franchisor designates as confidential shall be deemed confidential for purposes of this Agreement, except information which Franchisee can demonstrate came to its attention prior to disclosure thereof by Franchisor; or which, at or after the time of disclosure by Franchisor to Franchisee, lawfully had become or later becomes a part of the public domain, through lawful publication or communication by others.

(b)   Franchisee   and   the   Operating   Partner specifically acknowledge that, pursuant to this Agreement, Franchisee will receive valuable specialized training and confidential information, including, without limitation, information regarding the operational, sales, promotional and marketing methods and techniques of Franchisor and the System. Franchisee and the Operating Partner covenant that during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee and Operating Partner shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation or entity:

(i)   Own, maintain, operate, engage in, or have any interest in, any other food service business of any kind whatsoever regardless of where such other business is located, nor act as an officer, director, employee, partner, independent contractor, consultant, principal, agent, or proprietor for any such business, nor lend any assistance (financial, managerial or otherwise) to any such business, or

-15-

(ii) Divert or attempt to divert any business or customer of the Restaurant to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's Proprietary Marks and the System, or

(iii) Employ or seek to employ any person who is at that time employed by Franchisor, any affiliate of Franchisor or by any other franchisee or developer of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment.

Section 6.4 <u>Competition During Term of Agreement</u>. Franchisee and the Operating Partner each covenant that, except as otherwise approved in writing by Franchisor, Franchisee and the Operating Partner shall not, during the term of this Agreement, individually, or jointly with others, either directly or indirectly, for itself or himself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation or other entity, own, maintain, operate, engage in, or have any interest in any other food service business of any kind whatsoever regardless of where such other business is located; and Franchisee and/or the Operating Partner shall not directly or indirectly act as an officer, director, employee, partner, independent contractor, consultant, principal, agent or proprietor, or in any other capacity for, nor lend any assistance (financial, managerial or otherwise) or cooperation to any such restaurant business.

Section 6.5 <u>Competition After Termination of Agreement</u>. Franchisee and the Operating Partner each covenant that, except as otherwise approved in writing by Franchisor, Franchisee and the Operating Partner shall not, for a continuous uninterrupted period of two (2) years commencing upon the expiration or termination of this Agreement, regardless of the cause for termination, individually, or jointly with others, either directly or indirectly, for itself or himself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation or other entity, own, maintain, operate, engage in, or have any interest in any food service business operating within the casual dining segment of the restaurant industry, which business is, or is intended to be, located within a thirty (30) mile radius of any Outback Steakhouse® restaurant or other restaurant, however named, utilizing the System, as same may be modified, regardless of whether such restaurant is owned by Franchisor, an affiliate of Franchisor or other franchisees or licensees; and Franchisee and/or the Operating Partner shall not directly or indirectly act as an officer, director, employee, partner, independent contractor, consultant, principal, agent or proprietor, or in any other capacity for, nor lend any assistance (financial, managerial or

-16-

otherwise) or cooperation to any such business. The parties
acknowledge and agree that the "casual dining segment" of the
restaurant industry means restaurants which offer full table
service in a casual and informal dining atmosphere. The parties
further acknowledge and agree that all restaurants in the casual
dining segment of the restaurant industry compete with all other
restaurants in the casual dining segment of the restaurant
industry, regardless of the specific type of food served at any
such restaurants.

Section 6.6  Independent Covenants.  The parties agree
that each of the covenants contained in this Article VI shall be
construed as independent of any other covenant or provision of this
Agreement. If all or any portion of a covenant in this Article VI
is held unreasonable or unenforceable by a court or agency having
valid jurisdiction in an unappealed final decision to which
Franchisor is a party, Franchisee and Operating Partner each
expressly agree to be bound by any lesser covenant subsumed within
the terms of such covenant that imposes the maximum duty permitted
by law, as if the resulting covenant were separately stated in and
made a part of this Article VI.

Section 6.7  Reduction by Franchisor.  Franchisee and
Operating Partner understand and acknowledge that Franchisor shall
have the right, in its sole discretion, to reduce the scope of any
covenant set forth in this Article VI, or any portion thereof,
without Franchisee's or Operating Partner's consent, effective
immediately upon receipt by Franchisee of written notice thereof;
and Franchisee and Operating Partner each agree that it shall
comply forthwith with any covenant as so modified, which shall be
fully enforceable.

Section 6.8  Claims Not a Defense.  Franchisee and
Operating Partner expressly agree that the existence of any claims
it may have against Franchisor, whether or not arising from this
Agreement, shall not constitute a defense to the enforcement by
Franchisor of the covenants in this Article VI. Franchisee and
Operating Partner each agree to pay all costs and expenses
(including reasonable attorneys' fees) incurred by Franchisor in
connection with the enforcement of this Article VI.

Section 6.9  Reasonableness of Restrictions; Reformation;
Enforcement.  Franchisee and Operating Partner each recognize and
acknowledge that the geographical and time limitations contained in
this Article VI are reasonable and properly required for the
adequate protection of the Franchisor and the System. Franchisee
and Operating Partner each acknowledge that Franchisor is the owner
of the System and will provide to Franchisee and Operating Partner
training in and confidential information concerning the System in

-17-

reliance on the covenants contained in <u>Article VI</u> hereof.  It is agreed by Franchisee and Operating Partner that if any portion of the restrictions contained in <u>Article VI</u> are held to be unreasonable, arbitrary, or against public policy, then the restrictions shall be considered divisible, both as to the time and to the geographical area, with each month of the specified period being deemed a separate period of time and each radius mile of the restricted territory being deemed a separate geographical area, so that the lesser period of time or geographical area shall remain effective so long as the same is not unreasonable, arbitrary, or against public policy.  The parties hereto agree that in the event any court of competent jurisdiction determines the specified period or the specified geographical area of the restricted territory to be unreasonable, arbitrary, or against public policy, a lesser time period or geographical area which is determined to be reasonable, nonarbitrary, and not against public policy may be enforced against Franchisee and Operating Partner.  If Franchisee or Operating Partner shall violate any of the covenants contained herein and if any court action is instituted by the Franchisor to prevent or enjoin such violation, then the period of time during which the covenants of <u>Article VI</u> shall apply, as provided in this Agreement, shall be lengthened by a period of time equal to the period between the date of the breach of the terms or covenants contained in this Agreement and the date on which the decree of the court disposing of the issues upon the merits shall become final and not subject to further appeal.

Franchisee and Operating Partner each agree that the remedy at law for any breach of the covenants contained in <u>Article VI</u> hereof will be inadequate and would be difficult to ascertain and therefore, in the event of the breach or threatened breach of any such covenants, the Franchisor, in addition to any other remedy, shall have the right to enjoin Franchisee and/or Operating Partner from any threatened or actual activities in violation thereof; and Franchisee and Operating Partner hereby consent and agree that temporary and permanent injunctive relief may be granted in any proceedings which might be brought to enforce any such covenants without the necessity of proof of actual damages.

With respect to the covenants and agreements of Franchisee and Operating Partner set forth in <u>Article VI</u> hereof, the parties agree that a violation of such covenants and agreements will cause irreparable injury to the Franchisor for which the Franchisor will not have an adequate remedy at law, and that the Franchisor shall be entitled, in addition to any other rights and remedies it may have, at law or in equity, to obtain an injunction to restrain Franchisee and/or Operating Partner from violating, or continuing to violate, such covenants and agreements.  In the event

-18-

the Franchisor does apply for such an injunction, Franchisee and Operating Partner shall not raise as a defense thereto that the Franchisor has an adequate remedy at law.

Section 6.10  Franchisee's Personnel.  At Franchisor's request, Franchisee shall require and obtain execution of covenants similar to those set forth in this Article VI (including covenants applicable upon the termination of a person's relationship with Franchisee) from any or all of the following persons:  (1) all managers of Franchisee and any other personnel employed by Franchisee who have received or will receive training from Franchisor;  (2)  all officers, directors, and holders of a beneficial interest of one percent (1%) or more of the securities of Franchisee, and of any entity directly or indirectly controlling Franchisee, if Franchisee is a corporation;  (3) the general partners and any limited partners (including any corporation, and the officers, directors, and holders of a beneficial interest of one percent (1%) or more of the securities of any corporation which controls, directly or indirectly any general or limited partner), if Franchisee is a partnership.  Every covenant required by this Section 6.10 shall be in a form satisfactory to Franchisor, including, without limitation, specific identification of Franchisor as a third party beneficiary of such covenants with the independent right to enforce them.  Failure by Franchisee to obtain execution of a covenant required by this Section 6.10 shall constitute a default under Section 13.2 hereof.

### ARTICLE VII
### PROPRIETARY MARKS

Section 7.1  Representation.  Franchisor represents with respect to the Proprietary Marks that:

(a)  Franchisor is the owner of all right, title, and interest in and to the Proprietary Marks.

(b)  Franchisor has taken and will take all steps reasonably necessary to preserve and protect the ownership and validity of the Proprietary Marks.

(c)  Franchisor will permit Franchisee and other franchisees to use the Proprietary Marks only in accordance with the System and the standards and specifications attendant thereto which underlie the goodwill associated with and symbolized by the Proprietary Marks.

-19-

**Section 7.2** <u>Restriction on Use</u>.   With respect to Franchisee's licensed use of the Proprietary Marks pursuant to this Agreement, Franchisee agrees that:

(a)   Franchisee shall use only the Proprietary Marks designated by Franchisor, and shall use them only in the manner approved and permitted by Franchisor.

(b)   Franchisee shall use the Proprietary Marks only for the operation of the Restaurant and only at the location authorized hereunder, or in advertising for the Restaurant.

(c)   Unless otherwise authorized or required by Franchisor, Franchisee shall operate and advertise the Restaurant only under the name "Outback Steakhouse®" without prefix or suffix.

(d)   During the term of this Agreement and any renewal hereof, Franchisee shall identify itself as the owner of the Restaurant in conjunction with any use of the Proprietary Marks, including, but not limited tc, uses cn invoices, order forms, receipts, and contracts, as well as the display of a notice in such content and form and at such conspicuous locations on the premises of the Restaurant as Franchisor may designate in writing.

(e)   Franchisee's right to use the Proprietary Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of Franchisor's rights.

(f)   Franchisee shall not use the Proprietary Marks to incur any obligation or indebtedness on behalf of Franchisor.

(g)   Franchisee shall not use the Proprietary Marks as part of its corporate or other legal name.

(h)   Franchisee shall comply with Franchisor's instructions in filing and maintaining the requisite trade name or fictitious name registrations, and shall execute any documents deemed necessary by Franchisor or its counsel to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability.

(i)   In the event that litigation involving the Proprietary Marks is instituted or threatened against Franchisee, Franchisee shall promptly notify Franchisor and shall cooperate fully in defending or settling such litigation.

**Section 7.3**  <u>Ownership of Marks</u>.  Franchisee expressly understands and acknowledges that:

(a)  Franchisor is the owner of all right, title and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by the Proprietary Marks.

(b)  The Proprietary Marks are valid and serve to identify the System and those who are authorized to operate under the System.

(c)  Franchisee shall not directly or indirectly contest the validity of Franchisor's ownership of the Proprietary Marks.

(d)  Franchisee's use of the Proprietary Marks pursuant to this Agreement does not give Franchisee any ownership interest or other interest in or to the Proprietary Marks, except the license granted by this Agreement.

(e)  Any and all goodwill arising from Franchisee's use of the Proprietary Marks in its franchised operation under the System shall inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement and the license herein granted, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System or the Proprietary Marks.

(f)  The right and license of the Proprietary Marks granted hereunder to Franchisee is nonexclusive, and Franchisor has and retains the rights, among others:

(i)  To use the Proprietary Marks itself in connection with selling products and services;

(ii)  To grant other licenses for the Proprietary Marks, in addition to those licenses already granted to existing franchisees, if any;

(iii)  To develop and establish other systems using the same or similar Proprietary Marks, or any other proprietary marks, and to grant licenses or franchises thereto without providing any rights therein to Franchisee.

(g)  Franchisor reserves the right to substitute different Proprietary Marks for use in identifying the System and the businesses operating thereunder if Franchisor's currently owned Proprietary Marks no longer can be used, or if Franchisor, in its

-21-

sole  discretion,  determines  that  substitution  of  different
Proprietary Marks will be beneficial to the System.

### ARTICLE VIII
#### CONFIDENTIAL OPERATIONS MANUAL

Section 8.1  Compliance with Manual.   To protect the
reputation and goodwill of Franchisor and to maintain high
standards of operation under Franchisor's Proprietary Marks,
Franchisee shall conduct its business in strict accordance with the
Manual.   Franchisee acknowledges having received one copy of the
Manual on loan from Franchisor for the term of this Agreement.

Section 8.2  Confidentiality.   Franchisee shall at all
times treat the Manual, any other manuals created for or approved
for use in the operation of the Restaurant, and the information
contained therein, as confidential and subject to the covenants of
Article VI hereof, and shall use all reasonable efforts to maintain
such information as secret and confidential.  Franchisee shall not
at any time copy, duplicate, record, or otherwise reproduce the
foregoing materials, in whole or in part, nor otherwise make the
same available to any unauthorized person.

Section 8.3  Ownership.   The Manual shall at all times
remain the sole property of Franchisor and shall at all times be
kept in a secure place on the Restaurant premises.

Section 8.4  Revisions.  Franchisor may from time to time
revise the contents of the Manual, and Franchisee expressly agrees
to comply with each new or changed standard.

Section 8.5  Maintenance; Location.  Franchisee shall at
all times maintain the Manual at the Restaurant and insure that the
Manual is kept current and up to date; and, in the event of any
dispute as to the contents of the Manual, the terms of the master
copy of the Manual maintained by Franchisor at Franchisor's
principal office shall be controlling.

### ARTICLE IX
#### ACCOUNTING AND RECORDS

Section 9.1  Maintenance of Records.   Franchisee shall
maintain during the term of this Agreement, and shall preserve for
at least five (5) years from the dates of their preparation, full,
complete, and accurate books, records, and accounts prepared in
accordance with generally accepted accounting principles and in the

-22-

form and manner prescribed by Franchisor from time to time in the Manual or otherwise in writing.

Section 9.2   Monthly Reports.  Franchisee shall submit to Franchisor no later than the tenth (10th) day of each month during the term of this Agreement after the opening of the Restaurant, a remittance report in the form prescribed by Franchisor accurately reflecting all gross sales during the preceding calendar month and such other data or information as Franchisor may require.    In addition, and without limiting the foregoing, Franchisee shall submit a monthly and fiscal year-to-date profit and loss statement (which may be unaudited) for the Franchisee and the Restaurant, and shall submit copies of all state sales tax returns for the Restaurant.

Section 9.3   Quarterly Reports.  Franchisee shall submit to Franchisor, in the form prescribed by Franchisor, a quarterly balance sheet (which may be unaudited) within fifteen (15) days after the end of each quarter of the fiscal year of the Franchisee. Each such statement shall be signed by Franchisee or by Franchisee's treasurer or chief financial officer attesting that it is true and correct.

Section 9.4   Annual Reports.  Franchisee shall submit to Franchisor complete audited annual financial statements of Franchisee prepared by an independent certified public accountant satisfactory to Franchisor, within ninety (90) days after the end of each fiscal year of the Franchisee, showing the results of operations of the Franchisee and the Restaurant during said fiscal year.    Such statements shall include, at a minimum, a balance sheet, profit and loss statement and statement of sources and uses of funds.

Section 9.5   Additional Reports.  Franchisee shall submit to Franchisor, for review or auditing, such other forms, reports, records, information, and data as Franchisor may reasonably designate, in the form and at the times and places reasonably required by Franchisor, upon request and as specified from time to time in the Manual or otherwise in writing.

Section 9.6   Inspection Rights.    Franchisor or its designated agents shall have the right at all reasonable times to examine and copy, at Franchisor's expense, the books, records, and tax returns of Franchisee.    Franchisor shall also have the right, at any time, to have an independent audit made of the books of Franchisee.  If an inspection should reveal that any payments have been understated in any report to Franchisor, then Franchisee shall immediately pay to Franchisor the amount understated upon demand, in addition to interest from the date such amount was due until

-23-

paid, at the rate of eighteen percent (18%) per annum, or the maximum rate permitted by law, whichever is less.  If an inspection discloses an understatement in any report of two percent (2%) or more, Franchisee shall, in addition, reimburse Franchisor for any and all costs and expenses connected with the inspection (including, without limitation, travel, lodging and wages expenses and reasonable accounting and legal costs).  The foregoing remedies shall be in addition to any other remedies Franchisor may have.

Section 9.7  Expenses.  All reports, forms and other information required by this Article IX shall be prepared at Franchisee's expense and shall be submitted to Franchisor at the address indicated in Section 17.1 hereof.

## ARTICLE X
### ADVERTISING

Section 10.1  Acknowledgment.  The parties acknowledge the value of advertising, and the importance of the standardization of advertising programs to the furtherance of the goodwill and public image of the System.

Section 10.2  Required Local Advertising.  Until such time as Franchisor establishes a national advertising fund or a regional advertising cooperative for Franchisee's region, Franchisee shall expend each month during the initial term of this Agreement an amount not less than three percent (3%) of the Restaurant's gross sales for the preceding month on appropriate local advertising and promotions.  All local advertising and promotion by Franchisee in any medium shall be conducted in a dignified manner and shall conform to the standards and requirements of Franchisor as set forth in the Manual or otherwise. Franchisee shall obtain Franchisor's prior approval of all advertising and promotional plans and materials that Franchisee desires to use and that have not been prepared by Franchisor or previously approved by Franchisor within one (1) year.  Franchisee shall submit such unapproved plans and materials to Franchisor and Franchisor shall approve or disapprove such plans and materials within ten (10) days from the date of receipt thereof.  Franchisee shall not use any plans or materials until they have been approved by Franchisor and shall promptly discontinue use of any advertising or promotional plans or materials upon notice from Franchisor.

Section 10.3  Contribution to Fund or Cooperative.  Upon written notice from Franchisor, in lieu of the local advertising required by Section 10.2 hereof, each month during the initial term of this Agreement Franchisee shall contribute to a fund or cooperative established by Franchisor, an amount equal to three and

-24-

one-half percent (3.5%) of the Restaurant's gross sales for the preceding month for advertising and promotional purposes. Franchisee shall allocate its contributions as Franchisor may designate between the national advertising fund (hereinafter "Fund") described in Section 10.4 hereof, and the regional advertising cooperative association (hereinafter "Cooperative") for Franchisee's region described in Section 10.5 hereof. Except as provided in Section 10.6, Franchisee shall not be obligated to contribute more than three and one-half percent (3.5%) of Franchisee's monthly gross sales for advertising and promotional purposes; however, Franchisee is encouraged and will be permitted to conduct additional local advertising, at Franchisee's expense, subject to the terms and conditions contained in Section 10.2 hereof.

Section 10.4   Advertising Fund.   Franchisee agrees to make contributions to the Fund as required under Section 10.3 hereof, and further agrees that the Fund shall be maintained and administered by Franchisor or its designee, as follows:

(a)   Franchisor shall oversee all advertising and promotional programs with sole discretion to approve or disapprove the creative concepts, materials and media used in such programs, and the placement and allocation thereof. Franchisee agrees and acknowledges that the Fund is intended to maximize general public recognition and acceptance of the Proprietary Marks for the benefit of the System, and that Franchisor and its designee undertake no obligation in administering the Fund to make expenditures for Franchisee which are equivalent or proportionate to its contribution, or to ensure that any particular franchisee benefits directly or pro rata from the advertising or promotion conducted under the Fund.

(b)   The Fund, all contributions thereto, and any earnings thereon shall be used exclusively to meet the costs of advertising and/or promotional activities (including, without limitation, the cost of conducting television, radio, magazine, and newspaper advertising campaigns; direct mail and outdoor billboard advertising; marketing surveys and other public relations activities; employing advertising agencies to assist therein; and providing promotional brochures and other marketing materials to the restaurants operated under the System).

(c)   Franchisee shall contribute to the Fund by separate check made payable to the Fund. All sums paid by Franchisee to the Fund shall be maintained in an account separate from the other monies of Franchisor and shall not be used to defray any of Franchisor's expenses, except for such reasonable administrative costs and overhead, if any, as Franchisor may incur

in administration of the Fund.  The Fund and its earnings shall not otherwise inure to the benefit of Franchisor.  Franchisor or its designee shall maintain separate bookkeeping accounts for the Fund.

(d)  It is anticipated that all contributions to and earnings of the Fund shall be expended for advertising and/or promotional purposes during the taxable year within which the contributions and earnings are received.  If, however, excess amounts remain in the Fund at the end of such taxable year, all expenditures in the following taxable year(s) shall be made first out of accumulated earnings from previous years, next out of earnings in the current year, and finally from contributions.

(e)  The Fund is not and shall not be an asset of Franchisor or its designee.  A statement of the operations of the Fund as shown on the books of Franchisor or its designee shall be prepared annually by an independent certified public accountant selected by Franchisor and shall be made available to Franchisee.

(f)  Franchisor maintains the right to terminate the Fund at any time.  However, prior to termination, all monies in the Fund shall be expended for advertising and/or promotional purposes.

(g)  Franchisor, in its sole discretion, may grant to any franchisee an exemption for any length of time from the requirement of contribution to the Fund, upon written request of such franchisee stating reasons supporting such exemption.  If such an exemption is granted, such franchisee shall make the monthly local advertising expenditures required by and in accordance with Section 10.2 hereof.  Franchisor's decision concerning such request for exemption shall be final.  As a condition of granting such exemption, Franchisor may require a larger local advertising expenditure than that specified in Section 10.2.

Section 10.5  Regional   Advertising   Cooperative.  Franchisee agrees that Franchisor shall have the right, in its discretion, to designate any geographical area as a region for purposes of establishing a Cooperative.  If a Cooperative has been established for Franchisee's region at the time Franchisee commences business hereunder, Franchisee shall immediately become a member of such Cooperative.  If a Cooperative for Franchisee's region is established at any later time during the term of this Agreement, Franchisee shall become a member of such Cooperative no later than thirty (30) days after the date on which the Cooperative commences operation as provided below:

(a)  Each Cooperative shall be organized and governed in a form and manner, and shall commence operation on a date, approved in advance by Franchisor in writing.

-26-

(b)    Each Cooperative shall be organized for the exclusive purposes of administering regional advertising programs and developing, subject to Franchisor's approval, standardized promotional materials for use by the members in local advertising.

(c)    Each Cooperative shall be Franchisor's designee for maintaining and administering advertising and promotional programs in each region, and all contributions to and expenditures of each Cooperative shall be subject to provisions applicable to the Fund set forth in Section 10.4 hereof.

(d)    No    advertising   or   promotional   plans   or materials may be used by a Cooperative or furnished to its members without the prior approval of Franchisor.    All such plans and materials shall be submitted to Franchisor in accordance with the procedure set forth in Section 10.2 hereof.

(e)    Each member franchisee shall submit to the Cooperative, no later than the tenth (10th) day of each month, for the preceding calendar month, its contribution as provided in Section 10.3 hereof, together with such other statements or reports as may be required by Franchisor or by the Cooperative with Franchisor's prior written approval.

(f)    Franchisor, in its sole discretion, may grant to any franchisee an exemption for any length of time from the requirement of membership in a Cooperative, upon written request of such franchisee stating reasons supporting such exemption.    If such an exemption is granted, such franchisee shall make the monthly local advertising expenditure required by and in accordance with Section 10.2 hereof.   Franchisor's decision concerning such request for exemption shall be final.    As a condition of granting such exemption, Franchisor may require a larger local advertising expenditure than that specified in Section 10.2.

Section 10.6    Marketing Administration Fee.   In addition to the advertising and promotion expenditures and/or contributions required by Sections 10.2 and 10.3 hereof, Franchisee shall, each month during the initial term of this Agreement, pay to Franchisor an amount equal to one-half percent (.5%) of the Restaurant's gross sales for the preceding month as a marketing administration fee. The marketing administration fee shall be the exclusive property of Franchisor and shall be used by Franchisor for the maintenance, administration, direction and preparation of advertising and promotional   activities.     Franchisor   shall   not   be   required   to separately account to Franchisee for the marketing administration fee or the expenditures therefrom.

-27-

Section 10.7  Sale Price of Products.  Franchisee shall have the right to sell its products and offer services at any prices Franchisee may determine, and shall in no way be bound by any price which may be recommended or suggested by Franchisor.

## ARTICLE XI
## INSURANCE

Section 11.1  Requirement.  Franchisee shall procure, prior to the commencement of any operations under this Agreement or Attachment B hereto, and shall maintain in full force and effect at all times during the term of this Agreement, at Franchisee's expense, an insurance policy or policies protecting Franchisee and Franchisor, and their respective officers, directors, partners, and employees, against any demand or claim with respect to personal injury, death, or property damage, or any loss, liability, or expense whatsoever arising or occurring upon or in connection with the Restaurant.

Section 11.2  Insurors' Required Policies.  Such policy or policies shall be in form satisfactory to Franchisor, and shall be written by a responsible carrier or carriers acceptable to Franchisor who are duly licensed by the appropriate state authorities and have a Best Guide rating of not less than A.  Such policy or policies shall include, at a minimum (except as additional coverages and higher policy limits may reasonably be specified by Franchisor from time to time), the following:

(a)  Comprehensive general liability insurance, equivalent to ISO 86 form in the amount of One Million Dollars ($1,000,000) per occurrence combined single limit for bodily injury and property damage, Three Hundred Thousand Dollars ($300,000) fire damage legal liability and Five Thousand Dollars ($5,000) medical payments and One Million Dollars ($1,000,000) annual aggregate, annual aggregate to apply per Restaurant.

(b)  Liquor liability insurance in the amount of One Million Dollars ($1,000,000) each common cause and One Million Dollars ($1,000,000) annual aggregate, annual aggregate to apply per Restaurant.

(c)  Umbrella liability insurance, following form, in the amount of One Million Dollars ($1,000,000) per occurrence, One Million Dollars ($1,000,000) annual aggregate, annual aggregate to apply per Restaurant.

-28-

(d) Worker's compensation insurance as may be required by statute or rule of the state or locality in which the Restaurant is located, and employer's liability insurance with limits of Five Hundred Thousand Dollars ($500,000) bodily injury by accident each accident, Five Hundred Thousand Dollars ($500,000) bodily injury by disease policy limit; Five Hundred Thousand Dollars ($500,000) bodily injury by disease each employee.

(e) Special form coverage (including flood and earthquake if applicable) for the full cost of replacement of the Restaurant premises and all other property in which Franchisee may have an interest with no coinsurance clause and a replacement cost clause attached.

(f) Business income insurance that specifically provides for payment to Franchisor of the monthly royalty fee required by Section 3.2 hereof and the monthly marketing administration fee required by Section 10.6 hereof equal to the average monthly fees paid during the previous twelve months or such period as the Restaurant has been open for business if less than twelve months.

Section 11.3  <u>Construction Insurance</u>. In connection with any construction, renovation, refurbishment, or remodeling of the Restaurant, Franchisee shall maintain Builder's Risk All Risk insurance covering the completed value of the construction and commercial general liability insurance in the amount of One Million Dollars ($1,000,000) per occurrence bodily injury and property damage combined single limit, Two Million Dollars ($2,000,000) annual aggregate and performance and completion bonds in form and amount acceptable to Franchisor.

Section 11.4  <u>Effect    of    Franchisor's    Insurance</u>. Franchisee's obligation to obtain and maintain the foregoing policy or policies in the amounts specified shall not be limited in any way by reason of any insurance which may be maintained by Franchisor, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions set forth in <u>Article XV</u> of this Agreement.

Section 11.5  <u>Franchisor as Named Insured</u>. Franchisor shall be named as an additional insured on all liability and property damage insurance policies and Franchisor shall be named as a loss payee with respect to Franchisor's interest in fees under business income insurance policies and Franchisor's interest, if any, in real and/or personal property under liability and property damage insurance policies. All insurance policies shall contain a provision that Franchisor, although named as an insured and/or loss payee, shall nevertheless be entitled to recover under said

-29-

policies on any loss occasioned to Franchisor or its servants, agents or employees by reason of the negligence of Franchisee or its servants, agents or employees.

Section 11.6  <u>Evidence of Insurance</u>.  At least thirty (30) days prior to the time any insurance is first required to be carried by Franchisee, and thereafter at least thirty (30) days prior to the expiration of any such policy, Franchisee shall deliver to Franchisor Certificates of Insurance evidencing the proper coverage with limits not less than those required hereunder. Such Certificates, with the exception of Workers' Compensation, shall name Franchisor, and each of its partners, subsidiaries, affiliates, directors, agents and employees as additional insureds, and shall expressly provide that any interest of same therein shall not be affected by any breach by Franchisee of any policy provisions for which such Certificates evidence coverage. Further, all Certificates shall expressly provide that no less than thirty (30) days' prior written notice shall be given Franchisor in the event of material alteration to or cancellation of the coverages evidenced by such Certificates.

Section 11.7  <u>Right to Cure</u>.  Should Franchisee, for any reason, fail to procure or maintain the insurance required by this Agreement, as such requirements may be revised from time to time by Franchisor in the Manual or otherwise in writing, Franchisor shall have the right and authority (without, however, any obligation to do so) immediately to procure such insurance and to charge same to Franchisee, which charges, together with a reasonable fee for Franchisor's expenses in so acting, shall be payable by Franchisee immediately upon notice.   The foregoing remedies shall be in addition to any other remedies Franchisor may have.

**ARTICLE XII**
**TRANSFER OF INTEREST**

Section 12.1  <u>Transfer by Franchisor</u>.  Franchisor shall have the right to transfer or assign this Agreement and all or any part of its rights or obligations herein to any person or legal entity.

Section 12.2  <u>Transfer by Franchisee</u>.

(a)  Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee, and that Franchisor has granted this franchise in reliance on Franchisee's business skill, financial capacity, and character.  Accordingly, neither Franchisee nor any immediate or remote successor to any part of Franchisee's interest in this

-30-

franchise or the Restaurant, nor any individual, partnership, corporation, or other legal entity which directly or indirectly owns any interest in this franchise, the Restaurant or in Franchisee, shall sell, assign, transfer, convey, give away, hypothecate, pledge or otherwise dispose of, alienate or encumber, whether or not for consideration, any direct or indirect interest in this franchise, the Restaurant or in Franchisee, without the prior written consent of Franchisor and compliance with all terms and provisions of this Article XII; provided, however, that Franchisor's prior written consent shall not be required for a transfer of less than a one percent (1%) interest in a publicly held corporation. A publicly held corporation is a corporation registered under the Securities Exchange Act of 1934. Any purported assignment or transfer, by operation of law or otherwise, not having the written consent of Franchisor required by this Section 12.2(a) shall be null and void and shall constitute a material breach of this Agreement, for which Franchisor may then terminate without opportunity to cure pursuant to Section 13.2 of this Agreement.

(b) Franchisor shall not unreasonably withhold its consent to a transfer of any interest in this franchise, the Restaurant or in Franchisee; provided, however, that if a transfer, alone or together with other previous, simultaneous, or proposed transfers, would have the effect of transferring, in the aggregate, more than twenty-five percent (25%) ownership or voting interest in this franchise, the Restaurant or in Franchisee, Franchisor may, in its sole discretion, require any or all of the following as conditions of its approval:

(i) All of Franchisee's accrued monetary obligations and all other outstanding obligations to Franchisor, its subsidiaries, and its affiliates shall have been satisfied;

(ii) Franchisee shall be in full compliance with all provisions of this Agreement, any amendment hereof or successor hereto, and any other agreement between Franchisee and Franchisor, or its subsidiaries and affiliates;

(iii) The transferor shall have executed a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its officers, directors, shareholders, and employees, in their corporate and individual capacities, including, without limitation, claims arising under federal, state, and local laws, rules, and ordinances;

(iv) The transferee shall enter into a written agreement, in a form satisfactory to Franchisor, assuming and agreeing to discharge all of Franchisee's obligations under this

-31-

Agreement; and, if the obligations of Franchisee were guaranteed by the transferor, the transferee shall guarantee the performance of all such obligations in writing in a form satisfactory to Franchisor;

(v)   The   transferee   shall   demonstrate   to Franchisor's satisfaction that it meets Franchisor's educational, managerial, and business standards; possesses a good moral character, business reputation, and credit rating; has the experience, aptitude and ability to conduct the business franchised herein (as may be evidenced by prior related business experience or otherwise); and has adequate financial resources and capital to operate the Restaurant;

(vi) At Franchisor's option, the transferee shall execute (and/or, upon Franchisor's request, shall cause all interested parties to execute), for a term ending on the expiration date of this Agreement and with such renewal term as may be provided by this Agreement, the standard form franchise agreement then being offered to new System franchisees and other ancillary agreements as Franchisor may require for the franchised business, which agreements shall supersede this Agreement in all respects and the terms of which agreements may differ from the terms of this Agreement, including, without limitation, a higher percentage royalty rate and advertising contribution; provided, however, that the transferee shall not be required to pay an initial franchise fee;

(vii) The transferee, at its expense, shall upgrade the Restaurant to conform to the then current standards and specifications of System restaurants, and shall complete the upgrading and other requirements within the time specified by Franchisor;

(viii) Franchisee shall remain liable for all of the obligations to Franchisor in connection with the franchised business prior to the effective date of the transfer and shall execute any and all instruments reasonably requested by Franchisor to evidence such liability;

(ix)   At   the   transferee's   expense,   the transferee, the transferee's manager and the transferee's Operating Partner shall complete any training programs then in effect for franchisees upon such terms and conditions as Franchisor may reasonably require;

-32-

(x) Franchisee shall reimburse Franchisor for its reasonable costs and expenses associated with reviewing the application to transfer, including, without limitation, legal and accounting fees and salaries of Franchisor's personnel.

(c) Franchisee acknowledges and agrees that each condition which must be met by the transferee is necessary to assure such transferee's full performance of the obligations hereunder.

Section 12.3  Non-Individual Franchisees.  In the event Franchisee is not an individual (including, without limitation, a corporation, partnership, association or trust) the following requirements shall also apply to Franchisee:

(a) Franchisee shall be newly organized and its charter, partnership agreement or other organizing document shall at all times provide that its activities are confined exclusively to operating the Restaurant franchised herein.

(b) Copies of Franchisee's Articles of Incorporation, Bylaws, Partnership Agreement or other governing documents, and any amendments thereto, including the resolution of the Board of Directors, General Partners or other managing entity authorizing entry into this Agreement shall be promptly furnished to Franchisor.

(c) Franchisee shall maintain stop transfer instructions against the transfer on its records of any equity securities. Each certificate representing an ownership interest in Franchisee shall have conspicuously endorsed upon its face a statement in a form satisfactory to Franchisor that it is held subject to, and that further assignment or transfer thereof is subject to, all restrictions imposed upon assignments by this Agreement.

(d) Franchisee shall maintain a current list of all owners of record and all beneficial owners of any interest in or securities of Franchisee and shall furnish the list to Franchisor upon request.

(e) Franchisee shall obtain and deliver to Franchisor the written agreement of all person owning any ownership or voting interest in Franchisee to be bound by and comply with all terms and provisions of this Article XII.

-33-

Section 12.4   <u>Right of First Refusal</u>.

(a)   Any party owning any ownership or voting interest in this franchise, the Restaurant or Franchisee and desiring to accept a bona fide offer to acquire such interest ("Transferor") shall, within five (5) days of receipt and prior to acceptance thereof, provide written notice to Franchisor ("Notice of Offer") of each such offer.  The Notice of Offer shall specify the interest to be transferred ("Interest"), the identity of the offeror, the purchase price and manner of payment, the treatment of any liabilities to which the Interest is subject and shall include copies of all written communications from the offeror or Transferor containing or relating to the offer.  Transferor shall also provide such other documents and information relating to the offeror and/or the offer as Franchisor thereafter requests.

(b)   Upon receipt of a Notice of Offer, Franchisor shall have the right and option to purchase, and Transferor shall be obligated to sell to Franchisor, the Interest upon the same terms and conditions contained in the Notice of Offer.  In the event the consideration, terms and/or conditions contained in the Notice of Offer are such that Franchisor may not reasonably be required to furnish the same consideration, terms and/or conditions, Franchisor shall notify Transferor and Franchisor shall have the right to substitute therefor the reasonable cash equivalent.   If Franchisor and Transferor cannot agree on the reasonable cash equivalent within fifteen (15) days of receipt of the Notice of Offer, Franchisor and Franchisee shall each appoint an independent, qualified M.A.I. appraiser to determine the reasonable cash equivalent.  If the two (2) appraisers so appointed cannot agree on the reasonable cash equivalent, they shall appoint a third independent, qualified M.A.I. appraiser to determine the reasonable cash equivalent and the reasonable cash equivalent shall be the average of the two (2) closest appraisals.   The determination of such appraisers shall be final and binding on all parties.

(c)   Franchisor may exercise the purchase option granted in (b) above by providing written notice ("Notice of Exercise") to Transferor on or before the later of:  (i) forty-five (45) days from receipt of the Notice of Offer; (ii) thirty (30) days from the date of receipt of all additional information and documents relating to the offeror and/or the offer requested by Franchisor pursuant to (a) above; or (ii) thirty (30) days from receipt of written determination by the appraiser of reasonable cash equivalent pursuant to (b) above, if applicable.

(d)   The closing for any purchase by Franchisor hereunder shall be consummated and closed in Franchisor's principal

office at a mutually agreed upon date and time, provided that such closing shall be held within ninety (90) days from the date of Notice of Exercise.  At the closing, Transferor shall execute and deliver to Franchisor such documents, affidavits and instruments as are necessary or appropriate, in the opinion of Franchisor's counsel, to transfer good and marketable title in the Interest to Franchisor, free and clear of any lien, claim or encumbrance (except as otherwise specified in the Notice of Offeror). Transferor shall execute and deliver to Franchisor such representation, warranties and indemnities as are customary or appropriate, in the opinion of Franchisor's counsel, in connection with the transfer of property of a kind similar to the Interest. Franchisor shall deliver the purchase price to Transferor in accordance with the Notice of Offer and/or determination of reasonable cash equivalence.  If the Interest includes real property Transferor shall, at his expense, deliver to Franchisor an owner's marketability title insurance policy (ALTA FORM B latest revision), issued by a company acceptable to Franchisor's counsel, insuring Franchisor's title to the real property for the full amount of the purchase price without any exceptions or exclusions except for those acceptable to Franchisor.  Franchisee shall use his best efforts and due diligence to cure any title defects and the closing shall be extended for a reasonable cure period.  All costs, fees, document taxes and other expenses incurred in connection with the transfer of the Interest shall be allocated in accordance with the Notice of Offer.  Any costs not allocated therein shall be paid by Transferor.

(e)  As to any particular Notice of Offer, if Franchisor does not exercise the purchase option within the time limit of (c) above, or if Franchisor, through no fault of Transferor, fails to close the purchase of the Interest within the time limit of (d) above, then as to such particular Notice of Offer only, Transferor shall be free to transfer the Interest solely to the offeror named in the Notice of Offer upon the same terms and conditions contained in the Notice of Offer; provided however,

(i)  such transfer shall be subject to compliance with all terms and provisions of Section 12.2 hereof; and

(ii)  such transfer shall be consummated and closed on or before the earlier of:  (A) ninety (90) days after compliance with and satisfaction of the terms and provisions of Section 12.2; or (B) if Franchisor has not exercised its purchase option, ninety (90) days from the expiration date for exercise of the purchase option pursuant to (c) above; or (C) if Franchisor has exercised the purchase option but failed to close through no fault

-35-

of Transferor, ninety (90) days from the expiration date for closing pursuant to (d) above.

(f)  Transferor shall make no transfer of the Interest except to the offeror named in the Notice of Offer, on the same terms and conditions contained in the Notice of Offer and within the time limit specified in subsection (e). Any purported transfer not in strict compliance with all the requirements of the preceding sentence shall be null and void. If Transferor does not close and consummate the transfer of the Interest in strict accordance with the requirements of (e) and (f) hereof, Franchisor's purchase option shall again be exercisable and Transferor shall make no transfer of the Interest until he has again complied with all terms and provisions of this Section 12.4, including, without limitation, issuance of a new Notice of Offer. Any modification to an offer shall constitute a new offer for which Franchisor's purchase option shall again be exercisable and Transferor shall make no transfer pursuant to such modified offer until he has again complied with all terms and provisions of this Section 12.4 including, without limitation, issuance of a new Notice of Offer.

Section 12.5  Transfer Upon Death or Mental Incapacity. Upon the death or mental incapacity of the Franchisee (if an individual) or Franchisee's Operating Partner, the executor, administrator, or personal representative of such person shall transfer his interest to a third party approved by Franchisor within twelve (12) months after such death or mental incapacity, provided, however, such transfer shall be subject to Franchisor's rights of first refusal pursuant to Section 12.4. Until such transfer has been consummated in accordance with the provisions of this Article XII, Franchisor shall have the right, but not the obligation, to assume direct management control of the Restaurant on an interim basis, including, without limitation, installing representatives of Franchisor, at Franchisee's expense. Such transfers, including, without limitation, transfers by devise or inheritance, shall be subject to all the conditions of Section 12.2(b). However, in the case of transfer by devise or inheritance, if the heirs or beneficiaries of any such person are unable to meet the conditions of Section 12.2(b), the personal representative of the deceased Franchisee or Operating Partner shall have a reasonable time, not to exceed twelve (12) months from the date of death or incapacity, to dispose of the deceased's interest in the franchise or Franchisee, which disposition shall be subject to all the terms and conditions for transfers contained in this Agreement, including, but not limited to, Franchisor's right of first refusal under Section 12.4. If the interest is not disposed of within twelve (12) months from the date of death or incapacity, Franchisor may terminate this Agreement.

-36-

Section 12.6   <u>Non-Waiver of Claims</u>.  Franchisor's consent to a transfer of any interest in the franchise granted herein or in Franchisee shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver of Franchisor's right to demand exact compliance with any of the terms of this Agreement by the transferee.

Section 12.7   <u>Offerings by Franchisee</u>.   Subject to Franchisor's right of first refusal pursuant to <u>Section 12.4</u>, securities of Franchisee may be offered for sale, by private or public offering or otherwise, only with the prior written consent of Franchisor (whether or not Franchisor's consent is required under <u>Section 12.2</u> hereof), which consent shall not be unreasonably withheld.   All materials required for such offering by federal or state law shall be submitted to Franchisor for review prior to their being filed with any government agency; and any materials to be used in any exempt offering shall be submitted to Franchisor for review prior to their use.  No Franchisee offering shall imply (by use of the Proprietary Marks or otherwise) that Franchisor is participating in an underwriting, issuance, or offering of Franchisee or Franchisor securities; and Franchisor's review of any offering shall be limited solely to the subject of the relationship between Franchisee and Franchisor.  Franchisee and the other participants in the offering shall fully indemnify Franchisor in connection with the offering.   For each proposed offering, Franchisee shall reimburse Franchisor for its reasonable costs and expenses associated with reviewing the proposed offering, including, without limitation, legal and accounting fees and salaries of Franchisor's personnel.   Franchisee shall give Franchisor written notice, and provide all materials relating to the offering at least thirty (30) days prior to the date of commencement any offering or other transaction covered by this <u>Section 12.7</u>.

### ARTICLE XIII
### DEFAULT AND TERMINATION

Section 13.1   <u>Default by Franchisee; Termination Without Notice</u>.  Franchisee shall be in default under this Agreement, and all rights granted herein shall automatically terminate without notice to Franchisee, if:  (a) Franchisee shall become insolvent or make a general assignment for the benefit of creditors; or (b) if a petition in bankruptcy is filed by Franchisee or such a petition is filed against and not opposed by Franchisee; or (c) if Franchisee is adjudicated a bankrupt or insolvent; or (d) if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee or if a receiver or other

-37-

custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; or (e) if proceedings for a composition with creditors under any state or federal law should be instituted by or against Franchisee; or (f) if a final judgment remains unsatisfied or of record for thirty (30) days or longer (unless supersedeas bond is filed); or (g) if Franchisee is dissolved; or (h) if execution is levied against Franchisee's business or property; or (i) if suit to foreclose any lien or mortgage against the Restaurant premises or equipment is instituted against Franchisee and not dismissed within thirty (30) days; or (j) if the real or personal property of Franchisee's Restaurant shall be sold after levy thereupon by any sheriff, marshal, or constable.

        **Section 13.2**   <u>Default by Franchisee; Notice</u>.   Franchisee shall be deemed to be in default and Franchisor may, at its option and in addition to all other remedies available to Franchisor, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon receipt of notice by Franchisee, upon the occurrence of any of the following events:

        (a)   If Franchisee fails to construct and open the franchised business within the time limits provided in <u>Section 5.2</u> and Attachment B hereto;

        (b)   If Franchisee at any time ceases to operate or otherwise abandons the Restaurant, or loses the right to possession of the Restaurant premises, or otherwise forfeits the right to do or transact business in the jurisdiction where the Restaurant is located; provided, however, that if, through no fault of Franchisee, the premises are damaged or destroyed by an event such that repairs or reconstruction cannot be completed within ninety (90) days thereafter, then Franchisee shall have thirty (30) days after such event in which to apply for Franchisor's approval to relocate and/or reconstruct the premises, which approval shall not be unreasonably withheld, but which may be conditioned upon the payment to Franchisor of an agreed minimum royalty fee and marketing administration fee during the period the Restaurant is not in operation, such fees, unless otherwise agreed by Franchisor, to be equal to the average monthly fees paid pursuant to <u>Section 3.2</u> and <u>Section 10.6</u> hereof, respectively, during the previous twelve months, or such shorter period as the Restaurant has been open for business if less than twelve months.

        (c)   If Franchisee or the Operating Partner is convicted of a felony, or a crime involving moral turpitude, or any other crime or offense that Franchisor believes is reasonably likely to have an adverse effect on the System, the Proprietary

-38-

Marks, the goodwill associated therewith, or Franchisor's interest therein;

(d)   If a threat or danger to public health or safety results from the construction, maintenance, or operation of the Restaurant;

(e)   If Franchisee fails to maintain a qualified Operating Partner, as required under Section 5.3 hereof;

(f)   If Franchisee fails to maintain a General Manager having the employment agreement and ownership interests required under Section 5.4 hereof;

(g)   If Franchisee or any person holding any ownership or voting interest in Franchisee purports to transfer any rights or obligations under this Agreement or any interest in Franchisee to any third party without Franchisor's prior written consent, or otherwise without compliance with the terms of Article XII of this Agreement;

(h)   If Franchisee fails to comply with the covenants of Article VI hereof or fails to obtain execution of the covenants required under Article VI hereof;

(i)   If, contrary to the terms of Article VI or VIII hereof, Franchisee discloses or divulges the contents of the Manual or other confidential information provided to Franchisee by Franchisor;

(j)   If an approved transfer is not effected within a reasonable time, as required by Section 12.5 hereof, following the death or mental incapacity of Franchisee or the Operating Partner;

(k)   If Franchisee knowingly maintains false books or records, or knowingly submits any false reports to Franchisor;

(l)   If Franchisee misuses or makes any unauthorized use of the Proprietary Marks or otherwise materially impairs the goodwill associated therewith or Franchisor's rights therein;

(m)   If Franchisee engages in any business or markets any service or product under a name or mark which, in Franchisor's opinion, is confusingly similar to the Proprietary Marks;

(n)   If Franchisee or any person owning an interest in Franchisee borrows money or incurs any debt or liability in violation of Section 6.2 hereof;

(o)   If any information submitted by Franchisee (or any person owning an interest in Franchisee) in the Questionnaire for Franchisee Applicants is discovered to have been false, misleading or incomplete in any material respect;

(p)   If Franchisee, after curing a default pursuant to Section 13.3 hereof, commits the same default again, whether or not cured after notice; or

(q)   If Franchisee is in default more than twice in any twelve month period under Section 13.3 hereof for failure substantially to comply with any of the requirements imposed by this Agreement, whether or not cured after notice.

**Section 13.3** Cure. Except as provided in Sections 13.1 and 13.2 of this Agreement, upon any default by Franchisee which is susceptible of being cured, Franchisor, in addition to all other remedies available to Franchisor, may terminate this Agreement only by giving written notice of termination stating the nature of such default to Franchisee at least thirty (30) days prior to the effective date of termination; provided, however, that Franchisee may avoid termination by immediately initiating a remedy to cure such default and curing it to Franchisor's satisfaction within the thirty day period (or within such shorter time period as Franchisor may reasonably specify), and by promptly providing proof thereof to Franchisor.  If any such default is not cured within the specified time, or such longer period as applicable law may require, this Agreement shall terminate without further notice to Franchisee effective immediately upon the expiration of the thirty (30) day period or such longer period as applicable law may require. Defaults which are susceptible of cure hereunder may include, but are not limited to, the following illustrative events:

(a)   If Franchisee fails to comply with any of the requirements imposed by this Agreement, as it may from time to time be amended or reasonably be supplemented by the Manual, or fails to carry out the terms of this Agreement in good faith.

(b)   If Franchisee fails, refuses, or neglects promptly to pay any monies owing to Franchisor or its subsidiaries or affiliates when due, or to submit the financial or other information required by Franchisor under this Agreement.

-40-

(c)  If Franchisee fails to maintain or observe any of the standards or procedures prescribed by Franchisor in this Agreement, the Manual, or otherwise in writing.

(d)  If Franchisee fails, refuses, or neglects to obtain Franchisor's prior written approval or consent as required by this Agreement.

**Section 13.4  Liquidated Damages for Deviation from Manual**.  Franchisee acknowledges the importance of operation of the Restaurant in accordance with the System, as modified.  Franchisee further acknowledges that deviation from the requirements of the System, as specified in the Manual, will damage Franchisor, the System and Franchisor's goodwill, which damage is difficult to quantify.  Accordingly, the parties agree that in the event of repeated deviation from the requirements of the Manual, Franchisee shall pay to Franchisor, as liquidated and agreed upon damages, the following amounts:

| | |
|---|---|
| Second Violation in calendar year: | $1,000.00 |
| Third Violation in calendar year: | $2,000.00 |
| Each Additional Violation in calendar year: | $4,000.00 |

Liquidated damages under this Section 13.4 shall be paid to Franchisor within five (5) days of receipt of notice from Franchisor.  The imposition of liquidated damages pursuant to this Section 13.4 shall be at Franchisor's option.  Franchisor is not required to impose liquidated damages under this Section 13.4 and may instead pursue other remedies, including termination of this Agreement pursuant to Section 13.3.  If Franchisor imposes liquidated damages under this Section 13.4 for any violation, Franchisor may thereafter terminate this Agreement pursuant to Section 13.3 for a subsequent violation.

**Section 13.5  Remedies**.  Upon termination of this Agreement by Franchisor, Franchisor shall have the right to recover from Franchisee all damages and other remedies available to Franchisor at law or in equity, resulting from or arising out of Franchisee's default under this Agreement.  All such remedies shall be cumulative and non-exclusive.

ARTICLE XIV
OBLIGATIONS UPON TERMINATION OR EXPIRATION

Upon termination or expiration of this Agreement, all rights granted hereunder to Franchisee shall forthwith terminate, and:

**Section 14.1** Cessation of Franchise. Franchisee shall immediately cease to operate the Restaurant franchised under this Agreement, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Franchisor.

**Section 14.2** Use of Marks. Franchisee shall immediately and permanently cease to use, in any manner whatsoever, any confidential methods, procedures and techniques associated with the System; the Proprietary Marks OUTBACK STEAKHOUSE®, BLOOMIN' ONION® and all other Proprietary Marks and distinctive forms, slogans, signs, logos, symbols, and devices associated with the System. In particular, Franchisee shall cease to use, without limitation, all signs, advertising materials, displays, stationery, forms, and any other articles which display the Proprietary Marks.

**Section 14.3** Assumed Names. Franchisee shall take such action as may be necessary to cancel any fictitious name or equivalent registration which contains the mark "OUTBACK STEAKHOUSE®" or any other Proprietary Mark, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within five (5) days after termination or expiration of this Agreement.

**Section 14.4** Assignment of Lease. Franchisee shall, at Franchisor's option, assign to Franchisor all interest which Franchisee has in any lease or sublease for the Restaurant premises, and Franchisor shall assume all obligations under such lease accruing after the date of assignment. In the event Franchisor does not elect to exercise its option to acquire the lease or sublease for the Restaurant premises, Franchisee shall make such modifications or alterations to the Restaurant premises (including, without limitation, the changing of the telephone number) immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of said premises from that of other restaurants under the System, and shall make such specific additional changes thereto as Franchisor may reasonably request for that purpose. In the event Franchisee fails or refuses to comply with the requirements of this Section 14.4, Franchisor shall have the right to enter upon the premises where Franchisee's franchised business was conducted, without being guilty of trespass or any other tort, for the purpose of making or

-42-

causing to be made such changes as may be required, at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.

Section 14.5  <u>Similar Marks</u>.  Franchisee agrees, in the event it continues to operate or subsequently begins to operate any other business not in violation of the covenants of <u>Article VI</u>, not to use any reproduction, counterfeit, copy, or colorable imitation of the Proprietary Marks, either in connection with such other business or the promotion thereof, which is likely to cause confusion, mistake, or deception, or which is likely to dilute Franchisor's rights in and to the Proprietary Marks, and further agrees not to utilize any designation of origin or description or representation which falsely suggests or represents an association or connection with Franchisor constituting unfair competition.

Section 14.6  <u>Payment to Franchisor</u>.  Franchisee shall promptly pay all sums owing to Franchisor and its subsidiaries and affiliates.   In the event of termination for any default of Franchisee,  such sums shall include all damages, costs, and expenses,  including  reasonable attorneys'  fees,  incurred  by Franchisor as a result of the default, which obligation shall give rise to and remain, until paid in full, a lien in favor of Franchisor against any and all of the personal property, furnishings, equipment, signs, fixtures, and inventory owned by Franchisee and on the premises operated hereunder at the time of default.

Section 14.7  <u>Costs of Enforcement</u>.  Franchisee shall pay to  Franchisor  all  damages,  costs,  and  expenses,  including reasonable attorneys' fees, incurred by Franchisor subsequent to the termination or expiration of this Agreement in obtaining injunctive or other relief for the enforcement of any provisions of this Agreement.

Section 14.8  <u>Surrender of Materials</u>.  Franchisee shall immediately  deliver  to  Franchisor  all  manuals,  including  the Manual, records, files, instructions, correspondence, all materials related to operating the franchised business, including, without limitation, brochures, agreements, invoices, and any and all other materials relating to the operation of the franchised business in Franchisee's possession, and all copies thereof (all of which are acknowledged to be Franchisor's property), and shall retain no copy or record of any of the foregoing, except Franchisee's copy of this Agreement and of any correspondence between the parties and any other documents which Franchisee reasonably needs for compliance with any provision of law.

Section 14.9   <u>Option to Purchase or Lease</u>.

(a)   In the event of termination or expiration of this Agreement, Franchisor shall have the right and option to purchase, and Franchisee (or other owner) shall be obligated to sell to Franchisor, any or all of the furnishings, equipment, signs, fixtures, supplies, inventory and other personal property of Franchisee used in connection with the operation of the Restaurant, and (if owned by Franchisee, or if owned by the Operating Partner or any other person who also owns, directly or indirectly, more than ten (10) percent (10%) of the ownership or voting interest in the Restaurant or Franchisee, and if occupied by Franchisee without a written lease agreement) Franchisor shall have the right and option to purchase or lease, at Franchisor's election, the land, building and other improvements thereon constituting the Restaurant premises.   If the land, building and other improvements constituting the Restaurant premises are occupied by Franchisee pursuant to a written lease agreement, Franchisor shall have the option to require Franchisee to assign its interest in such lease to Franchisor as provided in <u>Section 14.4</u> hereof.

(b)   Franchisor shall exercise the option granted in (a) above by giving written notice ("Notice of Exercise") to Franchisee (i) within thirty (30) days from the date of termination or expiration for personal property and (ii) within sixty (60) days from the date of termination or expiration for real property.   The Notice of Exercise shall specify the items of property to be purchased or leased, a purchase price and/or rental therefor and manner of payment.   If Franchisee or other owner objects to the purchase price or rental specified in the Notice of Exercise, he shall give written notice of objection to Franchisor within ten (10) days of receipt of the Notice of Exercise.   Failure to give written notice of objections to Franchisor within the time limit of the preceding sentence shall constitute a waiver and acceptance of the purchase price or rental contained in the Notice or Exercise. In the event of timely notice of objection, Franchisor and Franchisee shall each appoint an independent, qualified M.A.I. appraiser to determine the fair market value or fair market rental of the property for which objection has been made.   If the two (2) appraisers as appointed cannot agree on the fair market value, or fair market rental, they shall appoint a third independent, qualified M.A.I. appraiser to determine the fair market value or fair market rental and the fair market value or fair market rental, as the case may be, shall be the average of the two (2) closest appraisals.   The determination of such appraisers shall be final and binding on all parties.

-44-

(c)   The consummation and closing of the purchase or lease of any property by Franchisor pursuant to this Section shall be held at the Franchisor's principal office at a mutually agreed upon date and time, provided that the closing shall occur on or before the later of:  (i) if no real property is being purchased or leased, the later of thirty (30) days from the date of Notice of Exercise or thirty (30) days from receipt of written determination of fair market value by the appraiser; or (ii) if real property is being purchased or leased, the later of ninety (90) days from the date of Notice of Exercise or ninety (90) days from the receipt of written determination of fair market value or fair market rental of the appraisers.

The time limits on closing shall be extended, at Franchisor's option, if additional time is required to cure title defects.

(d)   At the closing, Franchisee (or other owner) shall execute and deliver to Franchisor such documents, affidavits and instruments as are necessary or appropriate, in the opinion of Franchisor's counsel, to transfer good and marketable fee simple or leasehold title, as the case may be, to the property to Franchisor free and clear of any lien, claim or encumbrance.  Franchisee or other owner shall execute and deliver to Franchisor such representations, warranties and indemnities as are customary or appropriate, in the opinion of Franchisor's counsel, in connection with the transfer of property of similar kind.  If real property is being transferred, Franchisee or other owner shall, at his expense, provide Franchisor with an owner's marketability policy of title insurance (ALTA FORM B latest revision) insuring Franchisor's title to the real property for the full amount of the purchase price without exception or exclusion except for those acceptable to Franchisor.  Franchisee or other owner shall use his best efforts and due diligence to cure any title defects and the closing shall be extended for a reasonable cure period.  Franchisor shall deliver the purchase price to Franchisee or other owner; provided, Franchisor may set off therefrom any amounts due Franchisor from Franchisee.   All costs, stamps, fees and other expenses in connection with the closing and transfer of the property shall be paid by Franchisee or other owner.

(e)   If Franchisor elects to lease the land, building and other improvements constituting the Restaurant premises occupied by Franchisee without a written lease the parties shall execute a written lease providing for monthly rental payments in an amount determined as provided in (b) above, an initial lease term of five (5) years with three (3) renewal options of five (5) years each at Franchisor's election, and such other terms,

-45-

provisions, representations and warranties as are normal and customary in leases of such type.

(f)   Franchisee shall obtain the written agreement of any owner defined in this Section to be bound by and comply with the provisions of this Section 14.9.

Section 14.10  Compliance with Covenants.   Franchisee shall comply with the covenants contained in Article VI of this Agreement.

## ARTICLE XV
### INDEPENDENT CONTRACTOR AND INDEMNIFICATION

Section 15.1  Relationship of Parties.  It is understood and agreed by the parties hereto that this Agreement does not create a fiduciary relationship between them, that Franchisee is an independent contractor, and that nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, joint venturer, partner, employee, or servant of the other for any purpose whatsoever.

Section 15.2  Notice to Public.  During the term of this Agreement and any extensions hereof, Franchisee shall hold itself out to the public as an independent contractor operating the business pursuant to a franchise from Franchisor.  Franchisee agrees to take such action as may be necessary to do so, including, without limitation, exhibiting a notice of that fact in a conspicuous place in the franchised premises, the content of which Franchisor reserves the right to specify.

Section 15.3  Lack of Authority.  It is understood and agreed that nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty, or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name; and that Franchisor shall in no event assume liability for, or be deemed liable hereunder as a result of, any such action; nor shall Franchisor be liable by reason of any act or omission of Franchisee in its conduct of the franchised business or for any claim or judgment arising therefrom against Franchisee or Franchisor.

Section 15.4  Indemnification.   Franchisee hereby indemnifies and holds harmless Franchisor, its affiliates and Franchisor's officers, directors and employees, from and against any and all claims, liabilities, debts, obligations, judgments and causes of action resulting from, connected with, or arising out of, directly or indirectly, Franchisee's operation of the Restaurant

-46-

including, without limitation, negligence of Franchisee, its agents and employees and shall reimburse Franchisor for all costs, including attorney's fees, incurred in defending any such claim or enforcing this indemnification.

## ARTICLE XVI
## APPROVALS AND WAIVERS

Section 16.1 <u>Request for Waiver</u>. Whenever this Agreement requires the prior approval or consent of Franchisor, Franchisee shall make a timely written request to Franchisor therefor, and such approval or consent shall be obtained in writing.

Section 16.2 <u>No Reliance</u>. Franchisor makes no warranties or guarantees upon which Franchisee may rely, and assumes no liability or obligation to Franchisee, by providing any waiver, approval, consent, or suggestion to Franchisee in connection with this Agreement, or by reason of any neglect, delay, or denial of any request therefor.

Section 16.3 <u>No Waiver by Franchisor</u>. No failure of Franchisor to exercise any right or power reserved to it in this Agreement, or to insist upon compliance by Franchisee with any obligation or condition in this Agreement, and no custom or practice of the parties at variance with the terms hereof, shall constitute a waiver of Franchisor's rights to demand exact compliance with the terms of this Agreement. Waiver by Franchisor of any particular default shall not affect or impair Franchisor's rights with respect to any subsequent default of the same or of a different nature. No delay, omission, or forbearance on the part of Franchisor to exercise any right, option, duty, or power arising out of any breach or default by Franchisee under any of the terms, provisions, covenants, or conditions hereof shall constitute a waiver by Franchisor of its right to enforce any such right, option, duty, or power, nor shall such constitute a waiver by Franchisor of any rights with respect to any subsequent breach or default by Franchisee. Subsequent acceptance by Franchisor of any payments due to it hereunder shall not be deemed to be a waiver by Franchisor of any preceding breach by Franchisee of any terms, provisions, covenants, or conditions of this Agreement.

ARTICLE XVII
MISCELLANEOUS

Section 17.1  Notices.  Any and all notices required or permitted under this Agreement shall be in writing and shall be personally delivered, sent by nationally recognized overnight delivery service (e.g., Federal Express), or mailed by certified or registered mail, return receipt requested, to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party:

        Notices to Franchisor:    OUTBACK STEAKHOUSE OF FLORIDA, INC.
                                  550 North Reo Street, Suite 200
                                  Tampa, Florida  33609
                                  Attn:  General Counsel

        Notices to Franchisee:    EVERGREEN STATE LTD. PARTNERSHIP I
                                  18404 104th Avenue, N.E.
                                  Bothell, Washington  98011-3414
                                  Attn:  Craig Edwards

Any notice by certified or registered mail shall be deemed to have been given on the third business day following the date of postmark.  Any notice by a nationally recognized overnight delivery service shall be deemed to have been given on the date of delivery to recipient as shown by the records of such delivery service.

Section 17.2  Entire Agreement.  This Agreement, the documents referred to herein, and the Attachment hereto constitute the entire, full, and complete Agreement between Franchisor and Franchisee concerning the subject matter hereof, and supersede all prior agreements, no other representations having induced Franchisee to execute this Agreement.  Except for those permitted to be made unilaterally by Franchisor hereunder, no amendment, change, or variance from this Agreement shall be binding on either party unless mutually agreed to by the parties and executed by their authorized officers or agents in writing.

Section 17.3  Severability and Construction.  Except as expressly provided to the contrary herein, each portion, section, part, term, and/or provision of this Agreement shall be considered severable; and if, for any reason, any section, part, term, and/or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such shall not impair the operation of, or have any other effect upon, such other portions, sections, parts, terms, and/or provisions of this Agreement as may remain otherwise intelligible; and the latter shall continue to be given full force and effect and bind the parties hereto; and said

-48-

invalid portions, sections, parts, terms, and/or provisions shall be deemed not to be a part of this Agreement.

Section 17.4   <u>No Third Party Beneficiary</u>.   Except as expressly provided to the contrary herein, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or legal entity other than Franchisee, Franchisor, Franchisor's officers, directors, and employees, and such of Franchisee's and Franchisor's respective successors and assigns as may be contemplated (and, as to Franchisee, permitted) by <u>Article XII</u> hereof, any rights or remedies under or by reason of this Agreement.

Section 17.5   <u>Maximum Duty Imposed on Franchisee</u>. Franchisee expressly agrees to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any provision hereof, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof any portion or portions which a court may hold to be unreasonable and unenforceable in a final decision to which Franchisor is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order.

Section 17.6   <u>Headings</u>.   All headings and captions in this Agreement are intended solely for the convenience of the parties, and none shall be deemed to affect the meaning or construction of any provision hereof.

Section 17.7   <u>Construction</u>.  All references herein to the masculine, neuter, or singular shall be construed to include the masculine, feminine, neuter, or plural, where applicable; and all acknowledgments, promises, covenants, agreements, and obligations herein made or undertaken by Franchisee shall be deemed jointly and severally undertaken by all those executing this Agreement on behalf of Franchisee.  Time is of the essence as to all obligations under this Agreement.

Section 17.8   <u>Duplicate Originals</u>.  This Agreement may be executed in one or more copies, and each copy so executed shall be deemed an original.

Section 17.9   <u>Governing Law</u>.  This Agreement takes effect upon its acceptance and execution by Franchisor in Florida, and shall be governed by, interpreted and construed under the laws of the state of Florida, which laws shall be applied without giving effect to the principles of comity or conflicts of laws thereof, and which laws shall prevail in the event of any conflict of law.

-49-

Section 17.10   <u>Jurisdiction and Venue</u>.  The parties agree that any action brought by either party against the other in any court, whether federal or state, shall be brought within the State of Florida in the judicial circuit in which Franchisor has its principal place of business.  Each party hereby agrees to submit to the personal jurisdiction of such courts, and hereby waives all questions of personal jurisdiction or venue for the purpose of carrying out this provision, including, without limitation, the claim or defense therein that such courts constitute an inconvenient forum.

Section 17.11   <u>Remedies Cumulative</u>.  No right or remedy conferred upon or reserved to Franchisor by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

Section 17.12   <u>Equitable   Relief</u>.      Nothing   herein contained shall bar Franchisor's right to obtain injunctive relief against threatened conduct that will cause it loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary injunctions.

Section 17.13   <u>Parties Bound</u>.  This agreement shall be binding upon the parties hereto and their respective successors, permitted   assigns,   heirs,   personal   representatives   and administrators.

Section 17.14   <u>Enforcement</u>.  In the event it is necessary for any party to retain legal counsel or institute legal proceedings to enforce the terms of this Agreement, including, without limitation, obligations upon expiration or termination, the prevailing party shall be entitled to receive from the non-prevailing party, in addition to all other remedies, all costs of such enforcement including, without limitation, attorney's fees and court costs, and including appellate proceedings.

Section 17.15   <u>Acknowledgement of Franchisee</u>. Franchisee acknowledges that it has conducted an independent investigation of the business franchised hereunder, and recognizes that the business venture contemplated by this Agreement involves business risks and that its success will be largely dependent upon the ability of Franchisee as an independent businessman.   Franchisor expressly disclaims the making of, and Franchisee acknowledges that it has not received, any warranty or guarantee, express or implied, as to the potential volume, profits, or success of the business venture contemplated by this Agreement.

-50-

**Section 17.16**  <u>Receipt</u>.  Franchisee acknowledges that it received a copy of the complete Outback Steakhouse® Restaurant Franchise Agreement, the Attachments thereto, and agreements relating thereto, if any, at least five (5) business days prior to the date on which this Agreement was executed.  Franchisee further acknowledges that it received the disclosure document required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures" at least ten (10) business days prior to the date on which this Agreement was executed.  Franchisee acknowledges that it has read and understood this Agreement, the Attachments hereto, and agreements relating thereto, if any, and that Franchisor has accorded Franchisee ample time and opportunity to consult with advisors of Franchisee's own choosing about the potential benefits and risks of entering into this Agreement.

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed, and delivered this Agreement on the day and year first above written.

[SEAL]

ATTEST:

FRANCHISOR:

OUTBACK STEAKHOUSE OF FLORIDA, INC., a Florida corporation

By: _____
        Joseph J. Kadow

By: _____
        Robert D. Basham

Title:  Secretary

Title:  President

FRANCHISEE:

EVERGREEN STATE LTD. PARTNERSHIP I, a Washington limited partnership

By Its General Partner:

E-D JOINT VENTURE, a Washington general partnership

By Its Managing Venturer:

Attest:

EVERGREEN STATE RESTAURANT CORPORATION, a Washington corporation

By: _____

By: _____
Craig Edwards

Title: _____

Title:   President

WITNESSES:

OPERATING PARTNER:

_____

_____
Craig Edwards/ _____ _____

-52-

ATTACHMENT A

## APPROVED LOCATION

### UNDER

### OUTBACK STEAKHOUSE® RESTAURANT

### FRANCHISE AGREEMENT

The location approved by Franchisor for the Restaurant franchised under the attached Franchise Agreement shall be:

3111 South 38th Street
Tacoma, Washington  98409

(Refer to <u>Section 1.2</u> of Franchise Agreement)

A-1

ATTACHMENT B

## SITE SELECTION & CONSTRUCTION ADDENDUM

### TO

### OUTBACK STEAKHOUSE® RESTAURANT

### FRANCHISE AGREEMENT

OUTBACK STEAKHOUSE OF FLORIDA, INC. (hereinafter "Franchisor") and EVERGREEN STATE LTD. PARTNERSHIP I (hereinafter "Franchisee") have, this _20th_ day of _MARCH_____, 1995, entered into a certain Outback Steakhouse® Restaurant Franchise Agreement (hereinafter "Franchise Agreement") and desire to supplement its terms, as set out below.  The parties hereto therefore agree as follows:

A.   SITE SELECTION

(1)   Within sixty (60) days after execution of the Franchise Agreement, Franchisee shall acquire or lease, at Franchisee's expense, a location for the Outback Steakhouse® Restaurant franchised under the Franchise Agreement (hereinafter "Restaurant") at a site approved by Franchisor as hereinafter provided.   Such location shall be as indicated on Attachment A (the "Designated Area").  The Designated Area is described solely for the purpose of selecting a site for the Restaurant and does not imply or grant any rights to such Designated Area to Franchisee.

(2)   Failure by Franchisee to acquire or lease an approved site for the Restaurant within the time required in <u>Section A.1</u> hereof shall constitute a default under the Franchise Agreement and this Site Selection Addendum.

(3)   Prior to the acquisition by lease or purchase of a site for the Restaurant in the Designated Area, Franchisee shall submit to Franchisor, in the form prescribed by Franchisor, a description of the site, a market feasibility study for the site, and such other information or materials as Franchisor may reasonably require, together with a letter of intent or other evidence satisfactory to Franchisor which confirms Franchisee's favorable prospects for obtaining the site.   Recognizing that time is of the essence, Franchisee agrees that it must submit such information and materials for the proposed site to Franchisor in writing for its approval no later than fifteen (15) days after the execution of the

B-1

Franchise Agreement. Franchisor shall have thirty (30) days after receipt of such information and materials from Franchisee to approve or disapprove, in its sole discretion, the proposed site as the location for the franchised business. No site shall be deemed approved unless it has been expressly approved in writing by Franchisor.

(4)   Franchisor shall furnish to Franchisee the following:

(a)   Site selection guidelines and criteria, and such site selection counseling and assistance as Franchisor may deem advisable.

(b)   Such on site evaluation as Franchisor may deem advisable in response to Franchisee's requests for site approval; provided, however, that Franchisor shall not provide on site evaluation for any proposed site prior to the receipt of all information and materials concerning such site prepared by Franchisee as required pursuant to Section A.3 hereof. Franchisor will provide, at no additional charge to Franchisee, up to three (3) on site evaluations. Thereafter, if on-site evaluation is deemed necessary and appropriate by Franchisor (on its own initiative or at Franchisee's request), Franchisee shall pay a reasonable fee for each such evaluation and shall reimburse Franchisor for all reasonable expenses incurred by Franchisor in connection with such on-site evaluation, including, without limitation, the cost of travel, lodging and meals.

(5)   After the location for the franchised business is approved by Franchisor and leased or acquired by Franchisee pursuant to Section A.3 hereof, the location shall constitute the approved location, and its street address shall be recorded in Attachment A to the Franchise Agreement.

B.   LEASE

If Franchisee will occupy the premises of the franchised business under a lease, Franchisee shall, prior to execution thereof, submit the proposed lease to Franchisor for its written approval. The lease shall include the following terms and conditions:

(1)   That the premises shall be used only for the operation of the Restaurant franchised hereunder.

(2)   That the landlord consents to Franchisee's use of such Proprietary Marks and signage as Franchisor may prescribe for the Restaurant.

(3)   That the landlord agrees to furnish Franchisor with copies of any and all letters and notices sent to Franchisee pertaining to the lease and the premises, at the same time that such letters and notices are sent to Franchisee.

(4)   That Franchisee may not sublease or assign all or any part of its occupancy rights, or extend the term of or renew the lease, without Franchisor's prior written consent.

(5)   That Franchisor shall have the right to enter the premises to make any modification necessary to protect Franchisor's Proprietary Marks or to cure any default under the lease or under this Agreement or the Franchise Agreement.

(6)   That Franchisor shall have the option, but not the obligation, to assume Franchisee's occupancy rights, and the right to sublease, for the remainder of the lease term upon Franchisee's default or termination under such lease or upon Franchisee's default or termination under the Franchise Agreement or this Agreement.

C.   PLANS

Before commencing any construction of the Restaurant, Franchisee, at its expense, shall comply, to Franchisor's satisfaction, with all of the following requirements:

(1)   Franchisee shall employ a qualified architect or engineer who is reasonably acceptable to Franchisor to prepare, for Franchisor's approval, preliminary plans and specifications for site improvement and construction of the Restaurant based upon prototype drawings furnished by Franchisor.

(2)   Franchisee shall be responsible for obtaining all zoning classifications and clearances which may be required by state or local laws, ordinances, or regulations or which may be necessary or advisable owing to any restrictive covenants relating to Franchisee's location.  After having obtained such approvals and clearances, Franchisee shall submit to Franchisor, for Franchisor's approval, final plans for construction based upon the preliminary plans and specifications.  Once approved by Franchisor, such final plans shall not thereafter be changed or modified without the prior written permission of Franchisor.

(3)   Franchisee shall obtain all permits and certifications required for the lawful construction and operation of the Restaurant and shall certify in writing to Franchisor that all such permits and certifications have been obtained.

B-3

(4) Franchisee shall employ a qualified licensed general contractor who is reasonably acceptable to Franchisor to construct the Restaurant and to complete all improvements. Franchisee shall obtain and maintain in force during the entire period of construction the insurance required under <u>Section 11.3</u> of the Franchise Agreement.

D.   <u>CONSTRUCTION</u>

(1) Franchisee shall commence construction of the Restaurant within sixty (60) days after approval by Franchisor of Franchisee's site or, if the approved location is occupied by an existing tenant on the date of execution of the lease for the premises, immediately upon obtaining possession of the premises.

(2) Franchisee shall provide written notice to Franchisor of the date construction of the Restaurant commenced within ten (10) days after commencement. For the purposes of this Agreement and the Franchise Agreement, construction shall be deemed to commence on the date on which a building permit is issued. Thereafter Franchisee shall provide to Franchisor a biweekly progress report signed by Franchisee and its architect and its general contractor warranting that construction is proceeding on schedule and in accordance with the approved final plans and with all applicable laws, ordinances, regulations and restrictive covenants. Franchisee agrees that Franchisor and its agents shall have the right to inspect the construction at all reasonable times for the purpose of ascertaining that all work complies with the final plans approved by Franchisor.

(3) Franchisee shall maintain continuous construction of the Restaurant premises and shall complete construction (including all exterior and interior carpentry, electrical, painting, and finishing work, and installation of all furniture, fixtures, equipment, and signs) in accordance with the approved final plans, at Franchisee's expense, within one hundred eighty (180) days after commencement of construction (exclusive of time lost by reason of strikes, lockouts, fire, and other casualties and acts of God).

(4) Franchisee shall notify Franchisor of the date of completion of construction and, within a reasonable time thereafter, Franchisor shall conduct a final inspection of the Restaurant and its premises. Franchisee acknowledges and agrees that Franchisee shall not open the Restaurant for business without the express written authorization of Franchisor, and that Franchisor's authorization to open shall be conditioned upon Franchisee's strict compliance with the specifications of the approved final plans and with the standards of the System.

(5) Franchisee shall open the Restaurant for business within ten (10) days after the completion of construction. The parties agree that time is of the essence in the construction and opening of the Restaurant.

E.    EFFECT AND INTERPRETATION

This Addendum shall be considered an integral part of the Franchise Agreement between the parties hereto, and the terms of this Addendum shall be controlling with respect to the subject matter hereof. Except as modified or supplemented by this Addendum, the terms of the Franchise Agreement are hereby ratified and confirmed.

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed and delivered this Addendum effective the day and year first above written.

[SEAL]                                    FRANCHISOR:

ATTEST:                                   OUTBACK STEAKHOUSE OF FLORIDA,
                                          INC., a Florida corporation

By: _____              By: _____
       Joseph J. Kadow                           Robert D. Basham

Title: Secretary                         Title:  President

B-5

FRANCHISEE:

EVERGREEN     STATE     LTD.
PARTNERSHIP  I,  a  Washington
limited partnership

By Its General Partner:

E-D JOINT VENTURE, a Washington
general partnership

By Its Managing Venturer:

Attest:

EVERGREEN     STATE     RESTAURANT
CORPORATION,      a      Washington
corporation

By: _____

Title: DIRECTOR OPERATIONS

By: _____
     Craig Edwards

Title:  President

WITNESSES:

OPERATING PARTNER:

_____
DIRECTOR  OPERATIONS

_____
Craig Edwards   MARC DREWRY

B-6

# OUTBACK STEAKHOUSE, INC.

2202 N. West Shore Blvd. • 5th Floor • Tampa, FL 33607
Phone (813) 282-1225 • Fax (813) 282-1209
www.outback.com

January 10, 2001

Craig Edwards
President
Evergreen State Restaurant Corporation
3650 131st Avenue, S.E.
Bellevue, WA  98006

Dear Craig:

As you know, the Franchise Agreements between Outback Steakhouse of Florida, Inc. ("OSF") and Evergreen State Restaurant Corporation and its affiliated partnerships ("Evergreen") require that you maintain a qualified Operating Partner (as defined in Section 5.3 of the Franchise Agreements) acceptable to OSF.  To date, you have served as Operating Partner.

We regret to inform you that you are no longer acceptable to OSF as Operating Partner.  Your Franchise Agreements require that Evergreen promptly designate another individual to serve as Operating Partner.  Cliff Jones, who has temporarily served as Operating Partner for Evergreen in the past, remains an acceptable Operating Partner.

Please confirm as soon as possible that Cliff will be the new Operating Partner.  In the event Evergreen intends to submit someone other than Cliff as Operating Partner please advise me of that immediately.  I remind you of the qualification requirements for Operating Partner contained in Section 5.3 of your Franchise Agreements. Failure to promptly designate an acceptable replacement Operating Partner would constitute a default under Section 13.2 of the Franchise Agreements.

In addition, OSF will not grant additional franchises to Evergreen.  To be clear, the proposed restaurants to be located in Bothell, WA, Twin Falls, ID, Pulyapp, WA, Yakima, WA and Missoula, MT will not be franchised to Evergreen.

OSF will grant franchises for these proposed restaurants to a new franchisee of which Cliff Jones is the Operating Partner, provided the new franchisee includes a director of operations acceptable to OSF.  Marc Drewry is not an acceptable operations director for these proposed restaurants.  OSF believes the restaurants currently under Marc's supervision are not performing at an acceptable level and Marc would be unable to properly supervise the proposed restaurants in light of his responsibilities for his existing restaurants.

Very Truly Yours,

Joseph J. Kadow
Vice President and General Counsel

Cc:  Chris Sullivan
     Paul Avery

**EXHIBIT C**

# OUTBACK STEAKHOUSE, INC.

2202 N. WESTSHORE BLVD. – 5TH FLOOR, TAMPA, FLORIDA 33607
TELEPHONE: (813) 282-1225/FAX LEGAL: (813) 281-2114

## May 16, 2002

From:   Joe Kadow, Vice President and General Counsel
        Outback Steakhouse, Inc., Home Office

| To: | Company: | Facsimile No. | Telephone No. |
| --- | --- | --- | --- |
| Spencer Hall | Hall Zanzig Claflin | 206-292-5901 | |
| Kenneth Myer | Short Cressman & Burgess | 206-340-8856 | |
| Gregory L. Williams | | 249-7969 | |
| Cliff Jones | Evergreen | 425-562-9865 | |

# of pages, including this page:            3

***IMPORTANT NOTICE: THIS INFORMATION IS CONFIDENTIAL AND PRIVATE***

*This communication, which includes all the pages that are part of this transmission, is intended only for the use of the individual or entity to which it was inte0nded to be delivered. It may contain information that is privileged, proprietary, confidential and exempt from disclosure under applicable law. If the recipient or reader of this communication is not the intended recipient or the employee or agent responsible for delivery of the communication to the intended recipient, you are hereby notified that any use, application, revelation, disclosure, dissemination, distribution or copying of this communication is strictly prohibited.*

*If you have received this communication in error, please notify us immediately by telephone, destroy all copies and return the original communication to us at the above address via mail or courier delivery. Thank you.*

N:\Legal\CTroy\FAX\fax1.doc

# OUTBACK STEAKHOUSE, INC.

2202 N. West Shore Blvd. • 5th Floor • Tampa, FL 33607
Phone (813) 282-1225 • Fax (813) 282-1209
www.outback.com

**VIA FACSIMILE AND CERTIFIED MAIL
RETURN RECEIPT REQUESTED**

May 15, 2002

Craig Edwards                    Cliff Jones
P. O. Box 519                    Evergreen Restaurant Ventures, Inc.
Medina, WA  98039               3650 131st Street SE
                                Suite 320
                                Bellevue, WA  98006

Gentlemen:

As you know, by letter dated January 10, 2002 Outback Steakhouse of Florida, Inc. ("OSF") informed Evergreen State Restaurant Corporation and its affiliated franchisee partnerships ("Evergreen") that Craig Edwards was no longer acceptable to OSF as the Operating Partner for Evergreen (as defined in Section 5.3 of the applicable franchise agreements).

By letter dated February 7, 2002, OSF notified you that Cliff Jones was an acceptable replacement Operating Partner for Evergreen. Our letter of February 2, 2002 reminded you of the requirement contained in Section 5.3 of the Franchise Agreements that the Operating Partner own at least fifty percent (50%) equity and voting interest in the franchisee.

As you know, we have always accommodated our franchisees and their need to include outside investors by applying this 50% requirement to the entity ultimately in control of the franchisee. Each of the restaurants in issue is a limited partnership of which the sole general partner is E-D Joint Venture. The Managing Joint Venturer of E-D Joint Venture is Evergreen State Restaurant Corporation. Therefore, flowing through all the layers, the entity in control of the franchisee is Evergreen State Restaurant Corporation. Consistent with our past practices with our other franchise groups (including as applied to the Evergreen partnerships Craig Edwards), the Franchise Agreements require Cliff Jones as Operating Partner to have at least 50% equity and voting interest in Evergreen State Restaurant Corporation.

N:\Legal\CTroy\Evergreen\edwards & Jones.ltr.doc

Page 2
May 15, 2002

I acknowledge that we have previously had discussions regarding fulfilling the requirements of Section 5.3 by Craig's executing an irrevocable proxy in favor of Cliff or executing an acceptable shareholders agreement.

For a variety of reasons, including facts that have come to our knowledge regarding Craig's activities during his tenure as Operating Partner, we require that the terms of Section 5.3 of the Franchise Agreements be strictly complied with. This will require Cliff obtaining at least 50% equity and voting interest in Evergreen State Restaurant Corporation. Failure to comply with this requirement will constitute a default under the Franchise Agreements.

It is my hope that Craig and Cliff will amicably resolve this so that the franchises will be in compliance with Section 5.3. I urge all of you to consider the investments made by your limited partners in these restaurants.

I request that each of you contact me (through your counsel if you prefer) confirming that you will comply with Section 5.3 of the Franchise Agreements and indicating the time period you anticipate will be reasonably necessary for compliance. Obviously, we are willing to be reasonable and flexible regarding timing, provided you are proceeding toward compliance in good faith and with appropriate speed.

Very truly yours,

Joseph L. Kadow
Senior Vice President and General Counsel

Cc:    Spencer Hall, Esquire
       Hall Zanzig Claflin McEachern

       Gregory L. Williams, Esquire

       Kenneth L. Myer, Esquire
       Short Cressman & Burgess

       Chris Sullivan
       Paul Avery

JJK/cjt

N:\Legal\CTruy\Evergreen\edwards & Jones ltr.doc

# HALL ZANZIG CLAFLIN MCEACHERN |

*Trial Lawyers*

May 24, 2002

Mr. Joseph J. Kadow
Senior Vice President and General Counsel
Outback Steakhouse, Inc.
2202 N. West Shore Boulevard, 5th Floor
Tampa, Florida 33607

Re:     Craig R. Edwards - Outback Steakhouse, Inc.

Dear Joe:

I am responding to your letter of May 15. Craig Edwards is willing to sell his interest in Evergreen Restaurant Corporation to Cliff Jones if they can agree on a price.

You should know that we do not believe that the franchise agreement obligates Craig to sell his interest. If he and Cliff are able to agree, he will sell his interest voluntarily. His willingness to negotiate with Cliff should not be deemed to prejudice his right to retain his interest if the negotiations are unsuccessful. We can reserve any differences we have regarding Craig's right to retain his interest until we see whether a sale is possible.

As you know, Craig has already offered to enter into a shareholders agreement with Cliff Jones to satisfy an earlier request by Outback. Cliff never responded to that offer. Following your recent letter, I was contacted by Greg Williams, Cliff's attorney. Cliff's position is that Cliff will enter into negotiations regarding the purchase of Craig's interest, but will not make the first offer.

Given Cliff's unwillingness to make an offer, Craig will put together a proposal. He will do so as soon as he receives the information that he has requested

Mr. Joseph J. Kadow
May 24, 2002
Page 2

HALL ZANZIG CLAFLIN MCEACHERN | *Trial Lawyers*

from Cliff regarding Evergreen's operations.  Assuming Cliff cooperates, Craig intends to act promptly to see if the parties can reach an agreement.

Very truly yours,

HALL ZANZIG CLAFLIN MCEACHERN PLLC

Spencer Hall

SH:kab
cc:     Mr. Gregory L. Williams
        Mr. Kenneth L. Myer

06/19/2002  19:30    8132581680                 GREG WILLIAMS                        PAGE   01
08·19·2002 11:29 FAX 206 292 5901          HALL ZANZIG                            ☑002

# HALL ZANZIG CLAFLIN MCEACHERN |

*Trial Lawyers*

June 19, 2002

Mr. Gregory L. Williams                                    <u>SENT VIA FAX</u>
3108 Prospect Road
Tampa, Florida 33629

Re:   <u>Craig R. Edwards - Outback Steakhouse, Inc.</u>

Dear Greg:

Craig Edwards is willing to sell his entire interest in Evergreen State Restaurant Corporation to Cliff Jones for a price based on the valuation that the shareholders have provided to U.S. Bank. This assumes that the current valuation is no less than the valuation used in the past. (Cliff has told Craig that the current valuation is the same.) Please send me a copy of the most recent submittal to the bank.

The sale would include all Craig's stock in Evergreen State Restaurant Corporation and his limited partnership interests in the franchises owned by Evergreen. The terms of the sale would be all cash at closing. This proposal is conditioned on the parties' agreeing on the price and the execution of a formal Purchase and Sale Agreement.

Very truly yours,

HALL ZANZIG CLAFLIN MCEACHERN PLLC

Spencer Hall

SH:kab
cc:   Mr. Joseph J. Kadow (via fax)
       Mr. Kenneth L. Myer (via fax)

*A Professional Limited Liability Company*
1200 Fifth Avenue, Suite 1414, Seattle, WA 98101
Tel  206.292.5900  Fax  206.292.5901

# OUTBACK STEAKHOUSE, INC.

2202 N. WESTSHORE BLVD. – 5TH FLOOR, TAMPA, FLORIDA 33607
TELEPHONE: (813) 282-1225/FAX LEGAL: (813) 281-2114

### July 24, 2002

From:   Joe Kadow, Vice President and General Counsel
Outback Steakhouse, Inc., Home Office

| To: | Company: | Facsimile No. | Telephone No. |
|---|---|---|---|
| Spencer Hall | Hall Zanzig... | 206-292-5901 | |
| Gregory Williams | | 249-7969 | |

# of pages, including this page:              3

### IMPORTANT NOTICE: THIS INFORMATION IS CONFIDENTIAL AND PRIVATE

*This communication, which includes all the pages that are part of this transmission, is intended only for the use of the individual or entity to which it was inte0nded to be delivered. It may contain information that is privileged, proprietary, confidential and exempt from disclosure under applicable law. If the recipient or reader of this communication is not the intended recipient or the employee or agent responsible for delivery of the communication to the intended recipient, you are hereby notified that any use, application, revelation, disclosure, dissemination, distribution or copying of this communication is strictly prohibited.*

*If you have received this communication in error, please notify us immediately by telephone, destroy all copies and return the original communication to us at the above address via mail or courier delivery.  Thank you.*

N:\Legal\CTroy\FAX\fax1.doc

# OUTBACK STEAKHOUSE, INC.

2202 N. West Shore Blvd. • 5th Floor • Tampa, FL 33607
Phone (813) 282-1225 • Fax (813) 282-1209
www.outback.com

July 23, 2002

By Facsimile and US Mail

Spencer Hall, Esquire                    Gregory L. Williams, Esquire
Hall Zanzig Claflin McEarchern           3108 Prospect Road
1200 Fifth Avenue, Suite 1414            Tampa, FL 33629
Seattle, WA 98101

### Re:   Craig R. Edwards - Outback Steakhouse, Inc.

Dear Spencer and Greg:

This letter is a general response to the correspondence between you that you copied to me, but primarily to Spencer's letter to Greg of June 28, 2002. I don't intend to take the time to dispute every point raised by Spencer and my failure to address any particular point should not be taken as agreement or acquiescence on my part.

With respect to Spencer's statement that Craig does not want to sell only a portion of his shares, quite frankly I think Craig's desires are not what are at issue here. Our interest is in compliance with the franchise agreements. This requires Cliff to have at least 50% ownership of the general partner entity. If Craig wants to sell more and Cliff wants to buy it, that is not my concern. But Craig cannot refuse to comply with the franchise agreements on the basis that he wants to sell only all of his position. I remind everyone that we are now dealing with the second time that we have been required to replace Craig as operating partner solely due to his own actions.

Spencer seems to claim we did not require Craig to comply with the franchise agreements because Craig does not own 50% of the actual franchisee entities. The reality is we have Craig throwing back in our face an accommodation that we made for him. Craig sat in my office and asked if it would be acceptable (since he was raising money on a restaurant-by-restaurant basis) if he maintained control at the general partner level, even though on a fully diluted ownership basis he would not own 50% of the franchise. We made that accommodation for Craig as we have made for a number of other franchisees. Now after accommodating Craig, he is attempting to misconstrue this.

We are imposing on Cliff the same requirement that we imposed on Craig, no more – no less. Cliff must own at least 50% of the entity that serves as sole general partner and controls the limited partnerships.

M:\Legal\Troy\Evergreen\hall&williams.ltr.doc

With respect to valuation, if it will be of any assistance to you, we are willing to explain the formulas and methodologies we have used (subject to appropriate confidentiality agreements) to acquire franchised restaurants in the past. It should then be a relatively simple mathematical calculation to apply these formulas and methodologies to the Evergreen operation. What method you use is not our concern.

Gentlemen, more than enough time has gone by to have had this situation resolved. I feel Outback has been more than patient. Contrary to the assertions of Spencer's letter, our insistence on holding to the requirement that Cliff have 50% ownership is not the result of Cliff's lobbying. The first time Cliff was required to replace Craig we did not require Craig to surrender any ownership because we were hopeful that the replacement of Craig as operating partner would be temporary. In fact this was the case and Craig was able to return as operating partner.

Given the recurrence of the same problems that led to Craig's replacement the first time, and due to Craig's actions subsequent to this second replacement, it became clear that this was a permanent situation. That is the reason we are now requiring Craig and Cliff comply with the ownership requirement. Another example of leniency toward Craig being turned against us.

Please advise as to what you intend to do to resolve this situation. Evergreen has many individual investors involved. Craig and Cliff are not the only parties involved and I hope you will consider their interests as you deal with this matter. There is a readily ascertainable value for these interests and I hope you will proceed in good faith and with all reasonable speed to get this accomplished. Given the time that has elapsed, we will withhold from enforcing our rights under the franchise agreements for 30 days.

As always, Outback reserves all rights and remedies available to it under the franchise agreements and nothing contained herein should be construed as a waiver of any of those rights.

Very truly yours,

*Joseph J. Kadow /*    *signed for in his absence to avoid delay.*
                               *Connie Troy*

Joseph J. Kadow
Senior Vice President and General Counsel

JJK/cjt



COPY

August 26, 2002

Mr. Joseph J. Kadow
Outback Steakhouse, Inc.
2202 N. Westshore Blvd 5th Floor
Tampa, FA  33607

Re: Your Letter of July 23, 2002

Dear Joe:

Despite our efforts with Craig, we have been unable to work out a suitable arrangement to comply with our franchise agreements.   In the interest of our limited partners, Ray and myself, we would like to request an additional 60 days to comply with your requests.

We appreciate your patience in this matter.

Best Regards,


Clifford L. Jones
President & CEO

*Evergreen Restaurant Ventures, Inc.*
3650 131st Ave SE • Suite 320 • Bellevue, WA  98006 • Telephone (425) 562-9850 • Fax (425) 562-9865
Franchisee

# OUTBACK STEAKHOUSE, INC.

2202 N. West Shore Blvd. • 5th Floor • Tampa, FL 33607
Phone (813) 282-1225 • Fax (813) 282-1209
www.outback.com

September 18, 2002

Clifford L. Jones
President and CEO
Evergreen Restaurant Ventures, Inc.
3650 131st Avenue S.E.
Suite 320
Bellevue, WA  98006

Dear Cliff :

This letter will confirm our agreement to your request for an extension of time to comply with the franchise agreements.  We will grant an extension until November 1, 2002 provided that good faith efforts to comply are continuing.

Very truly yours,

Joseph J. Kadow
Senior Vice President and General Counsel

JJK/cjt

*extended by joe until 1/15/03 by phone 12/2/02*

N:\Legal\CTroy\Evergreen\Jones.ltr.doc

# OUTBACK STEAKHOUSE, INC.

2202 N. West Shore Blvd. • 5th Floor • Tampa, FL 33607
Phone (813) 282-1225 • Fax (813) 282-1209
www.outback.com

September 18, 2002

Clifford L. Jones
President and CEO
Evergreen Restaurant Ventures, Inc.
3650 131st Avenue S.E.
Suite 320
Bellevue, WA  98006

Dear Cliff :

This letter will confirm our agreement to your request for an extension of
time to comply with the franchise agreements. We will grant an extension until
November 1, 2002 provided that good faith efforts to comply are continuing.

Very truly yours,

Joseph J. Kadow
Senior Vice President and General Counsel

JJK/cjt



**EVERGREEN STATE RESTAURANT CORP.**
3650 – 131ST Ave. S.E.
Bellevue, Washington  98006
(425) 562-9850

February 14, 2003

**SENT VIA FAX AND REGULAR MAIL**

Mr. Raymond M. Leich
Leich & Associates
1304 DeSoto Avenue, Suite 404
Tampa, Florida  33606

Mr. Raymond M. Leich
P.O. Box 14476
Tampa, Florida  33606

Mr. Clifford L. Jones
Evergreen Restaurant Ventures, Inc.
3650 – 131st Avenue S.E., Suite 320
Bellevue, Washington  98006

Mr. Clifford L. Jones
2800 Ocean Boulevard
Corona Del Mar, California  92625

Gentlemen:

Please be advised that there will be a special meeting of the shareholders of Evergreen State Restaurant Corp. at the offices of Short, Cressman & Burgess PLLC, 999 Third Avenue, Suite 3000, Seattle, Washington, at 9:00 a.m. on Monday, February 24, 2003.  The agenda will be adoption of the attached First Amendment to Bylaws of Evergreen State Restaurant Corp.

If either of you would like to participate by telephone, please let me know in advance of the meeting the telephone number at which you can be reached.

Very truly yours,

Craig R. Edwards

**EXHIBIT D**

## FIRST AMENDMENT TO BYLAWS OF
## <u>EVERGREEN STATE RESTAURANT CORP.</u>

The Bylaws of Evergreen State Restaurant Corp. are hereby amended effective as of February 24, 2003 to replace the existing Article IX with Article IX set forth below and to add Articles XII through XV set forth below.

### ARTICLE IX

### <u>AMENDMENT OF BYLAWS</u>

<u>Section 1.</u>  <u>By the Shareholders.</u>  The shareholders may amend or repeal these Bylaws or adopt additional Bylaws, but only with the approval of shareholders holding not less than two-thirds of the Corporation's shares.

<u>Section 2.</u>  <u>By the Directors</u>.  The Directors may not amend or repeal these Bylaws or adopt additional Bylaws without shareholder approval as provided in Section 1 of this Article IX.

### ARTICLE XII

### <u>ACCESS TO INFORMATION</u>

Each of the shareholders will have the right to unlimited access to the originals of all books and records of the Corporation and any other information within Evergreen's possession or control.  Such right of access, includes, but is not limited to, unlimited access to information and materials in

the possession or control of attorneys, accountants, banks and other persons and entities who have provided services for Evergreen.

## ARTICLE XIII

### CORPORATE REVENUES

All of the Corporation's revenues will be applied and distributed in accordance with the provisions of this Article XIII unless otherwise agreed in writing by shareholders holding not less than two-thirds of the Corporation's shares.

Section 1. Background and Definitions. Evergreen is a participant in joint ventures that are the general partners in Evergreen State Limited Partnerships 1 through 27 (the "Limited Partnerships"). Each of the Limited Partnerships owns and operates an Outback Steakhouse restaurant pursuant to a franchise agreement with Outback Steakhouse of Florida, Inc. The franchise agreements and the agreements for the Limited Partnerships provide that Evergreen will receive a fee based on a percentage of the gross sales of the Outback Steakhouse Restaurants for providing management and accounting services ("Management Fees").

Section 2. Management Fees. All of the Corporation's costs of doing business, however characterized, will be paid from Management Fees. The Corporation's costs of doing business will be deemed to include, but will not be limited to, rent, salaries, legal expenses, accounting expenses, advertising, equipment and supplies. No Management Fees will be paid to any shareholder,

2

director or officer of the Corporation, or to any entity in which any such person has an ownership interest, unless the Corporation's costs of doing business are first paid in full from the Management Fees.

Section 3. Revenues Other than Management Fees. The affairs of the Corporation will be conducted so that all revenues other than Management Fees will be distributed to the Corporation's shareholders without any deductions. Such distributions to the Corporation's shareholders will include, but will not be limited to, all revenues other than Management Fees to which the Corporation is entitled from any joint venture or partnership in which the Corporation is a participant. Such distributions to the Corporation's shareholders will be made monthly.

ARTICLE XIV

ACTIONS REQUIRING SHAREHOLDER APPROVAL

Neither the Corporation, its officers or directors will take or approve any of the actions set forth in this Article XIV without the written agreement of shareholders holding not less than two-thirds of the Corporation's shares. Any action taken in violation of this paragraph may be voided at the election of any shareholders who did not provide written approval of such action. Actions requiring shareholder approval as provided in this Article XIV include, but are not limited to:

a. Selling, exchanging or disposing of any capital asset of any of the Limited Partnerships or of the Corporation if the total value of all capital

3

assets sold, exchanged or disposed of by that Limited Partnership or the Corporation during any 12-month period would exceed $100,000;

 b. Loaning funds or other assets of the Corporation to any other person or entity, guaranteeing the debt of any other person or entity, or using assets of the Corporation as security for the obligation of any other person or entity;

 c. Terminating, amending or transferring any interest in a franchise agreement, limited partnership agreement or joint venture agreement relating to any of the Limited Partnerships or the Corporation;

 d. Maintaining funds from the operations of any of the Limited Partnerships anywhere other than a bank account in the name of that Limited Partnership or in a bank account in the name of the Corporation, or maintaining funds belonging to the Corporation anywhere other than a bank account in the name of the Corporation;

 e. Any action or transaction for which one or more directors has a conflicting interest;

 f. Any other action requiring shareholder approval under the terms of the Corporation's Articles of Incorporation, the Corporation's Bylaws or applicable law;

 g. Any renewal or extension of any of the actions described above.

4

## ARTICLE XV

## REMEDIES

Any shareholder is authorized to take legal action on behalf of the Corporation for any breach of these Bylaws.

BE IT KNOWN that the foregoing First Amendment to Bylaws of Evergreen Sate Restaurant Corporation was adopted by the shareholders at a special meeting on February 24, 2003.  In witness whereof, I do hereunto subscribe my name.

_____

5

# AGREEMENT OF LIMITED PARTNERSHIP

## OF

## EVERGREEN STATE LIMITED PARTNERSHIP NO. 27

This Agreement of Limited Partnership is entered into as of the 24th day of January, 2000, by E-D JOINT VENTURE, a Washington joint venture, as general partner (the "General Partner"), EVERGREEN STATE RESTAURANT CORP., a Washington corporation, as the initial limited partner (the "Initial Limited Partner"), and the persons and/or entities who acquire Limited Partnership Units.

NOW, THEREFORE, the parties hereto agree as follows:

1. **DEFINITIONS.**

(a)    Accounting Period. "Accounting Period" means the accounting periods per year determined pursuant to the Partnership's accounting practices in operating the Project.

(b)    Act. "Act" means the Washington Uniform Revised Limited Partnership Act, codified as Chapter 25.10 of the Revised Code of Washington, as amended.

(c)    Adjusted Capital Account Deficit. "Adjusted Capital Account Deficit" means, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

   (i)    Credit to such Capital Account any amounts that such Partner is obligated to restore pursuant to this Agreement or pursuant to Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

   (ii)    Debit to such Capital Account the items described in Section 1.704-l(b)(2)(ii)(d)(4), (5) and (6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-l(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

(d)    Agreement. "Agreement" means this Agreement of Limited Partnership, as amended, modified or supplemented from time to time.

**EXHIBIT E**

(e)     Capital Account. "Capital Account" means, with respect to any Partner, the Capital Account maintained for such Partner in accordance with the following provisions:

(i)     To each Partner's Capital Account there shall be credited such Partner's Capital Contributions, such Partner's distributive share of Net Income and any items in the nature of income or gain that are specially allocated pursuant to Section 8 hereof, and the amount of any Partnership liabilities that are assumed by such Partner or that are secured by any Partnership property distributed to such Partner.

(ii)    To each Partner's Capital Account there shall be debited the amount of cash and the value of any Partnership property distributed to such Partner pursuant to any provision of this Agreement, such Partner's distributive share of Net Losses and any items in the nature of expenses or losses that are specifically allocated pursuant to Section 8 hereof, and the amount of any liabilities of such Partner assumed by the Partnership or that are secured by any property contributed by such Partner to the Partnership.

(iii)   In the event any interest in the Partnership is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(iv)    In determining the amount of any liability for purposes of Section (i) and (ii) hereof, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and the Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-l(b) of the Regulations, and shall be interpreted and applied in a manner consistent with such Regulations. In the event the General Partner shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Partnership or the General Partner), are computed in order to comply with such Regulations, the General Partner may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Partner pursuant to Section 8 hereof upon the dissolution of the Partnership. The General Partner also shall make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Section 1.704-l(b) of the Regulations.

(f)     Capital Contribution. "Capital Contribution" means, as of the time of determination, with respect to any Partner the total amount of cash and the fair market value of other property contributed to the capital of the Partnership by a Partner.

(g)     Code. "Code" means the Internal Revenue Code of 1986, as amended from time to time.

(h)     Franchise Agreement. "Franchise Agreement" means the Outback Steakhouse® Restaurant Franchise Agreement dated November, 1998, between Outback Steakhouse of Florida, Inc. and the General Partner, certain rights under which will be assigned by the General Partner to the Partnership for the purpose of operating the Project.

(i)     General Partner. "General Partner" shall have the meaning specified in the initial paragraph of this Agreement.

(j)     Initial Gross Asset Value. "Initial Gross Asset Value" means the gross fair market value of any asset contributed by a Partner to the Partnership as determined by the contributing Partner and the Partnership.

(k)     Initial Limited Partner. "Initial Limited Partner" shall have the meaning specified in the initial paragraph of this Agreement.

(l)     Limited Partners. "Limited Partners" means, collectively, the Initial Limited Partner and the other Limited Partners defined and specified in the initial paragraph of this Agreement; reference to a "Limited Partner" shall be deemed a reference to any one of the Limited Partners.

(m)     Memorandum. "Memorandum" means the Confidential Private Placement Memorandum under which Units are offered for sale pursuant to the offering.

(n)     Net Income and Net Losses. "Net Income" and "Net Losses" means, for each fiscal year or other period, an amount equal to the Partnership's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

     (i)     Any income of the Partnership that is exempt from Federal income tax and not otherwise taken into account in computing Net Income or Net Losses shall be added to such taxable income or loss;

(ii)   Any expenditures of the Partnership described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-l(b)(2)(iv)(i) of the Regulations, and not otherwise taken into account in computing Net Income or Net Losses, shall be subtracted from such taxable income or loss;

(iii)   In the event the value of any Partnership asset is adjusted, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Income or Net Losses.

(iv)   Gain or loss resulting from any disposition of Partnership property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its value;

(v)   In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account depreciation for book purposes for such fiscal year or other period;

(vi)   Notwithstanding any other provision of this definition, any items that are specifically allocated pursuant to Section 8 hereof shall not be taken into account in computing Net Income or Net Losses.

(o)   Nonrecourse Deductions.  "Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Regulations.  The amount of Nonrecourse Deductions for a Partnership fiscal year equals the net increase, if any, in the amount of Partnership Minimum Gain during the fiscal year, determined according to the provisions of Section 1.704-2(b) of the Regulations.

(p)   Offering.  "Offering" shall have the meaning specified in Section 6(c) of this Agreement.

(q)   Partners.  "Partners" means collectively the General Partner and the Limited Partners.

(r)   Partnership.  "Partnership" means Evergreen State Limited Partnership No. 27, a limited partnership organized under the laws of the State of Washington.

(s)    Partnership Interest.  "Partnership Interest" means that percentage of the Partnership owned by a Partner.  Each Limited Partner shall for all purposes have a two and one-eighth percent (2⅛%) Partnership Interest for each Unit held by such Limited Partner.  The Restaurant Manager or Proprietor of the Restaurant shall have a ten percent (10%) Partnership Interest.  One or more Managers or Proprietors of other Outback Restaurants owned by a partnership in which the General Partner is the General Partner or key employees of Evergreen State Restaurant Corporation shall have in the aggregate up to a 1% Partnership Interest.  The General Partner shall have in the aggregate a fifty-seven and one-eighth percent (57-1/8%) Partnership Interest.  It is intended that the Limited Partners shall acquire up to a total of fifteen (15) Units representing thirty-one and seven-eighths percent (31-7/8%) of the outstanding Partnership Interests.   If less than a 1% Partnership Interest is sold to Managers of the Outback Steakhouse Restaurant and key employees, the General Partner's Partnership Interest shall be increased by the amount not sold.  (For example, if only a .50% Partnership Interest is sold to Managers of other Outback Steakhouse restaurants, the General Partner's Partnership Interest shall be increased to 57-5/8%.)

(t)    Partnership Minimum Gain.  "Partnership Minimum Gain" has the meaning set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Regulations.

(u)    Project.  "Project" means the "Outback Steakhouse®" type restaurant to be opened and operated by the Partnership pursuant to this Agreement.

(v)    Regulations.  "Regulations" means the Federal Income Tax Regulations issued under the Code, as amended (or any corresponding provision or provisions of succeeding law).

(w)    1933 Act.  "1933 Act" means the Securities Act of 1933, as amended from time to time.

(x)    Special Limited Partnership Interests.  The Limited Partnership interests held by the General Manager and Outside Restaurant Manager.  Special Limited Partners shall not be allowed to vote on any matters on which the Limited Partners may vote.

(y)    Transfer.  "Transfer" shall have the meaning specified in Section 12(a) of this Agreement.

(z)    Units.  "Units" means those units in the Partnership owned by the Limited Partners.  Each Unit is equivalent to a two and one-eighth percent (2⅛%) Partnership Interest.

2.  **NAME OF PARTNERSHIP**.  The name of the Partnership shall be Evergreen State Limited Partnership No. 27.  The business of the Partnership, however, may be conducted under any other name selected by the General Partner.  The initial business name to be used by the partnership shall be "Outback Steakhouse®, Burlington."

3.  **PLACE OF BUSINESS**.  The Partnership's principal place of business shall be in Burlington, Washington and its mailing address shall be 3650 131st Ave. S.E., Suite 320, Bellevue, Washington 98006, unless either is changed by designation of the General Partner to another location.

4.  **PURPOSES**.    The Partnership has been formed for the purpose of owning, developing, operating, leasing and otherwise dealing with real, personal and intangible property of any kind for investment or the production of income and specifically to operate an "Outback Steakhouse®" restaurant located in Nampa.

5.  **TITLE TO PARTNERSHIP ASSETS**.  Ownership of assets acquired to effect the purposes of the Partnership shall be held in the name of the Partnership, except as otherwise provided for herein.

6.  **CAPITAL CONTRIBUTIONS OF PARTNERS**.

(a)   General Partner.  The General Partner has contributed cash and intangibles to the capital of the Partnership upon its formation for a fifty-seven and one-eighth percent (57-1/8%) Partnership Interest.

(b)   Initial Limited Partner.  The Initial Limited Partner contributed One Hundred Dollars ($100) to the capital of the Partnership upon its formation for a one hundredth percent (.01%) Partnership Interest.  Upon admission of the other Limited Partners, the Initial Limited Partner shall withdraw from the Partnership and receive a return of its contribution.

(c)   Limited Partners.  The Partnership is authorized to conduct a private offering of up to fifteen (15) Units (the "Offering") for a total Capital Contribution of Fifty Thousand Dollars ($50,000) per Unit, payable in cash upon admission to the Partnership.

(d)   Restaurant Manager or Proprietor and Outside Restaurant Manager.  The Partnership is authorized to sell a ten percent (10%) Special Limited Partnership Interest to the Restaurant Manager for Twenty-Five Thousand Dollars ($25,000) and an aggregate 1% Special Limited Partnership Interest to be owned by one or more Restaurant Managers of other Outback Steakhouses owned by partnerships in which the General Partner serves as General Partner or to key employees of Evergreen State Restaurant

Corporation for Two Thousand Five Hundred Dollars ($2,500). Hereinafter, the Restaurant Manager of such other Outback Steakhouse shall be referred to as the "Outside Restaurant Manager." Both the interest offered to the Restaurant Manager and the interest offered to the Outside Restaurant Manager shall be Special Limited Partnership Interests offered pursuant to the Restaurant Manager's Employment Agreement and pursuant to an employment agreement or other contract with the Outside Restaurant Manager.

(e)    Withdraw of Capital.  Prior to the dissolution and liquidation of the Partnership in accordance with Section 17 or the removal of a Limited Partner in accordance with Section 13, no Limited Partner shall be entitled, without the consent of the General Partner, to withdraw any part of his Capital Contribution, except for distributions made in accordance with Section 7.

(f)    Interest Earned on Partnership Capital.  Interest earned on Partnership funds shall inure to the benefit of the Partnership, and no Partner shall be entitled to receive interest, as such, on funds contributed by him.

(g)    Loans.  Subject to the provisions of Section 9(b)(iii) hereof, any Partner may (but shall not be obligated to) make loans to the Partnership at such times, in such amounts, and on such terms and conditions as may be agreed by the lending Partner and the Partnership.  No such loans shall be authorized unless permitted under the Franchise Agreement.

(h)    Additional Capital Contributions.  Except as otherwise provided for herein, no Limited Partner shall be required to contribute any capital to the Partnership or to lend any funds to the Partnership.

7.    **DISTRIBUTIONS.**

(a)    Cash Distributions.  All cash distributions from operations, sales or refinancing of the Project shall be distributed to the General Partner, the Restaurant Manager, the Outside Restaurant Manager, and the other Limited Partners in proportion to their Partnership Interests.  If, following a sale, the Restaurant Manager is to remain a Partner or otherwise retain his ownership interest, such proceeds shall be distributed only to the General Partner, Outside Restaurant Manager, and other Limited Partners in proportion to their Partnership Interests.

(b)    Timing of Distributions.  All cash distributions shall be made at such time and in such amounts as determined by the General Partner in its sole discretion.

(c)   <u>Compensation of Restaurant Manager</u>.  The Partners agree that the Partnership shall employ a general manager for the Partnership's Restaurant ("Restaurant Manager").  The Restaurant Manager shall be employed by the Partnership and shall enter into an employment agreement satisfactory to the General partner.  The Restaurant manager shall be allowed to purchase a ten percent (10%) Special Limited Partnership Interest in exchange for a purchase price of Twenty-Five Thousand Dollars ($25,000).  The Restaurant Manager's Employment Agreement grants certain options to the General Partner and imposes certain restrictions on the benefits the Restaurant Manager shall receive for such interest.  Except where the context or the Restaurant Manager's Employment Agreement provides otherwise, the Restaurant Manager shall be treated as a ten percent (10%) Limited Partner and allocated cash flow and income as a Limited Partner.  The Restaurant Manager shall not, however, be allocated any management fees payable to the General Partner or Evergreen State Restaurant Corporation in excess of 3% of gross sales multiplied by the Restaurant Manager's percentage interest in the Partnership.  The provisions of the Restaurant Manager's Employment Agreement as amended from time to time, are hereby incorporated by this reference and shall be treated as part of this Agreement as fully as if set forth herein.

(d)   <u>Partnership Interest of Outside Restaurant Manager</u>.  One or more Outside Restaurant Managers and key employees of Evergreen State Restaurant Corporation shall be allowed to purchase a total of up to a 1% special Partnership Interest in exchange for a purchase price of Two Thousand and Five Hundred Dollars ($2,500).  The Outside Restaurant Manager's agreement shall contain and grant to the General Partner certain options and impose certain restrictions on the benefits the Outside Restaurant Manager shall receive for such interest.  (A similar agreement shall be entered into by any key employee authorized to purchase an interest in the Partnership.  References in this Agreement to Outside Restaurant Managers shall be deemed to include key employees unless the context of this Agreement provides otherwise.)  Except where the context of the Outside Restaurant Manager's Agreement provides otherwise, the Outside Restaurant Manager and key employee shall be treated as a 1% Limited Partner and allocated cash flow and income as a Limited Partner.  The provisions in the Outside Restaurant Manager's Agreement (the employment agreement or other agreement entered into between the Outside Restaurant Manager and the General Partner or partnership by which such individual is employed) as amended from time to time, are hereby incorporated by this reference and shall be treated as part of this Agreement as fully as if set forth herein.  Such Agreement shall provide for the repurchase at cost of an Outside Restaurant Manager's or Key Employee's Special Limited Partnership Interest upon termination of employment within five (5) years after the receipt of such interest by such individual.  This right to acquire such interest at the Outside Restaurant Manager's or Key Employee's cost shall be included in an Employment Agreement to be entered into with the Outside Restaurant Manager or Key Employee but shall apply even if such individual fails to

execute an Employment Agreement or even in such situations where an Employment Agreement is entered into but the Employment Agreement does not specifically address this issue.

## 8.   ALLOCATIONS.

(a)   Net Income.  After giving effect to the special allocations set forth in Sections 8(c), 8(d) and 8(e) hereof, Net Income for any fiscal year shall be allocated first to each Partner in an amount equal to the cumulative Net Losses allocated to the Partners for all prior periods, and then to the General Partner and the Limited Partners in proportion to their Partnership Interests.

(b)   Net Losses.  After giving effect to the special allocations set forth in Sections 8(c), 8(d) and 8(e) hereof, Net Losses for any fiscal year shall be allocated to the General Partner and the Limited Partners in proportion to their Partnership Interests to the extent of the Limited Partners' positive Capital Account balances and then to the General Partner.  Notwithstanding the preceding, no losses shall be allocated to the Limited Partnership Interests of the Restaurant Manager or Outside Restaurant Manager.

(c)   Special Allocations.

(i)   Except as provided in Section 8(c)(iii) hereof, in the event any Limited Partner unexpectedly receives any adjustments, allocations or distributions described in Section 1.704-l(b)(2)(ii)(d)(4), (5), and (6) of the Regulations, items of Partnership income and gain shall be specially allocated to each such Limited Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Limited Partner as quickly as possible.

(ii)   If there is a net decrease in Partnership Minimum Gain, the Partners shall be allocated items of income and gain for such year (and, if necessary, for subsequent years) in proportion to, and to the extent of, an amount equal to the greater of: (A) the portion of each Partner's share of the net decrease in Partnership Minimum Gain during such year that is allocable to the disposition of Partnership property subject to one or more nonrecourse liabilities of the Partnership; or (B) the negative balance in each Partner's capital account at the end of such year (as adjusted pursuant to Regulation Section 1.704-2(f)(1). This Section 8(c)(ii) is intended to comply with the minimum gain chargeback requirements of Section 1.704-2(i) of the Regulations.

(iii)  To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Code Section 732(d), Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Section 1.704-I(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specifically allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Regulations.

(iv)  Nonrecourse Deductions for any fiscal year or other period shall be allocated among the Partners in accordance with their Partnership Interests.  Such allocations are intended to comply with Regulations Section 1.704-2(b)(1).

(d)    Curative Allocations.  The allocations set forth in Sections 8(c)(i), 8(c)(ii), 8(c)(iii), and 8(c)(iv) hereof (the "Regulatory Allocations") are intended to comply with certain requirements of Regulations Section 1.704-I(b).  Notwithstanding any other provisions of this Section 8 (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating other Net Income, Net Losses and items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of such allocations of other Net Income, Net Losses and other items and the Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Regulatory Allocations had not occurred.

(e)    Tax Allocations Under Code Section 704(c).  In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the General Partner and the Limited Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its Initial Gross Asset Value as defined in Section 1 hereof.  In the event the Initial Gross Asset Value of any Partnership asset is adjusted, subsequent allocations of income, gain, loss and deduction with respect to such assets shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Initial Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.  Any election or other decision relating to such allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intention of this Agreement.

(f)   Other Allocation Rules.

(i)   Generally, all Net Income and Net Losses allocated to the Partners shall be allocated among them in proportion to their Partnership Interests.  In the event additional Partners are admitted to the Partnership on different dates during any fiscal year, the Net Income (or Net Losses) allocated to the Partners for each such fiscal year shall be allocated among the Partners in proportion to the Partnership Interest each holds from time to time during such fiscal year in accordance with Code Section 706, using any convention permitted by law and selected by the General Partner.

(ii)   For purposes of determining the Net Income, Net Losses, or any other items allocable to any period, Net Income, Net Losses and any such other items shall be determined on a daily, monthly or other basis, as determined by the General Partner using any permissible method under Code Section 706 and the Regulations thereunder.

(iii)   Except as otherwise provided in this Agreement, all items of Partnership income, gain, loss, deduction and any other allocations not otherwise provided for shall be divided among the Partners in the same proportions as they share Net Income or Net Losses, as the case may be, for the year.

## 9.   **RIGHTS, DUTIES AND LIABILITIES OF GENERAL PARTNER.**

(a)   Management of Partnership Business.   The General Partner shall be responsible for the management and control of the affairs of the Partnership and shall have general responsibility and final authority in all matters affecting the Partnership's business.  In fulfilling such responsibilities, the General Partner shall have all rights and powers generally conferred by law or that are necessary, advisable or consistent in connection therewith.

(b)   Specific Rights and Powers.   In addition to any other rights and powers that it may possess, but subject to the limitations contained herein, the General Partner shall have all specific rights and powers required for or appropriate to its management of the Partnership and the Project, which, by way of illustration but not by way of limitation, shall include the following rights and powers:

(i)   To enter into and execute purchase and sale agreements and related documents in connection with the acquisition or disposition by the Partnership of properties, including the Project;

(ii)  To enter into and execute leases and related documents in connection with the leasing by the Partnership of properties, including the Project;

(iii)  To borrow money from third parties or affiliates of the General Partner and, if security is required therefor, to mortgage or subject to any other security device any Partnership assets, to obtain replacements of any mortgage or other security device, and to prepay, in whole or in part, refinance, increase, modify, consolidate or extend any obligation, upon such terms and in such amounts as the General Partner deems, in its reasonable discretion, to be in the best interests of the Partnership; provided, however, that a refinancing of the Partnership's properties shall be at the sole discretion of the General Partner.  Any money borrowed by the Partnership from the General Partner or its affiliates shall bear interest at a rate equal to two percentage points over-the-prime rate of interest announced from time to time by U.S. Bank, Seattle, Washington.  The Partnership shall not borrow money from the General Partner or its affiliates until the General Partner shall first have made reasonable efforts to obtain a loan at equivalent or better rates from unaffiliated parties.  Neither the General Partner nor its affiliates shall be obligated to make any loans to the Partnership; and no funds from any source will be loaned to or borrowed by the Partnership in excess of the amount permitted under the Franchise Agreement with the Franchisor.

(iv)  To acquire and enter into any contract of insurance that the General Partner reasonably deems necessary and proper for the protection of the Partnership or any asset of the Partnership or for any purpose beneficial to the Partnership;

(v)  To employ attorneys, accountants and other professionals on behalf of the Partnership;

(vi)  To create, by grant or otherwise, easements and servitudes;

(vii)  To pay, collect, compromise, arbitrate, resort to legal action for or otherwise adjust claims or demands of or against the Partnership;

(viii)  To establish from income derived from the Partnership's operations, such reserves as the General Partner shall deem necessary to help meet anticipated Partnership expenses;

(ix)  Subject to any limitations contained herein, to enter into and execute such additional agreements or other documents on behalf of the Partnership as the

General Partner deems necessary or desirable to effectuate the purposes and objectives of the Partnership;

(x)  To act on behalf of the Partnership without obtaining any consent from the Limited Partners and to legally bind the Partnership in all transactions between Outback Steakhouse of Florida, Inc. and the Partnership;

(xi)  To act on behalf of the Partnership without obtaining any consent from the Limited Partners and to legally bind the Partnership in connection with the sale to any third party of any of the assets of the Partnership; and

(xii)  To make any and all tax elections for the Partnership under state or federal law.

(c)  <u>Limitations on the General Partner's Authority</u>. The General Partner shall have no authority to do any act prohibited by law, nor shall the General Partner have any authority to:

(i)  Do any act in contravention of this Agreement;

(ii)  Do any act that would make it impossible to carry on the ordinary business of the Partnership, except as expressly provided in this Agreement;

(iii)  Confess a judgment against the Partnership;

(iv)  Execute or deliver any general assignment for the benefit of creditors of the Partnership;

(v)  Possess Partnership property or assign the rights of the Partnership in specific property for other than a Partnership purpose.

(d)  <u>Compensation</u>. In addition to compensation, fees and payments set forth elsewhere in this Agreement, the General Partner and its affiliates shall be entitled to the following compensation, fees, payments and reimbursements:

(i)  <u>Organization and Syndication Expenses</u>.  The Partnership shall reimburse the General Partner for its actual expenses in connection with the organization and syndication of the Partnership including site selection fees. Such expenses shall include, but shall not be limited to, legal, accounting and qualification expenses.

(ii) <u>Management and Accounting Fees</u>. The Partnership shall retain Evergreen State Restaurant Corp., an affiliate of the General Partner, to act on behalf of the Partnership, to manage the day-to-day operations of the Project, and to provide the internal accounting function for the Partnership, including providing financial statements, processing of accounts payable, internal control systems, outside payroll services, and year end audit and tax work. The Partnership shall pay Evergreen State Restaurant Corp. an annual management fee of up to four percent (4%) of gross sales of the Project. These services include all activities of the General Partner in carrying out and aiding outside service providers to carry out such functions. This management fee does not include the cost of any ordinary and necessary payments to outside accounting firms, payroll service firms, the cost of computer upgrades, computer consulting services, computer, computer assistance (in any form), or the cost of other service providers retained by the Partnership to conduct the functions customarily provided by outside service providers.

(e)   <u>Other Business of Partners</u>. The Partners and any shareholder, officer, director, employee, affiliate or other person holding a legal or beneficial interest in any entity that is a Partner, may engage in or possess an interest in other business ventures, whether such ventures are competitive with the Partnership or otherwise, and neither the Partnership nor the Partners shall have any right by virtue of this Agreement in or to such independent ventures or to the income or profits derived therefrom.

(f)   <u>Limitations on Liability of the General Partner to the Limited Partners and the Partnership</u>. The General Partner shall not be required to devote all of its time or business efforts to the affairs of the Partnership. The General Partner shall not be liable to the Partnership or to the Limited Partners and shall be indemnified for any loss or damage resulting from any act or omission performed or omitted in good faith that shall not constitute fraud, gross negligence or willful misconduct, in pursuance of the authority granted, to promote the interests of the Partnership. Moreover, the General Partner shall not be liable to the Partnership or the Limited Partners because any taxing authorities disallow or adjust any deductions or credits in the Partnership income tax returns. Anything in this Agreement to the contrary notwithstanding, the General Partner shall not be liable for the return of the Capital Contributions of the Limited Partners or for any portion thereof, it being expressly understood that any return of capital shall be made solely from the assets of the Partnership; nor shall the General Partner be required to pay to the Partnership or to any Limited Partner any capital deficits of any other Partner upon dissolution of the Partnership or otherwise.

(g)    Indemnity of General Partner.  As set forth in Subsection 9 (f) hereto, the doing of any act or the failure to do any act by the General Partner that shall not constitute fraud, gross negligence, or willful misconduct, in pursuance of the authority granted herein, to promote the interests of the Partnership, if done in good faith, shall not subject the General Partner to any liability and the Partnership will indemnify and hold harmless the General Partner and its partners and their shareholders, directors and officers from any claim, loss, expense, liability, action or damage resulting from or relating to any such act or omission, including, without limitation, reasonable fees and expenses of attorneys engaged by the General Partner or its successors or assigns in defense of such act or omission (whether incurred in preparation for or at trial, on appeal, in bankruptcy proceedings or otherwise) and other reasonable costs and expenses of litigation and appeal.

### 10.  **FISCAL MATTERS**

(a)    Fiscal Year.  The Partnership's fiscal year shall be the calendar year.

(b)    Books and Records.  The books and records of the Partnership shall be maintained by the General Partner at the principal office of the Partnership and each Partner shall have access to such books and records during reasonable business hours. The books and records shall be kept in accordance with the accrual method of accounting, in a consistent manner reflective of all Partnership transactions and shall be appropriate and adequate for the conduct of the Partnership affairs.  The General Partner shall also cause to be prepared and furnished within one hundred twenty (120) days after the end of the Partnership's fiscal year a reviewed financial statement.

(c)    Bank Accounts.  All funds of the Partnership are to be deposited in the Partnership's name in such bank account or accounts as may be designated by the General Partner, and shall be withdrawn on the signature of such person or persons as the General Partner may authorize.

(d)    Income Tax Information.  The General Partner shall cause income tax returns for the Partnership to be prepared and filed with the appropriate authorities and shall furnish to each Limited Partner, within 90 days after the close of the taxable year of the Partnership, all tax information with respect to the Partnership as may be reasonably required by such Partner for the preparation of his or its tax return.

(e)  <u>Tax Matters Partner: Tax Elections</u>.  The tax matters partner, as referred to in Section 6231(a)(7) of the Code, shall be the General Partner. The General Partner shall have the authority to make any election or other determination on behalf of the Partnership provided for in the Code or any provision of state or local tax law.

## 11.  <u>LIABILITY AND RIGHTS OF LIMITED PARTNERS.</u>

(a)  <u>Limitation of Limited Partners' Liabilities</u>.  Except as provided in the Act, a Limited Partner, unless he is deemed to be taking part in the control of the business of the Partnership, shall not be bound by, or be personally liable for, the expenses, liabilities or obligations of the Partnership or the General Partner.

(b)  <u>No Control of Business or Right to Act for Partnership</u>.  A Limited Partner shall take no part in or interfere in any manner with the conduct or control of the business of the Partnership and shall have no right or authority to act for or bind the Partnership.



The Restaurant Manager shall be an employee of Evergreen State Restaurant Corporation, the managing Joint Venturer of the General Partner. Other than such duties as may be from time to time assigned to him pursuant to his Employment Agreement, he shall have no rights other than those of a Limited Partner.

(c)  <u>No Priority</u>.  In connection with any distribution, whether upon winding up of the Partnership or otherwise, and whether or not it shall constitute a return of capital, no Limited Partner shall have the right to demand or receive property other than cash, although the General Partner may distribute property other than cash.  Except as otherwise specifically provided herein, no Limited Partner shall have priority over any other Limited Partner either as to the return of his contribution to the capital of the Partnership or as to allocations of profits or losses.

(d)  <u>Majority Voting Rights</u>.  The following actions may be taken by the affirmative vote (or by written consent) of a majority in interest of the Limited Partners:

(i)  Subject to the provisions of Section 18 hereof, amendments to this Agreement; provided that any such amendment shall not in any manner allow the Limited Partner to take part in the control of the Partnership's business;

(ii)  The election and admission of a substitute General Partner upon the resignation of the General Partner; and

(iii)   Termination of the Partnership.

(e)  <u>Voting by Restaurant Manager and Outside Restaurant Manager</u>.  The Partnership Interests of the Restaurant Manager and Outside Restaurant Manager shall not be eligible to vote on any matters.

## 12.  TRANSFER OF UNITS.



(a)  <u>General Prohibition on Assignment</u>.  Notwithstanding any other provisions hereof, the Limited Partners shall not assign, convey, sell, transfer, pledge, hypothecate, encumber or in any other way alienate (herein "Transfer") the Units without the prior written consent of the General Partner, which consent may be unreasonably withheld.  The Limited Partners acknowledge that the General Partner will not consent to a Transfer if it believes that the proposed transferee is unsuited to be a Limited Partner due to his or its affiliation with a competitor of the Project or due to his or its moral character, business reputation or financial capacity.  The Limited Partners further acknowledge that the General Partner will not consent to a Transfer if it believes (i) that the Transfer would result in the Partnership being treated for federal income tax purposes as an association taxable as a corporation, (ii) that the Transfer would constitute a violation of any applicable federal or state securities law or regulation, (iii) that the Transfer would cause a termination of the Partnership for federal income tax purposes, (iv) that the transferee does not meet investor suitability standards, or (v) that the Transfer would cause the termination, cancellation or suspension of any license or pursuit, including, without limitation, any liquor license issued to or for the benefit of the Partnership which is necessary for the operation of the Project.  Any purported Transfer not made in compliance with the restrictions contained herein shall be null and void.  In the event the Units of a Limited Partner are sold or transferred in compliance with this Agreement, the purchaser shall, upon compliance (but not until such compliance) with the provisions of this Section 12, succeed to the interest of the transferor Limited Partner and all of his rights, duties and obligations under this Agreement.

(b)  <u>Right of First Refusal</u>.  In the event a Limited Partner desires to sell all of his Units in the Partnership (a sale of less than all of a Limited Partner's Units being prohibited), such Limited Partner (the "Selling Partner") shall first notify the General Partner of his intention to sell his Units in accordance with the following procedure.  The Selling Partner shall first receive a bona fide written offer (the

"Initial Offer") to purchase all, but no less than all, of his Units, and before such Selling Partner may accept the Initial Offer, such Selling Partner shall offer to sell his Units in the following manner:

(i)      The Selling Partner shall deliver a copy of the Initial Offer to the General Partner as well as a written offer to sell his Units to the General Partner (the "Partner Offer"). The purchase price and other terms and conditions of the Partner Offer shall be the same as stated in the Initial Offer.

(ii)      The General Partner shall have fifty (50) days after receipt of the Partner Offer (the "Acceptance Period") to accept the Partner Offer by delivery of a written acceptance to the Selling Partner.

(iii)      If the General Partner does not accept the Partner Offer during the Acceptance Period, then, subject to the restrictions set forth in Section 12(a), the Selling Partner shall have the right to sell his Units to the person making the Initial Offer; provided, the sale must be precisely upon the terms and conditions as set forth in the Initial Offer and provided that such transferee complies with the provisions contained in this Section 12. In the event the Selling Partner's Units are so sold, the transferee shall thereafter become subject to the terms and conditions of this Section 12. In the event the Selling Partner's Units are not sold within sixty (60) days from the date the Selling Partner is first authorized to complete the sale; the right to sell to that transferee shall lapse and the Selling Partner shall continue to be subject to the terms and conditions of this Section 12 as if no offer had been made.

(c)    Conditions of Transfer and Assignment.  A Limited Partner shall not Transfer, nor shall any assignee have the right to become a substitute Limited Partner in place of his assignor unless all of the following conditions are satisfied:

(i) The General Partner shall receive an opinion of the assignee's legal counsel, which opinion shall be satisfactory to legal counsel for the Partnership, that such Units may be legally sold or distributed without registration under the 1933 Act, and/or registration or qualification under any other then applicable state and/or federal statutes, or such Units shall have been so registered or qualified, and an appropriate prospectus shall then be in effect;

(ii)  The assignee shall have executed an agreement, in form and substance satisfactory to the General Partner, assuming all of the duties and obligations of the assignor under this Agreement and agreeing to be bound by and subject to all of the terms and conditions of this Agreement;

(iii)  The assignor and the assignee shall have executed a written agreement, in form and substance satisfactory to the General Partner, to indemnify and hold the Partnership harmless from and against any loss or liability arising out of the transfer;

(iv)  The assignee executes an irrevocable Power of Attorney, satisfactory to the General Partner, appointing the General Partner as the assignee's lawful attorney-in fact for certain specified purposes;

(v)  The assignor and the assignee execute and acknowledge such other instruments as the General Partner may deem necessary or desirable to effect such substitution; and

(vi)  A transfer fee is paid to the Partnership sufficient to cover all reasonable expenses in connection with such assignment and substitution.

(d)  <u>Effective Date</u>.  The effective date of a substitution shall be the first day of the calendar quarter next following the later of:

(i)  the date upon which the General Partner has given its written consent to such substitution; or

(ii)  the date upon which the procedures set forth above have been ratified.

(e)  <u>Substitution Required for Vote or Other Rights</u>.  Unless or until an assignee of a Unit becomes a substitute Limited Partner, such assignee shall not be entitled to exercise any vote with respect to such Unit or exercise any other rights of a Limited Partner, including, but not limited to, the right to information, an accounting of Partnership transactions or inspection of Partnership books.

(f)  <u>Franchise Agreement Transfer Restrictions</u>.  In addition to all restrictions on transfer of Units contained in this Agreement, the transfer of Units shall also be subject to the transfer restrictions and right of first refusal granted to the franchisor under the Franchise Agreement.  The right of first refusal granted to

the General Partner under this Section 12 shall be subordinate to the right of first refusal granted to the franchisor under the Franchise Agreement.

(g)  Transfer of Stock of a Partner.  The restrictions set forth herein shall apply to any transfer, assignment, sale or encumbrance of any stock or other equity interest in any Limited Partner.  Each Limited Partner agrees to impose such transfer restrictions on its stock or other equity interests and to enter into such agreements with its shareholders or other holders of equity interests providing that they will at all times be in compliance with the terms of this Section 12.

## 13.  REMOVAL OF A LIMITED PARTNER.

In the event a Limited Partner engages in any conduct which would form the basis for a denial of an application, or otherwise result in the termination, cancellation, or suspension, by the Washington Liquor Control Board of a liquor license for the Project, the General Partner may, in its sole discretion, elect to remove such Limited Partner from the Partnership and, in such event, such Limited Partner's Partnership Interest shall be sold in accordance with the following provisions:

(a)  Accounting.  Upon receipt of notice of the removal of a Limited Partner, the Partnership shall cause an accounting to be prepared covering the transactions of the Partnership since the end of the previous fiscal year through the date of receipt of such notice, and after receipt of such notice, the General Partner shall not sell or dispose of any Partnership assets other than in the regular course of business unless such sale or disposition is pursuant to a contract entered into by, and binding upon, the Partnership prior to the date upon which such notice was received by the Partnership.  If possible, the accounting shall be completed before the effective date of removal and shall consist of a statement of earnings and balance sheet for the period and as of the date specified above, in sufficient detail to accurately and fully reflect the earnings or losses for the period and the financial condition of the Partnership.  The expenses of the accounting shall be borne by the removed Limited Partner.  Selection of the independent accountant shall be in the discretion of the General Partner.

(b)  Appraisal.  Upon the removal of a Limited Partner, the purchase price for his Partnership Interest shall be based upon an appraisal of the Partnership's assets and liabilities as of the effective date of removal, which shall be completed, if possible, no later than the effective date of removal.  The appraisal shall determine the market value of the Partnership's assets and liabilities as of the date of removal.

If the removed Limited Partner and the Partnership cannot agree on an appraiser, each of them shall appoint one appraiser, and the two selected appraisers shall appoint a third. If either the Partnership or the removed Limited Partner fails to appoint an appraiser within thirty (30) days after the notice of removal, the appraiser first appointed shall be the sole appraiser. The decision of the sole appraiser or a majority of the three appraisers shall bind the removed Limited Partner and the Partnership. The cost of such appraisal shall be borne by the removed Limited Partner.

(c) <u>Purchase Price</u>. The purchase price for the Limited Partner's Partnership Interest upon his removal shall be determined by applying the distribution formula under Section 7 hereof to an amount equal to the net proceeds from sale (less appraisal and other acquisition costs) as if the Partnership assets were sold at the date of removal for their appraised market value.



(d) <u>Purchase by Remaining Limited Partners or General Partner</u>. The Limited Partners remaining after removal of a Limited Partner may purchase all, but not less than all, of the Partnership Interest of the removed Limited Partner in proportion to their respective Partnership Interests, or such other proportion as they may mutually agree. In the event the remaining Limited Partners elect to not purchase all of the Partnership Interest of the removed Limited Partner, then the General Partner shall purchase all, but not less than all, of the Partnership Interest of the removed Limited Partner; provided, however, the General Partner and the remaining Limited Partners may, at the election of the General Partner, purchase all, but not less than all, of the Partnership Interest of the removed Limited Partner in such proportion as they may mutually agree.

(e) <u>Method of Payment</u>. In the event of the removal of a Limited Partner, the purchase price of his Partnership Interest shall be paid, unless the removed Limited Partner and the purchasing Partner(s) agree otherwise, by the purchasing Partner(s) giving the removed Limited Partner a non-interest bearing, unsecured Promissory Note evidencing such purchase price, due and payable at the end of three (3) years from the effective date of such removal. Such Note shall provide that the purchasing Partners may prepay all or any portion thereof without penalty.

(f) <u>Repayment of Removed Limited Partner's Loans</u>. Upon the effective date of the removal of a Limited Partner, the loans, if any, made by the removed Limited Partner to the Partnership shall be repaid together with interest as permitted under this Agreement as expeditiously as possible and before any distributions to the Partners purchasing such interest.

(g) Restoration of Negative Capital Account Balance by Removed Limited Partner. If the removed Limited Partner has a negative balance in its Capital Account following the transfer or liquidation of its interest in the Partnership, as determined after taking into account all Capital Account adjustments for the Partnership's taxable year during which such transfer or liquidation of the removed Limited Partner's interest occurs, the removed Limited Partner shall promptly make an additional Capital Contribution to the Partnership in an amount equal to such negative balance so as to restore its Capital Account to zero. The obligation of a Limited Partner removed under Section 13 to restore a negative Capital Account Balance shall not create any inference of any obligation of a Limited Partner to restore a negative Capital Account under any other circumstances unless specifically provided in this agreement.

## 14. MEETINGS.

Meetings of the Partnership may be called at any time by the General Partner. A meeting of the Partners may also be called by Limited Partners representing more than ten percent (10%) of the Partnership interests held by Limited Partners for any matters upon which the Limited Partners may vote.

Whenever Partners are required or permitted to take any action at any meeting, a written notice of the meeting shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each Partner entitled to vote at the meeting; provided, however, a Partner may waive notice of or attendance at any meeting of the Partnership and may attend by telephone or any other electronic communication device or may execute a signed written consent. At such meeting, the Partners shall transact such business as may properly be brought before the meeting. The Partners shall keep regular minutes of all their proceedings. The minutes shall be placed in the minute book of the Partnership.

Any action required by statute or by this Agreement to be taken at a meeting of the Partners, or any action that may be taken at a meeting of the Partners, may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all of the Partners entitled to vote with respect to the subject matter thereof. Such consent shall have the same force and effect as a unanimous vote of the Partners. Any such signed consent, or a signed copy thereof, shall be placed in the minute book of the Partnership.

15. **DEATH, INCOMPETENCY, BANKRUPTCY OR DISSOLUTION OF A LIMITED PARTNER.**

(a)    <u>Individual Limited Partner</u>.  Upon the death, legal incompetency or bankruptcy of an individual Limited Partner, his executor, administrator or personal representative shall have all of the rights of a Limited Partner for the purpose of settling or managing his estate, but shall not become a substitute Limited Partner without obtaining the consent of the General Partner and compliance with the other provisions hereof.  He shall also have such power as the decedent, incompetent or bankrupt possessed to assign his Units and to join with the assignee thereof in making application to substitute such assignee as a Limited Partner.

(b)    <u>Other Limited Partners</u>.  Upon the bankruptcy, insolvency, dissolution or other cessation to exist as a legal entity of a Limited Partner that is not an individual, the authorized representative of such Limited Partner shall have all of the rights of a Limited Partner for the purpose of effecting the orderly disposition of that Limited Partner's affairs or business, but shall not become a substitute Limited Partner without obtaining the consent of the General Partner and compliance with the other provisions hereof.  He shall also have such power as the Limited Partner possessed to assign its Units and to join with the assignee thereof in making application to substitute such assignee as a Limited Partner.

16. **WITHDRAWAL OF THE GENERAL PARTNER.**

(a)    <u>Limitation on Withdrawal</u>.  The General Partner may withdraw at any time, provided that (i) such withdrawal does not cause a default under or result in the acceleration of the repayment of any loan secured by assets owned by the Partnership and (ii) not less than sixty days prior to the effective date of such withdrawal, the General Partner nominates as a substitute general partner a willing person or entity that meets the requirements for continued qualification of the Partnership as a partnership for Federal income tax purposes in the opinion of counsel for the Partnership, and such substitute general partner is approved by the vote of Limited Partners owning more than fifty percent (50%) of the Units; provided, however, that the nomination of a substitute General Partner will not be required if, in the opinion of independent tax counsel, the Partnership will continue to qualify as a partnership for tax purposes without the election of a substitute General Partner.  The General Partner may be removed by the Franchisor pursuant to certain terms and conditions in the Franchise Agreement.  In such event, the General Partner shall be deemed to have withdrawn for purposes of this Agreement.

(b) Accounting. Upon receipt of notice of the withdrawal of the General Partner, the Partnership shall cause an accounting to be prepared covering the transactions of the Partnership since the end of the previous fiscal year through the date of receipt of such notice, and after receipt of such notice, the General Partner shall not sell or dispose of any Partnership assets other than in the regular course of business unless such sale or disposition is pursuant to a contract entered into by, and binding upon, the Partnership prior to the date upon which such notice was received by the Partnership. If possible, the accounting shall be completed before the effective date of withdrawal and shall consist of a statement of earnings and balance sheet for the period and as of the date specified above, in sufficient detail to accurately and fully reflect the earnings or losses for the period and the financial condition of the Partnership. The expenses of the accounting shall be borne by the withdrawing General Partner. Selection of the independent accountant shall be in the discretion of the General Partner.

(c) Appraisal. Upon the withdrawal of a General Partner, the purchase price for his Partnership Interest shall be based upon an appraisal of the Partnership's assets and liabilities as of the effective date of withdrawal, which shall be completed, if possible, no later than the effective date of withdrawal. This appraisal shall determine the market value of the Partnership's assets and liabilities as of the date of withdrawal.

If the withdrawing General Partner and the Partnership cannot agree on an appraiser, each of them shall appoint one appraiser, and the two selected appraisers shall appoint a third. If either the Partnership or such withdrawing General Partner fails to appoint an appraiser within thirty days after the notice of withdrawal, the appraiser first appointed shall be the sole appraiser. The decision of the sole appraiser or a majority of the three appraisers shall bind the withdrawing General Partner and the Partnership. The cost of such appraisal shall be borne equally by the withdrawing General Partner and the Partnership.

(d) Purchase Price. The purchase price for the General Partner's Partnership Interest upon its withdrawal shall be determined by applying the allocation formula under Section 8 hereof to an amount equal to the net proceeds from sale (less appraisal and other acquisition costs) as if the Partnership's assets were sold at the date of withdrawal for their appraised market value.

(e) Method of Payment. In the event of the withdrawal of the General Partner, the purchase price of his Partnership Interest shall be paid, unless the withdrawing General Partner and the Partnership agree otherwise, by the Partnership giving the General Partner a non-interest bearing, unsecured

promissory note evidencing such purchase price, due and payable at the end of three years from the effective date of such withdrawal. Such note shall provide that the Partnership may prepay all or any part thereof without penalty.

(f)     Repayment of General Partner's Loans. Upon the effective date of the withdrawal of the General Partner, the loans made by the General Partner or its affiliates to the Partnership shall be repaid as expeditiously as possible and before any distributions to the Limited Partners, together with interest as permitted under this Agreement.

(g)     Restoration of Negative Capital Account Balance by General Partner. If the withdrawing General Partner has a negative balance in its Capital Account following the liquidation of its interest in the Partnership, as determined after taking into account all Capital Account adjustments for the Partnership taxable year during which such liquidation of the General Partner's interest occurs, the General Partner shall promptly make an additional Capital Contribution to the Partnership in an amount equal to such negative balance so as to restore its Capital Account to zero.

17.     **TERMINATION AND DISSOLUTION.**

(a)     Termination and Dissolution. The Partnership shall be terminated and dissolved on December 31, 2029; provided, however, that the Partnership shall be terminated and dissolved upon the earlier occurrence of any of the following events:

(i) An event of withdrawal specified in RCW 25.10.230; provided, however, that no dissolution shall occur under this subparagraph if (A) there is another General Partner that elects to continue the business of the Partnership, or (B) if there is no other General Partner, within 90 days after the act all of the Limited Partners elect to continue the business of the Partnership and elect at least one successor General Partner that meets the requirements for continued qualification of the Partnership as a partnership for Federal income tax purposes;

(ii) The written consent to the termination and dissolution of the Partnership by the General Partner and Limited Partners holding a majority of the Units;

(iii) The sale or other disposition of all Partnership properties and investments; or



(iv) The entry of a decree of judicial dissolution under
RCW 25.10.450.

(b)    Change of Limited Partners. The Partnership shall not be terminated
or dissolved by the withdrawal of any Limited Partner, by the transfer of any Units
or by the admission of a Limited Partner or a substitute Limited Partner.

(c)    Liquidation of Assets and Distribution of Proceeds of Sale. Upon
the dissolution of the Partnership, the General Partner, or a trustee (the "Trustee")
elected by Limited Partners owning more than fifty percent (50%) of the Units in
case of a dissolution caused by one of the events set forth in Section 17(a)(i), or
the individual or entity specified in a decree of judicial dissolution in case of a
dissolution caused by the event set forth in Section 17(a)(iv), shall cause a sale of
the Partnership's assets (unless the sale of the Partnership's assets was the event
causing dissolution) as promptly as is consistent with obtaining the fair market
value thereof. Net Income or Net Loss for the period prior to termination shall be
allocated to the Partners, and the Partners' Capital Accounts shall be appropriately
credited or charged. If, after the allocations provided in the prior sentence are
made, the General Partner has a negative balance in its Capital Account, it shall
make an additional Capital Contribution to the Partnership in an amount equal to
such negative balance so as to restore its Capital Account to zero. The proceeds
from sales and all other assets of the Partnership shall be distributed to the Partners
in proportion to the positive balance in their respective Capital Accounts, as
adjusted until such accounts are reduced to zero. Anything herein to the contrary
notwithstanding, in the event of a dissolution of the Partnership caused by the
resignation of the General Partner, the total amount to be received by the General
Partner as compensation for its Partnership Interest shall be determined in
accordance with Section 16, and it shall not be entitled to any additional amounts
as a result of the implementation of this Section 17(c).

(d)    Distributions in Kind. In lieu of liquidating the Partnership's assets,
the General Partner or, in its place, the Trustee, may elect, in its sole discretion, to
distribute all or a portion of such assets in kind. In such event, the fair market
value of such assets shall be determined by an appraiser selected by the General
Partner or Trustee. Each Partner will receive an undivided interest in the
Partnership's assets, equal to the portion of the proceeds to which it would have
been entitled under the provisions of Section 17(c) if such assets had been sold at
fair market value, subject to its liabilities, in satisfaction of his interest in the
Partnership. The amount by which the fair market value of any property to be
distributed in kind to the Partners exceeds or is less than the basis of such property
shall, to the extent not otherwise recognized by the Partnership, be taken into

account in computing gain or loss of the Partnership for purposes of crediting or charging the Capital Accounts of and distributing proceeds to the Partners.

(e)     Return of Capital Investment. Each Limited Partner shall look solely to the assets of the Partnership for all distributions with respect to the Partnership and his Capital Contribution and share of profits or losses, and shall have no recourse therefor (upon dissolution or otherwise) against the General Partner or any other Limited Partner.

(f)     Waiver of Action for Dissolution. Each of the Limited Partners hereby irrevocably waives any right that such Limited Partner may have to cause the termination and dissolution of the Partnership, by court decree or otherwise.

(g)     Termination. The Partnership shall be terminated when all of the Partnership's property has been distributed and applied in accordance herewith. The establishment of any reserves in accordance with this Section shall not operate to extend the term of the Partnership; however, such reserves shall be distributed in the manner provided herein upon expiration of the period of such reserves.

### 18.    AMENDMENT OF AGREEMENT.

(a)     Amendments Not Requiring Agreement of Limited Partners. This Agreement shall be amended whenever required by the Act or otherwise by law. This Agreement may be amended by the General Partner without the consent of the Limited Partners (i) to effect changes of a ministerial nature that do not materially and adversely affect the rights, (ii) to give effect to the admission of substitute Limited Partners and (iii) to delete or add any provision of this Agreement required to be so deleted or added by a state securities commission or similar agency, which addition or deletion is deemed by such commission or agency to be for the benefit or protection of the Limited Partners.

(b)     Amendments Requiring Agreement of Limited Partners. Except as otherwise specifically provided herein, any amendment to this Agreement must be approved by Limited Partners owning more than fifty percent (50%) of the Units and the General Partner.

(c)     Obligations of the Limited Partners. Each Limited Partner covenants, on behalf of himself, his successors, assigns, heirs and personal representatives, to execute and deliver with acknowledgment or affidavit, if

257405.1/5$M501!/014009.00001          - 27 -

required, all documents and instruments that may be necessary or appropriate to effectuate amendments pursuant to the provisions of this Section 18.

(d)     Consent of General Partner.  No amendment shall be made to this Agreement without the consent of the General Partner.

### 19.     **POWER OF ATTORNEY**.

Each Limited Partner hereby constitutes and appoints the General Partner, with full power of substitution, as the attorney-in-fact for such Limited Partner, with power and authority to act in his or its name and on his or its behalf in the execution, acknowledgment and filing of documents relating to the Partnership and its business including, but not limited to, the following:

(a) This Agreement, as well as any amendments hereto, subject to the provisions of Section 13 hereof.

(b) Any instrument or document that may be required to be filed by the Partnership under appropriate state law or by any governmental agency or that the General Partner deems is in the best interest of the Partnership to file.

Each Limited Partner further acknowledges and affirms that the Power of Attorney hereby granted to the General Partner:

(i)  is a Power of Attorney coupled with an interest, is irrevocable and shall survive the death, disability or other incapacity of a Limited Partner;

(ii) may be exercised by the General Partner either by signing separately as attorney-in-fact for each Limited Partner or, after listing all of the Limited Partners executing any instrument, by a single signature of the General Partner acting as attorney-in-fact for all of them; and

(iii) shall survive the delivery of an assignment by a Limited Partner of his Units; provided that where the assignee of the whole of a Limited Partner's Units has been approved by the General Partner, the Power of Attorney of the assignor shall survive the delivery of such assignment for the sole purpose of enabling the General Partner to execute, acknowledge and file any instrument necessary to effect such substitution.



20. **MISCELLANEOUS.**

(a)     Notices.  Whenever any notice or other communication is required or permitted to be given under any provisions of this Agreement, such notice or other communication shall be in writing, signed by or on behalf of the person giving such notice or other communication, and shall be deemed to have been given when:

> (i)      Personally delivered;

> (ii)     Received by prepaid cable, wire, or facsimile; or

> (iii)    Unless mailed during a national postal strike, five business days after mailing by certified or registered mail, postage prepaid, with return receipt requested, addressed to the person or persons to whom such notice is to be given at the respective addresses on file with the General Partner or to the General Partner at the principal place of business of the Partnership.

(b)     Severability.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term of this Agreement, the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected thereby, and in lieu of each such illegal, invalid or unenforceable provision there shall be automatically added, as part of this Agreement, a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

(c)     Counterpart Execution.  This Agreement may be executed in any number of counterparts with the same effect as if all of the parties had signed the same document.  All counterparts shall be construed together and shall constitute a single agreement.

(d)     Further Action.  Each Partner shall execute and deliver such papers, documents and other instruments and perform such acts as are necessary or appropriate to implement the terms hereof and the intent of the parties hereto.

(e)     Section Headings.  Section headings contained in this Agreement are for reference purposes only and are in no way intended to describe, interpret, define, amplify or limit the scope or extent of the provisions of this Agreement or the intent of the parties hereto.

(f)     Person and Gender.  Whenever used in this Agreement and when required by the context, the singular shall include the plural, the plural shall include the singular, the masculine shall include the feminine and neuter genders, the feminine shall include the masculine and neuter genders, the neuter gender shall include the masculine and feminine genders and the word "person" shall include a corporation, firm, partnership or other form of association or entity.

(g)     Applicable Law.  The terms and provisions of this Agreement and any dispute arising hereunder shall be governed by the laws of the State of Washington.  The courts of the State of Washington shall have the sole and exclusive jurisdiction in any case or controversy arising under this Agreement or by reason of this Agreement.

(h)     Parties in Interest.  Except as otherwise provided herein, the covenants, terms, provisions and agreements herein contained shall be binding upon and shall inure to the benefit of the heirs, legal representatives, successors and assigns of the respective parties to this Agreement.

(i)     Integrated Agreement.  This Agreement constitutes the entire understanding and agreement among the parties hereto with respect to the subject matter hereof, and there are no agreements, understandings, restrictions, representations, or warranties among the parties other than those set forth or for which provision is made herein.

(j)     Ownership.  No Partner shall own any individual interest in any Partnership property, except that the General Partner may own the land and building upon which the Project is developed and lease such land and building to the Partnership.  Each Partner shall have only such rights with respect to Partnership property as are specifically enumerated herein.

(k)     Delivery of Certificate.  Neither the General Partner nor the Partnership shall be obligated to mail or otherwise deliver to the Limited Partners filed copies of the Partnership's certificate of limited partnership or certificate of amendment or cancellation or restated certificate or any judicial decree of any of the above.

21.    **ACKNOWLEDGMENTS.**

(a)     Independent Investigation.  Each Limited Partner acknowledges that he or it has conducted an independent investigation of the business contemplated by this Agreement and that he or it recognizes that such business involves business

risks making the success of the Partnership dependent upon many factors. The General Partner expressly disclaims the making of, and each Limited Partner acknowledges that he or it has not received nor relied upon, any warranty, representation or guarantee, express or implied, as to the potential volume, profits or success of the business venture contemplated by this Agreement.

(b)     No Contrary Representations or Warranties. Each Limited Partner acknowledges that he or it has no knowledge of any representations or warranties by the General Partner or its officers, directors, shareholders, employees, agents or servants about the business contemplated by this Agreement that are contrary to the terms of this Agreement or the documents referenced herein.

(c)     Registration of Offering or Units. Neither the offering nor the sale of the Units has been registered under the 1933 Act, as amended, but are being offered and issued in reliance upon an exemption therefrom for non-public offerings. The units must be held indefinitely unless (i) the sale or other transfer thereof is subsequently registered under the 1933 Act or an exemption from such registration is available, and (ii) the conditions set forth in this Agreement and the Franchise Agreement are met. The Partnership is under no obligation to register the Units or to comply with any exemption from registration.

These securities have not been registered under the Act as amended, but are being offered and issued in reliance upon the exemption from registration set forth in of that Act.

The securities have not been registered under the California Corporate Securities Law of 1968, as amended, and are being sold in reliance upon the exemption from registration set forth in Section 25102(f) of that Act.

These securities have not been registered under the Florida Securities and Investors Protection Act and are being sold in reliance upon an exemption contained in Section 517.061(11) of such Act. These securities cannot be sold, transferred or otherwise disposed of unless subsequently registered under the laws of the State of Florida, if such registration is required.

The Florida Securities and Investor Protection Act provides that when sales are made to five or more persons in Florida, pursuant to Section 517.061(11), any sales made are voidable at the option of the purchaser within three days after the first tender of consideration is made by the purchaser to the issuer or its agent, or within three days after the availability of the privilege is communicated to the purchaser, whichever occurs later.

These securities have been issued or sold in reliance on paragraph (13) of Code Section 10-5-9 of the "Georgia Securities Act of 1973", and may not be sold or transferred except in a transaction which is exempt under such Act or pursuant to an effective registration under such Act.

These securities have been issued or sold in reliance on Subsection (17) of the Revised Code of Washington 21.20.320 of the Securities Act of Washington, and may not be sold or transferred except in a transaction which is exempt under such Act or pursuant to an effective registration under such Act.

These securities are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act of 1933, as amended, and the applicable state securities laws, pursuant to registration or exemption therefrom. Investors should be aware that they will be required to bear the financial risks of this investment for an indefinite period of time.

**IN WITNESS WHEREOF,** this Agreement of Limited Partnership has been executed by the parties hereto as of the date first set forth above.

General Partner:                    Initial Limited Partner:

E-D JOINT VENTURE              EVERGREEN STATE RESTAURANT CORP.

By:_____     By:_____
_____        _____
Evergreen State Restaurant Corp.
Its Managing Joint Venturer

**LIMITED PARTNERS**

Name and Address            Number of Units
_____           _____
_____
_____

## GUARANTEE OF FRANCHISEE OBLIGATIONS

As an inducement to OUTBACK STEAKHOUSE OF FLORIDA, INC. ("Franchisor") to execute that certain Outback Steakhouse® Restaurant Franchise Agreement of even date herewith by and between Franchisor and EVERGREEN STATE LIMITED PARTNERSHIP NO. 27, a Washington limited partnership ("Franchisee"), and the Attachments thereto, relating to an Outback Steakhouse® restaurant to be located at 478 Anous Road, Burlington, Washington 98233, the undersigned, jointly and severally, hereby agree to be individually bound by all the terms and conditions of the Franchise Agreement, including any amendments thereto whenever made (hereinafter the "Agreement"), and unconditionally guarantee to Franchisor and its successors and assigns that all of Franchisee's obligations under the Agreement will be punctually paid and performed.

Upon default by Franchisee and notice from Franchisor, the undersigned will immediately make each payment and perform each obligation required of Franchisee under the Agreement. Without affecting the obligations of the undersigned under this Guarantee, Franchisor may, without notice to the undersigned, extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. The undersigned waive notice of amendment of the Agreement and notice of demand for payment or performance by Franchisee.

Upon the death of an individual guarantor, the estate of such guarantor will be bound by this Guarantee but only for defaults and obligations hereunder existing at the time of death, and the obligations of the other guarantors will continue in full force and effect.

IN WITNESS WHEREOF, each of the undersigned has signed this Guarantee effective as of the date of the Agreement.

GUARANTOR:

_____          _____
Witness

_____
Witness

H:\Users\XBRAUN\2000\osf\franchise\Washington\Burlington.guar.doc

# OUTBACK STEAKHOUSE, INC.

2202 N. WESTSHORE BLVD. – 5TH FLOOR, TAMPA, FLORIDA 33607
TELEPHONE: (813) 282-1225/FAX LEGAL: (813) 281-2114

## May 16, 2002

From:   Joe Kadow, Vice President and General Counsel
Outback Steakhouse, Inc., Home Office

| To: | Company: | Facsimile No. | Telephone No. |
|-----|----------|---------------|---------------|
| Spencer Hall | Hall Zanzig Claflin | 206-292-5901 | |
| Kenneth Myer | Short Cressman & Burgess | 206-340-8856 | |
| Gregory L. Williams | | 249-7969 | |
| Cliff Jones | Evergreen | 425-562-9865 | |

# of pages, including this page:        3

***IMPORTANT NOTICE: THIS INFORMATION IS CONFIDENTIAL AND PRIVATE***

*This communication, which includes all the pages that are part of this transmission, is intended only for the use of the individual or entity to which it was inte0nded to be delivered. It may contain information that is privileged, proprietary, confidential and exempt from disclosure under applicable law. If the recipient or reader of this communication is not the intended recipient or the employee or agent responsible for delivery of the communication to the intended recipient, you are hereby notified that any use, application, revelation, disclosure, dissemination, distribution or copying of this communication is strictly prohibited.*

*If you have received this communication in error, please notify us immediately by telephone, destroy all copies and return the original communication to us at the above address via mail or courier delivery. Thank you.*

N:\Legal\CT\roy\FAX\fax1.doc

**EXHIBIT F**

# OUTBACK STEAKHOUSE, INC.

2202 N. West Shore Blvd. • 5th Floor • Tampa, FL 33607
Phone (813) 282-1225 • Fax (813) 282-1209
www.outback.com

**VIA FACSIMILE AND CERTIFIED MAIL
RETURN RECEIPT REQUESTED**

May 15, 2002

Craig Edwards
P. O. Box 519
Medina, WA  98039

Cliff Jones
Evergreen Restaurant Ventures, Inc.
3650 131st Street SE
Suite 320
Bellevue, WA  98006

Gentlemen:

As you know, by letter dated January 10, 2002 Outback Steakhouse of Florida, Inc. ("OSF") informed Evergreen State Restaurant Corporation and its affiliated franchisee partnerships ("Evergreen") that Craig Edwards was no longer acceptable to OSF as the Operating Partner for Evergreen (as defined in Section 5.3 of the applicable franchise agreements).

By letter dated February 7, 2002, OSF notified you that Cliff Jones was an acceptable replacement Operating Partner for Evergreen. Our letter of February 2, 2002 reminded you of the requirement contained in Section 5.3 of the Franchise Agreements that the Operating Partner own at least fifty percent (50%) equity and voting interest in the franchisee.

As you know, we have always accommodated our franchisees and their need to include outside investors by applying this 50% requirement to the entity ultimately in control of the franchisee. Each of the restaurants in issue is a limited partnership of which the sole general partner is E-D Joint Venture. The Managing Joint Venturer of E-D Joint Venture is Evergreen State Restaurant Corporation. Therefore, flowing through all the layers, the entity in control of the franchisee is Evergreen State Restaurant Corporation. Consistent with our past practices with our other franchise groups (including as applied to the Evergreen partnerships Craig Edwards), the Franchise Agreements require Cliff Jones as Operating Partner to have at least 50% equity and voting interest in Evergreen State Restaurant Corporation.

N:\Legal\CTroy\Evergreen\edwards & Jones.ltr.doc

Page 2
May 15, 2002

I acknowledge that we have previously had discussions regarding fulfilling the requirements of Section 5.3 by Craig's executing an irrevocable proxy in favor of Cliff or executing an acceptable shareholders agreement.

For a variety of reasons, including facts that have come to our knowledge regarding Craig's activities during his tenure as Operating Partner, we require that the terms of Section 5.3 of the Franchise Agreements be strictly complied with. This will require Cliff obtaining at least 50% equity and voting interest in Evergreen State Restaurant Corporation. Failure to comply with this requirement will constitute a default under the Franchise Agreements.

It is my hope that Craig and Cliff will amicably resolve this so that the franchises will be in compliance with Section 5.3. I urge all of you to consider the investments made by your limited partners in these restaurants.

I request that each of you contact me (through your counsel if you prefer) confirming that you will comply with Section 5.3 of the Franchise Agreements and indicating the time period you anticipate will be reasonably necessary for compliance. Obviously, we are willing to be reasonable and flexible regarding timing, provided you are proceeding toward compliance in good faith and with appropriate speed.

Very truly yours,

Joseph L. Kadow
Senior Vice President and General Counsel

Cc:   Spencer Hall, Esquire
      Hall Zanzig Claflin McEachern

      Gregory L. Williams, Esquire

      Kenneth L. Myer, Esquire
      Short Cressman & Burgess

      Chris Sullivan
      Paul Avery

JJK/cjt

N:\Legal\CTroy\Evergreen\edwards & Jones.ltr.doc

# OUTBACK STEAKHOUSE, INC.

2202 N. WESTSHORE BLVD. – 5TH FLOOR, TAMPA, FLORIDA 33607
TELEPHONE: (813) 282-1225/FAX LEGAL: (813) 281-2114

### July 24, 2002

From:   Joe Kadow, Vice President and General Counsel
        Outback Steakhouse, Inc., Home Office

| To: | Company: | Facsimile No. | Telephone No. |
|-----|----------|---------------|---------------|
| Spencer Hall | Hall Zanzig… | 206-292-5901 | |
| Gregory Williams | | 249-7969 | |

# of pages, including this page:           3

**_IMPORTANT NOTICE: THIS INFORMATION IS CONFIDENTIAL AND PRIVATE_**

_This communication, which includes all the pages that are part of this transmission, is intended only for the use of the individual or entity to which it was inte0nded to be delivered. It may contain information that is privileged, proprietary, confidential and exempt from disclosure under applicable law. If the recipient or reader of this communication is not the intended recipient or the employee or agent responsible for delivery of the communication to the intended recipient, you are hereby notified that any use, application, revelation, disclosure, dissemination, distribution or copying of this communication is strictly prohibited._

_If you have received this communication in error, please notify us immediately by telephone, destroy all copies and return the original communication to us at the above address via mail or courier delivery. Thank you._

N:\Legal\CTroy\FAX\fax1.doc

**EXHIBIT G**

# OUTBACK STEAKHOUSE, INC.

2202 N. West Shore Blvd. • 5th Floor • Tampa, FL 33607
Phone (813) 282-1225 • Fax (813) 282-1209
www.outback.com

July 23, 2002

By Facsimile and US Mail

Spencer Hall, Esquire                    Gregory L. Williams, Esquire
Hall Zanzig Claflin McEarchern            3108 Prospect Road
1200 Fifth Avenue, Suite 1414             Tampa, FL 33629
Seattle, WA 98101

**Re:    Craig R. Edwards - Outback Steakhouse, Inc.**

Dear Spencer and Greg:

This letter is a general response to the correspondence between you that you copied to me, but primarily to Spencer's letter to Greg of June 28, 2002. I don't intend to take the time to dispute every point raised by Spencer and my failure to address any particular point should not be taken as agreement or acquiescence on my part.

With respect to Spencer's statement that Craig does not want to sell only a portion of his shares, quite frankly I think Craig's desires are not what are at issue here. Our interest is in compliance with the franchise agreements. This requires Cliff to have at least 50% ownership of the general partner entity. If Craig wants to sell more and Cliff wants to buy it, that is not my concern. But Craig cannot refuse to comply with the franchise agreements on the basis that he wants to sell only all of his position. I remind everyone that we are now dealing with the second time that we have been required to replace Craig as operating partner solely due to his own actions.

Spencer seems to claim we did not require Craig to comply with the franchise agreements because Craig does not own 50% of the actual franchisee entities. The reality is we have Craig throwing back in our face an accommodation that we made for him. Craig sat in my office and asked if it would be acceptable (since he was raising money on a restaurant-by-restaurant basis) if he maintained control at the general partner level, even though on a fully diluted ownership basis he would not own 50% of the franchise. We made that accommodation for Craig as we have made for a number of other franchisees. Now after accommodating Craig, he is attempting to misconstrue this.

We are imposing on Cliff the same requirement that we imposed on Craig, no more – no less. Cliff must own at least 50% of the entity that serves as sole general partner and controls the limited partnerships.

N:\Legal\CTroy\Evergreen\Hall&williams ltr.doc

With respect to valuation, if it will be of any assistance to you, we are willing to explain the formulas and methodologies we have used (subject to appropriate confidentiality agreements) to acquire franchised restaurants in the past. It should then be a relatively simple mathematical calculation to apply these formulas and methodologies to the Evergreen operation. What method you use is not our concern.

Gentlemen, more than enough time has gone by to have had this situation resolved. I feel Outback has been more than patient. Contrary to the assertions of Spencer's letter, our insistence on holding to the requirement that Cliff have 50% ownership is not the result of Cliff's lobbying. The first time Cliff was required to replace Craig we did not require Craig to surrender any ownership because we were hopeful that the replacement of Craig as operating partner would be temporary. In fact this was the case and Craig was able to return as operating partner.

Given the recurrence of the same problems that led to Craig's replacement the first time, and due to Craig's actions subsequent to this second replacement, it became clear that this was a permanent situation. That is the reason we are now requiring Craig and Cliff comply with the ownership requirement. Another example of leniency toward Craig being turned against us.

Please advise as to what you intend to do to resolve this situation. Evergreen has many individual investors involved. Craig and Cliff are not the only parties involved and I hope you will consider their interests as you deal with this matter. There is a readily ascertainable value for these interests and I hope you will proceed in good faith and with all reasonable speed to get this accomplished. Given the time that has elapsed, we will withhold from enforcing our rights under the franchise agreements for 30 days.

As always, Outback reserves all rights and remedies available to it under the franchise agreements and nothing contained herein should be construed as a waiver of any of those rights.

Very truly yours,

*Joseph J. Kadow /* *Signed for in his absence to avoid delay. Connie Troy*

Joseph J. Kadow
Senior Vice President and General Counsel

JJK/cjt

# BYLAWS

## OF

## EVERGREEN STATE RESTAURANT CORP.

**BYLAWS**

**TABLE OF CONTENTS**

ARTICLE I.        SHAREHOLDER MEETINGS....................   1

    Section 1    Time and Place..........................   1
    Section 2    Annual Meeting..........................   1
    Section 3    Special Meetings........................   1
    Section 4    Notices.................................   2
    Section 5    Telephonic Meeting......................   3
    Section 6    Quorum..................................   3
    Section 7    Proxies.................................   4
    Section 8    Action by Unanimous Consent.............   4
    Section 9    Election of Directors...................   5

ARTICLE II.       BOARD OF DIRECTORS MEETINGS............   5

    Section 1    Number and Qualification................   5
    Section 2    Election................................   5
    Section 3    Chairman of the Board...................   5
    Section 4    Vacancies...............................   6
    Section 5    Resignation and Removal.................   6
    Section 6    Annual Meetings.........................   7
    Section 7    Regular Meetings........................   7
    Section 8    Special Meetings........................   7
    Section 9    Notice..................................   7
    Section 10   Telephonic Meeting......................   8
    Section 11   Quorum..................................   8
    Section 12   Presumption of Assent...................   8
    Section 13   Action by Unanimous Consent.............   9
    Section 14   Combined Meeting of Directors
               and Shareholders.......................   9

ARTICLE III.      POWERS OF THE BOARD OF DIRECTORS.......   9

    Section 1    General Powers..........................   9
    Section 2    Director Compensation...................  10
    Section 3    Committees..............................  10

ARTICLE IV.       OFFICERS...............................  10

    Section 1    Officers Designated.....................  10
    Section 2    Officer Compensation....................  11
    Section 3    President...............................  11
    Section 4    Vice President..........................  11
    Section 5    Secretary...............................  11
    Section 6    Treasurer...............................  12
    Section 7    Dual Authority..........................  12
    Section 8    Resignation or Removal..................  12
    Section 9    Vacancies...............................  13

ARTICLE V.        REPAYMENT OF EXCESS COMPENSATION.......  13

ARTICLE VI.       INDEMNIFICATION........................ 14

    Section 1    Directors and Officers................. 14
    Section 2    Employees and Agents................... 14
    Section 3    Insurance.............................. 15

ARTICLE VII.     STOCK CERTIFICATES AND THEIR TRANSFER.. 15

    Section 1    Form................................... 15
    Section 2    Issuance............................... 16
    Section 3    Transfer............................... 16
    Section 4    Subscriptions.......................... 16
    Section 5    Record Date and Transfer Books........ 17
    Section 6    Voting Record.......................... 18

ARTICLE VIII.    BOOKS AND RECORDS...................... 18

    Section 1    Books of Accounts, Minutes, and
                     Share Register......................... 18
    Section 2    Copies of Resolutions.................. 20

ARTICLE IX.      AMENDMENT OF BYLAWS.................... 20

    Section 1    By the Shareholders.................... 20
    Section 2    By the Directors....................... 20

ARTICLE X.       RULES OF ORDER......................... 20

ARTICLE XI.      WAIVER OF NOTICE....................... 21

**BYLAWS**

**OF**

**EVERGREEN STATE RESTAURANT CORP.**

### ARTICLE I

### SHAREHOLDER MEETINGS

**Section 1.  Time and Place**:  All meetings of the shareholders shall be held at 10:00 a.m. at the registered office of the Corporation, unless the Board of Directors designates another time or place.

**Section 2.  Annual Meeting**:  The annual meeting of the shareholders shall be held during the month of the Corporation's license renewal or such other date as determined by the Board of Directors.  At the annual meeting of the shareholders, the officers shall report on the condition of the Corporation, and the shareholders shall elect directors for the following year. The failure to hold an annual meeting at the time and date specified in these Bylaws shall not affect the validity of any corporate action.

**Section 3.  Special Meetings**:  Special meetings of the shareholders may be called by the president, by a director, or by a shareholder or shareholders holding not less than ten percent (10%) of the outstanding stock of the Corporation entitled to vote on any issue proposed to be considered at the meeting.

Section 4.  Notices:  Written notice of all regular and special meetings stating the place, day, and hour of the meeting, shall be given to all shareholders entitled to vote at the meeting at least ten (10) days but not more than sixty (60) days prior to the meeting.  Written notice may be transmitted by mail, private carrier, or personal delivery, telegraph or teletype, or telephone, wire, or wireless equipment which transmits a facsimile of the notice.  Written notice is effective at the earliest of the following:  (a) when received; (b) upon deposit in the United States Mail if mailed with first class postage; (c) on the date shown on the return receipt, if sent by registered or certified mail, return receipt requested, and the receipt is signed by or on behalf of the addressee; or (d) upon successful transmission of a facsimile of the notice.

Notices of special meetings shall state the purposes for which the meeting has been called.  A regular or special meeting may be held at any time and place without notice if all shareholders are present in person or by proxy, or waive notice of the meeting.

Shareholders shall waive notice:  (a) in writing, signed by the shareholder and delivered to the Corporation for inclusion in the corporate records; (b) by attending the meeting, unless the shareholder at the beginning of the meeting objects to holding the meeting or transacting business at the meeting; or (c) by failing to object at the time of presentation of a matter

2

not within the purpose or purposes described in the meeting notice.

Section 5.  Telephonic Meeting:  One or more shareholders may participate in a shareholder meeting by means of telephone conference or similar communications equipment by which all persons participating in the meeting can hear each other during the meeting.  Participation in this manner shall constitute presence in person at the meeting.

Section 6.  Quorum:  A quorum for each voting group for a particular matter at any shareholder meeting shall be a majority of the outstanding stock of that group, represented in person or by proxy, entitled to vote on the issues being considered.  Once a share is represented at a meeting, other than to object to holding the meeting or transacting business, it is deemed to be present for quorum purposes for the remainder of the meeting and for any adjournment of that meeting unless a new record date is or must be set for the adjourned meeting.  If less than a quorum is represented at a meeting, the meeting may be adjourned to a future place and time without further notice unless a new record date is set.  At an adjourned meeting at which a quorum is represented, any business may be transacted that could have been transacted at the meeting as originally called.  If a quorum exists, action on a matter is approved by a voting group if the votes cast within the voting group favoring the action exceed the votes cast within the voting group opposing the action,

3

unless a different vote is required by law, the Articles of Incorporation, or these Bylaws.

Section 7. Proxies: Each shareholder entitled to vote on the issue being considered shall be entitled to vote, either in person or by proxy, as many shares as stand in his or her name on the books of the Corporation. Proxies shall be executed in writing by the shareholder or the shareholder's attorney-in-fact, and shall be filed with the secretary of the Corporation before or at the time of the meeting. Unless a longer period is stated therein, a proxy shall be invalid eleven (11) months after the date of its execution.

Section 8. Action by Unanimous Consent: Any action that may be taken at a shareholders' meeting may be taken without a meeting if a written consent setting forth the action so taken is signed by all shareholders entitled to vote with respect to the subject matter thereof. Any such consent shall be inserted in the minute book as if it were the minutes of a shareholders' meeting.

If RCW 23B requires that notice of proposed action be given to non-voting shareholders and the action is to be taken by unanimous consent of the voting shareholders, the Corporation must give its non-voting shareholders written notice of the proposed action at least 10 days before the action is taken. The notice must contain or be accompanied by the same material that, under RCW 23B, would have been required to be sent to non-voting shareholders and a notice of meeting at which the

4

proposed action would have been submitted to such shareholders for action.

Section 9.  Election of Directors:  Each shareholder entitled to vote at an election of directors may vote in person or by proxy the number of shares owned by him for as many persons as there are directors to be elected and for whose election he or she has a right to vote, or, unless the Articles of Incorporation provide otherwise, a shareholder may cumulate votes by distributing among one or more candidates as many votes as are equal to the number of such directors multiplied by the number of his or her shares.

## ARTICLE II

### BOARD OF DIRECTORS MEETINGS

Section 1.  Number and Qualification:  The Board of Directors of the Corporation shall consist of one or more members to be determined from time to time by a majority vote of the shareholders.  Directors need not hold stock in the Corporation or reside in Washington, but must have reached the age of majority.

Section 2.  Election:  The directors shall be elected each year by the shareholders at the annual shareholder meeting and shall serve until their successors have been elected and qualified, unless sooner removed pursuant to Article II, Section 5.

Section 3.  Chairman of the Board:  The Board of Directors may, if it so determines, elect from among its members a

5

Chairman of the Board, who shall preside at meetings of the Board of Directors and of the shareholders, and who shall have and may exercise such other powers and responsibilities as may, from time to time, be designated by the Board of Directors.

Section 4. Vacancies:  If a vacancy occurs among the directors, including a vacancy created by an increase in the number thereof, but excluding removal and election of a successor as provided herein, it shall be filled by the affirmative vote of a majority of the remaining directors (whether constituting a quorum or not) or by the shareholders, and such appointee shall hold office for the unexpired term of his predecessor in office and until a successor shall have been elected and qualified.

Section 5. Resignation and Removal:  Any director may resign at any time by giving written notice to the Board of Directors, the Chairman of the Board, the president, or secretary of the Corporation.  Any such resignation is effective when the notice is delivered unless the notice specifies a later effective date.

The shareholders may remove one or more directors, with or without cause, at a special meeting called for the purpose of removing the director, with the meeting notice stating removal as one of the purposes, pursuant to the procedures set forth in RCW 23B.08.080.

6

Section 6.  Annual Meetings:  The annual meeting of the Board of Directors shall be held on the same day and at the same location as the annual shareholder meeting.

Section 7.  Regular Meetings:  Regular meetings of the Board of Directors may be held at such times, dates and places as shall be fixed from time to time by the Board.

Section 8.  Special Meetings:  Special meetings of the Board of Directors may be called by the president, by a director, or by a shareholder or shareholders holding not less than ten percent (10%) of the outstanding voting stock of the Corporation.

Section 9.  Notice:  No written notice is necessary for regular or annual meetings.  Written notice of all special meetings shall be given to all directors at least two (2) days in advance of the meeting stating the time and place of the meeting.  A special meeting may be held at any time and place without notice if all directors are present in person or waive notice of the meeting.

Oral notice may be communicated in person or by telephone, wire or wireless equipment, which does not transmit a facsimile of the notice.  Oral notice is effective when communicated. Written notice may be transmitted by mail, private carrier, or personal delivery, telegraph or teletype, or telephone, wire or wireless equipment which transmits a facsimile of the notice. Written notice is effective at the earliest of the following: (a) when received; (b) five (5) days after its deposit in the

7

United States Mail if mailed with first class postage; (c) on the date shown on the return receipt, if sent by registered or certified mail, return receipt requested, and the receipt is signed by or on behalf of the addressee; or (d) upon successful transmission of a facsimile of the notice.

Section 10.  Telephonic Meeting:  One or more directors may participate in a meeting of the Board of Directors by means of telephone conference or similar communications equipment by which all directors participating in the meeting can hear each other during the meeting.  Participation in this manner shall constitute presence in person at the meeting.

Section 11.  Quorum:  A majority of the number of directors as determined by the shareholders in accordance with Article II, Section 1 hereof shall constitute a quorum.  Matters shall be decided by a majority of the directors at the meeting at which a quorum is present.  If less than a quorum is present at a meeting, the meeting may be adjourned to a future time and place without further notice.  At an adjourned meeting at which a quorum is present, any business may be transacted that could have been transacted at the meeting as originally called.

Section 12.  Presumption of Assent:  A director who is present at a meeting of the Board of Directors when action is taken is deemed to have assented to the action unless:  (a) the director objects to holding or transacting business at the meeting at the beginning of the meeting or promptly upon the director's arrival; (b) the director's dissent or abstention

from the action taken is entered in the minutes of the meeting; or (c) the director delivers written notice of the director's dissent or abstention to the presiding officer of the meeting before its adjournment or to the Corporation within a reasonable time after adjournment of the meeting. The right of dissent or abstention is not available to a director who votes in favor of the action taken.

Section 13.   Action by Unanimous Consent: Any action that may be taken at a directors' meeting may be taken without a meeting if a written consent approving the action is signed by all directors before or after the action taken, and delivered to the Corporation for inclusion in the corporate records.

Section 14.   Combined Meeting of Directors and Shareholders: At any regular or special meeting of the Board of Directors, if all of the outstanding voting stock is represented in person or by proxy, the meeting may, with unanimous shareholder consent, be conducted as a joint meeting of the directors and shareholders, and all business may be transacted and shall be of the same binding force and effect as though separate meetings had been held.

ARTICLE III

POWERS OF THE BOARD OF DIRECTORS

Section 1. General Powers: All corporate powers shall be exercised by or under the authority of, and the business and affairs of the Corporation shall be managed under the direction of, the Board of Directors except as otherwise provided by the

9

laws of the State of Washington or in the Articles of Incorporation.

Section 2. Director Compensation: The directors may be paid their reasonable expenses and/or a fixed sum for attendance at each meeting and/or a stated salary for services rendered as a director, as may be authorized by resolution of the Board of Directors. This provision shall not preclude any director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3. Committees. The Board of Directors may appoint committees consisting of two or more directors which shall have the power to act on behalf of the full Board of Directors to the extent provided in the resolution appointing the committee, except as restricted by RCW 23B.08.250.

ARTICLE IV

OFFICERS

Section 1. Officers Designated: The officers of this Corporation shall consist of a president and a secretary, each of whom shall be elected by the Board of Directors. The directors may also elect a treasurer, chief executive officer, one or more vice presidents, and such other officers as the Board of Directors may from time to time deem desirable or appropriate, and these officers shall perform such duties as may be assigned them by the Board of Directors. The officers shall be elected annually by the Board of Directors, and shall hold their offices until death, resignation, or their successors are

10

elected and qualified, unless sooner removed by the Board of
Directors, with or without cause, at a special meeting duly
called for that purpose.  Any two or more offices may be held by
the same person, including a director.

Section 2.  Officer Compensation:  The salary of all
officers shall be fixed by a majority vote of the Board of
Directors and may be changed from time to time as the Board of
Directors may determine.

Section 3.  President:  The president shall be the chief
executive officer of the Corporation (unless the Board of
Directors elects a different chief executive officer) and,
subject to the direction and control of the Board of Directors,
shall have general charge and supervision over the properties,
business, and affairs of the Corporation.  The president shall,
unless a Chairman of the Board is elected and is present,
preside at all meetings of the shareholders and the Board of
Directors.  The president shall be an ex officio member of all
committees, and shall perform such other duties as may be
required of him by the Board of Directors.

Section 4.  Vice President:  The vice president(s), if
elected, shall perform the duties of the president in the
absence of the president, and shall have and perform such other
duties as may be assigned by the Board of Directors or by the
president.

Section 5.  Secretary:  The secretary shall prepare minutes
of the directors' and shareholders' meetings.  The secretary

11

shall be responsible for keeping the records of the Corporation as described in Article VIII of these Bylaws. The secretary shall be the custodian of the corporate records and corporate seal (if any), shall be responsible for authenticating such corporate records and shall keep such other books and perform such other duties as may be required by law or assigned by the president or directors. The president may also authenticate the corporate records. In the absence of the secretary, a duly-elected assistant secretary or other officer shall perform such duties.

Section 6.  Treasurer: .Subject to the direction and control of the Board of Directors, the treasurer, if elected, shall have the custody, control, and responsibility for the funds and securities of the Corporation and shall account for the same and keep such books of account as the Board of Directors may require. The treasurer shall make reports of the financial condition of the Corporation to the president or the directors whenever requested, and a report of like character shall be submitted by the treasurer at the annual meeting of the shareholders. The treasurer shall, if required by the Board of Directors, give such bond as they may designate. In the absence of a treasurer, such duties shall be performed by a duly-elected assistant treasurer, or by the secretary.

Section 7.  Dual Authority: When any officer holds more than one position, the officer shall subscribe in accordance

12

with the work then at hand; that is, if then acting as vice president, he or she shall so designate.

Section 8.  Resignation or Removal:  Any officer may resign at any time by giving written notice to the Board of Directors, or to any officer of the Corporation.  Any such resignation is effective when the notice is delivered, unless the notice specifies a later date, and shall be without prejudice to the contract rights, if any, of such officer.

The Board of Directors, by majority vote of the entire Board, may remove any officer or agent appointed by it, with or without cause.  The removal shall be without prejudice to the contract rights, if any, of the person so removed.

Section 9.  Vacancies:  If the office of any officer becomes vacant by any reason, the Board of Directors may appoint a successor or successors who shall hold office for the unexpired term.

### ARTICLE V

### REPAYMENT OF EXCESS COMPENSATION

Any payments made to an officer or director of the Corporation as salary, commission, bonus, interest, rent, or expense reimbursements, which are disallowed in whole or in part by the Internal Revenue Service as a deductible expense, shall be repaid by such officer or director to the Corporation to the full extent of such disallowance.  It shall be the duty of the Board of Directors to enforce repayment of disallowed amounts. If authorized by the Board of Directors, proportionate amounts

may be deducted from the future compensation payments due to such officer or director until the amount owed to the Corporation has been recovered.

ARTICLE VI

INDEMNIFICATION

Section 1.  Directors:  The Corporation shall indemnify directors of the Corporation to the full extent permitted by RCW 23B.08.510, after authorizing such indemnification as required by RCW 23B.08.550.  If the Articles of Incorporation so provide, the Corporation shall indemnify the directors without regard to the limitations in RCW 23B.08.510 through RCW 23B.08.550.

The Board of Directors shall pay or reimburse the reasonable expenses incurred by a director by resolution adopted on a case-by-case basis, provided such payments or reimbursement is permitted by RCW 23B.08.530.  If the Corporation indemnifies or advances expenses to a director in connection with a proceeding by or in the right of the Corporation, the Corporation shall report the indemnification or advance in writing to the shareholders with or before the notice of the next shareholders' meeting.  Provided, however, in no event shall the Corporation indemnify a director made a party to a proceeding, or obligate itself to advance or reimburse expenses incurred in a proceeding from or on account of:

a.   Acts or omissions of the director finally adjudged to be intentional misconduct or a knowing violation of law;

14

b.    Conduct of the director finally adjudged to be in violation of RCW 23B.08.310;

c.    Any transaction with respect to which it was finally adjudged that such director personally received a benefit in money, property, or services to which the director was not legally entitled;

d.    Conduct deemed to be gross negligence.

Section 2.  Officers:  The Corporation shall indemnify and advance expenses to an officer who is not a director to the same extent as a director.

Section 3.  Employees and Agents:  The Corporation shall also have the power to indemnify employees and agents of the Corporation who are not officers and directors, to such extent as may be permitted by law, and as provided by the Articles of Incorporation, these Bylaws, general or specific action of the Board of Directors or contracts.

Section 4.  Insurance:  The Corporation shall have the power to purchase and maintain insurance on behalf of any person who is or was the director, officer, employee or agent of this Corporation, or who is or was serving at the request of the Corporation as an officer, employee or agent of another Corporation, partnership, joint venture, trust, other enterprise, or employee benefit plan, against any liability asserted against and incurred by that person in any such capacity or arising out of his or her status as such, whether or

15

not the Corporation would have the power to indemnify under the provisions of RCW 23B.08.510.

## ARTICLE VII

### STOCK CERTIFICATES AND THEIR TRANSFER

**Section 1.   Form:**  Stock certificates shall be signed by the president or vice president and by the secretary or an assistant secretary, and shall be endorsed to set forth written notice of any restrictions imposed on the transferability of such shares.  All certificates shall be consecutively numbered or otherwise identified.  The name and address of the person to whom the stock is issued and the number of shares and date of issue shall be entered on the stock transfer books of the Corporation.  Each stock certificate shall state on its face: (a) the name of the Corporation and that it is organized under the laws of the State of Washington; (b) the name of the person to whom the stock certificate is issued; and (c) the number and class of shares and the designation of the series, if any, the certificate represents.

**Section 2.   Issuance:**  No shares of the Corporation shall be issued unless authorized by the Board of Directors.  Such authorization shall include the maximum number of shares to be issued, the consideration received, and a statement that the consideration to be received for each share is adequate.  If shares are issued for other than cash, the Board of Directors shall determine the value of the consideration.

16

<u>Section 3.  Transfer</u>:  All certificates surrendered to the Corporation for transfer shall be canceled.  No new certificate shall be issued until the former certificates for a like number of shares have been surrendered and canceled, except that in case of a lost, destroyed or mutilated certificate, a new one may be issued therefor upon such terms and indemnity to the Corporation as the Board of Directors may prescribe.

<u>Section 4.  Subscriptions</u>:  Any stock subscription not paid in accordance with its terms may be collected as follows:

a.    A suit may be commenced to collect the unpaid balance of the subscription, or

b.    A notice shall be mailed to the subscriber at the last post office address known to the Corporation stating that, if the subscriber has not paid the amount due by a date at least 20 days after the date the notice is mailed, the Corporation will either (1) deem the subscription to have been forfeited and retain any sums paid as liquidated damages, or (2) will deem the subscription to have been forfeited.  In the event of a subsequent sale of any of the shares represented by the forfeited subscription, any excess of the proceeds realized over the amount due and unpaid on the subscription to the subscriber shall be paid to the delinquent subscriber, and the Corporation may hold the delinquent subscriber liable for any deficiency between the amount stated in the subscription, less the amounts paid by the subscriber and amounts realized on the subsequent sale.

Section 5.   Record Date and Transfer Books:  The Board of
Directors may fix in advance a record date for the purposes set
forth in RCW 23B.07.070, which shall not be more than seventy
(70) days nor less than ten (10) days prior to the date on which
the particular shareholder's action is to be taken.  If the
Board of Directors does not set a record date, the date on which
notice of the meeting is mailed or the date on which the
resolution of the Board of Directors declaring a dividend is
adopted, as the case may be, shall be the record date.  The
record date set shall apply for any adjournment of a
shareholders meeting unless the Board of Directors fixes a new
record date or the meeting is adjourned for more than one
hundred twenty (120) days after the initial record date.

Section 6.   Voting Record:  After fixing a record date for
a shareholders meeting, the secretary shall prepare an
alphabetical list of the names of all its shareholders on the
record date who are entitled to notice of a shareholders
meeting.  The list must be arranged by voting group, and within
each voting group by class or series of shares, and show the
address of and the number of shares held by each shareholder.
The shareholders list shall be available for inspection by any
shareholder, beginning ten (10) days prior to the meeting and
continuing through the meeting, at the Corporation's principal
office.  A shareholder, the shareholder's agent, or the
shareholder's attorney is entitled to inspect the list, during
regular business hours and at the shareholder's expense, during

18

the period it is available for inspection.  The Corporation shall make the shareholder's list available at the meeting, and any shareholder, the shareholder's agent, or the shareholder's attorney is entitled to inspect the list at any time during the meeting or any adjournment.

### ARTICLE VIII

### BOOKS AND RECORDS

Section 1.  Books of Accounts, Minutes, and Share Register. The Corporation:

a.  Shall keep as permanent records minutes of all meetings of its shareholders and Board of Directors, a record of all actions taken by the shareholders or Board of Directors without a meeting, and a record of all actions taken by a committee of the Board of Directors exercising the authority of the Board of Directors on behalf of the Corporation;

b.  Shall maintain appropriate accounting records;

c.  Shall maintain a record of its shareholders, in a form that permits preparation of a list of the names and addresses of all shareholders, in alphabetical order by class of shares showing the number and class of shares held by each; and

d.  Shall keep a copy of the following records at its principal office:

(1)  The Articles of Incorporation or Restated Articles of Incorporation and all amendments to them currently in effect;

(2)   The Bylaws or Restated Bylaws and all amendments to them currently in effect;

(3)   The minutes of all shareholders' meetings, and records of all actions taken by shareholders without a meeting, for the past three (3) years;

(4)   Its financial statements for the past three (3) years, including balance sheets showing in reasonable detail the financial condition of the Corporation as of the close of each fiscal year, and an income statement showing the results of its operations during each fiscal year prepared on the basis of generally accepted accounting principles or, if not, prepared on a basis explained therein;

(5)   All written communications to shareholders generally within the past three (3) years;

(6)   A list of the names and business addresses of its current directors and officers; and

(7)   Its most recent annual report delivered to the Washington Secretary of State.

Section 2.  Copies of Resolutions.  Any person dealing with the Corporation may rely upon a copy of any of the records of the proceedings, resolutions, or votes of the Board of Directors or shareholders, when certified by the president or secretary.

## ARTICLE IX

### AMENDMENT OF BYLAWS

**Section 1.  By the Shareholders:**  The shareholders, by a majority vote at any regular meeting of the shareholders or at any special meeting called for that purpose, may amend or repeal these Bylaws or adopt additional Bylaws.

**Section 2.  By the Directors:**  The Board of Directors may amend or repeal these Bylaws or adopt additional Bylaws, but shall not alter or repeal any Bylaws adopted by the shareholders.

## ARTICLE X

### RULES OF ORDER

The rules contained in the most recent edition of Robert's Rules of Order shall govern all meetings of shareholders and directors where those rules are not inconsistent with the Articles of Incorporation, Bylaws, or any special rules of order of the Corporation.

## ARTICLE XI

### WAIVER OF NOTICE

Whenever any notice of meeting is required to be given to any shareholder or director under the provisions of these Bylaws, the Articles of Incorporation or the Washington Business Corporation Act (RCW 23B), a written waiver of notice signed by the person or persons entitled to such notice and delivered to the Corporation for inclusion in the corporate records, whether

21

executed before or after the meeting, shall be deemed equivalent to the giving of such notice.

BE IT KNOWN that the foregoing Bylaws were adopted by the Board of Directors as the Bylaws of this Corporation, effective _10/16_____, 1994.  In witness whereof, I do hereunto subscribe my name as president and secretary of this Corporation.

Craig R. Edwards, President and Secretary

22

____ FILED          ____ ENTERED
____ LODGED         ____ RECEIVED

★    JAN 21 2003    ★

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                          DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| RAYMOND LEICH, a resident of Florida, derivatively on behalf of EVERGREEN STATE RESTAURANT CORP., <br><br> Plaintiff, <br><br> v. <br><br> CRAIG and JANE DOE EDWARDS, Washington residents, and their marital community, <br><br> Defendants, <br><br> and <br><br> EVERGREEN STATE RESTAURANT CORP., a Washington corporation, <br><br> Nominal Defendant. | NO. **C03-0108** ℞ <br><br> COMPLAINT |

Plaintiff, by and through his attorneys Tousley Brain Stephens PLLC, alleges as follows:

## I. PARTIES

1.1    Plaintiff Raymond Leich is a resident of Florida and was, at all times relevant hereto, a stockholder and member of the Board of Directors of Nominal Defendant Evergreen State Restaurant Corp. ("Evergreen").



COMPLAINT - 1
3962\001\147870.01

**Exhibit A**

TOUSLEY BRAIN STEPHENS PLLC
700 Fifth Avenue, Suite 5600
Seattle, Washington 98104-5056
TEL. 206.682.5600 • FAX 206.682.2992

1  1.2  Defendants Craig and Jane Doe Edwards are husband and wife, residents of

2 Washington, and constitute a marital community pursuant to the laws of Washington.  All acts

3 alleged to have been performed herein by Defendant Craig Edwards were performed on behalf

4 of himself and the marital community composed of him and Jane Doe Edwards.  Defendant

5 Craig Edwards was, at all times relevant hereto, the majority stockholder and Chairman of the

6 Board of Directors of Evergreen and directly participated in the wrongful conduct alleged

7 herein.

8  1.3  Nominal Defendant Evergreen is a privately held corporation incorporated under

9 the laws of Washington, with its principal executive offices located in Bellevue, King County,

10 Washington.  Evergreen is engaged in the ownership and operation of restaurants franchised

11 under an agreement with Outback Steakhouse, Inc. ("Outback").

12         **II.  JURISDICTION AND VENUE**

13  2.1  This Court has jurisdiction over the subject matter of this action pursuant to

14 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of

15 interest and costs, and the dispute is between citizens of different states.  This action was not

16 brought collusively to confer jurisdiction on a court of the United States that it would not

17 otherwise have.

18  2.2  Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(1) and (2)

19 because Defendants Edwards reside in this district and because many of the alleged acts

20 occurred in this district.

21         **III.  FACTUAL ALLEGATIONS**

22

23  3.1  Evergreen, along with various limited partners, owns and operates 27 Outback

24 restaurants in the Northwest (the "Restaurants").  These Restaurants are franchised under

25 franchise agreements with Outback (the "Agreements").

26

TOUSLEY BRAIN STEPHENS PLLC
700 Fifth Avenue, Suite 5600
Seattle, Washington 98104-5056
TEL. 206.682.5600 • FAX 206.682.2992

3.2     Section 5.3(a) of the Agreements reads:

Section 5.3 Operating Partner.   If Franchisee is not an individual, Franchisee shall designate an individual to serve as the "Operating Partner" of the Restaurant.   The Operating Partner shall, at all times, meet the following qualifications:

(a)     The Operating Partner shall own at least fifty percent (50%) voting interest in Franchisee and at least fifty percent (50%) voting interest through any voting apparatus in Franchisee during the entire period he serves as Operating Partner.

3.3     All of the Restaurants are owned by Evergreen State Limited Partnerships ("ESLP") Nos. 1–27. Each individual ESLP is controlled 50% by Evergreen as the General Partner, with the other 50% belonging to certain Limited Partners. The ESLPs are individually named as the Franchisees under the Agreements.

3.4     In 1993, Defendant Craig Edwards first approached Mr. Clifford Jones about investing in the Northwest franchise. Mr. Jones offered to be a passive, limited partner investor of up to 10% in each Outback restaurant.

3.5.     In 1994, Defendant Craig Edwards was granted the Northwest franchise rights for Outback and qualified by Outback as an Operating Partner under Section 5.3 of the Agreements.

3.6     In 1994, Defendant Craig Edwards confided in Mr. Jones that he was in over his head financially and was having difficulty running the franchise. He asked Mr. Jones if he would become a shareholder in Evergreen and not simply an investor in the limited partnerships. Mr. Jones agreed, but stressed to Defendant Craig Edwards that he was not interested in taking on a full-time operating position.

3.7     Defendant Craig Edwards and Mr. Jones agreed that Mr. Jones would invest $400,000 and become a 30% owner, while Defendant Craig Edwards would invest $200,000 and the franchise rights to become a 70% owner.

3.8     Mr. Jones wrote his check for $400,000 while, concealed from Mr. Jones, Defendant Craig Edwards contributed only $164,900 of the promised $200,000.

TOUSLEY BRAIN STEPHENS PLLC
700 Fifth Avenue, Suite 5600
Seattle, Washington 98104-5056
TEL. 206.682.5600 • FAX 206.682.2992

3.9     During that same year, Defendant Craig Edwards and Mr. Jones asked Mr. Leich to become a shareholder; he agreed, paying the same amount per share as Mr. Jones.

3.10    Subsequently, Evergreen was owned 69.3% by Defendant Craig Edwards, 29.7% by Mr. Jones, and 1% by Mr. Leich, and each served as a director of Evergreen.

3.11    In the summer of 1995, Mr. Leich contacted Mr. Jones and stated his concern that Defendant Craig Edwards was drinking heavily and having some serious behavioral problems that were affecting Defendant Craig Edwards' ability to manage Evergreen.

3.12    During the summer of 1995, Defendant Craig Edwards was absent, neglected necessary work required on the restaurant leases, and ignored important decisions. Defendant Craig Edwards made numerous promises that things would be and were being taken care of, but they were not.

3.13    In July 1995, Mr. Jones was informed that Chris Sullivan, CEO of Outback, wanted a meeting with all of the Evergreen shareholders regarding Defendant Craig Edwards' inept management and behavioral problems. Mr. Sullivan first met privately with Mr. Jones and requested that he step in and run Evergreen in order to get things back in shape. In order to help both Evergreen and Defendant Craig Edwards, Mr. Jones accepted the offer.

3.14    In a meeting with all of the Shareholders, Mr. Sullivan informed them that Mr. Jones was taking over and he demanded that Defendant Craig Edwards remedy his behavioral problems or the franchise rights would be pulled. Defendant Craig Edwards then entered an alcohol treatment program.

3.15    During the next 18 months, Mr. Jones, at his own expense, traveled to Seattle, often staying for over 30 days, in order to get Evergreen and its restaurants up and running. Mr. Jones took no salary and the only compensation he received during this period was to reimburse him for his out-of-pocket expenses. The compensation consisted of a one-time fee of $60,000 plus $10,000 for each new lease originated. Evergreen's Board specified that this

TOUSLEY BRAIN STEPHENS PLLC
700 Fifth Avenue, Suite 5600
Seattle, Washington 98104-5056
TEL. 206.682.5600 • FAX 206.682.2992

1   arrangement was limited and applicable only to Mr. Jones for services he provided through

2   December 1996.

3       3.16    At the end of 1996, after securing eight leases with six others pending, opening

4   and growing eight restaurants, and moving Evergreen and its restaurants to profitability,

5   Mr. Jones relinquished operating control back to Defendant Craig Edwards.  The Board once

6   again named Defendant Craig Edwards president and CEO, with the hope that he would now be

7   able to manage the operations effectively.

8       3.17    Immediately after the 1998 Board meeting, Defendant Craig Edwards revealed

9   to the Board that, in addition to his salary, he desired to pay himself the $10,000 one-time per

10  lease fee that was initially used to partially cover Mr. Jones' expenses during the 18-month

11  period Mr. Jones was running Evergreen.

12      3.18    Both Mr. Leich and Mr. Jones informed Defendant Craig Edwards that it was

13  not appropriate for him to take this additional money from Evergreen and that any such

14  payments were improper and unauthorized.

15      3.19    Defendant Craig Edwards agreed that he would not take the distributions.

16      3.20    During 1998 and 1999, Mr. Jones and Mr. Leich received distributions with

17  minimal information from Defendant Craig Edwards, but with his assurance that things were

18  going well.

19      3.21    Near the end of 1999, Mr. Jones and Mr. Leich began receiving reports that

20  Defendant Craig Edwards was again having behavioral problems.

21      3.22    These reports were verified in early 2000 when Defendant Craig Edwards was

22  found intoxicated in Evergreen's parking lot.

23      3.23    Mr. Leich notified Mr. Sullivan of the problem and Defendant Craig Edwards

24  agreed to return to alcohol treatment.

25

26

TOUSLEY BRAIN STEPHENS PLLC
700 Fifth Avenue, Suite 5600
Seattle, Washington  98104-5056
TEL. 206.682.5600 • FAX 206.682.2992

1    3.24   In September 2000, after his second period of rehabilitation, Defendant Craig

2    Edwards held a meeting in Florida with a number of investors and Paul Avery, Outback's

3    president.

4    3.25   As a result of the meeting and a subsequent verbal confrontation between

5    Defendant Craig Edwards and a limited partner in the Franchisees (Jim Woodside),

6    Mr. Sullivan contacted Mr. Jones in Germany and requested a face-to-face meeting.

7    3.26   At that meeting, Mr. Sullivan told Mr. Jones that because of the ongoing

8    problems created by Defendant Craig Edwards' inept management of Evergreen, Outback had

9    three options to resolve the problem: (1) roll up the Northwest franchise; (2) turn over the

10   franchise management to Tom Shannon, who operates franchises in California; or (3) that

11   Mr. Jones return to Evergreen and take over operational control of Evergreen.  The first two

12   options would result in extreme damage to the value of Evergreen.

13   3.27   Although he had no interest in a full-time operating position, Mr. Jones, in order

14   to protect his investment and those of the other shareholders and investors, returned to Seattle

15   and once again took over operational control of Evergreen.  Mr. Sullivan informed Defendant

16   Craig Edwards that he was being removed as Operating Partner and that he was not to be

17   involved, in any way, in the operations of the restaurants, and was not to have any visible

18   presence in connection with any Outback business or facility.

19   3.28   In January 2001, Mr. Jones returned to operational control of Evergreen.

20   Thereafter, he began to uncover the serious mismanagement of and breaches of fiduciary duty

21   that Defendant Craig Edwards had committed during his tenure as president and CEO.

22   3.29   Mr. Jones also discovered severe personnel issues, was forced to dismiss both

23   management and operational personnel, and forced to defend sexual harassment claims.  The

24   costs and expenses of these personnel matters were extremely detrimental to Evergreen and

25   were caused directly by Defendant Craig Edwards' poor management, lack of policies,

26   procedures, training, hiring, and compliance.

COMPLAINT - 6
3962\0011\47870.01

TOUSLEY BRAIN STEPHENS PLLC
700 Fifth Avenue, Suite 5600
Seattle, Washington 98104-5056
TEL. 206.682.5600 • FAX 206.682.2992

1       3.30    Defendant Craig Edwards chose not to pay sales tax on the equipment purchased

2   for the restaurants. Once Mr. Jones and Mr. Leich were informed about this illegal conduct,

3   they demanded that he correct the situation; Defendant Craig Edwards chose not to comply. As

4   a result, Evergreen was forced to pay over $600,000 in back taxes, interest, and audit expenses.

5       3.31    Upon financial review, Mr. Jones discovered that, in spite of his assurances to

6   the contrary, Defendant Craig Edwards had been paying himself $10,000 per lease, and, in fact,

7   had raised the charge to $15,000 per lease in addition to his salary, and in direct opposition to

8   the direction of the Board in 1998.

9       3.32    Upon financial review, Mr. Jones found, along with numerous other accounting

10  inaccuracies, that because of the financial mismanagement of Defendant Craig Edwards,

11  Evergreen's 27 restaurants had a working capital deficit of over $3 million. The deficit was a

12  direct violation of Section 6.2 of the Agreements.

13      3.33    In response to Mr. Jones' continued efforts to rectify the problems caused by

14  Defendant Craig Edwards, Defendant Craig Edwards continually accused Mr. Jones of

15  misconduct and threatened to terminate Mr. Jones based on Mr. Edwards' voting control of

16  69.3% of Evergreen.

17      3.34    Because of Defendant Craig Edwards' threats, Mr. Leich and Mr. Jones

18  attempted to structure a shareholders agreement. Mr. Jones subsequently discussed this

19  agreement with Outback's General Counsel, Joseph Kadow. At Mr. Kadow's request,

20  Mr. Jones attempted to structure a proxy for Defendant Craig Edwards to sign to ensure proper

21  management of Evergreen and to placate Outback's desire for compliance with the

22  Agreements.

23      3.35    After conferring with Mr. Sullivan and agreeing to sign the proxy with a

24  five-year limit, Defendant Craig Edwards summarily refused to execute the document.

25

26

TOUSLEY BRAIN STEPHENS PLLC
700 Fifth Avenue, Suite 5600
Seattle, Washington 98104-5056
TEL. 206.682.5600 • FAX 206.682.2992

1        3.36    As a result of Defendant Craig Edwards' sudden "change of heart" with regard

2    to the proxy agreement, Outback demanded that Evergreen comply not only with the provisions

3    of Section 5.3 concerning voting power, but also with those concerning ownership.

4        3.37    In response to Outback's then current demands, Mr. Jones offered a reasonable

5    solution to the problem of share ownership in Evergreen.  The proposal allowed for the

6    purchase of a sufficient number of shares to give Mr. Jones a 50% ownership in Evergreen,

7    with a valuation based on the same formula used by Outback when valuing franchises for

8    purchase.  Although this solution would not have been in strict compliance with Section 5.3 of

9    the Agreements, Outback agreed to approve such a structure.

10        3.38    As with all other attempts to save and enhance value in Evergreen, these efforts

11    have been unsuccessful, due to Defendant Craig Edwards' unreasonable positions.

12        3.39    On January 13, 2003, an independent certified public accounting firm, Hagen

13    Streiff Newton & Oshiro, retained to conduct a review of Evergreen financial matters,

14    submitted its findings.  The findings, based only upon a sampling of several Outback locations,

15    found misleading financial information and improper and illegal acts of Defendant Craig

16    Edwards (a CPA and former partner of one of the largest accounting firms in the country),

17    including, but not limited to, the following: improper recording of credits; failure to pay

18    required contributions; misleading overstatements of equity; non-compliance with debt

19    restrictions; materially misstated capital account balances; and repeated and blatant

20    duplications of expense reimbursements and fraudulent reimbursement claims, all

21    demonstrating blatant and egregious conduct by Defendant Craig Edwards.

22        3.40    While this report only tested certain locations, it is obvious that a thorough

23    forensic accounting review would expose many millions of dollars in irregularities during

24    Defendant Craig Edwards' tenure.

25

26

TOUSLEY BRAIN STEPHENS PLLC
700 Fifth Avenue, Suite 5600
Seattle, Washington 98104-5056
TEL. 206.682.5600 • FAX 206.682.2992

## IV. DEMAND HAS BEEN MADE TO THE BOARD

4.1     Evergreen's minority shareholders issued a letter to the Board of Directors on January 20, 2003, demanding that they take corrective action by commencing suit against Defendant Craig Edwards to recover damages and to force Defendant Craig Edwards to immediately comply with the provisions of the Franchise Agreements.  These demands were refused.  Any further demand is futile, as Defendant Craig Edwards is Chairman of the Board and the majority shareholder of Evergreen.

## V. FIRST CAUSE OF ACTION:
## BREACH OF FIDUCIARY DUTY

5.1     Plaintiff incorporates paragraphs 1.1–4.1 above as though fully set forth herein.

5.2     By virtue of his position as Chairman and controlling shareholder of Evergreen, Defendant Craig Edwards had the power to control, and did control Evergreen's business and corporate affairs.

5.3     By virtue of his position as Chairman and controlling shareholder of Evergreen, Defendant Craig Edwards owes Evergreen and its shareholders a duty to act as a fiduciary in regard to Evergreen's affairs and is required to use his ability to control and manage Evergreen in a fair, just, and equitable manner; maximize shareholder value; act in furtherance of the best interests of Evergreen and its shareholders; refrain from abusing his position of control; and not favor his own interests at the expense of Evergreen and its shareholders.

5.4     By virtue of the acts and conduct alleged herein, Defendant Craig Edwards has breached his fiduciary duties of care, loyalty, and accountability to Evergreen and its shareholders.

5.5     As a direct result of Defendant Craig Edwards' wrongful conduct and actions, Evergreen has suffered considerable damage in an amount to be proven at trial.

## VI. SECOND CAUSE OF ACTION:
## CORPORATE WASTE

6.1     Plaintiff incorporates paragraphs 1.1–4.1 above as though fully set forth herein.

TOUSLEY BRAIN STEPHENS PLLC
700 Fifth Avenue, Suite 5600
Seattle, Washington 98104-5056
TEL. 206.682.5600 • FAX 206.682.2992

1     6.2    By virtue of his position as Chairman and controlling shareholder of Evergreen,

2 Defendant Craig Edwards had the power to control, and did control, Evergreen's business and

3 corporate affairs.

4     6.3    By virtue of the acts and conduct alleged herein, Defendant Craig Edwards

5 misused corporate assets for his own gain and that of his marital community and has misused

6 and wasted Evergreen's corporate assets.

7     6.4    As a direct result of Defendant Craig Edwards' wrongful conduct and actions,

8 Evergreen has suffered considerable damage in an amount to be proven at trial.

9
## VII. THIRD CAUSE OF ACTION:
## MINORITY SHAREHOLDER OPPRESSION
10

11     7.1    Plaintiff incorporates paragraphs 1.1–4.1 above as though fully set forth herein.

12     7.2    By virtue of his position as Chairman and controlling shareholder of Evergreen,

13 Defendant Craig Edwards had the power to control, and did control, Evergreen's business and

14 corporate affairs.

15     7.3    By virtue of his position as Chairman and controlling shareholder of Evergreen,

16 Defendant Craig Edwards owes Evergreen and its shareholders fiduciary obligations and is

17 required to use his ability to control and manage Evergreen in a fair, just, and equitable manner;

18 maximize shareholder value; act in furtherance of the best interests of Evergreen and its

19 shareholders; refrain from abusing his position of control; and not favor his own interests at the

20 expense of Evergreen and its shareholders.

21     7.4    Defendant Craig Edwards has used Evergreen's treasury as his own personal

22 bank account, paying personal debts with corporate funds, and misappropriating and converting

23 corporate funds for his own purposes.

24     7.5    Defendant Craig Edwards' actions have violated the agreements and

25 representations that were relied upon by Mr. Leich and Mr. Jones, as minority shareholders.

26

COMPLAINT - 10
3962\0011\147870.01

TOUSLEY BRAIN STEPHENS PLLC
700 Fifth Avenue, Suite 5600
Seattle, Washington 98104-5056
TEL 206.682.5600 • FAX 206.682.2992

1    7.6    Defendant Craig Edwards has engaged in burdensome, harsh, and wrongful

2    conduct in his role as Chairman and controlling shareholder.  His actions show a lack of probity

3    and fair dealing and are a visible departure from the fair play that Mr. Jones and Mr. Leich

4    were entitled to expect as shareholders.

5    7.7    By virtue of the acts and conduct alleged herein, Defendant Craig Edwards has

6    oppressed the rights of Evergreen's minority shareholders.

7    7.8    As a direct result of Defendant Craig Edwards' wrongful conduct and actions,

8    Evergreen and its shareholders have suffered considerable damage in an amount to be proven at

9    trial.

10    **VIII.  FOURTH CAUSE OF ACTION:**
    **INJUNCTIVE RELIEF**

11

12    8.1    Plaintiff incorporates paragraphs 1.1–4.1 above as though fully set forth herein.

13    8.2    By virtue of his position as Chairman and controlling shareholder of Evergreen,

14    Defendant Craig Edwards had the power to control, and did control, Evergreen's business and

15    corporate affairs.

16    8.3    By virtue of his position as Chairman and controlling shareholder of Evergreen,

17    Defendant Craig Edwards owes Evergreen and its shareholders fiduciary obligations and is

18    required to use his ability to control and manage Evergreen in a fair, just, and equitable manner;

19    *maximize shareholder value; act in furtherance of the best interests of Evergreen and its*

20    shareholders; refrain from abusing his position of control; and not favor his own interests at the

21    expense of Evergreen and its shareholders.

22    8.4    By virtue of the acts and conduct alleged herein, Defendant Craig Edwards has

23    caused the violations of the Franchise Agreements and continues to endanger the viability of

24    Evergreen's only valuable assets.

25    8.5    Evergreen and the shareholders have suffered, and will continue to suffer,

26    irreparable injury from Defendant Craig Edwards' continued activities, which resulted in

TOUSLEY BRAIN STEPHENS PLLC
700 Fifth Avenue, Suite 5600
Seattle, Washington 98104-5056
TEL. 206.682.5600 • FAX 206.682.2992

1  violations of the Franchise Agreements.  Accordingly, mandatory injunctive relief compelling

2  Defendant Craig Edwards to take such steps necessary to ensure compliance with the Franchise

3  Agreements is appropriate.

### IX.  FIFTH CAUSE OF ACTION:
### CONVERSION

6  9.1  Plaintiff incorporates paragraphs 1.1–4.1 above as though fully set forth herein.

7  9.2  By virtue of his position as Chairman and controlling shareholder of Evergreen,

8  Defendant Craig Edwards had the power to control, and did control, Evergreen's business and

9  corporate affairs.

10  9.3  By virtue of the acts and conduct alleged herein, Defendant Craig Edwards has

11  permanently interfered with the possessory rights and interests in the corporate assets of

12  Evergreen and its shareholders and is liable for the value thereof.

13  9.4  As a direct result of Defendant Craig Edwards' conversion, Evergreen has

14  suffered considerable damage in an amount to be proven at trial.

### X.  SIXTH CAUSE OF ACTION:
### UNJUST ENRICHMENT

17  10.1  Plaintiff incorporates paragraphs 1.1–4.1 above as though fully set forth herein.

18  10.2  By virtue of his position as Chairman and controlling shareholder of Evergreen,

19  Defendant Craig Edwards had the power to control, and did control, Evergreen's business and

20  corporate affairs.

21  10.3  By virtue of the acts and conduct alleged herein, Defendants Edwards received

22  monies and benefits and wrongfully accepted and retained those monies and benefits to the

23  detriment of Evergreen and its shareholders.

24  10.4  Defendants Edwards' enrichment at the expense of Evergreen and the

25  shareholders was unjust.  It is unconscionable for Defendants Edwards to retain the monies

26

TOUSLEY BRAIN STEPHENS PLLC
700 Fifth Avenue, Suite 5600
Seattle, Washington  98104-5056
TEL. 206.682.5600 • FAX 206.682.2992

1   received and any interest thereon and proceeds therefrom, as a result of Defendant Craig

2   Edwards' wrongful activities.

3       10.5    As a direct result of Defendants Edwards' unjust enrichment, Evergreen and the

4   shareholders are entitled to damages in an amount to be proved at trial.

5 **XI. PRAYER FOR RELIEF**

6       WHEREFORE, plaintiff prays for judgment as follows:

7       11.1    An award of damages in an amount to be proved at trial, including, but not

8   limited to, the amount of all of the salaries and other compensation received by Defendant

9   Craig Edwards for the periods when Defendant Craig Edwards breached his fiduciary duties;

10      11.2    Restitution to Evergreen of all sums unlawfully received by Defendants, along

11   with interest from the date received;

12      11.3    Declaratory relief by the Court that Defendants are required to pay to Evergreen

13   69.3% of the amount required to remedy the working capital deficiency within the Northwest

14   Franchises and return the Franchisees to compliance with Section 6.2 of the Agreements;

15      11.4    Injunctive relief requiring Defendant Craig Edwards to sell all of his shares in

16   Evergreen to Evergreen at a price determined in accordance with the valuation paid by Outback

17   when purchasing a franchise;

18      11.5    Pre- and post-judgment interest as allowed by law;

19      11.6    Plaintiff's attorneys' fees, expert fees, and other costs and expenses of this

20   litigation to be awarded against Evergreen and Defendant Craig Edwards, as provided by law;

21      11.7    Such other and further relief as this Court may deem just and proper.

22

23

24

25

26

COMPLAINT - 13
3962\001\147870.01

TOUSLEY BRAIN STEPHENS PLLC
700 Fifth Avenue, Suite 5600
Seattle, Washington 98104-5056
TEL 206.682.5600 • FAX 206.682.2992

1    DATED this ___21ˢᵗ___ day of January, 2003.

2                                    TOUSLEY BRAIN STEPHENS PLLC

3

4                                    By:_____

5                                        David D. Hoff, WSBA #99
                                         Janissa A. Strabuk, WSBA #21827
6                                        700 Fifth Avenue, Suite 5056
                                         Seattle, WA  98104-5056
7                                        Telephone:  206.682.5600
                                         Attorneys for Plaintiff
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT - 14
396Z\001\147870.01

1                                          Honorable Barbara J. Rothstein

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

8  RAYMOND LEICH, a resident of Florida,   )
derivatively on behalf of EVERGREEN     )
9  STATE RESTAURANT CORP.,             )

10                 Plaintiff,      )     NO. C03-0108BJR
                           )
11                        )
            vs.              )     ANSWER TO COMPLAINT,
12                        )     COUNTERCLAIMS AND
  CRAIG and JANE DOE EDWARDS,        )     THIRD-PARTY CLAIMS
13  Washington residents, and their        )
  marital community,                )
14                        )
                         )
15               Defendants   )
                         )
16               and          )
                         )
17                        )
  EVERGREEN STATE RESTAURANT      )
18  CORP., a Washington corporation,      )
                         )
19                        )
          Nominal Defendant.   )
20  _____ )
  CRAIG R. EDWARDS, on his own behalf  )
21  and on behalf of EVERGREEN STATE   )
  RESTAURANT CORP.,              )
22                        )
                         )
23          Counterclaimant and   )
          Third-Party Plaintiff,  )
24                        )
                         )
25            vs.             )
                         )
26

**Exhibit B**

HALL ZANZIG CLAFLIN MCEACHERN
1200 Fifth Ave., Suite 1414, Seattle, WA 98101   206.292.5900

1 | RAYMOND M. LEICH, an individual;            )
2 | CLIFFORD L. JONES and LINDA JONES,          )
  | and their marital community; and            )
3 | EVERGREEN RESTAURANT VENTURES,              )
  | INC., a Washington corporation,             )
4 |                                             )
5 |               Counterclaim Defendant and   )
  |               Third-Party Defendants.       )
6 | _____)

7   Craig R. Edwards and Jane Doe Edwards, in answer to plaintiff's

8   Complaint, state:

9

10                      **INTRODUCTION**

11       Plaintiff's claims are procedurally defective and without substance.

12  Plaintiff has not complied, and cannot comply, with Rule 23.1 of the Federal Rules of Civil

13  Procedure.

14       Plaintiff's Complaint falsely alleges that plaintiff was unable to get

15

16  Evergreen to take action.  Plaintiff could have caused Evergreen to assert the claims that

17  are the subject of this action, but plaintiff made a tactical decision not to do so.  Plaintiff

18  and another director, Clifford L. Jones ("Jones"), are jointly represented by counsel of

19  record for plaintiff.  Jones is President and Chief Executive Officer of Evergreen.  Plaintiff

20

21  and Jones voted down their own proposal for Evergreen to assert claims against

22  defendants.

23       On Monday, January 20, 2003, at a meeting of Evergreen's board of

24

25  directors, plaintiff presented defendant Edwards with a letter from Tousley Brain

26  Stephens PLLC, a law firm jointly retained by plaintiff and fellow director Jones.  The

ANSWER TO COMPLAINT, COUNTERCLAIMS          HALL ZANZIG CLAFLIN MCEACHERN
AND THIRD-PARTY CLAIMS - 2                   1200 Fifth Ave., Suite 1414, Seattle, WA 98101   206.292.5900
Cause No. C03-0108BIR

1  letter contained a demand on behalf of plaintiff and Jones that "Evergreen's Board of

2  Director's immediately commence litigation against Mr. Edwards." Before receiving this

3  letter, Edwards was unaware that plaintiff and Jones desired to sue him or that they were

4  jointly represented by counsel. During the same meeting, Jones called for a vote by the

5

6  board of directors on whether to commence litigation against Edwards. Plaintiff and

7  Jones both voted against the proposal. On the following day, plaintiff filed this action

8  alleging that he was unable to get Evergreen to take action against Edwards.

9

10       Plaintiff is responsible for the accounting practices that are the subject of

11  plaintiff's Complaint. Plaintiff is a certified public accountant. Plaintiff has provided

12  professional accounting services to Evergreen throughout its existence. Evergreen has

13  paid plaintiff and his accounting firm, Leich & Associates, substantial fees to advise

14  Evergreen regarding the proper accounting treatment for Evergreen's financial

15  transactions. Plaintiff has been treasurer for Evergreen since at least 1995. Evergreen's

16

17  accounting system was set up and maintained in accordance with plaintiff's

18  recommendations. Plaintiff has prepared Evergreen's tax returns since Evergreen was

19  formed. The independent accounting firm of Willett Zevenbergen & Bennett has

20

21  regularly audited or reviewed the financial statements for the limited partnerships

22  managed by Evergreen. Plaintiff approved the accounting data that Evergreen provided

23  to Willett Zevenbergen & Bennett.

24

25       Assuming that plaintiff has any legitimate concerns, which he does not,

26  plaintiff made no reasonable effort to address such concerns without litigation. In April

1    2002, Jones caused Evergreen to retain the accounting firm of Hagen, Streiff, Newton &

2    Oshiro to review selected accounting transactions.  The transactions to be reviewed had

3    been approved by plaintiff and by Willett Zevenbergen & Bennett, the independent

4

5    accounting firm regularly retained by Evergreen.  The Hagen firm took approximately

6    nine months to prepare the report referenced in plaintiff's Complaint.  The Hagen firm's

7    report includes transactions dating back more than eight years.  Plaintiff prepared his

8    Complaint before the Hagen firm's report was disclosed to defendants or to the

9

10   independent accounting firm regularly retained by Evergreen.  Plaintiff provided a copy

11   of the Hagen firm's report to defendants less than three business days before plaintiff

12   filed this lawsuit.

13

14          Plaintiff's Complaint contains no verification as required by Rule 23.1.

15   Plaintiff cannot truthfully provide such verification.

16                       **I.  PARTIES**

17          1.1     Defendants admit that Raymond Leich ("Leich") is a shareholder and

18   member of the Board of Directors of Evergreen State Restaurant Corp. ("Evergreen").

19

20   Defendants lack information sufficient to admit or deny the allegation that plaintiff's legal

21   residence is Florida.  Defendants deny all other allegations in paragraph 1.1.

22          1.2     Defendants admit that Craig R. Edwards ("Edwards") is married,

23   and that he and his wife are residents of Washington.  Defendants admit that Edwards is

24

25   the majority shareholder and Chairman of the Board of Directors of Evergreen.

26   Defendants deny all other allegations in paragraph 1.2.

1        1.3     Defendants admit that Evergreen is incorporated under the laws of

2 Washington and that it has three shareholders.  Evergreen's office is in Bellevue,

3 Washington, in King County.  Evergreen owns interests in and provides management and

4 accounting services for restaurants operated pursuant to franchise agreements with

5

6 Outback Steakhouse of Florida, Inc. ("Outback").  Defendants deny all other allegations in

7 paragraph 1.3.

8

9 **II.  JURISDICTION AND VENUE**

10        2.1     Defendants admit that the amount in controversy exceeds $75,000,

11 exclusive of interest and costs.  Defendants deny all other allegations in paragraph 2.1.

12        2.2     Defendants admit that, to the extent there is jurisdiction, venue in this

13 district is proper.

14

15 **III.  FACTUAL ALLEGATIONS**

16        3.1     Edwards admits that Evergreen owns interests in Evergreen State

17 Limited Partnerships 1 through 27 (the "Limited Partnerships").  Each of the Limited

18 Partnerships owns and operates an Outback Steakhouse restaurant in the Northwest

19

20 pursuant to a franchise agreement with Outback.  Evergreen is required to provide

21 management and accounting services for the restaurants pursuant to the franchise

22 agreements and the agreements for the Limited Partnerships.  Defendants deny all other

23 allegations in paragraph 3.1.

24

25        3.2     Edwards admits that one or more franchise agreements for the

26 Limited Partnerships contain the language quoted in paragraph 3.2 of plaintiff's

ANSWER TO COMPLAINT, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS - 5
Cause No. C03-0108BIR

HALL ZANZIG CLAFLIN MCEACHERN
1200 Fifth Ave., Suite 1414, Seattle, WA 98101   206.292.5900

1 Complaint.  Defendants deny all other allegations in paragraph 3.2.

2      3.3      Edwards admits that Evergreen owns varying interests in the Limited

3 Partnerships.  Each of the Limited Partnerships is a franchisee under a franchise

4 agreement with Outback.  Defendants deny all other allegations in paragraph 3.3.

5

6      3.4      Defendants deny the allegations in paragraph 3.4.

7      3.5      Defendants admit the allegations in paragraph 3.5.

8      3.6      Defendants deny the allegations in paragraph 3.6.

9

10      3.7      Defendants admit the allegations in paragraph 3.7.

11      3.8      Edwards admits that Jones and Edwards made initial investments in

12 Evergreen as agreed.  Edwards admits that his initial investment consisted of more than

13 one payment.  Edwards denies that he concealed the timing of his investment from Jones.

14

15 Defendants deny all other allegations in paragraph 3.8.

16      3.9      Edwards admits that Leich acquired one share of Evergreen stock in

17 1995 for approximately $13,000.  Defendants deny all other allegations in paragraph 3.9.

18      3.10      Edwards admits that the shareholders of Evergreen State Restaurant

19

20 Corp. own 101 shares of stock.  Edwards owns 70 shares, Jones owns 30 shares of stock,

21 and Leich owns one share.  Defendants admit that Edwards, Jones, and Leich comprise

22 the Board of Directors of Evergreen.  Defendants admit that the percentages of ownership

23

24 stated in paragraph 3.10 of plaintiff's Complaint are correct subject to rounding errors.

25 Defendants deny all other allegations in paragraph 3.10.

26      3.11      Defendants deny the allegations in paragraph 3.11 based on lack of

1   information.  Defendants do not know whether Leich made the alleged statements to

2   Jones.

3          3.12   Defendants deny the allegations in paragraph 3.12.

4

5          3.13   Edwards admits that in approximately August 1995 Chris Sullivan,

6   CEO of Outback, met with Edwards and Jones regarding the management of Evergreen

7   and the franchises. At that meeting, Sullivan asked that Jones oversee the operations of

8   Evergreen for six months so that Edwards could participate in an alcohol treatment

9   program.  Edwards and Jones concurred.  Defendants lack information sufficient to admit

10   or deny the allegation about a private meeting between Jones and Sullivan.  Defendants

11   deny all other allegations in paragraph 13.

12          3.14   Edwards admits that Sullivan insisted that Edwards seek alcohol

13   treatment.  Sullivan indicated that Edwards' failure to obtain such treatment could

14   jeopardize his ability to participate in Outback franchises.  Edwards completed an alcohol

15   treatment program as requested.  Defendants deny all other allegations in paragraph 3.14.

16          3.15   Edwards admits that from approximately August 1995 to February

17   1996, Jones made various trips to Seattle and devoted additional time to Evergreen's

18   operations.  Edwards admits that Jones was compensated as agreed.  Defendants deny all

19   other allegations in paragraph 3.15.

20          3.16   Edwards admits that Jones was President of Evergreen from

21   approximately September 1995 until December 1996.  On December 5, 1995, Edwards was

22   elected Chief Executive Officer of Evergreen.  In December 1996, Edwards was reelected

23

24

25

26

President.  Defendants deny all other allegations in paragraph 3.16.

        3.17    Defendants deny the allegations in paragraph 3.17.

        3.18    Defendants deny the allegations in paragraph 3.18.

        3.19    Defendants deny the allegations in paragraph 3.19.

        3.20    Edwards admits that Evergreen's operations were "going well" in 1998 and 1999 and that Jones and Leich received appropriate distributions from Evergreen.  Edwards denies that Jones and Leich were limited to "minimal information" relating to Evergreen's operations.  Defendants deny all other allegations in paragraph 3.20.

        3.21    Defendants deny the allegations in paragraph 3.21 based on lack of information.

        3.22    Edwards admits that in 2000 he had a reoccurrence of alcohol problems.  Defendants deny all other allegations in paragraph 3.22.

        3.23    Edwards admits that in approximately June 2000 he returned to alcohol treatment.  Defendants deny all other allegations in paragraph 3.23.

        3.24    Edwards admits that in September 2000 there was a meeting in Florida attended by Paul Avery, Marc Drewry, Mark Johnson, Leich, Edwards, and several limited partners in the Limited Partnerships.  Defendants deny all other allegations in paragraph 3.24.

        3.25    Edwards admits that he had a discussion with Jim Woodside in the lobby of the hotel following the meeting referenced in paragraph 3.24 above.  Edwards

1  denies that there was any "confrontation" with Woodside. Defendants deny all other

2  allegations in paragraph 3.25 based on lack of information.

3
4       3.26    Defendants deny the allegations regarding a meeting between

5  Sullivan and Jones based on lack of information. Defendants deny the allegations about

6  what options would cause harm to Evergreen on the ground that those allegations are not

7  sufficiently detailed to permit a meaningful response. Defendants deny all other

8
9  allegations in paragraph 3.26.

10      3.27    Edwards admits that Outback advised Edwards that he was no

11  longer acceptable to Outback as Operating Partner. Outback advised Edwards that Jones

12  or Shannon would be acceptable as Operating Partner. Outback also stated that

13
14  Evergreen could propose other candidates for Operating Partner subject to Outback's

15  approval. Outback did not want Edwards to have continuing involvement in restaurant

16  operations. Jones asked Edwards if he would agree to Jones' assuming responsibility for

17  Evergreen's operations. Jones said that he would look out for Edwards' interests and

18
19  protect Edwards' investment. Jones said that he would do a better job than Shannon

20  would. Defendants deny all other allegations in paragraph 3.27.

21      3.28    Edwards admits that in January 2001, with Edwards' approval, Jones

22  was elected President and CEO of Evergreen and assumed control of Evergreen's

23  franchise operations. Defendants deny all other allegations in paragraph 3.28.

24
25      3.29    Edwards admits that Jones dismissed certain management and

26  operational personnel, including persons hired by Jones. Edwards also admits that

1   Evergreen was required to deal with sexual harassment claims relating to certain Outback

2   restaurants.  Defendants deny all other allegations in paragraph 3.29.

3           3.30    Edwards admits that Evergreen did not pay Washington sales tax on

4   certain equipment purchased through Outback.  There was a factual and legal basis for

5   Evergreen's actions.  Plaintiff concurred in the decision not to pay sales tax on such

6   purchases.  The State of Washington took the position that sales tax was due, and sales

7   taxes were paid with interest.  Defendants deny all other allegations in paragraph 3.30.

8
9           3.31    Defendants deny the allegations in paragraph 3.31.

10          3.32    Defendants deny the allegations in paragraph 3.32.

11          3.33    Edwards admits that he expressed concern about Jones' handling of

12
13  Evergreen's funds and Jones' refusal to permit access to Evergreen's books and records.

14  Defendants deny all other allegations in paragraph 3.33.

15
16          3.34    Defendants deny the allegations in paragraph 3.34.

17          3.35    Edwards admits that he declined to execute certain irrevocable

18  proxies proposed by Jones.  Defendants deny all other allegations in paragraph 3.35.

19
20          3.36    Edwards admits that in May 2002 Outback requested that Evergreen

21  comply with Section 5.3 of the franchise agreements.  Defendants deny all other

22  allegations in paragraph 3.36.

23
24          3.37    Edwards denies that Jones has made a reasonable proposal for

25  resolving issues relating to the control of Evergreen.  Outback has never required

26  compliance with Section 5.3 of the franchise agreements.  Defendants deny plaintiff's

1  allegations regarding conversations between Jones and Outback based on lack of

2  information.  Defendants deny all other allegations in paragraph 3.37.

3

4          3.38    Defendants deny the allegations in paragraph 3.38.

5          3.39    Edwards admits that in April 2002, Jones caused Evergreen to retain

6  the accounting firm of Hagen, Streiff, Newton & Oshiro to review selected accounting

7  transactions.  The transactions to be reviewed had been approved by plaintiff and by

8
9  Willett Zevenbergen & Bennett, the independent accounting firm regularly retained by

10 Evergreen.  With Jones' input, the Hagen firm prepared a report that is critical of

11 Evergreen's accounting practices.  Edwards denies that such criticisms are valid.  Plaintiff

12 is responsible for the accounting practices that are the subject of plaintiff's Complaint.

13 Defendants deny all other allegations in paragraph 3.39.

14

15              **IV.  DEMAND HAS BEEN MADE TO THE BOARD**

16          4.1     Edwards admits that on January 20, 2003, plaintiff and Jones

17 submitted a demand on Evergreen's Board of Directors to commence litigation against

18 Edwards.  Plaintiff and Jones constitute a majority of Evergreen's Board of Directors.

19
20 Jones is President and Chief Executive Officer of Evergreen.  Plaintiff and Jones voted

21 down their own proposal for Evergreen to assert claims against Edwards.  Plaintiff filed

22 this action the following day.  Defendants deny all other allegations in paragraph 4.1.

23 /////
24

25

26

ANSWER TO COMPLAINT, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS - 11
Cause No. C03-0108BJR

HALL ZANZIG CLAFLIN McEACHERN
1200 Fifth Ave., Suite 1414, Seattle, WA 98101    206.292.5900

## V.  FIRST CAUSE OF ACTION:
## BREACH OF FIDUCIARY DUTY

5.1     Defendants incorporate by reference their responses to paragraphs 1.1 through 4.1 above.

5.2     Edwards admits that he is the majority shareholder and Chairman of the Board of Directors of Evergreen, and that he has the rights available to a person in those positions.  Defendants deny that Edwards has misused any rights available to him.  Defendants deny all other allegations in paragraph 5.2.

5.3     Defendants admit that as the majority shareholder and Chairman of the Board of Directors of Evergreen, Craig Edwards has such duties as are imposed by Evergreen's Articles of Incorporation and Bylaws and by applicable law.  Defendants deny all other allegations in paragraph 5.3.

5.4     Defendants deny the allegations in paragraph 5.4.

5.5     Defendants deny the allegations in paragraph 5.5.

## VI.  SECOND CAUSE OF ACTION:
## CORPORATE WASTE

6.1     Defendants incorporate by reference their responses to paragraphs 1.1 through 5.5 above.

6.2     Edwards admits that he is the majority shareholder and Chairman of the Board of Directors of Evergreen, and that he has the rights available to a person in those positions.  Defendants deny that Edwards has misused any rights available to him.  Defendants deny all other allegations in paragraph 6.2.

6.3     Defendants deny the allegations in paragraph 6.3.

6.4     Defendants deny the allegations in paragraph 6.4.

### VII.  THIRD CAUSE OF ACTION: MINORITY SHAREHOLDER OPPRESSION

7.1     Defendants incorporate by reference their responses to paragraphs 1.1 through 6.4 above.

7.2     Edwards admits that he is the majority shareholder and Chairman of the Board of Directors of Evergreen, and that he has the rights available to a person in those positions.  Defendants deny that Edwards has misused any rights available to him. Defendants deny all other allegations in paragraph 7.2.

7.3     Defendants admit that as the majority shareholder and Chairman of the Board of Directors of Evergreen, Craig Edwards has such duties as are imposed by Evergreen's Articles of Incorporation and Bylaws and by applicable law.  Defendants deny all other allegations in paragraph 7.3.

7.4     Defendants deny the allegations in paragraph 7.4.

7.5     Defendants deny the allegations in paragraph 7.5.

7.6     Defendants deny the allegations in paragraph 7.6.

7.7     Defendants deny the allegations in paragraph 7.7.

7.8     Defendants deny the allegations in paragraph 7.8.

### VIII.  FOURTH CAUSE OF ACTION: INJUNCTIVE RELIEF

8.1     Defendants incorporate by reference their responses to

paragraphs 1.1 through 7.8 above.

8.2     Edwards admits that he is the majority shareholder and Chairman of the Board of Directors of Evergreen, and that he has the rights available to a person in those positions.  Defendants deny that Edwards has misused any rights available to him.  Defendants deny all other allegations in paragraph 8.2.

8.3     Defendants admit that as the majority shareholder and Chairman of the Board of Directors of Evergreen, Craig Edwards has such duties as are imposed by Evergreen's Articles of Incorporation and Bylaws and by applicable law.  Defendants deny all other allegations in paragraph 8.3.

8.4     Defendants deny the allegations in paragraph 8.4.

### IX.  FIFTH CAUSE OF ACTION:
### CONVERSION

9.1     Defendants incorporate by reference their responses to paragraphs 1.1 through 8.4 above.

9.2     Edwards admits that he is the majority shareholder and Chairman of the Board of Directors of Evergreen, and that he has the rights available to a person in those positions.  Defendants deny that Edwards has misused any rights available to him.  Defendants deny all other allegations in paragraph 9.2.

9.3     Defendants deny the allegations in paragraph 9.3.

9.4     Defendants deny the allegations in paragraph 9.4.

/////

## X.  SIXTH CAUSE OF ACTION
## UNJUST ENRICHMENT

10.1    Defendants incorporate by reference their responses to paragraphs 1.1 through 9.4 above.

10.2    Edwards admits that he is the majority shareholder and Chairman of the Board of Directors of Evergreen, and that he has the rights available to a person in those positions.  Defendants deny that Edwards has misused any rights available to him.  Defendants deny all other allegations in paragraph 10.2.

10.3    Defendants deny the allegations in paragraph 10.3.

10.4    Defendants deny the allegations in paragraph 10.4.

10.5    Defendants deny the allegations in paragraph 10.5.

## XI.  MISCELLANEOUS

11.1    Defendants deny all allegations not admitted above.

11.2    Defendants reserve the right to amend this answer following discovery.

## DEFENSES

Defendants assert the following defenses:

1.    Plaintiff's Complaint fails to state a claim upon which relief can be granted.

2.    This action was brought collusively to confer jurisdiction on a court of the United States that it would not otherwise have.

ANSWER TO COMPLAINT, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS - 15

HALL ZANZIG CLAFLIN MCEACHERN
1200 Fifth Ave., Suite 1414, Seattle, WA 98101   206.292.5900

3.      Plaintiff's claims are barred by plaintiff's failure to comply with Rule 23.1 of the Federal Rules of Civil Procedure.

4.      Plaintiff's claims are barred by the doctrines of waiver and estoppel.

5.      Plaintiff's claims are barred by lack of standing.

6.      Plaintiff's claims are barred by applicable statues of limitation.

7.      Plaintiff's claims are barred by plaintiff's wrongful conduct.

8.      Plaintiff's claims are barred by plaintiff's unreasonable and uncooperative conduct.

9.      Plaintiff's claims are barred by plaintiff's failure to join an indispensable party.

## COUNTERCLAIMS AND THIRD-PARTY CLAIMS

Craig R. Edwards, on his own behalf and on behalf of Evergreen State Restaurant Corp., asserts the following counterclaims and third-party claims against Raymond M. Leich, Clifford L. Jones and Linda Jones, husband and wife, and Evergreen Restaurant Ventures, Inc., a Washington Corporation.

### Parties

1.      Counterclaimant and third-party plaintiff, Craig R. Edwards ("Edwards"), is a resident of Washington.  Edwards owns approximately 69 percent of the stock of Evergreen State Restaurant Corp.

2.      Counterclaim and third-party defendant Raymond M. Leich ("Leich") is a resident of a state other than Washington.  Leich owns approximately one

1   percent of the stock of Evergreen State Restaurant Corp.  Leich is a member of the Board

2   of Directors of Evergreen.

3          3.      Third-party defendants Clifford L. Jones ("Jones") and Linda Jones

4   
5   are husband and wife and are residents of Washington.  Jones owns approximately

6   30 percent of the stock of Evergreen State Restaurant Corp.  Jones is President and CEO

7   and a member of the Board of Directors of Evergreen.  All of Jones' actions that are the

8   
9   subject of these counterclaims and third-party claims were taken for the benefit of his

10  marital community.

11         4.      Evergreen State Restaurant Corp. ("Evergreen") is a Washington

12  corporation.  Evergreen was formed in 1994.  Edwards, Jones and Leich are the sole

13  
14  shareholders of Evergreen.  Evergreen has 101 shares of stock issued and outstanding.

15  Edwards owns 70 shares of Evergreen stock.  Jones owns 30 shares of Evergreen stock.

16  Leich owns 1 share of Evergreen stock.  The Board of Directors of Evergreen consists of

17  Edwards, Jones and Leich.  Edwards is Chairman of the Board of Evergreen.  Jones is

18  
19  President and CEO of Evergreen.  Leich is Secretary/Treasurer of Evergreen.

20         5.      Third-party defendant Evergreen Restaurant Ventures, Inc. is a

21  Washington corporation.

22                          **Jurisdiction**

23         6.      The court has jurisdiction over these counterclaims and third party

24  
25  claims pursuant to 28 USC § 1366 because the counterclaims and third party claims are so

26  related to plaintiff's claims that they form part of the same case or controversy.

ANSWER TO COMPLAINT, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS - 17
Cause No. C03-0108BJR

HALL ZANZIG CLAFLIN MCEACHERN
1200 Fifth Ave., Suite 1414, Seattle, WA 98101    206.292.5900

**Background**

7.     Edwards was a partner in the accounting firm of DeLoitte & Touche for approximately 23 years. He served a variety of clients in the restaurant industry, including Outback Steakhouse, Inc. In 1994, he resigned from DeLoitte & Touche to found Evergreen. The business plan for Evergreen was to invest in and operate Outback Steakhouse Restaurants in the Northwest. At the time, Outback had no restaurants in this part of the country.

8.     Evergreen opened its first Outback Steakhouse Restaurant in March 1995. From 1995 through 2000, Evergreen opened 27 Outback Steakhouse Restaurants in Washington, Oregon, Alaska and Idaho.

9.     Evergreen is a participant in joint ventures that are the general partners in Evergreen State Limited Partnerships 1 through 27 (the "Limited Partnerships"). Each of the Limited Partnerships owns and operates an Outback Steakhouse restaurant pursuant to a franchise agreement with Outback Steakhouse of Florida, Inc. ("Outback").

10.     Edwards was President or CEO of Evergreen from the time Evergreen was founded in 1994 until January 2001, except for a brief period of approximately three months in 1995. Edwards was President of Evergreen from 1994 until September 1995, and from December 1996 until January 2001. Edwards was CEO of Evergreen from December 1995 until January 2001. Jones was President of Evergreen from September 1995 until December 1996. Leich has been Treasurer of Evergreen from

1995 to the present.

11.     While Edwards was in charge, Evergreen's operations were successful. In 1998, for example, Outback selected Evergreen as "Franchise of the Year."

**Operating Partner**

12.     All the Outback Steakhouse Restaurant Franchise Agreements for the Limited Partnerships provide that if the Franchisee is not an individual, the Franchisee will designate an individual to serve as the "Operating Partner." The Franchise Agreements provide that the Operating Partner will be a person acceptable to both Franchisee and Franchisor.

13.     Edwards was designated as Operating Partner for all the Limited Partnerships. Edwards' designation as Operating Partner was approved by the Limited Partnerships and by Outback.

**Change in Operating Partner**

14.     In 2000, Evergreen's operations were impacted by a general economic downturn. At the end of 2000, Outback asked Evergreen to name a new Operating Partner.

15.     Outback told Evergreen that Jones would be acceptable as Operating Partner for the Limited Partnerships.

16.     Outback told Evergreen that Tom Shannon, an individual who is Operating Partner for other Outback Steakhouse Restaurants, would also be acceptable as Operating Partner for the Limited Partnerships.

ANSWER TO COMPLAINT, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS - 19

HALL ZANZIG CLAFLIN MCEACHERN
1200 Fifth Ave., Suite 1414, Seattle, WA 98101   206.292.5900

17.     Jones asked Edwards to agree to Jones' assuming responsibility for Evergreen's operations. Jones said that he would look out for Edwards' interests and protect Edwards' investment.

18.     In January 2001, Edwards, Jones and Leich elected Jones President and CEO of Evergreen.

19.     In January 2001, Evergreen designated Jones as Operating Partner for the Limited Partnerships.

20.     Outback approved Evergreen's designation of Jones as Operating Partner for the Limited Partnerships.

### Evergreen Ventures

21.     In January 2001, Jones formed a new Washington corporation named Evergreen Restaurant Ventures, Inc. ("Evergreen Ventures").

22.     Jones is President and CEO of Evergreen Ventures.

23.     Jones is the controlling shareholder of Evergreen Ventures.

24.     Jones and Leich are directors of Evergreen Ventures.

25.     Leich is Treasurer of Evergreen Ventures.

26.     Jones proposed that Evergreen Ventures, as opposed to Evergreen, own an interest in and manage all additional Outback Steakhouse Restaurants opened in the Northwest.

27.     Jones proposed that Evergreen use Evergreen Ventures to provide management and accounting services to Evergreen's Limited Partnerships.

## Corporate Legal Counsel

28.     In January 2001, Jones directed Evergreen's legal counsel, Short Cressman & Burgess PLLC ("Short Cressman"), to prepare legal documents needed to accomplish Jones' objectives.

29.     Short Cressman prepared a checklist of agreements and other items that would be required to accomplish Jones' objectives.

30.     Short Cressman advised Jones and Edwards that Short Cressman had conflicts of interest with respect to the differing interests of Evergreen and Evergreen Ventures and the shareholders of those entities.

31.     Short Cressman advised the shareholders of Evergreen and Evergreen Ventures to consult with independent counsel.

## Operations of Evergreen Ventures

32.     Following Short Cressman's advice that the shareholders consult with independent counsel, Jones proceeded to implement his plans without any agreement between Evergreen and Evergreen Ventures or among the shareholders of those entities.

33.     Since January 2001, Evergreen Ventures has opened five Outback Steakhouse Restaurants.  Evergreen Ventures owns controlling interests in and manages those restaurants.  Evergreen had largely completed development of all those restaurants before Jones transferred them to Evergreen Ventures.

34.     Evergreen Ventures has employed all of Evergreens' employees.

ANSWER TO COMPLAINT, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS - 21

35.     Evergreen Ventures has taken the office space used by Evergreen.

36.     Evergreen Ventures is using Evergreen's former employees to provide management and accounting services to Evergreen's Limited Partnerships.

37.     Jones is depositing Evergreen's funds into Evergreen Ventures' bank accounts.

38.     Jones and Evergreen Ventures are using funds belonging to Evergreen for the operations of Evergreen Ventures.

39.     Jones has denied Edwards access to the books and records of Evergreen.

40.     Leich has supported and assisted Jones in the above activities.

**Management Fees**

41.     All the partnership agreements for the Limited Partnerships provide that Evergreen will receive a fee based on a percentage of the gross sales of the Outback Steakhouse Restaurants for providing management and accounting services to the Limited Partnerships ("Management Fees").

42.     All Management Fees from the Limited Partnerships are property of Evergreen.

43.     When Edwards was Operating Partner, all Management Fees from the Limited Partnerships were paid to Evergreen.  Evergreen paid Edwards a salary.

44.     Jones has taken the position that Jones' status as Operating Partner excuses him from paying the Management Fees from the Limited Partnerships to

Evergreen. Instead of taking a salary from Evergreen, Jones is directing all the Management Fees to Evergreen Ventures. Jones and Evergreen Ventures then refuse to account for their use of the Management Fees.

45. Jones is using all Management Fees from the Limited Partnerships for the benefit of Jones and Evergreen Ventures.

46. Jones has refused to use any of the Management Fees from the Limited Partnerships to pay Evergreen's expenses.

### Corporate Credit

47. Jones and Evergreen Ventures are using the credit of Evergreen and the Limited Partnerships for the benefit of Evergreen Ventures.

48. Jones and Evergreen Ventures have pledged the assets of Evergreen and the Limited Partnerships for the benefit of Evergreen Ventures.

### Conflicts of Interest

49. Jones has a conflicting interest as defined by RCW 23B.08.700 with respect to any transaction between Evergreen and Evergreen Ventures.

50. Leich has a conflicting interest as defined by RCW 23B.08.700 with respect to any transaction between Evergreen and Evergreen Ventures.

51. To the extent Leich and Jones as officers and directors of Evergreen purport to have approved any transaction benefiting Evergreen Ventures, such purported approval is invalid.

52. Jones has a conflicting interest as defined by RCW 23B.08.700 with

1 │ respect to any transaction between Evergreen and Jones.

2
3
4

53.     To the extent Jones as an officer and director of Evergreen purports to have approved any transaction benefiting Jones, such purported approval is invalid.

5
6

54.     Leich has a conflicting interest as defined by RCW 23B.08.700 with respect to any transaction between Evergreen and Leich.

7
8
9

55.     To the extent Leich as an officer and director of Evergreen purports to have approved any transaction benefiting Leich, such purported approval is invalid.

10

**Accounting Malpractice**

11

56.     Leich is a certified public accountant.

12
13

57.     Leich has provided professional accounting services to Evergreen throughout its existence.

14
15
16
17

58.     Evergreen has paid Leich and his accounting firm substantial fees to advise Evergreen regarding the proper accounting treatment for Evergreen's financial transactions.

18
19
20
21

59.     Leich has been Treasurer for Evergreen since at least 1995. Evergreen's accounting system was set up and maintained in accordance with plaintiff's recommendations.

22
23
24

60.     Leich has prepared Evergreen's tax returns since Evergreen was formed.

25
26

61.     The independent accounting firm of Willett Zevenbergen & Bennett has regularly audited or reviewed the financial statements for the limited partnerships

1  managed by Evergreen.

2      62.    Leich has approved the accounting data that Evergreen provided to

3  Willett Zevenbergen & Bennett.

4

5      63.    Leich failed to make proper disclosure of conflicts of interest and to

6  obtain effective waivers of such conflicts when rendering accounting services to

7  Evergreen.

8      64.    To the extent that Evergreen may be determined to have used any

9

10 improper accounting practice, Leich is liable for accounting malpractice.

11     65.    Whether or not Evergreen is determined to have used any improper

12 accounting practice, Leich should be required to disgorge to Evergreen all fees paid to

13 him for accounting services.

14

15                    **Harm to Evergreen and Edwards**

16     66.    The actions of Jones, Leich and Evergreen Ventures have caused

17 money damages to Evergreen and Edwards.

18

19     67.    The actions of Jones, Leich and Evergreen Ventures have caused

20 irreparable harm to Evergreen and Edwards.

21     68.    The actions of Jones, Leich and Evergreen Ventures are causing

22 continuing harm to Evergreen and Edwards.

23                          **Unjust Enrichment**

24

25     69.    Jones, Leich and Evergreen Ventures have been unjustly enriched by

26 their actions.

ANSWER TO COMPLAINT, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS - 25
Cause No. C03-0108BJR

HALL ZANZIG CLAFLIN McEACHERN
1200 Fifth Ave., Suite 1414, Seattle, WA 98101   206.292.5900

**Refusal to Cooperate**

70.     Jones and Leich have refused to make any reasonable effort to resolve the differences of the parties.

71.     Edwards proposed a shareholders agreement but received no meaningful response. Jones has never proposed any shareholders agreement to Edwards.

72.     Jones has indicated a desire to purchase some or all of Edwards' stock in Evergreen, but Jones refused to propose a price. Jones insisted that Edwards propose a price. When Edwards proposed a price, Jones criticized Edwards' proposed price as excessive.

73.     Edwards indicated to Jones and Leich that Edwards would prefer not to take legal action. Edwards suggested to Jones and Leich that the parties use a third party mediator in an effort to resolve their differences. Jones and Leich responded with this lawsuit.

74.     Leich's claims against Edwards are without merit. Leich's claims were asserted solely for tactical purposes. Leich and Jones are jointly represented by Leich's counsel of record. It appears that Jones was not named as a plaintiff because naming Jones would preclude diversity jurisdiction.

**Derivative Action**

75.     Edwards was a shareholder of Evergreen at the time of the wrongful actions of Jones, Leich and Evergreen Ventures.

76.     The counterclaims and third-party claims are not collusive claims to

1    confer jurisdiction on a court of the United States that it would not otherwise have.

2        77.    Edwards has made repeated requests that Jones, Leich and Evergreen

3    Ventures cease their wrongful conduct.

4

5                            **Causes of Action**

6        78.    Jones' actions constitute self-dealing, breach of fiduciary duties,

7    conversion, corporate waste, misappropriation of corporate assets, misappropriation of

8    corporate opportunities, unjust enrichment, and otherwise violate Jones' duties as an

9

10   officer and director of Evergreen.

11       79.    Leich's actions constitute self-dealing, breach of fiduciary duties,

12   conversion, corporate waste, misappropriation of corporate assets, misappropriation of

13   corporate opportunities, unjust enrichment, and otherwise violate Leich's' duties as an

14

15   officer and director of Evergreen.  Leich's actions also constitute negligence and

16   accounting malpractice.

17       80.    Evergreen Ventures' actions constitute conversion, interference with

18   contractual relationships, interference with business opportunities, unjust enrichment,

19

20   and otherwise violate applicable law.

21                            **PRAYER FOR RELIEF**

22       WHEREFORE, defendants, counterclaimant and third-party plaintiff

23   request the following relief against Leich, Jones and his marital community, and

24

25   Evergreen Ventures:

26       1.    Dismissal with prejudice of all claims asserted by Leich either on his

---

ANSWER TO COMPLAINT, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS - 27
Cause No. C03-0108BIR

HALL ZANZIG CLAFLIN MCEACHERN
1200 Fifth Ave., Suite 1414, Seattle, WA 98101   206.292.5900

own behalf or on behalf of Evergreen ;

2. An award of damages in favor of Edwards and Evergreen in an amount to be proven at trial;

3. Disgorgement to Evergreen of all fees paid to Leich for accounting services;

4. Injunctive relief as may be necessary to stop the continuing misconduct of Leich, Jones and Evergreen Ventures;

5. An award of costs and reasonable attorneys' fees; and

3. Such other relief as the Court deems just and proper.

DATED this ___13___ day of February, 2003.

HALL ZANZIG CLAFLIN MCEACHERN PLLC

By_____
Spencer Hall
WSB No. 6162
Attorneys for Defendants, Counterclaimant
and Third-Party Plaintiff

<u>VERIFICATION</u>

STATE OF WASHINGTON    )
                                 )   ss.
COUNTY OF KING            )

CRAIG R. EDWARDS, being duly sworn, states:

That he is the counterclaimant and third-party plaintiff in the above-captioned matter; that he has read the counterclaim and third-party claims and believes the allegations set forth in these claims to be true.

_____
Craig R. Edwards

SUBSCRIBED AND SWORN to before me this __13th__ day of February, 2003.

_____
(Signature of Notary)
KAREN A. BENEDICT
(Printed Name)

Notary Public in and for the State of Washington, residing at _Bellevue_
My Commission expires _3-1-05_

ANSWER TO COMPLAINT, COUNTERCLAIMS
AND THIRD-PARTY CLAIMS - 29

Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| RAYMOND LEICH, a resident of Florida, derivatively on behalf of EVERGREEN STATE RESTAURANT CORP., | ) ) ) ) | |
| Plaintiff, | ) ) | NO. C03-0108BJR |
| vs. | ) ) | AFFIDAVIT OF SERVICE |
| CRAIG and JANE DOE EDWARDS, Washington residents, and their marital community, | ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| EVERGREEN STATE RESTAURANT CORP., a Washington corporation, | ) ) ) | |
| Nominal Defendant. | ) ) | |

STATE OF WASHINGTON)
              )   ss.
COUNTY OF KING    )

      KAREN A. BENEDICT, being first duly sworn, states:

      1.    I am an employee of Hall Zanzig Claflin McEachern PLLC.

AFFIDAVIT OF SERVICE - 1
Cause No. C03-0108BJR

HALL ZANZIG CLAFLIN MCEACHERN
1200 Fifth Ave., Suite 1414, Seattle, WA 98101   206.292.5900

1        2.    I hereby certify that on February 13, 2003, I caused a copy of the

2    Summons In a Civil Case and Answer to Complaint, Counterclaims and Third-Party

3    Claims to be served on the following:

4

5            David D. Hoff
        Janissa A. Strabuk

6            Tousley Brain Stephens PLLC
        700 Fifth Avenue, Suite 5600

7            Seattle, Washington 98104-5056

8            (via hand-delivery)

9

10                                         *Karen A. Benedict*

11                                         Karen A. Benedict

12       SUBSCRIBED AND SWORN to before me this ___13th___ day of February,

13   2003.

14

15                                         *Sherrie A. Pierce*

16                                         (Signature of Notary)

17                                         *Sherrie A. Pierce*
                                      (Printed Name)

18                         Notary Public in and for the State of
                      Washington, residing at *Federal Way*

19                         My Commission expires _2-12-05_

20

21

22

23

24

25

26