```
        FILED _____ ENTERED
1  ____ LODGED _____ RECEIVED UNITED STATES DISTRICT COURT
2       MAR 0 5 2003  MR WESTERN DISTRICT OF WASHINGTON
3          AT SEATTLE                      AT SEATTLE
       CLERK U.S. DISTRICT COURT
       WESTERN DISTRICT OF WASHINGTON DEPUTY
    BY
4
```

| | |
|---|---|
| 5  RAYMOND LEICH, a resident of ) <br> Florida, derivatively on    ) <br> 6  behalf of EVERGREEN STATE    ) <br> RESTAURANT CORP ,           ) <br> 7          Plaintiff,         ) <br> vs                           ) <br> 8  CRAIG and JANE DOE EDWARDS,  ) <br> Washington residents, and    ) <br> 9  their marital community,     ) <br>          Defendants,         ) <br> 10 and                          ) <br> EVERGREEN STATE RESTAURANT   ) <br> 11 CORP., a Washington          ) <br> corporation,                 ) <br> 12         Nominal Defendant   ) <br> _____) <br> 13 CRAIG R  EDWARDS, on his own ) <br> behalf and on behalf of      ) <br> 14 EVERGREEN STATE RESTAURANT   ) <br> CORP ,                       ) <br> 15    Counterclaimant and      ) <br>    Third-Party Plaintiff,    ) <br> 16 vs                           ) <br> RAYMOND LEICH, an individual,) <br> 17 CLIFFORD L. JONES and LINDA  ) <br> JONES, and their marital     ) <br> 18 community, and EVERGREEN     ) <br> RESTAURANT VENTURES, INC., a ) <br> 19 Washington corporation,      ) <br>    Counterclaim Defendants, ) <br> 20    Third-Party Defendants   ) | Case C03-108R <br><br><br> **ORIGINAL** |

Case C03-108R

**ORIGINAL**

CV 03 00108 #00000033

```
                HEARING ON MOTION FOR TEMPORARY RESTRAINING ORDER
21 on February 26, 2003, before the Honorable Barbara Jacobs
   Rothstein, United States District Judge, at the United States
22 Courthouse, Seattle, Washington
   Appearances of Counsel
23 On Behalf of Plaintiff          DAVID HOFF  ERIC BLANK
                                   Attorneys at Law
24 On Behalf of Defendant          SPENCER HALL  RONALD BEARD
                                   Attorneys at Law
25 Sue Palmerton, Official Court Reporter
   (206) 553-1899                                        33
```

1   Seattle, Washington, Wednesday, February 26, 2003, 3 07 p m

2          THE CLERK   Calling case number CO3-0108, Raymond Leich

3   versus Craig and Jane Doe Edwards   Counsel, please make your

4   appearance

5          MR   HOFF   Yes.   Your Honor, my name is David Hoff

6   I'm the attorney for the plaintiff   And my co-counsel is Mr

7   Eric Blank

8          MR   BLANK   Good afternoon, Your Honor

9          THE COURT   Good afternoon

10          MR   HALL.   Your Honor, I'm Spencer Hall   I represent

11   Craig Edwards and his marital community.   Seated next to me is

12   Mr   Edwards and on his right is Ron Beard   He is appearing as

13   co-counsel with us in this case

14          MR   BEARD   Good afternoon, Your Honor

15          THE COURT   Mr. Hoff, you are going to lead off?

16          MR   HOFF·   Yes, Your Honor

17          THE COURT·   And I was figuring about 20 minutes a side.

18   Would that be enough?

19          MR   HOFF·   If that   Yes, I think it will be enough

20          THE COURT   You want to save some time for rebuttal?

21          MR   HOFF   Yes, I would, Your Honor.

22          THE COURT   All right

23          MR   HOFF   Your Honor, we are before you today simply

24   to ask to restrain a shareholders meeting to take place until

25   such time as a preliminary hearing can be held on our

1   injunction   To just give you the briefest background in this
2   case

3   Evergreen is the corporation which has joint ventures with
4   limited partners that own 27 restaurants, Outback Steak
5   restaurants   Each one of them is a separate franchise that is
6   issued

7   Evergreen is a corporation that was managed by Mr  Edwards
8   until approximately three years ago when Mr  Edwards had some
9   difficulties, some medical difficulties which affected his
10  health, and there were some drinking problems that caused him to
11  go to alcohol treatment centers   And Outback Steakhouses said
12  that you have to get him out of management of this company or
13  else we're going to pull the franchises

14  And they asked that Mr  Jones, who was a passive investor in
15  these franchises and in Evergreen, they asked that Mr  Jones
16  come in and he be the manager of the operation   And that if he
17  would do so, they would not -- they would not interfere with the
18  franchises and they would let the franchises exist

19  Mr  Jones did so and formed a management company called
20  Evergreen Ventures, Inc  which is referred to as ERVI, E-R-V-I,
21  in the papers in front of you   And ERVI undertook the
22  managements of these 25 Outback Steakhouses

23  This was pursuant to an agreement between Mr  Edwards and
24  Mr  Jones whereby ERVI would manage these restaurants and these
25  franchises and the joint venture partners, the limited partners

1   in this venture   And that they would do so and they would take

2   a management fee which amounted to, I believe it was 200 --

3   around $250,000 a year, which was the same fee that Mr  Edwards

4   had been taking previously as manager

5       The way that ERVI managed the business was to not distribute

6   the money all out, but to keep the money back in the corporation

7   for the benefit of the restaurants and the partners

8       What happened is that disputes arose between the parties

9   This agreement has been in operation for about two years with

10  ERVI running Evergreen -- or not running Evergreen, but running

11  the restaurants.

12      There was a dispute that Mr  Edwards originally raised that

13  he thought that there were some conflicts of interest on behalf

14  of ERVI   For that reason, an independent public accounting firm

15  was hired   And that independent public accounting firm which

16  was hired on January -- pardon me, which was hired last year was

17  Hagen Streiff Newton and Oshiro

18      They came back and gave a preliminary report where they said

19  we found nothing wrong, we don't find any conflicts of interest,

20  but there are some very strange looking financial transactions

21  in this company, and we feel that you should have us do some

22  further looking

23      All of the parties, including Mr  Edwards, agreed that

24  Oshiro, et al , should continue to look at the books of the

25  company   They did a sampling looking at four of the 27

1   restaurants    And in that sampling, they discovered that there

2   were fraudulent activities performed while Mr  Edwards was in

3   charge of the country -- of the company, including the

4   fraudulent requests for reimbursement and expenses

5       And one of the examples was a $25,000 airline ticket to

6   Australia which was paid by Outback, but he then took a copy of

7   the ticket and also submitted it for reimbursement to the

8   company    And just matters where he would supply copies of

9   American Express charges that included all of the copies, the

10  original copy as well as the copies, that obviously it was not

11  even submitted to the restaurant

12      What they said in their report of the four restaurants they

13  looked at -- remember we're talking about four out of 27 -- they

14  have discovered that there was over $200,000 of these

15  misallocated funds    And they said and I'm going to quote, they

16  said that, "The duplication of items, especially airfares where

17  ticket receipt, travel agent statement and credit card statement

18  are all submitted for reimbursement of the same go beyond simple

19  mistakes or careless errors    These repeated and blatant

20  duplications indicate that the intent was to be reimbursed for

21  expenses not incurred "

22      This in addition to other -- list of other things that are

23  contained in our pleadings and contained in the demand letter

24  that was made to the corporation indicated that there were

25  fraudulent activities that had been performed by Mr  Edwards

1   which materially affected the financial statements that these

2   steakhouses and these joint ventures had given to the lending

3   institutions that were financing them to the tune of about

4   $250,000 per restaurant to buy restaurant equipment, and not to

5   mention potential liabilities to the limited partners, which,

6   you know, haven't even been addressed yet.

7        So, as a result, they received this accountant's report on

8   January 13th   Upon receipt of it immediately distributed it to

9   all the directors, including Mr. Edwards.  Called a shareholders

10  meeting with a request that there be a shareholders action

11  brought against Mr  Edwards   And that a suit, a minority

12  shareholder impression suit and a derivative shareholders action

13  be brought to try remedy these activities, have Mr  Edwards pay

14  back to the company what he unlawfully put in there   And

15  frankly, Your Honor, to deal with the potential of other

16  liabilities to banks, lending institutions and limited partners

17  that flowed from fraudulent financial statements.

18       Mr  Edwards, who had never done anything to cause any

19  action, any change in the bylaws, anything to happen with this

20  corporation prior to this meeting and this demand, upon the

21  filing of the lawsuit immediately filed a request, as you can

22  see here, that there be a shareholders meeting.

23       The intent of the shareholder meeting, and there are some

24  things that he's listed as the intent of that meeting which are

25  fairly innocuous, but the worst, the worst part of the proposed

1   amendments are to basically restrict the management of ERVI, Mr

2   Jones' corporation, of these restaurants and to basically turn

3   over the control of the funds back to Mr. Edwards, who was the

4   subject of the accounting statements which found him guilty of

5   fraud

6          THE COURT   Okay   Now, why don't you point out to me

7   which of these amendments does what you're saying

8          MR  HOFF   Yes, Your Honor

9          THE COURT   It's hard to follow them because many of

10  them refer to articles

11         MR  HOFF   First of all, Your Honor, it says that under

12  article, proposed article 8 which is on page 2 of the proposed

13  amendments, it says all of the corporation's revenues will be

14  applied and distributed in accordance with provisions of this

15  article 13 -- I think I misstated.  It's article 13 -- unless

16  otherwise agreed in writing by shareholders holding not less

17  than two-thirds of the corporation's shares   That would be Mr

18  Edwards, he owns 70 percent

19      It says under section 2 that all of the corporation's costs

20  of doing business, however characterized, will be paid from the

21  management fees   The corporation's cost of doing business will

22  be deemed to include, but will not be limited to rent, salaries,

23  legal expenses, accounting expenses, advertising, equipment and

24  supplies

25      Evergreen is not managing these restaurants pursuant to the

1   agreement with Mr  Edwards and pursuant to Outback's demand

2   The management is being provided by ERVI   So, what they are

3   saying is that now Evergreen gets these revenues

4       And section 3 says revenues other than management fees    The

5   affairs of the corporation will be conducted so that all

6   revenues other than management fees will be distributed to the

7   corporation's shareholders    That means that it will be a direct

8   funnel to funnel out 70 percent of all the money that comes in

9   to Mr  Edwards since he is the 70 percent shareholder of the

10  corporation

11      This will result directly in Outback lifting these

12  franchises    Its irreparable harm is that these whole franchises

13  are now in existence because an arrangement was negotiated that

14  Outback demanded    And that is that Mr  Edwards no longer have

15  any management control

16      The other is article 14, which requires -- and you see what

17  is happening here is they're taking normal activities that would

18  be done by management and making them to require shareholder

19  control    So that Mr  Jones -- pardon me, Mr  Edwards as the

20  majority shareholder would have direct control over the

21  operations

22      They couldn't sell or exchange or dispose of any capital

23  assets except as approved by Mr. Edwards    They couldn't loan

24  funds or other assets to the corporation except as approved by

25  Mr  Edwards    They couldn't terminate, amend or transfer any

1   interest in a franchise agreement except as authorized by Mr.

2   Edwards   They couldn't do anything with a limited partnership

3   agreement or a joint venture agreement or anything related to

4   the limited partners except as approved by Mr  Edwards.

5   Now, these are very drastic sorts of actions.  You're taking

6   the management of a corporation and you're saying we're giving

7   the management of the corporation to the majority shareholder

8   This is exactly one of the bases of the majority shareholder

9   impression suit that we're bringing   And this is a continuation

10   of the activities which have already been found to amount to

11   mismanagement when Mr. Edwards was running this.

12   And, again, Your Honor, we're not asking at this point for

13   some permanent injunction enjoining him to do this   All we're

14   asking is that this is such a drastic step that can cause such

15   irreparable injuries, that we want this -- we want to have this

16   meeting postponed until a full hearing can be held on the

17   preliminary injunction

18                THE COURT   Thank you   Mr  Hall

19                MR  HALL   May it please the Court   As you might

20   imagine, we have a greatly different view of things   Our view

21   simply is this is a business dispute   It requires a business

22   solution

23   There's two ways of approaching this.  We can either have

24   these parties resolve their differences by using their corporate

25   rights that they have pursuant to the rules of corporate

1   governance to resolve their differences or we can have court
2   intervention

3       If we are going to have court intervention, in my view the
4   opposing sides should be seeing if they can meet the standard
5   for the appointment of a receiver or something of that nature
6   Somebody who can get in here and protect both sides

7       It is not appropriate to ask this Court or any court to
8   selectively interfere with corporate rights   And what they are
9   asking this Court to do is to strip Mr  Edwards of the only
10  protections he has to protect himself against their actions and
11  let them continue doing what they want

12      Now, the facts in this case are complex and they're a mess
13  and I'm not going to go over them   But I would like to just
14  make sure the Court understands a couple of things which I think
15  can be confusing

16      Outback said that they no longer wanted Mr. Edwards to be
17  the designated operating partner for Evergreen   He had some
18  alcohol problems   He sought treatment   But they didn't want
19  him to be the operating partner

20      It was Evergreen's right   And I might add, at that point
21  there was no suggestion that Mr  Edwards had ever done anything
22  improper, any accounting improprieties, that there was any
23  self-dealing.   There was simply a problem with the economy was
24  down, sales weren't that good and Mr. Edwards had an alcohol
25  problem and they wanted a new operating partner

1    They said that Mr  Jones would be an acceptable alternative
2    They said that Mr  Shannon would be an acceptable alternative
3    They said that Evergreen could propose someone else   Outback
4    has absolutely no right to select the operating partner.  That
5    is Evergreen's decision

6    Mr  Edwards cooperated and he said fine, Mr. Jones is
7    acceptable   And the idea was that Mr  Jones would run the
8    restaurants, the restaurant operations, 27 existing restaurants
9    There was never any intention that Mr. Edwards would lose his
10   right to have input as a director and shareholder over major
11   decisions such as disposition of assets of Evergreen

12   And what happened was Mr  Jones said, you know, if we open
13   new restaurants, I really think it would be fairer if I got to
14   have those for myself, and Outback thinks that would be a good
15   idea, too   Would you agree to that?   And I'd like to form
16   another corporation and when we open new restaurants, I would
17   like to get those for my corporation

18   Mr  Edwards said, well, you know, I guess that's not a
19   problem assuming we work everything out and it doesn't hurt
20   Evergreen.  So, he formed -- Mr  Jones formed his new
21   corporation, ERVI   And they talked about how the two
22   corporations were going to operate side by side

23   And it didn't make any sense to have two sets of employees
24   and two sets of office space and so forth, so Mr  Jones said why
25   don't we -- I will transfer the employees over to my corporation

1   and you can just contract management services from my

2   corporation   Mr  Edwards says, well, fine, and we'll pay you

3   the net management fees from Evergreen

4        So, that's all great up to that point   And they start out

5   to document this   And Short Cressman says wait a minute, we've

6   got a conflict here, let's get some independent counsel   So,

7   that happened

8        Then there were never any documents drafted, which you have

9   two very distinct corporations here, ERVI and Evergreen   Mr

10  Jones is a designated operating partner for Evergreen

11  Everything he does for Evergreen is done on behalf of Evergreen

12  He owes his duties to Evergreen, to these 27 restaurants

13       And he also wears another hat   He is the CEO and owner of

14  ERVI.  And for five of these restaurants, he's operating as the

15  designated operating partner for ERVI, the other corporation.

16  So, there is a potential for a mess here

17       And what was supposed to happen is Evergreen would have

18  greatly reduced operating expenses because they didn't have all

19  these employees anymore   But they would have some expenses like

20  attorneys fees, Short Cressman   They'd have some accounting

21  fees, they'd have some license fees, maybe a few hundred

22  thousand dollars a year   Those were supposed to be paid.  And

23  then Mr  Edwards was ready to have the rest of the management

24  fees paid over to ERVI on a contract basis to use some of their

25  services to manage these things

1    Basically what happened was Mr  Jones got in there and

2    decided he just didn't want to ever have to deal with Mr

3    Edwards again and just basically started combining these two

4    corporations, which was never intended by anybody

5    And what has happened is that we, Mr  Edwards basically has

6    acted with restraint throughout this   He has written letter

7    after letter asking for simple things like I just want access to

8    corporate information, and he can't get it   He has written

9    letters saying please stop commingling the funds   You don't

10   need to commingle the funds between these two corporations to do

11   what was intended. And he gets different answers. At one time,

12   we hear an answer that the commingling will be stopped   At

13   other times, they don't get any answer

14   Then there is this issue of transactions between the two

15   corporations where there is conflicting interests   And an

16   example of that is this cross-collateralization of a loan from

17   the bank   Now, we aren't trying to interfere with any existing

18   relationship or any -- of any contract in existence   That is

19   not what's going on here.

20   And Mr  Edwards found out after the fact they had cross-

21   collateralized a loan so that the assets of Evergreen are being

22   pledged for the debt of ERVI   And that's a concern potentially

23   Because although in the affidavit that was submitted, Mr. Jones

24   said that Evergreen has more debt than ERVI, 2 2 million to 1 7,

25   that is a little misleading because Evergreen has 27 stores, so

1   it's got debt of 81,000 per store   ERVI has debt of 340,000 per
2   store

3          THE COURT   Just out of curiosity, what are the assets
4   that are being cross-collateralized?  Are they the franchise
5   agreements?

6          MR. HALL   It's my understanding it's everything   It's
7   the leases, the stores.  It's the cash that is in the account.

8          THE COURT   So, it's the right to payments from the
9   restaurant   That is what we're talking about?

10          MR   HALL   My understanding is it includes that, but
11   there are also physical facilities and leases.

12          THE COURT   But Evergreen doesn't own any of the
13   physical facilities, does it?

14          MR   HALL   No   But it's a general partner in the
15   limited partnerships that do.

16     And so, the point is this.  There is $340,000 of debt per
17   store on Mr  Jones' restaurants   So, his budding business is a
18   lot more risky and a lot more leveraged   All Mr  Edwards asked
19   for was on a going forward basis when it comes time to consider
20   whether we want to have an arrangement to cross-collateralize
21   between these two corporations, that he have a say in that
22   He's not trying to undo anything in the past   Mr  Jones has
23   said no to that

24     And on these management fees, Mr. Jones basically said I'm
25   not going to pay any expenses of Evergreen anymore   What I'm

1   going to do is I'm going to take all the management fees over to

2   ERVI, a million-600,000 dollars each year roughly, and this

3   $200,000 of expenses that are remaining, I'm just going to

4   charge that to the investment income of Evergreen and you, Craig

5   Edwards, can pay 70 percent of that and it's tough luck   And

6   that was not the deal.  There is nothing that suggests that was

7   the deal   And we've said please quit doing that and he said no

8        So, finally, finally we wrote letters that were increasingly

9   tough saying, you know, please respond to this or we're going to

10  have to take legal action   And they filed this lawsuit, in my

11  view, as a preemptive matter to get an advantage over us and

12  maybe they succeeded, I don't know

13       But what I do know is that you could litigate this whole

14  lawsuit to conclusion and it wouldn't change the fact that these

15  parties need to get along   That these parties need to reach a

16  business deal as to how they're going to proceed.

17       And we have suggested again and again third-party mediation,

18  anything that will work   All we want defensively, protectively

19  and I think it's more than reasonable is we want equal access to

20  information   We can't even respond to this ridiculous

21  accountants' report because we can't get access to the books and

22  records of the company

23       We want agreement that if any new transaction is entered

24  into between Evergreen and ERVI, these two companies, where

25  there is a conflicting interest by Jones or Leich, that we are

1   involved in that decision    They can't just ignore us and deal
2   with their own company on new transactions, which seems to me
3   very modest

4       And if there is going to be any impairment of the assets of
5   Evergreen, I'm not talking about the day-to-day operations of
6   the restaurants or who manages the restaurants and how they sell
7   their steaks    No body is interested in that    And that is what
8   Outback doesn't want Mr  Edwards interfering in.

9       There have been no amendments to any of these franchise
10  agreements since the inception of the company    There is no
11  reason there should be any amendments now    There is no reason
12  anybody should transfer these franchises to a third party

13      What they won't provide assurances they won't do, they won't
14  even provide assurances they won't transfer these franchise
15  agreements to themselves    And in fact, at one point they
16  asserted in a letter that they had assigned all these management
17  fees formally to their own company    So we wrote and asked where
18  is the assignment agreement, and they said, well, there's not
19  really one    So, that's what we want in terms of standstill

20      On the money, I'll tell you what is happening on the money
21  because it always comes back to the practicalities    This
22  company, Evergreen -- forget ERVI for a minute -- but Evergreen
23  has roughly $3,000,000 in investment income every year    It is
24  Mr  Edwards' essentially his sole source of income, his share of
25  those distributions    It has a $1 6 million it gets in

1  management fees.  So, we're talking about $4 6 million that

2  these people have control over

3      Mr  Edwards can't incur one dime of expense on behalf of

4  Evergreen because he's not an officer, he's not involved in

5  running the corporation.  And if we pass these bylaws, he still

6  couldn't go out and incur one dime of expense  We're talking

7  about expenses being incurred by Cliff Jones on behalf of

8  Evergreen and then he's refusing to pay them out of the

9  management fee  So, there is --

10      THE COURT  What do you mean he's refusing to pay them?

11  Who is paying them?

12      MR  HALL·  He takes the investment income of Evergreen

13  and pays that and then takes all the management fees for himself

14

15      THE COURT:  For himself or running the company?

16      MR  HALL  Well, you can label this any way you want

17  When Mr  Edwards was the CEO and designated operating partner of

18  Evergreen, the way it worked was the roughly million-six would

19  come in  He'd pay the employees, the rent, the lawyers, the

20  accountants, whatever other expenses there were  He would take

21  a salary.  If there was anything left over, they would

22  distribute it to all the shareholders  All right?  And

23  sometimes there was something left over

24      The way it works now -- it's not supposed to be working this

25  way -- the money never even hits the Evergreen bank account

1   Mr. Jones -- although you can pick up one of these franchise
2   agreements and they put it into evidence and it says right there
3   on page 14 Evergreen gets the money   But it never hits the bank
4   anymore   They just divert it over to ERVI   Take it all for
5   themselves   Don't pay the accountants or lawyers back over at
6   Evergreen

7       And worse than that, they take the $3,000,000 of investment
8   income, kind of slosh it around over at ERVI for a while and
9   fund their restaurants and use it however they want   And
10  eventually pay some back and make some belated distributions to
11  Mr  Edwards

12          THE COURT·  Is Mr. Edwards getting a salary?

13          MR  HALL   No   He gets a salary from nowhere   He is
14  dependent for shareholder distributions to live, to pay his
15  bills, to pay me

16          THE COURT   What is he doing for the corporation right
17  now?

18          MR  HALL   Nothing   He's a shareholder

19          THE COURT   Then why should he get a salary?

20          MR  HALL   He shouldn't   He should get shareholder
21  distributions

22          THE COURT.  So, what is his concern, that he's not
23  getting a sufficient distribution because too much is taken out
24  of the investment income account?

25          MR  HALL   Yes   His concern is that they're reducing

1   the distributions by diverting part of the funds where they
2   shouldn't, and they are using the monies of Evergreen to --
3   putting them at risk running ERVI and won't even give him a say

4       Like when the bank comes up in renewal in a couple of
5   months, they will just ignore him and do what they want with
6   Evergreen's assets   He should have a say in that   That was the
7   idea   He would have oversight, but he wouldn't be involved in
8   day-to-day operations, he wouldn't draw a salary

9           THE COURT   Let me ask you something   Were you
10  finished, just about?   Did you have more?

11          MR   HALL   In what I want to say to the Court?   I did
12  have something else I wanted to say, but I'm happy to respond

13          THE COURT   Go ahead.   I want to hear the rest

14          MR   HALL   I guess, you know, I guess here's my point
15  and I don't want to belabor the facts   But certainly they have
16  looked at everything in this case   I mean, they say four out of
17  27 restaurants they have looked at   They've looked at four out
18  of 27 restaurants when they want to argue about these accounting
19  treatments   But in terms of anything that could be self-
20  dealing, they have looked at the whole nine yards

21      They've looked at eight years   They've looked at every
22  expense Mr   Edwards ever turned in and we deny there is one
23  single dollar of self-dealing

24      But if everything they said was true, Your Honor, we're
25  talking about $70,000 or so   I mean, it's just insane   If they

1   won this case, they wouldn't be entitled to the relief they're
2   seeking

3       So, I guess where I end up is where I started, which is if
4   this Court is going to strip Mr  Edwards of his ability to try
5   and protect himself in this mess and try to negotiate a
6   resolution, we're in trouble   We need to negotiate with our
7   full rights so they can't basically take this corporation for a
8   song.  And that's what I want

9       So, either I'm happy if you leave the parties to their own
10  devices or I'm happy if you want to step in and say, hey, just
11  hold everything   You guys don't take another dollar out of
12  here   You guys, you know, don't do any new transactions until
13  we sort this out   I would be happy with that

14      But I would not be happy being left hanging in the middle
15  where we're stripped of our ability to protect ourself   I guess
16  that's what I'm trying to say

17      And finally most importantly, the way it stands right now
18  they have money to fund their accounts, to squeeze Mr  Edwards
19  I mean, they're using the corporate funds, these management fees
20  to hire like this accounting firm that went out and concocted
21  this report   That should have been hired on their own nickel
22  because it's a shareholders dispute and that was not authorized
23  We have no money to hire accountants because they're dragging
24  their feet on distributions

25      So, we have to make sure the money flows evenhandedly so

1  that they don't choke us to death if we're going to havee a

2  dispute.  I'm happy to do it either through bylaws or through

3  the Court, but it should be evenhanded is all I'm saying

4         THE COURT   Thank you, Mr  Hall   Mr  Hoff, you want to

5  respond?

6         MR  HOFF   Yes, Your Honor   Obviously there's a lot of

7  disputed facts here and it's not going to serve any useful

8  purpose to go back and forth on the disputes

9     But I do want to just read you a paragraph from Mr  Jones'

10 declaration which was filed in response to a submission by Mr

11 Hall, which is paragraph 13 on page 5 of his declaration, where

12 he says, "Let me reemphasize how the management fees are being

13 used   Management fees pay for critical management and

14 accounting support for the restaurants owned by the various

15 limited partners   ERVI also uses fees to pay for technical

16 support and training related to food items and service and for

17 the salaries of managers in training   ERVI also has used the

18 fees in the past two years to rebuild the marketing effort not

19 undertaken by Edwards   For example, ERVI purchased a billboard

20 at Safeco Field in Seattle to promote Outback Steakhouse

21 restaurants and to secure a lucrative co-marketing agreement

22 with the Seattle Mariners "

23         THE COURT   I can read the rest of it, Mr  Hoff   I've

24 got it right here

25         MR  HOFF   The point is, Your Honor, that the issue

1  here is whether the money that comes in should be used to

2  reinvest in the restaurants and the business and go to the

3  limited partners or whether it should be distributed to Mr

4  Edwards

5      And one of the big issues that Outback had, and there is no

6  dispute and you've heard no dispute here that Outback said

7  you've got to get Mr Edwards out of control   And, of course,

8  there is a dispute in the affidavit because Mr Jones said it

9  was Outback that mandated he be the person

10     The reason that was done is because money was being taken

11  out of these franchises   The restaurants weren't operating

12  properly   We're just asking to preserve the status quo pending

13  the hearing   That's all, Your Honor

14         THE COURT   Okay   Well, the Court has no problem in

15  dealing with the issue before it today   I think -- I guess what

16  I was going to ask you, Mr. Hall, was -- but I think I already

17  arrived at a conclusion about it   I fail to see in balancing

18  harm here, I fail to see any dire need on the part of Mr.

19  Edwards to pass these amendments immediately. It just doesn't

20  wash with me   And that would seriously change the status quo

21     He would basically by these amendments, I'm convinced, be

22  put in a position where he could manage just about every

23  important decision that would come up.

24     So, I am going to grant the temporary restraining order

25  But that's really not the end of it and I think Mr Hall has

1  | made a good point

2  | The real question is where do we go from there    And I
3  | think that this is not -- when I say I'm granting the temporary
4  | restraining order, I think the way in which the Court sees this,
5  | yes, he is not going to be able to hold a shareholder meeting
6  | and pass his own amendments that make everything require 70
7  | percent shareholder to run the corporation

8  | On the other hand, as far as plaintiffs are concerned, there
9  | are definitely certain transactions in which Mr. Edwards should
10 | be given information    I don't see anything wrong with the
11 | amendment requiring him to get corporate information    That is
12 | not going to hurt anybody    That should be done

13 | MR   HOFF    Nor do we, Your Honor

14 | THE COURT    Shouldn't be opposed

15 | MR. HOFF    I agree

16 | THE COURT    So, why don't you drop that part out of
17 | your TRO

18 | MR   HOFF.   We will be happy to agree or we'll simply
19 | agree that we will give them any of the information they want,
20 | as we have previously    That is a disputed item, too

21 | THE COURT    I don't want to hear a dispute about it    I
22 | want him to get any corporate information he needs

23 | MR   HOFF    We agree, Your Honor

24 | THE COURT    I could sit down and do this with you on an
25 | agonizing line-by-line basis    But I want to know exactly what

1   are the areas that he is asking -- I mean, the way I interpret

2   what Mr  Hall has said is that he is asking and using these

3   amendments as a way of gaining information and input that has

4   been denied him   And that were he able to have some input into

5   this, were he able to be informed of some of the big events that

6   are coming up, like cross-collateralization when it happens or

7   new loans that are coming up, he wouldn't need amendments to

8   ensure that he be given that information or that he at least be

9   notified when this big events are coming up

10      I can sit here and say, okay, these are the things   Mr

11  Hall has mentioned a few.  I could sit here and say, okay, so he

12  should be told if there is ever going to be cross-

13  collateralization   He should be told if there are going to be

14  renewals of loans or financing with the bank   Well, information

15  on how the management fees are being used, and how the

16  investment income is being distributed and what it's being used

17  for   You know, if these were given to him, he wouldn't need the

18  amendments that he's asking for

19      Now, it's very clear to the Court that -- I can say this as

20  a mastery of understatement -- that there is a lack of trust on

21  the part of the parties   That sounds like understatement to me

22  You know, the parties have said some -- are really saying some

23  pretty ugly things about each other through their lawyers as

24  they stand up here today

25      Once that is done, it would do no good for me to say go out

1    and work this out   I doubt that is going to happen in the

2    context of a suit in which each side is basically saying the

3    other side is dealing improperly with great sums of money

4    We're not talking small sums of money here

5         One of the reasons I'm ruling the way I'm ruling, just so

6    that the parties know is I do think that not maintaining the

7    status quo could result in more harm than good, you know     Mr

8    Edwards may win -- if he won his point, may lose -- win the

9    battle but lose the war   If Outback kicks everybody off

10   managing these restaurants, what good is it going to do?

11        So, I think the status quo is to not not deal with these

12   amendments right now, but I am much more concerned with how to

13   proceed with this in the future   Maybe the way to deal with

14   this is not to deal with it in open court   To get some advice

15   from counsel in chambers on some procedural way that we can get

16   this on a track where the parties might be able to, given the

17   lack of trust, might be able to work with each other, either

18   through a third party or whatever   So, maybe that is the way to

19   go

20        Because I've given you my ruling on the TRO, but that is not

21   only going to take care of the next ten days.  Maybe renewal in

22   the next ten days.  But the amendment part of it is just a side

23   show   What's going on here are some real underlying problems

24   And there must be ways that we can implement to help the parties

25   work this out

1      As you've all pointed out, nothing ever got done in writing

2   That might resolve some of these   So, why don't you come into

3   chambers and let's try to be a little creative here

4          MR  HOFF   Before we do so, Your Honor, could you set

5   the amount of the TRO bond?

6          THE COURT   What's the harm?  Mr  Hall, what do you

7   want?  What is the harm to him?  What is the danger of his

8   losing anything by not getting these amendments passed in the

9   next couple weeks?  I have a hard time seeing what it is, so

10          MR  HALL   Well, Your Honor, if counsel is basically

11   representing that they're not going to try to transfer any of

12   the assets, you know, try to do any new deal, get rid of these

13   assets, major transactions until we can talk this out with the

14   Court, I think that you're right, for the next ten days it's not

15   a big deal   But I would be very distressed, for example, if we

16   waited ten days and came back and found out they had done a

17   transaction.

18          THE COURT   This is exactly what I want to deal with in

19   chambers   I think it has to be a two-way street   But I heard

20   Mr  Hoff saying that, that status quo meant exactly that   That

21   they're not going to use the couple of weeks in which I have

22   basically enjoined him from holding this meeting to go out and

23   transfer all the assets that he's concerned about and that is

24   why he wanted the amendments   That is not what the Court

25   envisions.

1    And I want to find -- actually what I'm hoping we can talk

2    about is a way to get an agreement between the parties that can

3    make you live with this until we can work out the major problems

4    underlying the whole suit   I mean, there is a way to just put

5    everybody at ease.  Since you don't trust each other, they're

6    not going to do it on a handshake   But we could do it by an

7    agreement between the attorneys who I think, knowing both of

8    you, do trust each other and will pursue your clients' interest

9    And frankly your clients' interest in this case is to work

10   something out

11         MR. HALL   In the spirit of trying to generate some

12   trust, Your Honor, if that is the deal and the understanding

13   staying, I'm not going to make an issue over a bond for the next

14   ten days

15         THE COURT   I'll see you in chambers

16       (At 4 03, court was in recess )

17

18

19

20

21

22

23

24

25

# CERTIFICATE

I, Susan Palmerton, court reporter for the United States District Court in the Western District of Washington at Seattle, was present in court during the foregoing matter and reported said proceedings stenographically

I futher certify that thereafter, I, Susan Palmerton, have caused said stenographic notes to be transcribed via computer, and that the foregoing pages are a true and accurate transcription to the best of my ability

Dated this 3rd day of March, 2003.

_____
Susan Palmerton