Honorable Barbara J Rothstein

FILED
LODGED _____ ENTERED
_____ RECEIVED
APR 3 0 2003     MR
AT SEATTLE
CLERK U.S. DISTRICT COURT
BY WESTERN DISTRICT OF WASHINGTON
DEPUTY

1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

8   RAYMOND LEICH, a resident of Florida,
derivatively on behalf of EVERGREEN
9   STATE RESTAURANT CORP.,

10          Plaintiff,

11      vs

12

13  CRAIG and JANE DOE EDWARDS,
Washington residents, and their
14  marital community,

15          Defendants,

16      and

17

18  EVERGREEN STATE RESTAURANT
CORP , a Washington corporation,

19          Nominal Defendant

20

21  CRAIG R EDWARDS, on his own behalf
and on behalf of EVERGREEN STATE
22  RESTAURANT CORP ,

23          Counterclaimant and
Third-Party Plaintiff,
24

25      vs

26

NO  C03-0108BJR

SECOND
AFFIDAVIT OF
SPENCER HALL

CV 03-00108 #00000048

**ORIGINAL**

SECOND AFFIDAVIT OF SPENCER HALL - 1
Cause No  C03-0108BJR

HALL ZANZIG ZULAUF
CLAFLIN MCEACHERN

1200 Fifth Avenue, Suite 1414
Seattle, Washington 98101

206 292 5900

1  RAYMOND M LEICH, an individual,                )
2  CLIFFORD L JONES and LINDA JONES,               )
   and their marital community, and                )
3  EVERGREEN RESTAURANT VENTURES,                  )
   INC , a Washington corporation,                 )
4                                                   )
5               Counterclaim Defendant and         )
                Third-Party Defendants             )
6  _____ )

7  STATE OF WASHINGTON)
8                     )        ss
   COUNTY OF KING     )
9

10        SPENCER HALL, being duly sworn, states

11        1     I am counsel for defendants, counterclaimant and third-party plaintiff

12  in this action  I have personal knowledge of the matters stated in this affidavit

13        2     On February 26, 2003, this Court conducted a hearing on plaintiff's

14  motion for temporary restraining order   A copy of the transcript of that hearing is

15  Exhibit 1 to this affidavit   At that hearing before this Court, David Hoff, counsel for Ray

16  Leich and Cliff Jones, promised that his clients would permit all shareholders to have

17  equal access to the books and records of Evergreen State Restaurant Corporation

18  ("Evergreen"), as provided in Craig Edwards' proposed bylaw on that subject  A copy of

19  that proposed bylaw is Exhibit 2 to this affidavit

20

21

22        3     Following the hearing, Messrs Jones and Leich refused to honor their

23  counsel's commitment  Their counsel told me that Mr. Jones was unwilling to permit

24  Mr Edwards to come to Evergreen's place of business for any purpose   They told me that

25  Mr Jones wanted Mr Edwards to make requests for documents through counsel   The

26

SECOND AFFIDAVIT OF SPENCER HALL - 2
Cause No  C03-0108BJR

HALL ZANZIG ZULAUF
CLAFLIN MCEACHERN

1200 Fifth Avenue Suite 1414
Seattle Washington 98101

206 292 5900

1   documents would then be copied   All copies would be made at Mr  Edwards' expense

2       4       Mr  Edwards does not need copies of all Evergreen's documents   He

3

4   needs access to Evergreen's books and records so that he can extract information relating

5   to the issues in this case   Original records are preferable to copies in some instances   For

6   example, expense reports contain pencil entries and small pieces of paper that make

7   originals easier to work with than copies   Copies would be acceptable in other instances

8

9   if there were not major cost issues

10      5       Since the February 26 hearing, counsel for Mr  Edwards have

11  incurred copying charges in excess of $7,000 to access information   Most of these charges

12  would have been unnecessary if Mr  Edwards had access to Evergreen's books and

13

14  records   Mr  Edwards also has incurred unnecessary legal fees because all information

15  requests have had to be processed through legal counsel

16      6       There are major problems with the position of Messrs  Leich and

17  Jones barring Mr  Edwards from access to corporate information   First, mass copying is

18

19  impractical from a cost standpoint   Despite incurring substantial charges, we have copied

20  only a fraction of the information that is needed   Second, mass copying is wasteful

21  Mr  Edwards does not need copies of volumes of whole documents   He needs access to

22  the information in the documents and the ability to make copies of selected entries

23

24  Third, requesting documents through counsel results in unnecessary legal expense,

25  repeated delays, and professed misunderstandings about what is being requested   We

26  still do not have information that we have been requesting since before this lawsuit

SECOND AFFIDAVIT OF SPENCER HALL - 3
Cause No  C03-0108BJR

HALL ZANZIG ZULAUF
CLAFLIN MCEACHERN

1200 Fifth Avenue, Suite 1414
Seattle, Washington 98101

206 292 5900

1  began

2          7      I was able to obtain permission for Mr Edwards to have three work

3

4  sessions with his own expense records  The nature of those work sessions is described in

5  Mr Edwards' affidavit  I recently asked permission for Mr Edwards to resume working

6  with his expense records  Mr Jones' counsel reminded me that Mr Jones was unwilling

7  to permit Mr Edwards to work with his expense records unless Mr Jones monitored him

8

9  the entire time  Mr Jones' counsel told me that Mr Jones no longer has the time to do

10  that  Consequently, Mr Jones has offered Mr Edwards the option of having all his

11  expense records copied at his expense  Alternatively, Mr Edwards can review his

12  expense records at the offices of Mr Jones' legal counsel, where Mr Edwards will be

13

14  monitored constantly by a paralegal.  Mr. Edwards will be required to pay the paralegal's

15  hourly rate

16          8      Messrs Jones and Leich claim that their treatment of Mr Edwards is

17  justified because their accounting report (the "Hagen Report") purportedly shows that

18

19  Mr Edwards cannot be trusted  Moss Adams, a regional accounting firm, has reviewed

20  the Hagen Report and relevant documents to which Mr Edwards has been permitted

21  access  Moss Adams has concluded that the criticisms in the Hagen Report are either

22  incorrect or have no material impact  Moss Adams' preliminary findings regarding each

23

24  of the subject areas in the Hagen Report are summarized in a memorandum by W Arthur

25  King, CPA and Managing Partner of Moss Adams  A copy of the memorandum is

26  Exhibit 3 to this affidavit

SECOND AFFIDAVIT OF SPENCER HALL - 4
Cause No C03-0108BJR

HALL ZANZIG ZULAUF
CLAFLIN MCEACHERN

1200 Fifth Avenue, Suite 1414
Seattle, Washington 98101
206 292 5900

1      9      I am unaware of any reason that Mr Edwards should be barred from

2   working with the original books and records of Evergreen at Evergreen's place of

3
    business   There is no evidence that these parties have ever come close to having a
4

5   physical confrontation or have had any problem other than a legal disagreement

6   involving corporate control issues

7      10      We proposed a reasonable arrangement to counsel for Messrs Jones

8
    and Leich   We suggested that Mr Edwards call a designated individual at Evergreen a
9

10  day in advance whenever he wanted to review records at Evergreen   He could be placed

11  in an office or conference room of Evergreen's choice while he was there so that he did

12  not get in anyone's way   He could retrieve records himself or, if Messrs Jones and Leich

13
    preferred, someone could bring records to him   Mr Edwards could check out when he
14

15  left so that someone could confirm that he was not taking any records with him   A copy

16  of my letter to David Hoff and Janissa Strabuk, dated February 28, 2003, is Exhibit 4 to

17  this affidavit   This offer was rejected

18

19

20                                                   _____
                                                          Spencer Hall
21

22

23

24

25

26

SECOND AFFIDAVIT OF SPENCER HALL - 5          HALL ZANZIG ZULAUF   | 1200 Fifth Avenue, Suite 1414
Cause No  C03-0108BJR                          CLAFLIN MCEACHERN    | Seattle  Washington 98101
                                                                    | 206 292 5900

1    SUBSCRIBED AND SWORN to before me this __30^th__ day of April, 2003

2

3

4        _Karen A. Benedick_
                             (Signature of Notary)
5                            _KAREN A. BENEDICT_
                             (Printed Name)
6
     Notary Public in and for the State of
7    Washington, residing at _Bellevue_
     My Commission expires _3-1-05_
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

HALL ZANZIG ZULAUF
CLAFLIN MCEACHERN    1200 Fifth Avenue, Suite 1414
                    Seattle, Washington 98101

                    206 292 5900

**EXHIBIT 1**

1                    UNITED STATES DISTRICT COURT

2                   WESTERN DISTRICT OF WASHINGTON

3                             AT SEATTLE

4                                          RECEIVED
                                             MAR 0 6 2003

5    RAYMOND LEICH, a resident of )
     Florida, derivatively on     )               HALL ZANZIG
6    behalf of EVERGREEN STATE     )          CLAFLIN McEACHERN PLLC
     RESTAURANT CORP.,             )
7           Plaintiff,             )
     vs.                           )     Case CO3-108R
8    CRAIG and JANE DOE EDWARDS,   )
     Washington residents, and    )
9    their marital community,      )
            Defendants,            )
10   and                           )
     EVERGREEN STATE RESTAURANT    )
11   CORP., a Washington           )
     corporation,                  )
12          Nominal Defendant      )          COPY
                                   )
13   CRAIG R. EDWARDS, on his own  )
     behalf and on behalf of       )
14   EVERGREEN STATE RESTAURANT    )
     CORP.,                        )
15      Counterclaimant and        )
        Third-Party Plaintiff,     )
16   vs.                           )
     RAYMOND LEICH, an individual, )
17   CLIFFORD L. JONES and LINDA   )
     JONES, and their marital      )
18   community, and EVERGREEN      )
     RESTAURANT VENTURES, INC., a  )
19   Washington corporation,       )
        Counterclaim Defendants,   )
20      Third-Party Defendants     )
                 HEARING ON MOTION FOR TEMPORARY RESTRAINING ORDER
21   on February 26, 2003, before the Honorable Barbara Jacobs
     Rothstein, United States District Judge, at the United States
22   Courthouse, Seattle, Washington.
     Appearances of Counsel.
23   On Behalf of Plaintiff.              DAVID HOFF   ERIC BLANK
                                          Attorneys at Law
24   On Behalf of Defendant:             SPENCER HALL   RONALD BEARD
                                          Attorneys at Law
25   Sue Palmerton, Official Court Reporter
     (206) 553-1899

1    Seattle, Washington, Wednesday, February 26, 2003; 3 07 p.m

2          THE CLERK.  Calling case number C03-0108, Raymond Leich

3    versus Craig and Jane Doe Edwards.  Counsel, please make your

4    appearance.

5          MR. HOFF.  Yes.   Your Honor, my name is David Hoff.

6    I'm the attorney for the plaintiff   And my co-counsel is Mr.

7    Eric Blank.

8          MR  BLANK:  Good afternoon, Your Honor.

9          THE COURT.  Good afternoon

10          MR. HALL   Your Honor, I'm Spencer Hall.  I represent

11    Craig Edwards and his marital community.  Seated next to me is

12    Mr. Edwards and on his right is Ron Beard   He is appearing as

13    co-counsel with us in this case.

14          MR  BEARD.  Good afternoon, Your Honor.

15          THE COURT   Mr. Hoff, you are going to lead off?

16          MR. HOFF:  Yes, Your Honor

17          THE COURT·  And I was figuring about 20 minutes a side.

18    Would that be enough?

19          MR  HOFF.  If that.   Yes, I think it will be enough.

20          THE COURT   You want to save some time for rebuttal?

21          MR. HOFF.  Yes, I would, Your Honor.

22          THE COURT.  All right.

23          MR. HOFF:  Your Honor, we are before you today simply

24    to ask to restrain a shareholders meeting to take place until

25    such time as a preliminary hearing can be held on our

1   injunction.   To just give you the briefest background in this

2   case.

3        Evergreen is the corporation which has joint ventures with

4   limited partners that own 27 restaurants, Outback Steak

5   restaurants.   Each one of them is a separate franchise that is

6   issued

7        Evergreen is a corporation that was managed by Mr. Edwards

8   until approximately three years ago when Mr. Edwards had some

9   difficulties, some medical difficulties which affected his

10  health, and there were some drinking problems that caused him to

11  go to alcohol treatment centers.   And Outback Steakhouses said

12  that you have to get him out of management of this company or

13  else we're going to pull the franchises

14       And they asked that Mr. Jones, who was a passive investor in

15  these franchises and in Evergreen, they asked that Mr. Jones

16  come in and he be the manager of the operation   And that if he

17  would do so, they would not -- they would not interfere with the

18  franchises and they would let the franchises exist.

19       Mr. Jones did so and formed a management company called

20  Evergreen Ventures, Inc. which is referred to as ERVI, E-R-V-I,

21  in the papers in front of you.   And ERVI undertook the

22  managements of these 25 Outback Steakhouses.

23       This was pursuant to an agreement between Mr. Edwards and

24  Mr  Jones whereby ERVI would manage these restaurants and these

25  franchises and the joint venture partners, the limited partners

1   in this venture.  And that they would do so and they would take

2   a management fee which amounted to, I believe it was 200 --

3   around $250,000 a year, which was the same fee that Mr. Edwards

4   had been taking previously as manager.

5       The way that ERVI managed the business was to not distribute

6   the money all out, but to keep the money back in the corporation

7   for the benefit of the restaurants and the partners.

8       What happened is that disputes arose between the parties.

9   This agreement has been in operation for about two years with

10  ERVI running Evergreen -- or not running Evergreen, but running

11  the restaurants.

12      There was a dispute that Mr. Edwards originally raised that

13  he thought that there were some conflicts of interest on behalf

14  of ERVI.  For that reason, an independent public accounting firm

15  was hired   And that independent public accounting firm which

16  was hired on January -- pardon me, which was hired last year was

17  Hagen Streiff Newton and Oshiro.

18      They came back and gave a preliminary report where they said

19  we found nothing wrong, we don't find any conflicts of interest,

20  but there are some very strange looking financial transactions

21  in this company, and we feel that you should have us do some

22  further looking.

23      All of the parties, including Mr. Edwards, agreed that

24  Oshiro, et al., should continue to look at the books of the

25  company.   They did a sampling looking at four of the 27

1   restaurants.  And in that sampling, they discovered that there

2   were fraudulent activities performed while Mr  Edwards was in

3   charge of the country -- of the company, including the

4   fraudulent requests for reimbursement and expenses.

5       And one of the examples was a $25,000 airline ticket to

6   Australia which was paid by Outback, but he then took a copy of

7   the ticket and also submitted it for reimbursement to the

8   company.   And just matters where he would supply copies of

9   American Express charges that included all of the copies, the

10  original copy as well as the copies, that obviously it was not

11  even submitted to the restaurant.

12      What they said in their report of the four restaurants they

13  looked at -- remember we're talking about four out of 27 -- they

14  have discovered that there was over $200,000 of these

15  misallocated funds.  And they said and I'm going to quote, they

16  said that, "The duplication of items, especially airfares where

17  ticket receipt, travel agent statement and credit card statement

18  are all submitted for reimbursement of the same go beyond simple

19  mistakes or careless errors.  These repeated and blatant

20  duplications indicate that the intent was to be reimbursed for

21  expenses not incurred."

22      This in addition to other -- list of other things that are

23  contained in our pleadings and contained in the demand letter

24  that was made to the corporation indicated that there were

25  fraudulent activities that had been performed by Mr. Edwards

1   which materially affected the financial statements that these
2   steakhouses and these joint ventures had given to the lending
3   institutions that were financing them to the tune of about
4   $250,000 per restaurant to buy restaurant equipment, and not to
5   mention potential liabilities to the limited partners, which,
6   you know, haven't even been addressed yet.

7       So, as a result, they received this accountant's report on
8   January 13th   Upon receipt of it immediately distributed it to
9   all the directors, including Mr  Edwards. Called a shareholders
10  meeting with a request that there be a shareholders action
11  brought against Mr. Edwards. And that a suit, a minority
12  shareholder impression suit and a derivative shareholders action
13  be brought to try remedy these activities, have Mr. Edwards pay
14  back to the company what he unlawfully put in there.  And
15  frankly, Your Honor, to deal with the potential of other
16  liabilities to banks, lending institutions and limited partners
17  that flowed from fraudulent financial statements

18      Mr  Edwards, who had never done anything to cause any
19  action, any change in the bylaws, anything to happen with this
20  corporation prior to this meeting and this demand, upon the
21  filing of the lawsuit immediately filed a request, as you can
22  see here, that there be a shareholders meeting

23      The intent of the shareholder meeting, and there are some
24  things that he's listed as the intent of that meeting which are
25  fairly innocuous, but the worst, the worst part of the proposed

1   amendments are to basically restrict the management of ERVI, Mr.
2   Jones' corporation, of these restaurants and to basically turn
3   over the control of the funds back to Mr. Edwards, who was the
4   subject of the accounting statements which found him guilty of
5   fraud.

6         THE COURT.  Okay.  Now, why don't you point out to me
7   which of these amendments does what you're saying.

8         MR. HOFF   Yes, Your Honor.

9         THE COURT:  It's hard to follow them because many of
10  them refer to articles.

11        MR  HOFF·  First of all, Your Honor, it says that under
12  article, proposed article 8 which is on page 2 of the proposed
13  amendments, it says all of the corporation's revenues will be
14  applied and distributed in accordance with provisions of this
15  article 13 -- I think I misstated.  It's article 13 -- unless
16  otherwise agreed in writing by shareholders holding not less
17  than two-thirds of the corporation's shares   That would be Mr
18  Edwards, he owns 70 percent.

19      It says under section 2 that all of the corporation's costs
20  of doing business, however characterized, will be paid from the
21  management fees.  The corporation's cost of doing business will
22  be deemed to include, but will not be limited to rent, salaries,
23  legal expenses, accounting expenses, advertising, equipment and
24  supplies.

25      Evergreen is not managing these restaurants pursuant to the

1    agreement with Mr. Edwards and pursuant to Outback's demand.

2    The management is being provided by ERVI.  So, what they are

3    saying is that now Evergreen gets these revenues.

4        And section 3 says revenues other than management fees.  The

5    affairs of the corporation will be conducted so that all

6    revenues other than management fees will be distributed to the

7    corporation's shareholders.  That means that it will be a direct

8    funnel to funnel out 70 percent of all the money that comes in

9    to Mr. Edwards since he is the 70 percent shareholder of the

10   corporation.

11       This will result directly in Outback lifting these

12   franchises.  Its irreparable harm is that these whole franchises

13   are now in existence because an arrangement was negotiated that

14   Outback demanded   And that is that Mr  Edwards no longer have

15   any management control

16       The other is article 14, which requires -- and you see what

17   is happening here is they're taking normal activities that would

18   be done by management and making them to require shareholder

19   control   So that Mr. Jones -- pardon me, Mr. Edwards as the

20   majority shareholder would have direct control over the

21   operations.

22       They couldn't sell or exchange or dispose of any capital

23   assets except as approved by Mr. Edwards.  They couldn't loan

24   funds or other assets to the corporation except as approved by

25   Mr  Edwards.  They couldn't terminate, amend or transfer any

1   interest in a franchise agreement except as authorized by Mr.

2   Edwards.   They couldn't do anything with a limited partnership

3   agreement or a joint venture agreement or anything related to

4   the limited partners except as approved by Mr. Edwards.

5       Now, these are very drastic sorts of actions.  You're taking

6   the management of a corporation and you're saying we're giving

7   the management of the corporation to the majority shareholder.

8   This is exactly one of the bases of the majority shareholder

9   impression suit that we're bringing   And this is a continuation

10  of the activities which have already been found to amount to

11  mismanagement when Mr. Edwards was running this.

12      And, again, Your Honor, we're not asking at this point for

13  some permanent injunction enjoining him to do this   All we're

14  asking is that this is such a drastic step that can cause such

15  irreparable injuries, that we want this -- we want to have this

16  meeting postponed until a full hearing can be held on the

17  preliminary injunction.

18            THE COURT·   Thank you   Mr. Hall.

19            MR. HALL.   May it please the Court   As you might

20  imagine, we have a greatly different view of things.  Our view

21  simply is this is a business dispute.  It requires a business

22  solution.

23      There's two ways of approaching this.  We can either have

24  these parties resolve their differences by using their corporate

25  rights that they have pursuant to the rules of corporate

1   governance to resolve their differences or we can have court

2   intervention.

3       If we are going to have court intervention, in my view the

4   opposing sides should be seeing if they can meet the standard

5   for the appointment of a receiver or something of that nature.

6   Somebody who can get in here and protect both sides.

7       It is not appropriate to ask this Court or any court to

8   selectively interfere with corporate rights.  And what they are

9   asking this Court to do is to strip Mr  Edwards of the only

10  protections he has to protect himself against their actions and

11  let them continue doing what they want.

12      Now, the facts in this case are complex and they're a mess

13  and I'm not going to go over them.  But I would like to just

14  make sure the Court understands a couple of things which I think

15  can be confusing.

16      Outback said that they no longer wanted Mr. Edwards to be

17  the designated operating partner for Evergreen   He had some

18  alcohol problems.  He sought treatment.  But they didn't want

19  him to be the operating partner.

20      It was Evergreen's right.  And I might add, at that point

21  there was no suggestion that Mr  Edwards had ever done anything

22  improper, any accounting improprieties, that there was any

23  self-dealing.  There was simply a problem with the economy was

24  down, sales weren't that good and Mr  Edwards had an alcohol

25  problem and they wanted a new operating partner

1   They said that Mr. Jones would be an acceptable alternative.
2   They said that Mr. Shannon would be an acceptable alternative.
3   They said that Evergreen could propose someone else.  Outback
4   has absolutely no right to select the operating partner.  That
5   is Evergreen's decision.

6   Mr. Edwards cooperated and he said fine, Mr. Jones is
7   acceptable   And the idea was that Mr. Jones would run the
8   restaurants, the restaurant operations, 27 existing restaurants.
9   There was never any intention that Mr. Edwards would lose his
10  right to have input as a director and shareholder over major
11  decisions such as disposition of assets of Evergreen.

12  And what happened was Mr. Jones said, you know, if we open
13  new restaurants, I really think it would be fairer if I got to
14  have those for myself, and Outback thinks that would be a good
15  idea, too.  Would you agree to that?  And I'd like to form
16  another corporation and when we open new restaurants, I would
17  like to get those for my corporation.

18  Mr  Edwards said, well, you know, I guess that's not a
19  problem assuming we work everything out and it doesn't hurt
20  Evergreen.  So, he formed -- Mr. Jones formed his new
21  corporation, ERVI.  And they talked about how the two
22  corporations were going to operate side by side.

23  And it didn't make any sense to have two sets of employees
24  and two sets of office space and so forth, so Mr. Jones said why
25  don't we -- I will transfer the employees over to my corporation

1   and you can just contract management services from my

2   corporation.  Mr. Edwards says, well, fine, and we'll pay you

3   the net management fees from Evergreen.

4       So, that's all great up to that point.  And they start out

5   to document this.  And Short Cressman says wait a minute, we've

6   got a conflict here, let's get some independent counsel.  So,

7   that happened

8       Then there were never any documents drafted, which you have

9   two very distinct corporations here, ERVI and Evergreen.  Mr

10  Jones is a designated operating partner for Evergreen

11  Everything he does for Evergreen is done on behalf of Evergreen.

12  He owes his duties to Evergreen, to these 27 restaurants

13      And he also wears another hat.  He is the CEO and owner of

14  ERVI.  And for five of these restaurants, he's operating as the

15  designated operating partner for ERVI, the other corporation.

16  So, there is a potential for a mess here.

17      And what was supposed to happen is Evergreen would have

18  greatly reduced operating expenses because they didn't have all

19  these employees anymore   But they would have some expenses like

20  attorneys fees, Short Cressman.  They'd have some accounting

21  fees, they'd have some license fees, maybe a few hundred

22  thousand dollars a year.  Those were supposed to be paid.  And

23  then Mr  Edwards was ready to have the rest of the management

24  fees paid over to ERVI on a contract basis to use some of their

25  services to manage these things.

1     Basically what happened was Mr. Jones got in there and

2     decided he just didn't want to ever have to deal with Mr.

3     Edwards again and just basically started combining these two

4     corporations, which was never intended by anybody.

5         And what has happened is that we, Mr. Edwards basically has

6     acted with restraint throughout this.  He has written letter

7     after letter asking for simple things like I just want access to

8     corporate information, and he can't get it.  He has written

9     letters saying please stop commingling the funds.  You don't

10    need to commingle the funds between these two corporations to do

11    what was intended.  And he gets different answers.  At one time,

12    we hear an answer that the commingling will be stopped.  At

13    other times, they don't get any answer.

14        Then there is this issue of transactions between the two

15    corporations where there is conflicting interests.  And an

16    example of that is this cross-collateralization of a loan from

17    the bank.  Now, we aren't trying to interfere with any existing

18    relationship or any -- of any contract in existence.  That is

19    not what's going on here

20        And Mr. Edwards found out after the fact they had cross-

21    collateralized a loan so that the assets of Evergreen are being

22    pledged for the debt of ERVI   And that's a concern potentially.

23    Because although in the affidavit that was submitted, Mr  Jones

24    said that Evergreen has more debt than ERVI, 2.2 million to 1.7,

25    that is a little misleading because Evergreen has 27 stores, so

1    it's got debt of 81,000 per store   ERVI has debt of 340,000 per
2    store.

3              THE COURT:  Just out of curiosity, what are the assets
4    that are being cross-collateralized?  Are they the franchise
5    agreements?

6              MR. HALL.  It's my understanding it's everything.  It's
7    the leases, the stores.  It's the cash that is in the account

8              THE COURT.  So, it's the right to payments from the
9    restaurant.  That is what we're talking about?

10             MR  HALL   My understanding is it includes that, but
11   there are also physical facilities and leases.

12             THE COURT·  But Evergreen doesn't own any of the
13   physical facilities, does it?

14             MR. HALL:  No   But it's a general partner in the
15   limited partnerships that do

16        And so, the point is this.  There is $340,000 of debt per
17   store on Mr. Jones' restaurants   So, his budding business is a
18   lot more risky and a lot more leveraged.  All Mr. Edwards asked
19   for was on a going forward basis when it comes time to consider
20   whether we want to have an arrangement to cross-collateralize
21   between these two corporations, that he have a say in that
22   He's not trying to undo anything in the past.  Mr. Jones has
23   said no to that.

24        And on these management fees, Mr. Jones basically said I'm
25   not going to pay any expenses of Evergreen anymore.  What I'm

1   going to do is I'm going to take all the management fees over to

2   ERVI, a million-600,000 dollars each year roughly, and this

3   $200,000 of expenses that are remaining, I'm just going to

4   charge that to the investment income of Evergreen and you, Craig

5   Edwards, can pay 70 percent of that and it's tough luck.  And

6   that was not the deal.  There is nothing that suggests that was

7   the deal   And we've said please quit doing that and he said no.

8        So, finally, finally we wrote letters that were increasingly

9   tough saying, you know, please respond to this or we're going to

10  have to take legal action.  And they filed this lawsuit, in my

11  view, as a preemptive matter to get an advantage over us and

12  maybe they succeeded, I don't know.

13       But what I do know is that you could litigate this whole

14  lawsuit to conclusion and it wouldn't change the fact that these

15  parties need to get along.  That these parties need to reach a

16  business deal as to how they're going to proceed

17       And we have suggested again and again third-party mediation,

18  anything that will work.  All we want defensively, protectively

19  and I think it's more than reasonable is we want equal access to

20  information.  We can't even respond to this ridiculous

21  accountants' report because we can't get access to the books and

22  records of the company

23       We want agreement that if any new transaction is entered

24  into between Evergreen and ERVI, these two companies, where

25  there is a conflicting interest by Jones or Leich, that we are

1   involved in that decision.   They can't just ignore us and deal
2   with their own company on new transactions, which seems to me
3   very modest.

4        And if there is going to be any impairment of the assets of
5   Evergreen, I'm not talking about the day-to-day operations of
6   the restaurants or who manages the restaurants and how they sell
7   their steaks.   No body is interested in that.   And that is what
8   Outback doesn't want Mr. Edwards interfering in.

9        There have been no amendments to any of these franchise
10  agreements since the inception of the company.   There is no
11  reason there should be any amendments now.   There is no reason
12  anybody should transfer these franchises to a third party.

13       What they won't provide assurances they won't do, they won't
14  even provide assurances they won't transfer these franchise
15  agreements to themselves   And in fact, at one point they
16  asserted in a letter that they had assigned all these management
17  fees formally to their own company   So we wrote and asked where
18  is the assignment agreement, and they said, well, there's not
19  really one.   So, that's what we want in terms of standstill.

20       On the money, I'll tell you what is happening on the money
21  because it always comes back to the practicalities.   This
22  company, Evergreen -- forget ERVI for a minute -- but Evergreen
23  has roughly $3,000,000 in investment income every year.   It is
24  Mr. Edwards' essentially his sole source of income, his share of
25  those distributions.   It has a $1.6 million it gets in

1   management fees.  So, we're talking about $4.6 million that
2   these people have control over.

3       Mr. Edwards can't incur one dime of expense on behalf of
4   Evergreen because he's not an officer, he's not involved in
5   running the corporation.  And if we pass these bylaws, he still
6   couldn't go out and incur one dime of expense.  We're talking
7   about expenses being incurred by Cliff Jones on behalf of
8   Evergreen and then he's refusing to pay them out of the
9   management fee   So, there is --

10          THE COURT   What do you mean he's refusing to pay them?
11  Who is paying them?

12          MR  HALL   He takes the investment income of Evergreen
13  and pays that and then takes all the management fees for himself
14  .

15          THE COURT:  For himself or running the company?

16          MR  HALL·  Well, you can label this any way you want.
17  When Mr  Edwards was the CEO and designated operating partner of
18  Evergreen, the way it worked was the roughly million-six would
19  come in.  He'd pay the employees, the rent, the lawyers, the
20  accountants, whatever other expenses there were.  He would take
21  a salary.  If there was anything left over, they would
22  distribute it to all the shareholders   All right?  And
23  sometimes there was something left over.

24      The way it works now -- it's not supposed to be working this
25  way -- the money never even hits the Evergreen bank account

1  Mr   Jones -- although you can pick up one of these franchise
2  agreements and they put it into evidence and it says right there
3  on page 14 Evergreen gets the money.  But it never hits the bank
4  anymore.  They just divert it over to ERVI.  Take it all for
5  themselves.  Don't pay the accountants or lawyers back over at
6  Evergreen.
7      And worse than that, they take the $3,000,000 of investment
8  income, kind of slosh it around over at ERVI for a while and
9  fund their restaurants and use it however they want   And
10  eventually pay some back and make some belated distributions to
11  Mr. Edwards.
12          THE COURT   Is Mr. Edwards getting a salary?
13          MR. HALL·  No.   He gets a salary from nowhere.  He is
14  dependent for shareholder distributions to live, to pay his
15  bills, to pay me.
16          THE COURT·  What is he doing for the corporation right
17  now?
18          MR. HALL:  Nothing   He's a shareholder
19          THE COURT:  Then why should he get a salary?
20          MR. HALL:  He shouldn't.  He should get shareholder
21  distributions
22          THE COURT.  So, what is his concern, that he's not
23  getting a sufficient distribution because too much is taken out
24  of the investment income account?
25          MR. HALL·  Yes    His concern is that they're reducing

1   the distributions by diverting part of the funds where they

2   shouldn't, and they are using the monies of Evergreen to --

3   putting them at risk running ERVI and won't even give him a say.

4       Like when the bank comes up in renewal in a couple of

5   months, they will just ignore him and do what they want with

6   Evergreen's assets.  He should have a say in that   That was the

7   idea.  He would have oversight, but he wouldn't be involved in

8   day-to-day operations, he wouldn't draw a salary.

9           THE COURT   Let me ask you something   Were you

10  finished, just about?  Did you have more?

11          MR  HALL:  In what I want to say to the Court?  I did

12  have something else I wanted to say, but I'm happy to respond

13          THE COURT.  Go ahead.  I want to hear the rest.

14          MR. HALL·  I guess, you know, I guess here's my point

15  and I don't want to belabor the facts.  But certainly they have

16  looked at everything in this case.  I mean, they say four out of

17  27 restaurants they have looked at.  They've looked at four out

18  of 27 restaurants when they want to argue about these accounting

19  treatments.  But in terms of anything that could be self-

20  dealing, they have looked at the whole nine yards.

21      They've looked at eight years.  They've looked at every

22  expense Mr. Edwards ever turned in and we deny there is one

23  single dollar of self-dealing.

24      But if everything they said was true, Your Honor, we're

25  talking about $70,000 or so.  I mean, it's just insane   If they

1   won this case, they wouldn't be entitled to the relief they're
2   seeking.

3       So, I guess where I end up is where I started, which is if
4   this Court is going to strip Mr. Edwards of his ability to try
5   and protect himself in this mess and try to negotiate a
6   resolution, we're in trouble.  We need to negotiate with our
7   full rights so they can't basically take this corporation for a
8   song   And that's what I want.

9       So, either I'm happy if you leave the parties to their own
10  devices or I'm happy if you want to step in and say, hey, just
11  hold everything.  You guys don't take another dollar out of
12  here.  You guys, you know, don't do any new transactions until
13  we sort this out.  I would be happy with that.

14      But I would not be happy being left hanging in the middle
15  where we're stripped of our ability to protect ourself.  I guess
16  that's what I'm trying to say.

17      And finally most importantly, the way it stands right now
18  they have money to fund their accounts, to squeeze Mr  Edwards.
19  I mean, they're using the corporate funds, these management fees
20  to hire like this accounting firm that went out and concocted
21  this report.  That should have been hired on their own nickel
22  because it's a shareholders dispute and that was not authorized.
23  We have no money to hire accountants because they're dragging
24  their feet on distributions.

25      So, we have to make sure the money flows evenhandedly so

1   that they don't choke us to death if we're going to havee a

2   dispute.  I'm happy to do it either through bylaws or through

3   the Court, but it should be evenhanded is all I'm saying.

4          THE COURT:  Thank you, Mr. Hall.  Mr. Hoff, you want to

5   respond?

6          MR  HOFF.  Yes, Your Honor.  Obviously there's a lot of

7   disputed facts here and it's not going to serve any useful

8   purpose to go back and forth on the disputes.

9      But I do want to just read you a paragraph from Mr. Jones'

10  declaration which was filed in response to a submission by Mr

11  Hall, which is paragraph 13 on page 5 of his declaration, where

12  he says, "Let me reemphasize how the management fees are being

13  used.  Management fees pay for critical management and

14  accounting support for the restaurants owned by the various

15  limited partners.  ERVI also uses fees to pay for technical

16  support and training related to food items and service and for

17  the salaries of managers in training   ERVI also has used the

18  fees in the past two years to rebuild the marketing effort not

19  undertaken by Edwards   For example, ERVI purchased a billboard

20  at Safeco Field in Seattle to promote Outback Steakhouse

21  restaurants and to secure a lucrative co-marketing agreement

22  with the Seattle Mariners."

23         THE COURT·  I can read the rest of it, Mr  Hoff   I've

24  got it right here.

25         MR. HOFF·  The point is, Your Honor, that the issue

1   here is whether the money that comes in should be used to

2   reinvest in the restaurants and the business and go to the

3   limited partners or whether it should be distributed to Mr

4   Edwards.

5       And one of the big issues that Outback had, and there is no

6   dispute and you've heard no dispute here that Outback said

7   you've got to get Mr. Edwards out of control   And, of course,

8   there is a dispute in the affidavit because Mr. Jones said it

9   was Outback that mandated he be the person

10      The reason that was done is because money was being taken

11  out of these franchises.  The restaurants weren't operating

12  properly.  We're just asking to preserve the status quo pending

13  the hearing.  That's all, Your Honor.

14          THE COURT   Okay.  Well, the Court has no problem in

15  dealing with the issue before it today.  I think -- I guess what

16  I was going to ask you, Mr. Hall, was -- but I think I already

17  arrived at a conclusion about it.  I fail to see in balancing

18  harm here, I fail to see any dire need on the part of Mr.

19  Edwards to pass these amendments immediately.  It just doesn't

20  wash with me    And that would seriously change the status quo.

21      He would basically by these amendments, I'm convinced, be

22  put in a position where he could manage just about every

23  important decision that would come up.

24      So, I am going to grant the temporary restraining order

25  But that's really not the end of it and I think Mr. Hall has

1  | made a good point.

2  | The real question is where do we go from there    And I

3  | think that this is not -- when I say I'm granting the temporary

4  | restraining order, I think the way in which the Court sees this,

5  | yes, he is not going to be able to hold a shareholder meeting

6  | and pass his own amendments that make everything require 70

7  | percent shareholder to run the corporation.

8  | On the other hand, as far as plaintiffs are concerned, there

9  | are definitely certain transactions in which Mr  Edwards should

10 | be given information.  I don't see anything wrong with the

11 | amendment requiring him to get corporate information    That is

12 | not going to hurt anybody    That should be done.

13 | MR. HOFF.  Nor do we, Your Honor.

14 | THE COURT.  Shouldn't be opposed.

15 | MR  HOFF:  I agree

16 | THE COURT:  So, why don't you drop that part out of

17 | your TRO.

18 | MR. HOFF   We will be happy to agree or we'll simply

19 | agree that we will give them any of the information they want,

20 | as we have previously.  That is a disputed item, too.

21 | THE COURT   I don't want to hear a dispute about it.  I

22 | want him to get any corporate information he needs.

23 | MR. HOFF   We agree, Your Honor.

24 | THE COURT:  I could sit down and do this with you on an

25 | agonizing line-by-line basis.  But I want to know exactly what

1   are the areas that he is asking -- I mean, the way I interpret
2   what Mr. Hall has said is that he is asking and using these
3   amendments as a way of gaining information and input that has
4   been denied him.  And that were he able to have some input into
5   this, were he able to be informed of some of the big events that
6   are coming up, like cross-collateralization when it happens or
7   new loans that are coming up, he wouldn't need amendments to
8   ensure that he be given that information or that he at least be
9   notified when this big events are coming up

10      I can sit here and say, okay, these are the things   Mr.
11  Hall has mentioned a few.  I could sit here and say, okay, so he
12  should be told if there is ever going to be cross-
13  collateralization.  He should be told if there are going to be
14  renewals of loans or financing with the bank   Well, information
15  on how the management fees are being used, and how the
16  investment income is being distributed and what it's being used
17  for   You know, if these were given to him, he wouldn't need the
18  amendments that he's asking for.

19      Now, it's very clear to the Court that -- I can say this as
20  a mastery of understatement -- that there is a lack of trust on
21  the part of the parties.  That sounds like understatement to me.
22  You know, the parties have said some -- are really saying some
23  pretty ugly things about each other through their lawyers as
24  they stand up here today.

25      Once that is done, it would do no good for me to say go out

1   and work this out.  I doubt that is going to happen in the

2   context of a suit in which each side is basically saying the

3   other side is dealing improperly with great sums of money.

4   We're not talking small sums of money here

5       One of the reasons I'm ruling the way I'm ruling, just so

6   that the parties know is I do think that not maintaining the

7   status quo could result in more harm than good, you know.   Mr

8   Edwards may win -- if he won his point, may lose -- win the

9   battle but lose the war.  If Outback kicks everybody off

10  managing these restaurants, what good is it going to do?

11      So, I think the status quo is to not not deal with these

12  amendments right now, but I am much more concerned with how to

13  proceed with this in the future.  Maybe the way to deal with

14  this is not to deal with it in open court.  To get some advice

15  from counsel in chambers on some procedural way that we can get

16  this on a track where the parties might be able to, given the

17  lack of trust, might be able to work with each other, either

18  through a third party or whatever.  So, maybe that is the way to

19  go

20      Because I've given you my ruling on the TRO, but that is not

21  only going to take care of the next ten days.  Maybe renewal in

22  the next ten days   But the amendment part of it is just a side

23  show.   What's going on here are some real underlying problems

24  And there must be ways that we can implement to help the parties

25  work this out.

1    As you've all pointed out, nothing ever got done in writing.
2    That might resolve some of these.  So, why don't you come into
3    chambers and let's try to be a little creative here.

4              MR. HOFF.  Before we do so, Your Honor, could you set
5    the amount of the TRO bond?

6              THE COURT.  What's the harm?  Mr. Hall, what do you
7    want?  What is the harm to him?  What is the danger of his
8    losing anything by not getting these amendments passed in the
9    next couple weeks?  I have a hard time seeing what it is, so.

10             MR. HALL.  Well, Your Honor, if counsel is basically
11   representing that they're not going to try to transfer any of
12   the assets, you know, try to do any new deal, get rid of these
13   assets, major transactions until we can talk this out with the
14   Court, I think that you're right, for the next ten days it's not
15   a big deal.  But I would be very distressed, for example, if we
16   waited ten days and came back and found out they had done a
17   transaction.

18             THE COURT:  This is exactly what I want to deal with in
19   chambers.  I think it has to be a two-way street.  But I heard
20   Mr. Hoff saying that, that status quo meant exactly that    That
21   they're not going to use the couple of weeks in which I have
22   basically enjoined him from holding this meeting to go out and
23   transfer all the assets that he's concerned about and that is
24   why he wanted the amendments    That is not what the Court
25   envisions.

1      And I want to find -- actually what I'm hoping we can talk
2   about is a way to get an agreement between the parties that can
3   make you live with this until we can work out the major problems
4   underlying the whole suit.  I mean, there is a way to just put
5   everybody at ease.  Since you don't trust each other, they're
6   not going to do it on a handshake.  But we could do it by an
7   agreement between the attorneys who I think, knowing both of
8   you, do trust each other and will pursue your clients' interest.
9   And frankly your clients' interest in this case is to work
10  something out.

11      MR. HALL.  In the spirit of trying to generate some
12  trust, Your Honor, if that is the deal and the understanding
13  staying, I'm not going to make an issue over a bond for the next
14  ten days.

15      THE COURT:  I'll see you in chambers.

16      (At 4:03, court was in recess )

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE

2

3

4      I, Susan Palmerton, court reporter for the United States

5    District Court in the Western District of Washington at

6    Seattle, was present in court during the foregoing matter and

7    reported said proceedings stenographically.

8

9      I futher certify that thereafter, I, Susan Palmerton, have

10   caused said stenographic notes to be transcribed via computer,

11   and that the foregoing pages are a true and accurate

12   transcription to the best of my ability.

13

14      Dated this 3rd day of March, 2003.

15

16

17

18   _____

19                  Susan Palmerton

20   .

21

22

23

24

25

**EXHIBIT 2**

**EVERGREEN STATE RESTAURANT CORP.**
**3650 – 131ST Ave. S.E.**
**Bellevue, Washington  98006**
**(425) 562-9850**

February 14, 2003

**SENT VIA FAX AND REGULAR MAIL**

Mr. Raymond M  Leich                                    Mr. Raymond M. Leich
Leich & Associates                                         P O. Box 14476
1304 DeSoto Avenue, Suite 404                    Tampa, Florida  33606
Tampa, Florida  33606

Mr. Clifford L. Jones                                      Mr. Clifford L  Jones
Evergreen Restaurant Ventures, Inc            2800 Ocean Boulevard
3650 – 131st Avenue S E., Suite 320            Corona Del Mar, California  92625
Bellevue, Washington  98006

Gentlemen

          Please be advised that there will be a special meeting of the shareholders
of Evergreen State Restaurant Corp. at the offices of Short, Cressman & Burgess PLLC,
999 Third Avenue, Suite 3000, Seattle, Washington, at 9.00 a.m. on Monday,
February 24, 2003.  The agenda will be adoption of the attached First Amendment to
Bylaws of Evergreen State Restaurant Corp.

          If either of you would like to participate by telephone, please let me know
in advance of the meeting the telephone number at which you can be reached.

                              Very truly yours,

                              Craig R  Edwards

## FIRST AMENDMENT TO BYLAWS OF
## EVERGREEN STATE RESTAURANT CORP.

The Bylaws of Evergreen State Restaurant Corp. are hereby amended effective as of February 24, 2003 to replace the existing Article IX with Article IX set forth below and to add Articles XII through XV set forth below.

### ARTICLE IX

### AMENDMENT OF BYLAWS

Section 1.  By the Shareholders.  The shareholders may amend or repeal these Bylaws or adopt additional Bylaws, but only with the approval of shareholders holding not less than two-thirds of the Corporation's shares

Section 2.  By the Directors  The Directors may not amend or repeal these Bylaws or adopt additional Bylaws without shareholder approval as provided in Section 1 of this Article IX.

### ARTICLE XII

### ACCESS TO INFORMATION

Each of the shareholders will have the right to unlimited access to the originals of all books and records of the Corporation and any other information within Evergreen's possession or control.  Such right of access, includes, but is not limited to, unlimited access to information and materials in

the possession or control of attorneys, accountants, banks and other persons and entities who have provided services for Evergreen.

## ARTICLE XIII

## CORPORATE REVENUES

All of the Corporation's revenues will be applied and distributed in accordance with the provisions of this Article XIII unless otherwise agreed in writing by shareholders holding not less than two-thirds of the Corporation's shares

Section 1. Background and Definitions. Evergreen is a participant in joint ventures that are the general partners in Evergreen State Limited Partnerships 1 through 27 (the "Limited Partnerships"). Each of the Limited Partnerships owns and operates an Outback Steakhouse restaurant pursuant to a franchise agreement with Outback Steakhouse of Florida, Inc   The franchise agreements and the agreements for the Limited Partnerships provide that Evergreen will receive a fee based on a percentage of the gross sales of the Outback Steakhouse Restaurants for providing management and accounting services ("Management Fees")

Section 2. Management Fees. All of the Corporation's costs of doing business, however characterized, will be paid from Management Fees. The Corporation's costs of doing business will be deemed to include, but will not be limited to, rent, salaries, legal expenses, accounting expenses, advertising, equipment and supplies.  No Management Fees will be paid to any shareholder,

2

director or officer of the Corporation, or to any entity in which any such person has an ownership interest, unless the Corporation's costs of doing business are first paid in full from the Management Fees.

Section 3. Revenues Other than Management Fees. The affairs of the Corporation will be conducted so that all revenues other than Management Fees will be distributed to the Corporation's shareholders without any deductions. Such distributions to the Corporation's shareholders will include, but will not be limited to, all revenues other than Management Fees to which the Corporation is entitled from any joint venture or partnership in which the Corporation is a participant. Such distributions to the Corporation's shareholders will be made monthly.

ARTICLE XIV

ACTIONS REQUIRING SHAREHOLDER APPROVAL

Neither the Corporation, its officers or directors will take or approve any of the actions set forth in this Article XIV without the written agreement of shareholders holding not less than two-thirds of the Corporation's shares. Any action taken in violation of this paragraph may be voided at the election of any shareholders who did not provide written approval of such action. Actions requiring shareholder approval as provided in this Article XIV include, but are not limited to:

a. Selling, exchanging or disposing of any capital asset of any of the Limited Partnerships or of the Corporation if the total value of all capital

3

assets sold, exchanged or disposed of by that Limited Partnership or the
Corporation during any 12-month period would exceed $100,000;

      b.  Loaning funds or other assets of the Corporation to any other
person or entity, guaranteeing the debt of any other person or entity, or using
assets of the Corporation as security for the obligation of any other person or
entity,

      c.  Terminating, amending or transferring any interest in a
franchise agreement, limited partnership agreement or joint venture agreement
relating to any of the Limited Partnerships or the Corporation,

      d.  Maintaining funds from the operations of any of the Limited
Partnerships anywhere other than a bank account in the name of that Limited
Partnership or in a bank account in the name of the Corporation, or maintaining
funds belonging to the Corporation anywhere other than a bank account in the
name of the Corporation;

      e.  Any action or transaction for which one or more directors has a
conflicting interest;

      f.  Any other action requiring shareholder approval under the
terms of the Corporation's Articles of Incorporation, the Corporation's Bylaws or
applicable law;

      g.  Any renewal or extension of any of the actions described above.

## ARTICLE XV

## REMEDIES

Any shareholder is authorized to take legal action on behalf of the Corporation for any breach of these Bylaws

BE IT KNOWN that the foregoing First Amendment to Bylaws of Evergreen Sate Restaurant Corporation was adopted by the shareholders at a special meeting on February 24, 2003.  In witness whereof, I do hereunto subscribe my name

_____

**EXHIBIT 3**

# MOSS-ADAMS LLP mrf

CERTIFIED PUBLIC ACCOUNTANTS

1001 Fourth Avenue, Suite 2900
Seattle, WA 98154 1199

*Phone* 206 223 1820
*FAX* 206 622 9975
www.mossadams com

March 20, 2003

Mr. Ronald Beard
Lane Powell Spears Lubersky
1420 Fifth Avenue
Suite 4100
Seattle, WA 98101-2338

Mr Spencer Hall
Hall Zanzig Claflin McEachern
1200 Fifth Avenue
Suite 1414
Seattle, WA 98101

RECEIVED
MAR 2 0 2003

HALL ZANZIG
CLAFLIN McEACHERN PLLC

Re      Edwards vs Leich

Dear Sirs

We were asked to review certain information and reports in connection with the Edwards vs Leich litigation. You also wanted us to comment on the report prepared by Hagen Streiff Newton & Oshiro (Hagen), dated January 13, 2003. The purpose of this memorandum is to provide you with our preliminary findings regarding each of the twelve findings in the Hagen report, as well as other general comments

## Finding #1 – Cash credits given by ESLP landlords are improperly recorded on ESLP's books and records.

This finding deals with the accounting for tenant improvement allowances provided by the landlords directly to Evergreen State Restaurant Corporation (ESRC) The Hagen report incorrectly concludes that these credits should have gone directly to the limited partnerships Their report includes an excerpt from a lease identified as their Exhibit 1 We also reviewed the leases and agree that the tenant allowances are discussed in them. However, the "Estimated Sources and Uses of Proceeds" from the Private Placement Memorandum (PPM) clearly states the amount of the allowances and that they aren't included in the estimates of receipts and expenses. Exhibit 1 of this report includes this excerpt of the PPM  The actual transactions of the tenant allowances occurred between the landlords and ESRC, with the checks going directly to ESRC  The reason for this arrangement was because ESRC was guaranteeing the lease

A member of
Moores Rowland International
an association of independent
accounting firms throughout
the world

Offices in
Principal Cities of
Washington Oregon
and California



MOSS-ADAMS LLP

Mr Ronald Beard
Mr. Spencer Hall
March 20, 2003
Page 2

The Hagen report also focuses on tax considerations, not Generally Accepted Accounting Principle (GAAP) considerations  For GAAP purposes, the professional standards allow for this type of transaction where the tenant improvements are shown at the gross amount by the limited partnership. It is our understanding the Plaintiff, Ray Leich reviewed the accounting for these transactions when preparing the year-end books for the auditors and for his use in preparing the tax returns  The original transaction was recorded in ESRC as an increase in cash and capital. It should also be noted that Mr Leich (Plaintiff) prepared all the tax returns consistently with how they were reported in the financial statements  We reviewed a schedule prepared by Mr Edwards, verifying that all of the limited partnership tax returns were prepared without any adjustments to decrease tenant improvements for the allowances  We reviewed the Burlington and Coeur D'Alene tax returns from Mr Edwards schedule and verified that the returns were prepared without adjustments to the tenant improvements  This fact contradicts the last paragraph of Finding #1 of the Hagen report, which states, "the credit had been applied, in some locations, for tax purposes "

In our discussions with Mr Al Willett, the CPA who performed the audit/review of the joint ventures, he assumed that since Mr Leich (Plaintiff) had reviewed the records prior to forwarding them, these transactions were properly recorded  Mr Willett also indicated there were no notes payable to ESRC or the JV's indicating the amounts needed to be repaid to ESRC. Therefore, the recording of them as capital is proper

Based on the information that we have reviewed to date, it is our opinion that the accounting for these tenant improvement allowances was recorded correctly and in conformance with GAAP and with the terms of the PPM  Our research of the Professional Accounting Standards, Technical Bulletin 88-1, *Issues Relating to Accounting for Leases*, confirmed this accounting treatment. Our Exhibit 2 includes a memorandum written by Craig Edwards to Wyndham Smith, of Deloitte and Touche, outlining the accounting for the lease transactions and Mr. Smith's reply indicating the accounting is appropriate and correct  Mr Smith's memorandum also includes the applicable section of Technical Bulletin 88-1

# MOSS-ADAMS LLP mri

Mr Ronald Beard
Mr Spencer Hall
March 20, 2003
Page 3

**Finding #2 – Unsubscribed units were attributed to the general partner without evidence of payment.**

The PPM for the Burlington Franchise #27 indicates that "up to 15 units of the limited partnership interest" were to be sold at $50,000 per unit, for a total of $750,000 In actuality, only 12 units were sold for a total of $600,000 The Hagen report concludes that the general partners inappropriately allocated more income to themselves as a result of this offering not being fully subscribed. We disagree with this conclusion The introduction to the PPM for the Burlington Limited Partnership #27 clearly states, **"the partnership is offering, exclusively by this memorandum, up to 15 units of limited partnership interests"** (See Exhibit 3) It does not say they must sell the full number of units being offered

Each unit represents a certain percentage of ownership for all of the PPMs. For example, if each unit is worth 2% and the full 15 units being offered are sold, the limited partners would be eligible for 30% of the income allocations However, if you only sell 12 units, the limited partners would only be eligible for 24% of the income allocation By default, the general partners would receive the remaining amount of income allocation This is confirmed in the definitions section of the Partnership Agreement for the definition of "Partnership Interest" That definition includes an example where the partnership interest of the General Partner is increased when less than a 1% interest is sold to a manager (See Exhibit 4) The quarterly distribution allocations to the partners also always add up to 100% In those schedules, each of the limited partners receives exactly the percentage of ownership that is stated in the PPM

**Finding #3 – Initial funding of restaurants creates a debt that is over and above what is authorized in the franchise agreement.**

The Hagen report concludes that the franchises were in violation of the Franchise Agreement because they borrowed more than what was allowed per that agreement As part of their procedures, Hagen reviewed the accounting records for the Burlington and Southcenter franchises We verified and agreed with the asset costs per the Hagen report to the financial statements



**MOSS-ADAMS** LLP

Mr Ronald Beard
Mr Spencer Hall
March 20, 2003
Page 4

As part of their conclusion, Hagen is treating the capital contributions from the general partners as debt to be repaid  As discussed in Finding #1 above, in the cases where tenant allowances were paid to ESRC, those funds were then contributed to the limited partnerships as capital  Hagen came to their conclusion by reviewing trial balances of the partnerships **before** all the adjusting journal entries were made  As of the end of each year, all amounts funded from ESRC to the partnerships were properly recorded or reclassified as capital  We would also like to restate that Mr Leich (Plaintiff) reviewed all of the accounting information prior to it being sent to Mr Willett

We disagree with the conclusions of Hagen for the treatment of the amounts funded from the general partner for Burlington and Southcenter and the amount of debt was in violation of the Franchise Agreement  We also reviewed the balance sheets for all partnerships in the 2001 reviewed financial statements and found all to be in compliance with the debt covenant

**Finding #4 – Minimum contributions by the general partner, as listed in the PPMs, were not made.**

In the report, Hagen concludes that the general partner did not make the minimum partner contribution as required by the PPM  They stated three examples, Burlington, Southcenter and Coeur D'Alene  We believe their conclusion comes from their reading of the "Estimated Sources and Uses of Proceeds" from each PPM. We disagree with their finding for the following reasons

- The "Estimated Sources and Uses of Proceeds" clearly states "Estimated Contribution by General Partner"  It does not say that the amount is **required** to be contributed  The Estimated Contribution by General Partner is an estimate because it is the amount required to balance the Sources with the Uses  (See Exhibit 1)

- Section 6 of the Partnership Agreement is entitled "Capital Contributions of the Partners"  Subsection (a) of Section 6, "General Partner" does not indicate any dollar amount of contribution required to be made by the General Partner (See Exhibit 5).

- As mentioned throughout our report, Hagen did not give proper credit to the general partners for their capital contributions  In all cases, the General Partners contributed whatever was necessary to pay the costs of opening a new restaurant



**MOSS-ADAMS** LLP

Mr Ronald Beard
Mr Spencer Hall
March 20, 2003
Page 5

## Finding #5 – Subscribed units and units recorded on the books and records do not coincide.

This finding is similar to Finding #2  Hagen is concluding that income should be allocated to the limited partners in the total percentage that assumes all of the units were sold  For example, in the Burlington limited partnership, if all 15 units were sold at 2 125% each, then the limited partners would be eligible for 31 875% of the allocated income  We agree with that formula  However, for Burlington, only 12 units were sold at 2 125% each, which results in only 25 5% of the income to be allocated to the limited partners  It does not make sense that more income would be allocated to the limited partners then what they agreed to buy.

See Exhibit 6 for a copy of a Burlington partnership distribution allocation schedule  In all cases, we are assuming each partner received their proper share of income as per the partnership agreement

The Coeur D'Alene partnership actually over subscribed by selling 20 units rather than 16  This is the exact opposite of Burlington  As you would expect, for Coeur D'Alene, the general partner's share of income is less than is stated in the PPM because of the over subscription  This indicates a consistency in methodology

The Hagen report also indicates a discrepancy in the ownership percentage of each unit for Tacoma  We agree with that conclusion  The 2 4% per the Partnership Agreement section on definitions is incorrect  The 2.667% per the PPM is correct. The cash distribution and income allocation schedule used 2.6% in the quarter distribution schedule we reviewed  Craig Edwards was not sure why that was done  For all of the limited partners, the total amount of the incorrect allocation per the schedule we reviewed was $401 (39% vs. 40% of approximately $40,000)  It is not a material amount, but it should be fixed

## Finding #6 – The omission of minority interest on E-D and E-J joint venture combined financial statements and the E-D joint venture financial statements are not in accordance with GAAP.

## Finding #7 - Joint ventures equity is materially overstated due to the omission of minority interest.

**MOSS-ADAMS LLP** **mri**

Mr Ronald Beard
Mr Spencer Hall
March 20, 2003
Page 6

**Finding #8 – The combined E-D and E-J joint venture financial statements omit any explanatory note as to the respective interests of each joint venture.**

The Hagen report concludes that the combined financial statements were not in accordance with GAAP because they did not separately disclose the equity interests of the limited partnerships Mr Al Willett, partner of Willett Zevenbergen & Bennett, and Mr Craig Edwards, indicated that the financial statement format was selected based on input and discussions with the users of those financial statements The primary users were US Bank and the franchiser, Outback Steakhouse of Florida, Inc Mr Willett stated that he specifically discussed the format with US Bank and they indicated it was appropriate for their needs and included all relevant information In 1995, Mr Edwards provided Mr Robert Merritt, Chief Financial Officer of Outback Steakhouse of Florida, a proposed combined financial statement asking his concurrence as to the format

Mr Merritt faxed back his response that the "financials you sent me will do just fine Thanks. Bob Merritt" A copy of this information is included as Exhibit 7 of this report We agree that additional disclosures would have been required in the basic financial statements to comply with GAAP Most of the information is included in the supplemental information, but those schedules are not technically part of the basic financial statements

In this situation, we believe it is more important that the users of the financial statements receive the information they need We recommend in the future that the additional information be included in the financial statements or the auditor's report be modified to state the financial statements are not in conformity with GAAP because they do not include all necessary disclosures.

It should also be noted all of the limited partners receive year-end financial information for each of their partnerships.

Because the users of the financial statements approved the format and all relevant information is included, we do not believe that there were any misleading disclosures

MOSS ADAMS LLP mri

Mr Ronald Beard
Mr Spencer Hall
March 20, 2003
Page 7

**Finding #9 – Non-compliance with debt restrictions pursuant to the franchise agreements have been obscured in the audited financial statements by irregular accounting entries.**

The Hagen report is concluding that certain amounts of capital contributed by the general partners was incorrectly classified as capital rather than in the "Due To ESRC" account This conclusion goes back to the earlier findings that.

- The amounts contributed by ESRC were actually liabilities/debt and not capital

- The trial balances reviewed by Hagen were not the final year-end statements Based on our discussions with Mr Al Willett, the accounting for these transactions was reviewed by Mr Leich (Plaintiff) In the accounting, the money transferred from ESRC to the limited partnerships was properly recorded as a contribution of capital by the general partner We have not seen any evidence indicating that these were anything other than a contribution of capital

The Hagen report mentions the companies cash management system After the limited partnerships were operating businesses, the general partner would sweep any excess cash from all the limited partnerships into a combined account The accounting for these transactions was properly recorded as a Due To/From ESRC. However, these were funds from operations and not from the original capital contribution

**Finding #10 – Subsequent to January 1998, ESLPs were charged $15,000 each for store opening and site selection in conflict with Board of Directors' instructions.**

It is our understanding that each of the limited partnerships was charged a fixed amount for site selection as documented in the PPMs This was substantiated by our review of a few of them This is a common practice in these types of business transactions The finding in the Hagen report was that Mr Edwards continued to charge the ESLPs for site selection charges, even after he was instructed to cease such practice at a 1998 meeting of the Board of Directors We have two comments in regards to this finding First, we have not been able to substantiate the Board of Directors directive We reviewed the Board of Director minutes that were made available to us and did not find minutes from any 1998 meeting

# MOSS-ADAMS LLP mri

Mr Ronald Beard
Mr Spencer Hall
March 20, 2003
Page 8

In addition, the Hagen report does not include an exhibit of such minutes Second, this practice of charging for site selection continues today and there is no concern it is an improper practice Exhibit 8 is an excerpt from the PPM for Restaurant #29, which indicates there is a charge of $15,000 for site selection. Because of the lack of any evidence of a Board directive, we are not sure why this was included in the Hagen report

**Finding #11 – Expenses reimbursed for store opening and site selection contain numerous items not properly expensed and/or not related to store opening or site selection.**

It appears that a tremendous amount of work was performed by the Hagen firm, which resulted in this finding. In addition to exhibits, the Hagen report included four schedules The first is comprised of an 80-page spreadsheet listing all expenses reported by Mr Edwards from 1995 to the present The other three schedules were comprised of a more detailed review of three shorter periods that were also included in the first schedule

We have not been able to review the actual expense reports as of the date of this report According to Mr Edwards, there were no written policies and procedures for expense reimbursements It should be noted that when companies do not record the proper information for expense reports, such expenses might be disallowed under tax audit Mr Leich (Plaintiff) would have been aware of this as he prepared all of the tax returns, which deducted these expenses

Mr Edwards is currently reviewing old expense reports to determine if there were duplications or errors As part of our review, we did examine the September and October 2000 American Express statements where the charges for the Australia trip were recorded The statements verified that the airfare and other trip related expenses were paid by Mr Edwards. In addition, many of the expenses were classified by Hagen as non-business because there may not have been proper documentation. According to Mr Edwards they were business expenses that included activities with other Outback business owners and gifts for employees and venders Hagen also mentions that incorrect exchange rates were often used on foreign currency transactions. We reviewed a few of the transactions included on the schedules and determined that both Mr Edwards and Hagen used the incorrect rates Mr Edwards estimated the amount while completing his expense report Hagen used an estimated rate as of some other date The actual amount was what was paid by American Express

**MOSS-ADAMS LLP** mf

Mr Ronald Beard
Mr Spencer Hall
March 20, 2003
Page 9

We are concerned about the true nature of this finding for many reasons

- On page 24 of their report, Hagen states "these repeated and blatant duplications indicate that the intent was to be reimbursed for expenses not incurred" Hagen could not possibly know Mr Edwards intent since they never took the time to talk to him

- The report makes no mention of any firm policy for the use of a specific expense report As such, Mr Edwards was not breaking any company policy when he summarized his expenses on blank paper

- Hagen did not appear to review the expense reporting habits of any other stockholder or employee Mr Edwards states that others in the company had similar types of expenses

This finding, as well as Finding #12 below, appears to be fairly minor If the other stockholders decide to continue pursuing this finding, we recommend all expense reports be reviewed for an agreed upon period and any expense that appears to be a duplicate or inappropriate be paid back to the company by the respective stockholder This does not appear to be worthy of a significant amount of outside legal or other consulting time

**Finding #12 – Other expenses have been paid on behalf of Mr. Edwards without the knowledge of other Board of Directors.**

The Hagen report concludes that certain expenses were paid on behalf of Mr Edwards, which were in fact expenses that should have been paid by him personally The expenses included Mr Edwards portion of life and health insurance, etc. It is unclear how Hagen came to the conclusion that these expenses were paid on behalf of Mr Edwards without the knowledge of the other Board of Directors If the company's policies required these expenses to have been paid by Mr. Edwards, or any other shareholder or employee, then there is an argument they should be reimbursed to the company If there is no written policy, then it is a matter of opinion as to whether they should be paid back Hagen did not provide any documentation from the Board of Directors stating they were not aware of these expenses Our review of the Board minutes did not indicate such knowledge either

**MOSS-ADAMS** LLP  **mrɪ**

Mr Ronald Beard
Mr Spencer Hall
March 20, 2003
Page 10

Our conclusion is that the findings in the Hagen report are either incorrect or have no
material or detrimental impact to investors. We believe the findings are not significant
enough to warrant legal action It appears to be a case of stockholders with different
agendas who are unable to resolve their differences

This report is furnished solely for the use in the Edwards vs. Leich litigation matter

Sincerely,

W  Arthur King, CPA
for Moss Adams LLP

Enclosures

WAK/jaf

\\Seasrv\VOL1\Users\ArtK\Shared\Letters\Edwards vs leich draft 2 doc

**EXHIBIT 4**

# HALL ZANZIG CLAFLIN MCEACHERN |

*Trial Lawyers*

February 28, 2003

Mr. David D Hoff                                              <u>SENT VIA FAX</u>
Ms Janissa A Strabuk
Tousley Brain Stephens PLLC
700 Fifth Avenue, Suite 5600
Seattle, Washington 98104-5056

Re     <u>Leich v Edwards and Evergreen State Restaurant Corporation</u>

Dear David and Janissa

        At the hearing before Judge Rothstein on February 26, Dave stated on the record that your clients had no objection to Mr Edwards' proposed amendment to the bylaws insuring all shareholders equal access to corporate information  He assured Judge Rothstein that such access would be granted immediately without the need for amending the bylaws or a court order

        Yesterday, I proposed what I thought was a reasonable arrangement  I suggested that Mr Edwards call a designated individual at Evergreen a day in advance whenever he wants to review records at Evergreen  He could be placed in an office or a conference room of Evergreen's choice while he is there so that he does not get in anyone's way  Someone could bring the records to him so that there is no danger that he will disturb the filing system  He would be willing to check out when he leaves so that someone can confirm that he does not take any records with him

        You have proposed a much more burdensome arrangement that I do not believe is consistent with the concept of equal access. The only records that your clients have agreed to permit Mr Edwards to review at Evergreen are expense records  For

*A Professional Limited Liability Company*
1200 Fifth Avenue, Suite 1414, Seattle, WA 98101
Tel  206 292 5900  Fax  206 292 5901